MARK POE (Bar No. 223714)
  mpoe@gawpoe.com
RANDOLPH GAW (Bar No. 223718)
  rgaw@gawpoe.com
SAMUEL SONG (Bar No. 245007)
  ssong@gawpoe.com
VICTOR MENG (Bar No. 254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Defendant Roma Mikha, Inc.
and Third-Party Plaintiffs NMRM, Inc.
and Skyline Market, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: OUTLAW LABORATORIES, LP LITIGATION | Case No.  3:18-cv-840-GPC-BGS<br><br>**CLASS ACTION**<br><br>**AMENDED COUNTERCLAIMS OF ROMA MIKHA, INC. AND THIRD-PARTY CLAIMS OF NMRM, INC. AND SKYLINE MARKET, INC.**<br><br>**JURY TRIAL DEMANDED** |

Pursuant to the Court's Order of November 27, 2018 and Federal Rules of Civil Procedure 13(a) (Compulsory Counterclaim) and 14(a) (Third-Party Practice), Defendant-Counterclaimant Roma Mikha, Inc. hereby amends its counterclaims against Outlaw Laboratory, LP, and Third-Party Plaintiffs NMRM, Inc. and Skyline Market, Inc. hereby amend their third-party claims against Outlaw Laboratory, LP—a member of the association-in-fact Racketeer Influenced and Corrupt Organizations Act ("RICO")  enterprise described below.

**THE STORES' COUNTERCLAIMS AND THIRD-PARTY COMPLAINT**

These counterclaims and third-party claims are brought by Roma Mikha, Inc., NMRM, Inc., and Skyline Market, Inc. (together, the "Stores"), on behalf of themselves and all other victims of the scheme to defraud that is described herein. The Stores allege as follows:

**INTRODUCTION**

1.      As will be seen, the "litigation" that is being pursued by Outlaw Laboratory and the other members of its enterprise is a scheme to defraud small businesses, reminiscent of the racket that was run by the now disbarred attorneys who operated the Trevor Law Group in the early 2000s, or the lawyers and straw men who ran Prenda Law, Inc.

2.      Here, Plaintiff Outlaw Laboratory—evidently an online-only seller of "supplements" based in Texas—uses Los Angeles-based law firm Tauler Smith LLP to send demand letters to small (almost always immigrant-run) independent corner stores and liquor stores, threatening the owners for selling over-the-counter "sexual enhancement pills."  The demand letter outlines objectively frivolous claims against the owner for violations of the federal RICO and Lanham Act statutes, claims that "you are liable for over $100,000 if we prosecute this matter," and then offers to "settle" the phony dispute for varying amounts around $10,000.

3.      If the owner doesn't respond, Outlaw offers increasingly smaller settlements.  In Roma Mikha's case, for example, Outlaw's demand letter

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

threatened liability of "over $100,000," and offered $14,000 to settle.  A few weeks later, it conveyed through a third-party lawyer an offer of just $2,800.  Obviously 99% of rational business-persons (especially immigrants with a first language other than English) are not going to hire a lawyer at $300-500/hour to defend against such a tiny demand, so hundreds of stores around the country have coughed up the money.

## BACKGROUND

4.     Outlaw Laboratory and the other members of an association-in-fact enterprise (hereafter, the "Outlaw Enterprise") have struck upon a get-rich-quick scheme.  The scheme operates by the members sticking up small, immigrant-run businesses across California and around the country, with the threat that "you are liable for over $100,000 if we prosecute this matter to a jury trial," and then accepting protection money ("settlements") from these small business owners in amounts as little as $2,500.

5.     The Outlaw Enterprise operates in the same mode as the "protection rackets" in the movies.  It sends heavies (whom it labels "investigators") to the victims' small corner stores to identify potential targets, and then conveys the message:  "This is a real nice store you got here; it'd be a shame if something happened to it."  And then just like the mob bosses, the Outlaw Enterprise offers to solve that "problem" if the store owner is willing to fork over money for protection—protection from the problem that the enterprise itself is threatening.

6.     Whether the perpetrators are armed with law degrees or blackjacks, this type of conduct is exactly the form of racket that the Racketeer Influenced and Corrupt Organizations Act ("RICO") was designed to quash, through creating a private right of action for the racketeers' victims.  Because the members of the Outlaw Enterprise used the U.S. mails in conducting this "scheme to defraud"—committing thousands of predicate acts of mail fraud over a period of many months—they are liable for disgorgement of their ill-gotten gains, three times the

1 damages they caused, and an injunction ordering dissolution of the Outlaw

2 Enterprise.

3 **Warning Letter and Response**

4      7.     In an effort to protect the Stores and future victims of the Outlaw

5 Enterprise, undersigned counsel sent a detailed letter to Outlaw's counsel on

6 August 9, 2018, explicitly disavowing any financial demand either for themselves

7 or their clients, and proposing that the Outlaw Enterprise keep what it has extorted

8 so far, but demanding that it cease future stick-ups.  Eleven minutes later, Robert

9 Tauler (Outlaw's lead attorney and a not-yet-named member of the Outlaw

10 Enterprise) flippantly responded:

11

12 | From: | Robert Tauler |
| Sent: | Thursday, August 9, 2018 12:59 PM |
| To: | Mark Poe |
| Cc: | matt.smith@taulersmith.com; leticia.kimble@taulersmith.com; Randy Gaw |
| Subject: | Re: Notice letter re enhancement pills scheme |

Mark,

Just because you don't understand something doesn't mean it's a bad thing.  Do some research on our claims like a real lawyer and stop sending me stupid letters.  Your accusations are a disgrace to our profession.

Robert Tauler, Esq.
Tauler Smith LLP

20      8.     The research having been done, Roma Mikha, Inc., NMRM, Inc., and

21 Skyline Market, Inc. now bring these claims on behalf of themselves and all other

22 victims of the Outlaw Enterprise, for restitution, damages, and an end to the

23 scheme.

24 **JURISDICTION**

25      9.     The Court has jurisdiction over the Stores' claims under 28 U.S.C.

26 § 1331, because they arise under a federal statute, the Racketeer Influenced and

27 Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

28

   AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

10.     The Court has personal jurisdiction over Counterclaim-defendant / third-party defendant Outlaw Laboratory, LP because—although it does not appear to be an entity that is registered to do business in California—it voluntarily appeared in this District by bringing its claims here.

## PARTIES

11.      Counterclaimant Roma Mikha, Inc. does business as Bobar #2 Liquor, and operates a small store located at 1777 Palm Avenue, San Diego, California. The store is a typical corner store, selling the full array of products that one would expect to find at any convenience store.

12.     Third-party Plaintiff NMRM, Inc. does business as Sunset Liquor, which operates out of a small strip mall located at 985 Broadway, Chula Vista, California.  Like Bobar #2, Sunset Liquor is a typical corner store, selling the full array of products that one would expect to find at any convenience store.

13.     Third-party Plaintiff Skyline Market, Inc. does business as Skyline Farms Market, which operates out of a retail store located at 1505 Skyline Drive, Lemon Grove, California.  Like the others, Skyline Market is a small retail store that sells an array of food, beverage, and sundry products.

14.     On information and belief, counterclaim-defendant / third-party defendant Outlaw Laboratory, LP is a Texas business entity, which markets a variety of supplements.  Outlaw alleges that it sells "male enhancement products" called TriSteel and TriSteel 8hour.

## FACTUAL ALLEGATIONS

### A. The FDA Advises Consumers to Avoid the Sexual Enhancement Products.

15.     This litigation was spawned by a series of "Public Notification[s]" that have been issued by the FDA beginning in March 2015, alerting the public that the "sexual enhancement" products seen near the front of liquor stores and convenience

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

stores may contain "sildenafil," the active prescription in Viagra.[1]  Rather than banning the sale of the products at issue, the FDA's "public notifications" merely say that the agency "is advising consumers not to purchase or use [product name], a product promoted for sexual enhancement."  *See, e.g.*, https://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicine Safely/MedicationHealth Fraud/ucm615213.htm ("Public Notification" for something called "Gold Rhino 25000").

16.    Documents obtained from the FDA demonstrate that not all of the "sexual enhancement pills" at issue contain sildenafil, or any other prescription drug.  While two of the three lab analyses included in the FDA's FOIA response indicated the presence of sildenafil, the third did not.  Attached hereto as Exhibit B is the lab analysis performed by the FDA on that third sample of "Platinum 3000, Rhino 7."  According to the FDA's "Summary of Analysis," "[t]he presence of a male enhancement adulterant could not be confirmed by LC-MS analysis."

17.    There exists no reliable or comprehensive data as to what proportion of any of the various SKUs of sexual enhancement pills at issue in Outlaw Laboratory's claim against the Stores actually contain sildenafil or any other prescription drug.  Nor are the Stores aware of any "lot numbers" or other originating information that could be used to segregate the pharmaceutical-containing pills from the adulterated pills.

18.    More to the point, Outlaw Laboratory's complaint makes no allegation as to how it might be able to prove that any package offered for sale by any of these three Stores—or offered by any other *specific* store in the class—in fact contained any prescription drug.

19.    The Outlaw Enterprise's inability to prove any violation of law by the

---

[1] A full list can be found at: https://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/MedicationHealthFraud/ucm234539.htm

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

1   Stores and members of the class explains why they are offering *de minimis*

2   settlements as part of their fraudulent scheme, and illustrates the objective

3   baselessness of the shakedown scheme to begin with.

4       20.     Notably, neither the FDA nor any other regulator has banned, or

5   otherwise declared it "illegal" for retail stores merely to sell these products.  Indeed,

6   as recently as November 27, 2018, the FDA issued a press release that does nothing

7   more than repeat that "[t]he U.S. Food and Drug Administration is warning

8   consumers not to purchase or use Rhino male enhancement products."[2]  The FDA

9   has not issued a recall of any of the sexual enhancement products at issue in this

10  case, nor has it issued any order that retail stores must discontinue selling them.

11      21.     That is because sildenafil is hardly a dangerous pharmaceutical—it is

12  sold over the counter in the United Kingdom, and is currently under consideration

13  for over-the-counter sales in the United States.  The Stores anticipate that as

14  discovery progresses, the Outlaw Enterprise will be unable to identify even a single

15  adverse health event caused by any of the products upon which the stick-up scheme

16  described herein is predicated, and certainly none resulting from any sale by these

17  Stores or any other member of the class.

18      22.     Convenience store owners of course have no idea what is contained in

19  these products, any more than they know the list of ingredients found in cigarettes,

20  Coca-Cola, or 5-Hour Energy, let alone the hundreds of other items they stock on

21  their shelves.  Outlaw has not alleged, nor will it be able to find authority for, the

22  notion that store owners have some statutory or common law duty to investigate the

23  actual ingredients in all of their merchandise, nor a duty to monitor the bowels of

24  the FDA's website (let alone those of the dozens of other regulators with purview

25  over the stores' wares) to see what regulatory agencies are saying about the items

26  _____

27       [2] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/
    ucm626723.htm

28

6                    AMENDED COUNTERCLAIMS / THIRD-PARTY
                                              CLAIMS

on their shelves, and what "advice" the FDA is offering to *consumers*.

**B. Members of the Outlaw Enterprise Hatch a Scheme to Run a Shakedown Against a Vulnerable Community of Victims.**

23.     Since at least December 2017, and continuing through the present, the Outlaw Enterprise has preyed upon hundreds of independently operated convenience store owners—including the Stores here, and all members of the class they seek to represent—by sending them demand letters that threaten "over $100,000" in liability, based upon a series of false and misleading statements.  A sample of the form letter sent by the Outlaw Enterprise (addressed to the d/b/a of Third Party Plaintiff NMRM, Inc.) is submitted as Exhibit A to this pleading.

24.     The first paragraph of the form letter refers to two "Exhibits":  an "Exhibit A" consisting of a photo of the product allegedly in the recipient's store, and an "Exhibit B," consisting of one or more of the FDA's "Public Notifications" described above.  The letters then make a series of false and misleading statements, including:

- "your company [insert name] is selling illegal sexual enhancement products;"
- "Attached as EXHIBIT B are notices from the Food and Drug Administration regarding the illegality of the Illicit Products;"
- "As you can see, the Illicit Products are illegal to sell;"
- "As you can see, the Illicit Products . . . subject your company to legal action for racketeering . . . under RICO (Racketeer Influenced Corrupt Organizations);"
- "[u]nder these federal laws our client is entitled to: [*inter alia*] Your profits from the sale of the Illicit Products dating back four years . . . Attorney's fees . . . Punitive damages . . . Triple [sic] damages . . ."
- "We estimate that you are liable for over $100,000;"
- "If this matter is not fully resolved before [a date typically 30 days out]

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

1       we file [sic] a lawsuit against your business."

2       25.     None of those statements were true when made, and they are all

3   misleading.  The products are not "illegal to sell," let alone "as you can see" from

4   the referenced FDA "notifications."  As noted, the FDA's notifications do nothing

5   more than "advis[e] consumers not to purchase" the product.  But if the enterprise's

6   letter stated the true fact that the FDA is merely advising consumers not to purchase

7   the products, the letters would lose their intent to induce fear in these immigrant

8   communities, and the scheme would lose its effectiveness.  Accordingly, after

9   planting the "illegal to sell" seed, the scheme to defraud proceeds with a parade of

10  horribles, including RICO litigation, and financial ruin.

11      26.     The Outlaw Enterprise's scheme is intentionally designed to be

12  particularly misleading to its target audience, which consists almost exclusively of

13  (as typified by the three Stores here) immigrants for whom English is not their first

14  language.  Particularly for immigrants, the Enterprise's false representations about

15  make-believe government dictates of "illegality" are terrifying.

16      27.     The threat of RICO liability is further false and misleading in that, on

17  information and belief, the Outlaw Enterprise has never actually sued any store

18  under RICO, because any lawyer of ordinary skill knows that there is not even a

19  colorable claim for RICO liability against these stores.

20      28.     The assertion of imminent RICO liability is knowingly false when

21  made.  The usual signatory on the demand letters is Leticia Kimble (an as-yet-

22  unnamed member of the Outlaw Enterprise who works as "counsel" to the as-yet-

23  unnamed member Tauler Smith LLP, on whose letterhead the fraudulent letters are

24  written).  A 2008 graduate of the University of Michigan Law School, Ms. Kimble

25  holds herself out to be a "RICO expert."  *See* https://www.taulersmith.com/team/.

26  Any "RICO expert" knows both that the RICO threats are legally laughable, but

27  terrifying to a lay person, especially the lay members of this target audience.

28      29.     Viewed differently, the attorney members of the Outlaw Enterprise

8       AMENDED COUNTERCLAIMS / THIRD-PARTY
                                            CLAIMS

1 evidently recognized that stating RICO allegations to the Court would violate Rule
2 11. They nevertheless made those same allegations directly to their victims, which
3 caused hundreds of such victims to fork over a few thousand dollars each, because
4 of this scheme.

5      30.    Roma Mikha, Inc. received, by U.S. Mail, the fraudulent demand letter
6 authored by one or more participants in the Outlaw Enterprise, and signed by
7 Leticia Kimble, on or about February 7, 2018. It was sued in this action on July 25,
8 2018, but has not yet been served with summons. Roma Mikha has suffered an
9 injury to its business because it initially believed the demand letter's false
10 assertions, and removed these legal products from its shelves, thereby losing
11 legitimate sales.

12      31.    NMRM, Inc. received, by U.S. Mail, the fraudulent demand letter
13 authored by one or more participants in the Outlaw Enterprise, and signed by
14 Leticia Kimble, on or about December 15, 2017. On information and belief,
15 NMRM, Inc. has not been sued as part of the scheme. NMRM has suffered an
16 injury to its business because it initially believed the demand letter's false
17 assertions, and removed these legal products from its shelves, thereby losing
18 legitimate sales.

19      32.    Skyline Market received, by U.S. Mail, the fraudulent demand letter
20 authored by one or more participants in the Outlaw Enterprise, and signed by
21 Leticia Kimble. Fearful of the prospect of facing "over $100,000" in liability as
22 threatened, Skyline Market agreed to pay the Outlaw Enterprise $2,800. In addition
23 to that amount, Skyline Market suffered further injury to its business because it
24 believed the demand letter's false assertions, and removed these legal products
25 from its shelves, thereby losing legitimate sales. Skyline Market has been further
26 injured by paying attorneys' fees to coordinate payment of the protection money.

27      33.    On information and belief, the Outlaw Enterprise has used the U.S.
28 Mail to pursue the scheme against over one thousand victims around the United

States, hundreds of whom are in California alone.

## C. The Demand Letters Threaten Objectively Baseless Sham Litigation.

34.     The Outlaw Enterprise's shakedown scheme alleged herein is not immunized by its First Amendment right to petition the government, because the First Amendment protects only conduct that is "genuine," not conduct that is designed to serially extort small businesses out of money.  Here, the allegations, threats, and demands set forth in the serial demand letters were not genuine, but were objectively baseless.

35.     There are numerous indicators of the baselessness of the threats set forth in the demand letters.  For example, as alleged in paragraph 16 *supra* and shown in Exhibit B, a reasonable inquiry would have shown that not all "sexual enhancement pills" contain sildenafil or any other prescription drug.  The mass distribution of thousands of demand letters to random stores was thus a stickup that was not individually tailored to the recipients.  Instead, it was a process that would inevitably demand payment both from stores that sold adulterated pills, and from those that did not.

36.     The Outlaw Enterprise failed to conduct any individualized testing or investigation to determine which of the thousands of recipients of the demand letter actually sold or offered for sale an item that contained a prescription drug.

37.     The baselessness of the letters' threat of financial ruin from RICO liability was further objectively baseless because there was not then, nor now, any plausible basis by which Outlaw Laboratory could have pled the commission of at least two predicate acts by each individual store.  The exclusive list of predicate acts that can form the basis of a RICO violation is set forth in 18 U.S.C. § 1961(1).  The sale of sildenafil does not even arguably constitute any violation of any of the crimes on that list.

38.     Nor could the Outlaw Enterprise have reasonably alleged mail or wire

AMENDED COUNTERCLAIMS / THIRD-PARTY
CLAIMS

fraud as predicate acts, given that there is no basis to believe that any of the Stores sold any of the products using the mails or wires.  As any reasonable investigation would have shown, all of the stores acquire the products at issue over the counter from their wholesaler, and sell all of their products over the counter to walk-in customers.

39.    The objective baselessness of the RICO threats is further indicated by the fact that there is no reasonable way that the Outlaw Laboratory could have plausibly alleged that the stores are members of any form of RICO enterprise.  The relationship between the stores, the wholesalers, and the unknown manufacturers of the challenged products is nothing more than the standard chain of distribution, identical to the distribution of Coca-Cola, Snickers, and Wrigley's chewing gum. Outlaw Laboratory could not have alleged any structure or agreement among even each store and *one* other person, let alone an Enterprise consisting of the *thousands* of stores that received the demand letter.

40.    The objective baselessness of the RICO threats is further indicated by the fact that there is no reasonable way that the Outlaw Laboratory could have plausibly alleged that it suffered any harm that was proximately caused by the stores' commission of any (non-existent) predicate acts.  Supreme Court precedent requires the plaintiff to show how his injury was proximately caused by the commission of the (here, non-existent) predicate acts.  The opinion in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), for example, precludes such a showing where one business claims that it was injured by predicate acts of its competitor that were directed at third parties, which is the most that Outlaw Laboratory could allege, even if it could hypothesize that the stores committed two of the violations enumerated in section 1961(1).

41.    Indeed, Outlaw Laboratory does not even transact any business in California, so it could not have lost out on any sales made by the California-based, small convenience store owners like the Stores.  As of the date of this filing,

11                    AMENDED COUNTERCLAIMS / THIRD-PARTY
                                    CLAIMS

Outlaw Laboratory is not registered with the California Secretary of State to do business here.

42.     Another indicator of the objective baselessness of the RICO threats is that the Stores do not engage in any interstate commerce.  Their customers are local neighborhood residents, and nobody would have crossed state lines to just to buy a Rhino product from them.  But RICO applies only when the racketeering enterprise is engaged in, or has more than an incidental effect upon, interstate commerce.

43.     As further factual development will show, the threat of Lanham Act liability was also objectively baseless under *Lexmark v. Static Control Components*, 134 S. Ct. 1377 (2014), as the members of the Outlaw Enterprise knew or should have known at the time they sent the demand letters.  That is because there has never been, and will never be, any evidence that Outlaw Laboratory ever actually lost a sale of TriSteel or TriSteel 8 Hour as a result of any store-defendant's conduct in offering the challenged products for sale.

44.     The objective baselessness of the threat of RICO liability was crucial to the effectiveness of the Outlaw Enterprise's shakedown scheme, because the economic devastation to the small businesses that the demand letters threatened is primarily predicated upon that claim.  To wit, the threatened financial ruin for each recipient of the demand letter is set forth as follows:

> As you can see, the Illicit Products are illegal to sell and subject your company to legal action for racketeering and unfair business practices under RICO (Racketeer Influenced Corrupt Organizations) and the Federal Lanham Act.  Accordingly, under these federal laws our client is entitled to:
>
> - Your profits from the sale of the Illicit Products dating back four years. (15 U.S.C. § 1117)
> - Attorney's fees. (18 U.S.C. § 1964)
> - Punitive damages. (15 U.S.C. § 1117)
> - Triple damages. (18 U.S.C. § 1964 & 15 U.S.C. § 1117)

(*See* Ex. A.)

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

45.     The second item threatens that the store will be liable for Outlaw Laboratory's "attorney's fees" under "18 U.S.C. § 1964," which is the RICO statute.  In addition, Outlaw threatened that if the store did not cough up the money, it would be liable for "triple damages" under RICO.  As set forth above, there was neither then nor now any objectively reasonable way for the Outlaw Enterprise to have believed that such threats of RICO liability were "genuine."

46.     Also objectively baseless is the threat that the stores would be liable for "triple damages" under 15 U.S.C. § 1117 if they refused to pay the ransom. Liability for treble damages under section 1117 is limited to the "knowing" use of "a counterfeit mark," or cases in which the judge determines that "the circumstances of the case" warrant an increase in the default measure of "actual damages."  *Id.*  On information and belief, the members of the Outlaw Enterprise knew at the time, and know now, that there has never been any basis to accuse these small stores of trading in counterfeit marks, and could not reasonably expect that a judge would treble the stores' liability in the exercise of his or her discretion.  Even if the members of the Outlaw Enterprise were deluded, such a threat was *objectively* baseless.

47.     Finally, the chart threatens the stores with "punitive damages" under section 1117.  But section 1117 specifically prohibits the imposition of money damages as a "penalty," and well-established caselaw holds that punitive damages are not allowed under section 1117.  *See, e.g.*, *Falcon Stainless, Inc. v. Rino Companies, Inc.*, No. 08-CV-0926-AHS-MLGX, 2011 WL 13130487, at *4 (C.D. Cal. Aug. 2, 2011).

48.     In contrast to what the members of the Outlaw Enterprise knew or should have known regarding the objective baselessness of the threatened financial ruin, it *was* reasonable for the members of the Enterprise to expect that the immigrant proprietors of these small stores would *not* know the ins and outs of RICO liability and predicate acts, nor the scope of 15 U.S.C. § 1117.  Indeed, it was

13                    AMENDED COUNTERCLAIMS / THIRD-PARTY
                                                CLAIMS

that asymmetry of knowledge and sophistication that made the stores' so vulnerable to the Enterprise's depredations and fraudulent statements.  That is what transforms the demand letters from "genuine" petitions for relief, into sham litigation.

### The Objectively Baseless Threats of Financial Ruin Were the Only Thing that Made this Shakedown Scheme Effective in Extorting Hundreds of Small Settlements.

49.     As the evidence is developed, it will become apparent that none of Outlaw Laboratory's claims was genuine, and that the entire litigation is a sham, but the Stores' claims are focused more directly on the fraudulent demand letters.

50.     The demand letters were effective in the Outlaw Enterprise's fulfillment of the fraudulent scheme precisely because of the objectively baseless claims of financial ruin.  As illustrated *supra*, none of the final three components of liability threatened in the chart has any genuine basis.  But the combination of those three baseless items is the only way that the Outlaw Enterprise could have "estimate[d] that you are liable for over $100,000 if we prosecute this matter to a jury trial."  (Ex. A at 2.)

51.     That is, the first bullet point threatens liability only for "Your profits from the sale of the Illicit Products."  (*Id.* at 1.)  But Roma Mikha, for example, made a profit of only around $3 on each packet of sexual enhancement pills it sold.  Even assuming Outlaw Laboratory could ever adduce evidence of proximate causation sufficient to satisfy *Lexmark*, and assuming (contrary to fact, *see* Ex. B) that every such packet contained sildenafil, and further assuming that there could be any evidence by which to prove so, Roma Mikha's maximum profits (and therefore Outlaw's maximum recovery) would have been no more than a couple hundred dollars.

52.     The demand letters would not have yielded $2,800 - $4,000 settlements, however, if the Outlaw Enterprise had made the only "genuine" threat that could have been alleged on these facts:  "under these federal laws we estimate

that you will be liable for $300 if we prosecute this matter to a jury trial." So the Outlaw Enterprise spiked the demand letters with objectively baseless misrepresentations and threats, to trick the stores into paying up several thousand dollars to avoid the financial ruin that was baselessly threatened.

### D. The Outlaw Enterprise Has Undertaken a Series of Lawsuits and Activities Incidental to Litigation, Without Regard to the Individual Merits

53.    The unprotected nature of the Outlaw Enterprise's conduct is further illustrated by its blunderbuss conduct in distributing thousands of demand letters to its victims, but following through on only some of those claims.  NMRM, for example, received the demand letter but has never been sued.  Similarly, despite the fact that this litigation has been pending now for nearly four months, Outlaw Laboratory has never bothered to pursue it even through the first step of obtaining and serving a summons on *any* of the 50 defendants.

54.    On information and belief, Outlaw Laboratory has distributed over one thousand copies of the demand letter, and has filed at least six actions in different jurisdictions.  Some of the demand letters have resulted in lawsuits that have survived the pleading stage in other jurisdictions, but that is no indication that any *individual* claim has merit; it means only that if one accepts the allegations as true, some courts have determined that Outlaw's form pleading states a plausible claim (at least as against whatever arguments were mustered for dismissal in the adjudicated motions).

55.    These demands and lawsuits have been initiated without regard to the merits.  For example, when it comes time for Outlaw to present evidence as to any particular retail store, it will be unable to trace any conduct by that store to any lost sale of TriSteel or TriSteel 8 hour by Outlaw Laboratory.  The reviewing court will thereupon dismiss the Lanham Act claim for lack of proximate cause, resulting in dismissal of the remaining causes of action, which are predicated upon it.

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

56.     Another example of Outlaw's disregard for the merits of any individual claim is seen in the fact that, on information and belief, Outlaw Laboratory has not served any of the hundreds of defendants with even a single piece of written discovery.

57.     Still another example that the Outlaw Enterprise knew that the claims were objectively meritless from the get-go is the fact that, once this case was removed to federal court, they continued to serve invalid state-court summons on the Stores' co-defendants.  They did this even after being informed by counsel for the Stores that such service was invalid under federal law.  Such behavior demonstrates that the Outlaw Enterprise had no interest in meritoriously litigating Outlaw Laboratory's claims, but simply was hoping to intimidate a few additional class members into reaching a quick settlement before those stores learned about the existence of these counterclaims.

58.     The docket indicates that at least seven stores paid settlements to Outlaw Laboratory between the date that the Outlaw Enterprise was informed of the invalidity of the summons, and the date that the Court ordered Outlaw Laboratory to inform its victims of the summons' invalidity.  Four of these settlements appear to have been obtained even after Outlaw Laboratory admitted the invalidity of the summons by filing a non-opposition to the motion of Midway Shell to quash the summons served upon it.

**E. Structure and Roles of the Outlaw Enterprise**

59.     The Outlaw Enterprise consists of multiple members, the exact identities of whom will be obtained in discovery.  The Outlaw Enterprise was created prior to December 2017, and has continuously operated its scheme since that time.

60.     Outlaw Laboratory, LP, is a principal member of the Outlaw Enterprise.  According to the Texas Secretary of State, Outlaw Laboratory was

formed in September 2016.  It apparently operates out of a single retail location at 6666 Gulf Freeway, in Houston, which is shown on Google Streetview to be a storefront under a sign "TF Supplements.com."  Although the fraudulent letters and the Complaint allege that Outlaw Laboratory is "a manufacturer, distributor and retailer of male enhancement products 'TriSteel' and 'TriSteel 8 hour," on information and belief, that product is not sold in any stores in this district.  None of the Stores (nor other store owners with whom they have discussed the case) has either seen or heard of any such product, until seeing the fraudulent letters at issue here.

61.     On information and belief, TriSteel and TriSteel 8 Hour were created as artifices upon which to found the enterprise's scheme.  For one thing, the first recorded appearance of Outlaw Laboratory's website (per the WayBackMachine available through www.archive.org) is July 13, 2017, and as shown on Exhibit A hereto, the Outlaw Enterprise began sending the fraudulent demand letters just five months later (if not before then).

62.     Public records indicate that Outlaw Laboratory is owned by enterprise members Michael Wear and Shawn Lynch.  On information and belief, these individuals participate with the other members of the Outlaw Enterprise in conducting the enterprise's affairs, including by creating "competing" products upon which to found the false advertising claims, and by working with other members to decide which geographies in which to conduct the scheme, and by signing for, and accepting receipt of the ill-gotten gains.

63.     The Los Angeles law firm Tauler Smith LLP is another member of the Outlaw Enterprise.  On information and belief, the firm is a partnership owned by Robert Tauler and Matthew Smith, who direct the affairs of Tauler Smith and are independent members of the enterprise in their own right.  Tauler Smith's and Mr. Tauler's role in conducting the affairs of the Outlaw Enterprise exceeds that of mere attorney agents of the "client" Outlaw Laboratory.  For example, in response

to the undersigned's letter requesting that the Outlaw Enterprise curb its conduct, Mr. Smith responded on behalf of the Tauler Smith and the enterprise just 11 minutes later, directing the undersigned to, "[d]o some research on our claims like a real lawyer and stop sending me stupid letters," and advising that "[y]our accusations are a disgrace to our profession." On information and belief, this decision to continue to pursue the affairs of the Outlaw Enterprise was done without receiving direction from either Mr. Wear or Mr. Lynch (the nominal owners of the nominal "client"). Rather, Mr. Smith's response shows that the affairs of the enterprise are independently conducted by the law firm and its principals.

64. On information and belief, Leticia Kimble is an independent member of the Outlaw Enterprise. Tauler Smith's website describes Ms. Kimble as "Of Counsel" to the firm, apparently operating as the "Founder of Kimble Legal Consulting." Ms. Kimble participates and directs the affairs of the enterprise as seen in the fact that she is the signatory on the fraudulent letters, and the person who directs the victims of the scheme to "contact our office" to coordinate the necessary amount of protection money.

65. Other members of the Outlaw Enterprise include an unknown number of independently operating "investigators," who cruise urban communities in search of potential victims, and then take photos of the victims' storefronts and shelf space, forwarding those photos to the other members of the Outlaw Enterprise, so that the scheme can be launched against new victims.

66. As further information is developed as to the identities and roles of the enterprise members other than Outlaw Laboratory, LP, the Stores reserve their right to amend this pleading to name those persons and entities as defendants.

## CLASS ALLEGATIONS

67. The Stores bring these class claims on behalf of themselves and all other victims of the Outlaw Enterprise who have been subject to an identical pattern of racketeering activity.

68.     As representatives of all similarly situated business entities the Stores propose an overarching "Store Class" defined as follows:

> All business entities in the United States that received a demand letter substantially similar to the letter received by the class representatives.

69.     Roma Mikha, Inc. further proposes certification of a subclass (the "Sued Stores") on behalf of itself and all similarly situated business entities, defined as follows:

> All business entities in the United States that received a demand letter substantially similar to the letter received by Roma Mikha, Inc., and that were subsequently named as defendants in state or federal litigation brought by Outlaw Laboratory, LP.

70.     NMRM, Inc. further proposes certification of a subclass (the "Threatened Stores") on behalf of itself and all similarly situated business entities, defined as follows:

> All business entities in the United States that received a demand letter substantially similar to the letter received by NMRM, Inc., and that were not thereafter named as defendants in state or federal litigation brought by Outlaw Laboratory, LP.

71.     Skyline Market further proposes certification of a subclass (the "Payment Class") on behalf of itself and all similarly situated business entities, defined as follows:

> All business entities in the United States that received a demand letter substantially similar to the letter received by Skyline Market, and that subsequently paid or agreed to pay money to Tauler Smith LLP, Outlaw Laboratory, or an agent of either.

72.     The proposed Store Class and each of the proposed subclasses are appropriate for certification under both subsections (b)(2) and (b)(3) of Federal

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

Rule of Civil Procedure 23 because:

(a)     The proposed classes are so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable;

(b)     The members of the proposed classes are readily ascertainable from the records on file with one or more members of the Outlaw Enterprise;

(c)     There are numerous questions of law and fact common to the proposed classes, and those common issues of law and fact will predominate over any questions that may affect the claims of only individual members of the class.  Such common questions include but are not limited to:

(i)     Whether the statements made in the demand letters constitute a scheme to defraud, within the meaning of 18 U.S.C. § 1341;

(ii)     Whether the members of the Outlaw Enterprise constitute an "associated-in-fact" enterprise, and whether each of the named defendants participated in conducting the affairs of the enterprise;

(iii)     Whether the Outlaw Enterprise used the U.S. Mails in conducting the alleged scheme to defraud;

(iv)     Whether the named-defendant members of the Outlaw Enterprise acted with a sufficiently culpable mental state to warrant liability under RICO;

(v)     Whether the alleged scheme to defraud was a proximate cause of the injuries alleged by the classes;

(vi)     Whether the members of the proposed Payment Class are entitled to rescind their "settlements" with the Outlaw Enterprise, and if so, whether they are entitled to restitution of the ill-gotten funds;

(v)     Whether the members of the proposed classes are entitled to injunctive relief to stop the Outlaw Enterprise from continuing to perpetuate the scheme.

(d)     The Stores' claims are typical of the overarching "Store Class," and of

20

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

each of the subclasses that each Store seeks to represent.  Each Store has been injured by the same wrongful conduct of the Outlaw Enterprise and each of its members, and accordingly their claims arise from the same practices and conduct that gives rise to the claims of all of their fellow members;

(e)     The Stores will fairly and adequately protect the interests of the classes and all of their members, in that they have no interests that are antagonistic to those of their fellow class members.  The Stores have engaged counsel who have a depth of experience in both prosecuting and defending class action claims;

(f)     A class action is superior to other available methods of adjudicating this dispute for at least the following reasons:

(i)     Given the size of the individual class members' claims and the expense of litigating those claims, few, if any, class members could afford to or would seek legal redress individually for the wrongs that the Outlaw Enterprise committed against them.  Indeed, as alleged, that was precisely the enterprise's purpose in first asserting "liability" of "over $100,000," but then offering "settlements" for as little as $2,500—to make this shakedown too good of an offer to dispute in the courts;

(ii)     Any pending litigation that exists against the class members is only in its initial stages, and to the Stores' knowledge, no other class member has thus far brought its own claims against the Outlaw Enterprise or any of its members;

(iii)     Concentrating these claims in this forum is desirable because there is no particular regional or jurisdictional interest in trying such claims in any other forum.  Such concentration of all of the Outlaw Enterprise's victims in this action will instead promote efficiency of the courts;

(iv)     The Stores do not know of any difficulty in managing their claims as a class action, given the uniformity and consistency of the Outlaw Enterprise's conduct as against each member of the classes.

73.     Sufficient information to provide notice to each class member can be accessed from the Outlaw Enterprise's records.  Indeed, the specific address of each member of the class is set forth at the top of each of the fraudulent demand letters.

## FIRST CAUSE OF ACTION
### (Violation of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1962(c))

74.     The Stores re-allege and incorporate by reference each of the allegations contained in the paragraphs above as if fully set forth herein.

75.     Section 1962(c) provides in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

76.     At all relevant times, Outlaw Laboratory, LP was a "person" under the meaning of 18 U.S.C. § 1961(3), because it is "capable of holding a legal or beneficial interest in property."  Outlaw Laboratory, LP was associated with the association-in-fact enterprise described herein as the "Outlaw Enterprise," because it was the vehicle upon which the scheme to defraud predicated its legal threats. Outlaw Laboratory, LP conducted and participated in the affairs of that enterprise by allowing its name to be used in the fraudulent mailings that constitute the pattern of racketeering activity (per 18 U.S.C. § 1961(5)) at issue in this case, in violation of 18 U.S.C. § 1962(c).

77.     Outlaw Laboratory, LP has committed or aided and abetted the commission of at least two acts of racketeering activity (i.e., mail fraud in violation of 18 U.S.C. § 1341) by assisting the other members of the Outlaw Enterprise in drafting and arranging for the mailing of the fraudulent demand letters by which the scheme to defraud was perpetrated.  These acts of racketeering activity that Outlaw

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

Laboratory, LP committed and/or conspired to, or aided and abetted in the commission of, were related to each other, and are ongoing, such that they pose the threat of continuing racketeering activity.

78.    On information and belief, the Outlaw Laboratory partnership entity, through its principals Michael Wear and Sean Lynch, further participated in and conducted the affairs of the Outlaw Enterprise by assisting Tauler Smith LLP and Leticia Kimble in identifying and choosing the enterprise's victims (i.e., the Stores and the members of the classes they seek to represent).

79.    On information and belief, the Outlaw Laboratory partnership entity, through its principals Michael Wear and Sean Lynch, further participated in and conducted the affairs of the Outlaw Enterprise by determining the reservation prices of the scheme's victims, at which point they would be more likely to cough up protection money than to retain counsel to defend their legal rights.

80.    Outlaw Laboratory and the other members of the Outlaw Enterprise knowingly and intentionally made the misrepresentations, acts of concealment, and failures to disclose that constitute this scheme to defraud, and either knew or recklessly disregarded that the misrepresentations (such as the assertion that one "can see" from the FDA notifications that the challenged products are "illegal to sell and subject your company to legal action for racketeering . . . under RICO") would be material to the victims of the scheme, and knew and intended that the Stores and all members of the classes would rely on the misrepresentations upon which the scheme is predicated.

81.    Outlaw Laboratory and the other members of the Outlaw Enterprise have obtained money belonging to the Payment Class as a result of these violations. Outlaw Laboratory and the other members of the Outlaw Enterprise have further caused members of the Store Class, the Sued Stores Class, the Threatened Stores Class, and the Payment Class to lose money by causing those stores to remove the challenged products from their shelves, thereby losing sales and revenue from those

23                    AMENDED COUNTERCLAIMS / THIRD-PARTY

products.  In the absence of the Outlaw Enterprise scheme, none of the class members would have suffered these injuries.  Accordingly, the Stores and all of the class members' losses were directly and proximately caused by the Outlaw Enterprise, and the scheme to defraud alleged herein.

**SECOND CAUSE OF ACTION**
**(Violation of the Racketeer Influenced Corrupt**
**Organizations Act, 18 U.S.C. § 1962(d))**

82.    The Stores re-allege and incorporate by reference each of the allegations contained in the paragraphs above as if fully set forth herein.

83.    Section 1962(d) provides:

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

84.    At all relevant times, Outlaw Laboratory, LP was a "person" under the meaning of 18 U.S.C. § 1961(3), because it is "capable of holding a legal or beneficial interest in property."  Outlaw Laboratory, LP was associated with the association-in-fact enterprise described herein as the "Outlaw Enterprise," because it was the vehicle upon which the scheme to defraud predicated its legal threats. Outlaw Laboratory, LP conspired with the other as-yet-unnamed members of the Outlaw Enterprise to violate subsection (c) of § 1962, through agreeing with those other members on the structure, purpose, and conduct of the Outlaw Enterprise, and by taking numerous overt acts in furtherance of the scheme to defraud, including drafting and/or approving the fraudulent demand letters, setting and/or approving the minimum amounts of protection money that the victims must pay, and by receiving the ill-gotten proceeds from the shakedown.  On information and belief, Outlaw Laboratory, LP took additional overt acts in conformance with the conspiracy by hiring and/or directing the activities of the "investigators" who were tasked with identifying and selecting the victims of the racket, and/or by making

payments to those "investigators" in furtherance of the scheme.

85.   Outlaw Laboratory, LP's fellow conspirators and members of the Outlaw Enterprise have committed or aided and abetted the commission of at least two acts of racketeering activity (i.e., mail fraud in violation of 18 U.S.C. § 1341) by drafting, signing, and mailing the fraudulent demand letters by which the scheme to defraud was perpetrated.  These acts of racketeering activity were related to each other, and are ongoing, such that they pose the threat of continuing racketeering activity.

86.   Outlaw Laboratory and the other members of the Outlaw Enterprise knowingly and intentionally agreed to make the misrepresentations, acts of concealment, and failures to disclose that constitute this scheme to defraud, and either knew or recklessly disregarded that the misrepresentations (such as the assertion that one "can see" from the FDA notifications that the challenged products are "illegal to sell and subject your company to legal action for racketeering . . . under RICO") would be material to the victims of the scheme, and knew and intended that the Stores and all members of the classes would rely on the misrepresentations upon which the scheme is predicated.

87.   Outlaw Laboratory and the other members of the Outlaw Enterprise have obtained money belonging to the Payment Class as a result of these violations. Outlaw Laboratory and the other members of the Outlaw Enterprise have further caused members of the Store Class, the Sued Stores Class, the Threatened Stores Class, and the Payment Class to lose money by causing those stores to remove the challenged products from their shelves, thereby losing sales and revenue from those products.  In the absence of the Outlaw Enterprise scheme, none of the class members would have suffered these injuries.  Accordingly, the Stores and all of the class members' losses were directly and proximately caused by the Outlaw Enterprise, and by Outlaw Laboratory, LP's agreement to conspire with the other members of the Outlaw Enterprise to perpetuate the scheme.

AMENDED COUNTERCLAIMS / THIRD-PARTY
CLAIMS

## THIRD CAUSE OF ACTION
### (Rescission)

88.     The Stores re-allege and incorporate by reference each of the allegations contained in the paragraphs above as if fully set forth herein.

89.     Skyline Market hereby gives notice of its intention to rescind the "Confidential Settlement Agreement and Release" that it entered with Outlaw Laboratory, LP, and accordingly rescinds that agreement.

90.     There are numerous sufficient grounds upon which Skyline Market is entitled to rescission of the agreement.  At the time Skyline Market signed the agreement, it did so under duress, given that it had been threatened with liability of "over $100,000 if we prosecute this matter," and was then presented with an offer to get out of that jam for a mere $2,800, or 2.8% of the asserted liability. Defending its legal rights would have cost Skyline Market hundreds of dollars per hour, such that the amount of the minimal demand would have been dwarfed before Skyline Market's attorneys even showed up to the initial case management conference in the threatened action.

91.     Skyline Market and the other members of the class it seeks to represent are also entitled to rescission and restitution of the benefits they conferred on the Outlaw Enterprise because at the time they entered the "Confidential Settlement Agreement and Release," they did not know that their agreement had been predicated upon a scheme to defraud that was illegal *ab initio*, as set forth above, and in Counts 1 and 2.  Accordingly, the agreements entered by Skyline Market and the members of the class it seeks to represent are now void and/or voidable, and those entities are entitled to a return of the amounts that were illegally taken from them.

## PRAYER FOR RELIEF

**WHEREFORE**, the Stores pray for judgment as follows:

1.     For judgment against Outlaw Laboratory, LP;

AMENDED COUNTERCLAIMS / THIRD-PARTY CLAIMS

2.    For compensatory and treble damages;

3.    For rescission of the agreements entered into between Outlaw
      Laboratory, LP and Skyline Market and the other members of the
      Payment Class;

4.    For restitution to Skyline Market and the other members of the
      Payment Class of the benefits they conferred upon Outlaw Laboratory,
      LP and the other members of the Outlaw Enterprise;

5.    For preliminary and permanent injunctive relief dissolving the Outlaw
      Enterprise, and ordering Outlaw Laboratory, LP not to engage in any
      further such schemes;

6.    For attorneys' fees;

7.    For costs; and

8.    For such other and further relief as the Court deems just and proper.


Dated:  November 30, 2018                    GAW | POE LLP


                                             By: _____
                                                 Mark Poe
                                                 Attorneys for Roma Mikha, Inc.,
                                                 NMRM, Inc. and Skyline Market,
                                                 Inc.

AMENDED COUNTERCLAIMS / THIRD-PARTY
CLAIMS

# CERTIFICATE OF SERVICE

### Case No. 3:18-cv-1882-GPC-BGS

I HEREBY CERTIFY that on November 30, 2018, I filed the following documents with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day either by Notice of Electronic Filing generated by CM/ECF or by U.S. mail on all counsel of record entitled to receive service.

**AMENDED COUNTERCLAIMS OF ROMA MIKHA, INC. AND THIRD-PARTY CLAIMS OF NMRM, INC. AND SKYLINE MARKET, INC.**

**EXHIBIT A (DEMAND LETTER)**

**EXHIBIT B (NEGATIVE FDA LAB RESULT)**

GAW | POE LLP

By: _____
Mark Poe
Attorneys for Roma Mikha, Inc.,
NMRM, Inc., and Skyline Market,
Inc.