UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE OUTLAW LABORATORY, LP LITIGATION | Case No.: 3:18-cv-840-GPC-BGS consolidated with 3:18-cv-1820-GPC-BGS<br><br>**ORDER**<br><br>**(1) DENYING OUTLAW LABORATORY'S MOTION TO DISMISS THE FIRST AMENDED CROSS-COMPLAINT [ECF No. 38];**<br><br>**(2) TO SHOW CAUSE.** |

Before the Court is Plaintiff/Counterdefendant Outlaw Laboratory, LP's ("Outlaw") motion to dismiss Defendant/Counterclaimant Roma Mikha, Inc., and Third-Party Plaintiffs NMRM, Inc. and Skyline Market, Inc.'s (collectively, "Counterclaimants'") Amended Counterclaim and Third-Party Complaint (the "Amended Cross-Complaint"). (ECF No. 38.) This motion has been fully briefed. (ECF Nos. 42, 46, 50.) After consideration of the parties' their moving papers and the applicable law, the Court **denies** Outlaw's motion to dismiss.

# I. BACKGROUND[1]

The Court has previously discussed the instant litigation in some detail in its previous Order dated November 27, 2018. (ECF No. 31). The Court will substantially rely on that account, supplementing it with additional or updated information where necessary.

## A. Outlaw Laboratories LP

Outlaw is a Texas-based manufacturer of male-enhancement products called "TriSteel" and "TriSteel 8 hour." Outlaw's products are made in the United States, and, at least as alleged by Outlaw, are distributed for sale in all 50 states. According to Counterclaimants, Outlaw was formed in Texas in September 2016. Counterclaimants challenge that Outlaw transacts any business in California, since Outlaw had not, at the time, been registered with the California Secretary of State to do any business there.

## B. Outlaw's demand letters

Sometime starting in 2017 and continuing through 2018, Outlaw, through its attorneys at Tauler Smith LLP, began mailing demand letters to proprietors of gas stations, liquor stores, and corner stores in California, and beyond. Those recipients allegedly sold male-enhancement pills designated by the word "Rhino," which Outlaw alleges contain undisclosed sildenafil, a prescription pharmaceutical regulated by the FDA.

Outlaw's demand letters warned recipients that they were "selling illegal sexual enhancement drugs," which "subject your company to legal action for racketeering . . . under RICO (Racketeer Influenced Corrupt Organizations) and the Federal Lanham Act" and obligate the recipients to pay to Outlaw "profits from the sale of Illicit Products dating back four years . . . Attorney's fees . . . Punitive damages . . . Triple damages . . .

---

[1] The parties have asked the Court to take judicial notice of a number of items, including FDA documents, federal indictments, and press releases from the Department of Justice. The Court has previously granted such requests (*see* ECF No. 31, at 8 n.3, 16 n.5), and sees no reason not to grant them with respect to this motion.

." The letter estimates the recipients' liabilities at "over $100,000" but states that Outlaw is "willing to settle all claims in exchange for a one-time settlement agreement [$9,765, in the sample demand letter enclosed at ECF No. 32-1] and your agreement to stop selling the Illicit Products."

The letters conclude by warning that "[i]f this matter is not fully resolved before [a date typically within 30 days]," that a lawsuit will be filed against the recipient. Attached to the letters are three exhibits: (1) "photographs taken at your place of business capturing your sale of the Illicit Products," (2) "notices from the Food and Drug Administration regarding the illegality of the Illicit Products," and (3) a draft complaint which Outlaw indicates will be filed in the absence of settlement. (*Id.*)

A copy of the draft complaint was presented to the Court as an attachment to Counterclaimants' Amended Cross-Complaint. (ECF No. 32-1, at 6.) Notably, the draft complaint lists the letter recipient as the first named defendant, and also designates a redacted list of "Distributor" and "Supplier" defendants as co-conspirators. Outlaw gestures to a purported arrangement between the Supplier defendants (who would offer mislabeled sildenafil pills for wholesale) and the Distributor defendants (who would receive and distribute the same at their stores). The draft complaint pleads two causes of action: a civil RICO conspiracy based on an alleged scheme to defraud the public—through use of the wires and mail—by mislabeling and advertising a prescription drug, and a Lanham Act violation for the conspirators' misrepresentations of their products in commerce.

After issuing the initial demand letter, Outlaw followed-up with additional offers to settle, usually for increasingly smaller amounts. (ECF No. 32-1, at 2.) For example, one defendant was initially threatened with "over $100,000" in liability and given an offer of $14,000 for settlement. (*Id.* at 3.) A few weeks later, Outlaw communicated a reduced settlement offer of just $2,800. (*Id.*) Some recipients, like Third-Party Plaintiff Skyline Market, Inc., acquiesced to Outlaw's demands and settled. Others, like defendants Roma Mikha, Inc., and NMRM, Inc., resisted.

### C. Outlaw files suit

The present litigation arises out of two complaints filed by Outlaw in 3:18-cv-840-GPC-BGS, and 3:18-cv-1820-GPC-BGS, which have been consolidated before this court.

Outlaw filed its May 2, 2018 complaint in federal court, naming a high volume of defendants, all of whom it had previously mailed a demand letter. Thereafter, Outlaw filed a similar complaint on August 12, 2018 in state court, which was later removed by defendant Roma Mikha, Inc. Both complaints allege that the defendants are engaged in a scheme to distribute and sell unlawful Rhino products.[2] They further claim that laboratory testing and public announcements by the Federal Drug Administration ("FDA"), have revealed that Rhino products contain hidden drug ingredients like sildenafil (a prescription drug found in Viagra), desmethyl carbodenafil (an analogue of sildenafil), dapoxetine (an anti-depressant drug), and tadalafil (a prescription drug found in Cialis).

Outlaw claims that, by selling the Rhino products at their stores, defendants disseminate the false statements on Rhino products stating that they are "all natural," contain "no harmful synthetic chemicals," "no prescription necessary," and have limited side effects. Outlaw further asserts that the defendants' scheme has diverted sales away from its legitimate "TriSteel" male enhancement products, in violation of California Business and Profession Code § 17200 (prohibiting unlawful, unfair, or fraudulent business acts), § 17500 (prohibiting false and misleading advertising), and § 43(a)(1)(B) of the Lanham Act (prohibiting false advertising).[3]

Notably, unlike the lawsuit portended by Outlaw's demand letters, the actual lawsuits filed by Outlaw do not state a claim for RICO conspiracy.

---

[2] Outlaw's complaint implicates a range of Rhino products, including: Rhino 7 Platinum 5000, Rhino 12 Titanium 6000, Rhino 7 Platinum 3000, Rhino 8 Platinum 8000, Rhino 7 Blue 9000, Rhino 69 Platinum 9000, and Rhino 12 Titanium 6000.

[3] To be precise, the complaint filed in 3:18-cv-840-GPC-BGS includes only the Lanham Act claim.

4

### D. Counterclaimants file their original Cross-Complaint

On August 24, 2018, Roma Mikha, Inc., NMRM, Inc., and Skyline Market, Inc. filed a Third Party Complaint (the "Original Cross-Complaint") against Outlaw. The Original Cross-Complaint alleged a class action against Outlaw for (1) a civil RICO violation, 18 U.S.C. § 1962(c), (2) RICO conspiracy, 18 U.S.C. § 1962(d), and (3) rescission of any settlement agreements like the one entered into by Skyline Market.

Counterclaimants alleged a RICO enterprise between Outlaw, Tauler Smith LLP, and other as-yet-unnamed individuals, aimed at perfecting a legal "shakedown" of small-time San Diego convenience stores. They claim that the "TriSteel" products "were created as artifices" to "found the false advertising claims," and that Outlaw itself is no more than a front for the unlawful enterprise.

Counterclaimants took especial umbrage with the demand letters sent by Outlaw, claiming that they were aimed at a "vulnerable community of victims," comprised of mostly "small, immigrant-run businesses." They urged that Outlaw's demand letters are not only manipulative, but also fraudulent, because Counterclaimants claimed that the Rhino "products are not illegal to sell." Sending those fraudulent letters through the U.S. Mails, therefore, constitutes mail fraud under 18 U.S.C. § 1341; committing mail fraud multiple times forms a pattern of racketeering under RICO.

### E. The Court dismisses Outlaw's RICO claims pursuant to *Noerr-Pennington*

The Court addressed Outlaw's motion to dismiss the original Cross-Complaint in an Order dated November 27, 2018. (ECF No. 31.) As relevant to the instant motion, the Court held that Counterclaimants' RICO claims must be dismissed because Outlaw was protected by *Noerr-Pennington* immunity, and Counterclaimants insufficiently alleged that Outlaw's demand letters fell within the sham litigation exception thereto. Because Counterclaimants' allegations of sham litigation were but cursorily-stated, the Court held that Counterdefendants failed to plead sufficient facts demonstrating that Outlaw's demand letters were so "objectively baseless . . . that no reasonable litigant could

5

3:18-cv-840-GPC-BGS
consolidated with 3:18-cv-1820-GPC-BGS

realistically expect success on the merits." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* 508 U.S. 49, 60 (1993) ("*PRE II*"). The Court granted leave to amend so that Counterclaimants could attempt to overcome this deficiency.

### F. The Amended Cross-Complaint and the pending Motion to Dismiss

On November 30, 2018, Counterclaimants timely filed their Amended Cross-Complaint. (ECF No. 32). The Amended Cross-Complaint contains significantly more allegations with respect to the objective baselessness of Outlaw's demand letters.

On December 14, 2018, Outlaw filed a motion to dismiss the Amended Cross-Complaint, contending that despite Counterclaimants' efforts, the Amended Cross-Complaint merely rehashes allegations respecting Outlaw's subjective motivations for mailing its demand letters, and should be dismissed for failing to state a claim. (ECF No. 38.) Thereafter, Counterclaimants filed an opposition (ECF No. 42), and Outlaw replied (ECF No. 46). Because Outlaw raised an argument for the first time in its reply brief, Counterclaimants requested, and this Court granted, leave for a sur-reply so that Counterclaimants could address the authority cited by Outlaw. (*See* ECF Nos. 48 (request to file), 49 (order granting), 50 (sur-reply).)

## II. Legal Standard for Rule 12(b)(6) motions

A Rule 12(b)(6) motion attacks the complaint as not containing sufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In this respect, "[d]ismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a

motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

"Generally, a court may not consider material beyond the complaint in ruling on a Fed. R. Civ. P. 12(b)(6) motion." *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). However, "[a] court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment," as long as the facts noticed are not "subject to reasonable dispute." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citation omitted); *see also United States v. Ritchie*, 342 F.3d 903, 908–09 (9th Cir. 2003).

## III. Discussion

Outlaw argues that Counterclaimants' RICO claims are barred as a matter of law by the *Noerr-Pennington* doctrine, because Outlaw's allegedly fraudulent demand letters arose out of its protected, pre-litigation petitioning conduct. Anticipating Counterclaimants' invocation of the sham litigation exception, Outlaw flatly denies that any such exception might apply. Accordingly, the issue before the Court is whether Counterclaimants have pleaded facts demonstrating that the litigation threatened by Outlaw in its demand letters were a sham. Unless the demand letters fall within the sham litigation exception, they cannot subject Outlaw to liability under RICO.

### A. Noerr-Pennington and the Sham Litigation Exception

The *Noerr-Pennington* doctrine derives from the First Amendment's Petition Clause and immunizes those who petition the government from statutory liability for their petitioning conduct. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). Pre-suit demand letters, such as the ones at issue here, are recognized as involving petitioning-adjacent conduct falling within the protective ambit of *Noerr-Pennington*. *See id.*, at 933 (recognizing that pre-suit demand letters "were not themselves petitions," but affording them First Amendment protection because "the Petition Clause may nevertheless preclude burdening them so as to preserve the breathing space required for the effective

7

exercise of the rights it protects"); *Rock Rivers Commc'ns Inc. v. Universal Music Grp. Inc.*, 745 F.3d 343, 351 (9th Cir. 2014) (holding that cease-and-desist letters and threats of litigation are subject to *Noerr-Pennington* immunity).

"Under the *Noerr-Pennington* doctrine, such pre-litigation material is immune from suit unless the threatened lawsuit was a sham." *Rock Rivers Commc'ns*, 745 F.3d at 351. Indeed, "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute," *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972), such as RICO. *See Sosa*, 437 F.3d at 938; *see also Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. Oct. 11, 2000) (unpublished) ("Noerr-Penning immunity [and the sham exception it implicates are] applicable to RICO actions and to state-law claims such as fraud and tortious interference.").

A "sham" lawsuit is one where the suit is both "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and "an attempt to interfere *directly* with the business relationship of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process." *PRE II*, 508 U.S. at 60–61 (alterations, citation, and internal quotation marks omitted). Both parts of the "strict two-step analysis" articulated by *PRE II* must be met in order for the exception to apply, though the inquiry into the party's subjective motivations does not take place unless the litigation is alleged to be sufficiently and objectively baseless. *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Const.*, 31 F.3d 800, 810 (9th Cir. 1994) ("Only if the suit is found to be objectively baseless does the court proceed to examine the litigant's subjective intent.")

"Whether something is a genuine effort to influence government action, or a mere sham is a question of fact." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253–54 (9th Cir. 1982). As a result, "courts rarely award *Noerr–Pennington* immunity at the motion to dismiss stage, where the Court must accept as true the non-moving party's well-pleaded allegations" with respect to sham litigation. *Sonus*

*Networks, Inc. v. Inventergy, Inc.*, No. C-15-0322 EMC, 2015 WL 4539814, at *2 (N.D. Cal. July 27, 2015). At the same time, because courts apply a heightened pleading standard when a claim implicates the right to petition, *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991), a party seeking to strip another of *Noerr-Pennington* immunity may not rest on conclusory allegations alone. *Id.*; *Franchise Realty Interstate Corp. v. San Francisco Local Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1082 (9th Cir. 1976) (holding that a party invoking an exception to *Noerr-Pennington* immunity "must include specific allegations of the specific activities" which bring the opposing party outside the doctrine's protective umbrella).

**2. Objectively Baseless**

Outlaw does not dispute that Counterclaimants have pleaded sufficient facts with respect to the subjective component of the sham litigation exception—i.e., that its pre-litigation conduct evinced "an attempt to interfere *directly* with the business relationships of a competitor." *PRE II*, 508 U.S. at 60–61. Instead, Outlaw urges only that Counterclaimants cannot make it past the threshold inquiry of objective baselessness.

As the Supreme Court recognized in *PRE II*, "the sham exception contains an indispensable objective component." *Id.* at 58. The threat of litigation contained in a pre-suit demand letter is objectively baseless if it involves "the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief." *Id.* at 62. In this regard, the Supreme Court has found it useful to refer to concept of probable cause, "as understood and applied in the commonlaw tort of wrongful civil proceedings." *Id.* "Probable cause to institute civil proceedings requires no more than a 'reasonable belief that there is a chance that a claim may be held valid upon adjudication.'" *Id.* (citing *Hubbard v. Beatty & Hyde, Inc.*, 343 Mass. 258, 262 (1961) (quotation marks and alterations omitted) and RESTATEMENT (SECOND) OF TORTS § 675, cmt. e (1977)). "The existence of probable cause to institute legal proceedings precludes a finding that a . . . defendant has engaged in sham litigation." *Id.*

The Second Restatement of Torts states that probable cause exists when one who

institutes a civil proceeding against another "reasonably believes in the existence of the facts upon which the claim is based," *and* "correctly or reasonably believes that under those facts the claim may be valid under the applicable law." RESTATEMENT (SECOND) OF TORTS § 675. Thus, probable cause may be lacking either when a *Noerr-Pennington* defendant commits a mistake of law, or a mistake of fact. *Id.* cmt. a (noting that the claimant's "mistaken belief in the possible validity of his claim may be a mistake as to the facts upon which the claim is based or a mistake as to the possible validity of his claim under the facts reasonably believed to exist"). Probable cause may sustain the immunity, since "even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *White v. Lee*, 227 F.3d 1214, 1233 (9th Cir. 2000) (quoting *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421–422 (1980) (per curiam)).

With respect to a mistake of law, probable cause exists so long as "there is a sound chance that [the *Noerr-Pennington* defendant's] claim may be held legally valid upon adjudication." *Id.* cmt. e. Thus, legal arguments which are "'warranted by existing law,' or at the very least . . . based on an objectively 'good faith argument for the extension, modification, or reversal of existing law,'" may not be held a sham even if the theory of liability is murky and untested. *PRE II*, 508 U.S. at 65 (finding that, despite a circuit split on the issue, the *Noerr-Pennington* defendant had probable cause to sue on a claim that the plaintiff's videodisc rental activities intruded on its copyrights, in light of the "unsettled condition of the law") (quoting FED. R. CIV. P. 11); *cf. MGA Entm't, Inc. v. Mattel, Inc.*, No. CV05-2727NM(RNBX), 2005 WL 5894689, at *12 (C.D. Cal. Aug. 26, 2005) (finding demand letters objectively baseless where they threatened recipients with legal action for disclosing publicly available information).

With respect to a mistake of fact, a person initiating a civil proceeding cannot have a reasonable belief in the existence of the facts on which the proceedings are based if he knows that the alleged facts are not true. RESTATEMENT (SECOND) OF TORTS § 675 cmt. d. On the other hand, "if their existence is not certain," but if the party instigating civil

proceedings "believes that he can establish their existence to the satisfaction of the court and jury," probable cause shall lie. *Id.*

Counterclaimants' allegations vis-à-vis the baselessness of Outlaw's demand letters sound both in mistake of fact and mistake of law, though Counterclaimants do not organize them as such. For ease of discussion, the Court has segregated them into their respective categories. Because Outlaw's demand letters lack probable cause due to mistakes of both law and fact, the Court concludes that Counterclaimants have properly pleaded that Outlaw's pre-litigation conduct was a sham.

**3. Lack of Probable Cause - Mistakes of Law**

Counterclaimants argue that Outlaw's demand letters contain a number of legally untenable assertions which lie beyond the pale of existing law, or any good faith extension thereof. In particular, Counterclaimants assert that Outlaw cannot possibly prevail on the RICO claims threatened in their demand letters because indispensable elements of those claims—like qualifying predicate acts, and proximate cause—are missing. *See Mercer Publ'g, Inc. v. Smart Cookie Ink, LLC*, No. C12-0188JLR, 2012 WL 5499871, at *1–3 (W.D. Wash. Nov. 13, 2012) (holding defendant's copyright claims objectively baseless because it was alleged to lack ownership of valid copyrights, a necessary element to asserting copyright infringement).

**a. Predicate Act – Sale of Sildenafil**

The indispensable elements of a civil RICO claim are: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property by the conduct constituting the violation. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (citing 18 U.S.C. §§ 1964(c), 1962(c)). Seizing upon the fourth element, Counterclaimants argue that the sale of sildenafil is not a predicate act recognized by 18 U.S.C. § 1961(1), and could therefore not have formed the basis of a RICO claim. (ECF No. 42, at 12.)

Outlaw counters that its demand letters did not assert RICO liability based solely

11

on the illegality of selling sildenafil without a prescription. (*See, e.g.*, ECF No. 46, at 7 ("While Counterclaimants assert [Outlaw] would not have been successful in a civil RICO case [sic] of action because sildenafil is not a controlled substance, they ignore the other theories under which such a claim might have been made.")) As the draft complaint attached to its demand letters confirm, Outlaw's pre-litigation position was that Counterclaimants were engaged in the predicate acts of mail and wire fraud—two predicate acts inarguably recognized under the RICO statute. Specifically, Outlaw's draft complaint alleged that sildenafil is a prescription drug regulated by the FDA and that demand letter recipients offered Rhino products containing sildenafil for sale—without proper disclosure of their contents, and under the fraudulent claim that they are "all natural" and require no prescription to administer—as part of a conspiracy and scheme to defraud consumers by way of "false and misleading labeling and advertisements . . . . using the wires, in violation of federal law." (ECF No. 32-1, at 7, 15, 16.).

The Court must agree with Outlaw that RICO claims involving such predicate acts are warranted by existing law. For one, Outlaw has directed the Court to the civil RICO claims mounted in *In re Neurontin Marketing and Sales Practices Litigation*, 712 F.3d 51 (1st Cir. 2013).[4] In that case, the First Circuit affirmed a court and jury verdict issued against Pfizer, Inc. for the "fraudulent marketing of off-label uses of its drug Neurontin," a prescription drug. *Id.* at 52. As described by the district court, Pfizer, Inc. had been accused of committing mail and wire fraud by communicating "half truths" about the efficacy of Neurontin, which the plaintiff had claimed were "materially misleading." *In re Neurontin Marketing and Sales Practices Litigation*, 677 F. Supp. 2d 479, 487, 492 (D. Mass. 2010).

Although there are some differences between the *In re Neurontin* litigation and the

---

[4] Outlaw cited to this case in its first motion to dismiss the original Cross-Complaint, and discussed it (with respect to the instant motion to dismiss) for the first time in its reply. Counterclaimants requested and the Court granted leave for Counterclaimants to file a sur-reply to rebut Outlaw's discussion of the case.

12

threats contained in Outlaw's demand letters, the differences do not vitiate Outlaw's reliance on *In re Neurontin* for the proposition that its threatened RICO claim was legally viable. As that case demonstrates, a civil RICO claim predicated on false and misleading statements made about a prescription drug may give rise to liability when a scheme to defraud is perpetrated through the use of the mails and wires. Here, the FDA webpage previously furnished by Outlaw indicates that sildenafil citrate is a prescription drug. (*See* ECF No. 15-2, at 2, judicially noticed per ECF No. 31, at 8 n.3.) And Outlaw's demand letters explicitly allege a scheme to defraud vis-à-vis the misleading statements inscribed on the Rhino products, which are alleged to have formed "a pattern of racketeering activity involving interstate commerce, wires, and electronic communications." (ECF No. 32-1, at 16.)

In light of *In re Neurontin*,[5] the Court cannot conclude that the RICO action

---

[5] The Court notes that Outlaw has also asserted reliance on *United States v. Donovan*, 539 F. App'x 648 (6th Cir. 2013), and the recent indictment of Daniel Lee in the Central District of California, *United States v. Lee*, No. 8:18-CR-00226-JVS, among other cases. Outlaw's invocation of these cases warrants a few comments.

First, the Court finds that Outlaw's description of the *Donovan* case was at worst a deliberate misrepresentation and at best a careless misstatement. Outlaw represented to the Court in its original motion to dismiss that in *Donovan*, "the illegal distribution of Viagra . . . served as the predicate acts requisite for the United States Government prosecution of the Racketeering Influenced and Corrupt Organization Act." (ECF No. 15, at 6.) As Counterclaimants point out, however, the RICO conspiracy for the distribution of controlled substances in *Donovan* was predicated "only on marijuana and cocaine," not Viagra (or its active ingredient, sildenafil). (ECF No. 42, at 14 (citing *Donovan*, 539 F. App'x at 654.)) In fact, it is emphatically not the case that the RICO claims in *Donovan* involved the sale of unlawful Viagra—on the contrary, the Sixth Circuit held that "Viagra is not a controlled substance," and that "the jury instructions incorrectly stated that Viagra is a controlled substance." 539 F. App'x at 653.

The Court therefore finds no support for the viability of Outlaw's RICO threats in *Donovan*. Although Outlaw claims that any misrepresentation was inadvertent, the Court, alerted of the recent Rule 11 sanctions imposed against Outlaw's counsel in *Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, No. 3:16-CV-02810-BEN-BGS, 2018 WL 4385368, at *6 (S.D. Cal. Sept. 14, 2018), for "advanc[ing] demonstrably false representations and arguments," hereby warns Outlaw against future mischaracterizations of law. The Court trusts that all counsel will remain mindful of their duties as participants in the justice system, duties arising not only from Rule 11 but also from the ethical mandates governing all members of the bar.

Turning to the indictment in *Lee*: the indictment charged the defendant of conspiring to introduce into commerce misbranded and undisclosed sildenafil in violation of the Federal Food, Drug and

threatened by Outlaw lacked probable cause as a matter of law—and evinced sham litigation—for want of a qualifying predicate act.[6]

### b. Lack of Proximate Cause

Counterclaimants assert in the alternative that the RICO claim is not warranted by existing law because Outlaw alleged injury arising out of predicates acts directed at third-parties—i.e., at consumers of male-enhancement pills—rather than at Outlaw. (ECF No. 32-3, at 13.) Counterclaimants point to *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), wherein the Supreme Court reversed the Second Circuit's decision that a complaint adequately pleads proximate cause "even where the scheme depended on fraudulent communications directed to and relied on by a third party rather than the plaintiff." *Id.* at 456 (quoting *Ideal Steel Supply Corp. v. Anza*, 373 F. 3d 251, 262 (2d 2004)). Holding to the contrary, the Supreme Court explained that the injury alleged by the plaintiffs was too attenuated and indirect from the claimed violation to sustain proximate cause. *Id.* at 456–461.

Outlaw did not rebut Counterclaimants' assertions with respect to proximate causation. It has neither attempted to distinguish *Anza* from the litigation threatened in its demand letters, nor articulated any arguments for extension or modifications of the rule statement Counterclaimants have derived from *Anza*. In light of the facial relevance of *Anza* and the failure of Outlaw to address that authority, the Court finds the RICO claim in the demand letters legally untenable for want of probable cause.

---

Cosmetic Act, 21 U.S.C. §§ 331(a), 333(a)(2) and 352(a)(1)). This indictment does not aid Outlaw. Although unlawful, violations of the FDCA are not predicate acts under RICO. *See, e.g. Flores v. Emerich & Fike*, No. 1:05-CV-0291 AWI DLB, 2008 WL 2489900, at *33 (E.D. Cal. 2008) (holding that a complaint stating claims under 21 U.S.C. § 331(a) does not present a predicate act).
[6] Indeed, as the district court in another off-label promotion case noted, a RICO claim for off-label promotion and misbranding may lie where the RICO defendant is alleged to have made literally false, misleading, and material omissions. *See In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, No. MDL 08-1934 PSGAGRX, 2009 WL 1703285, at *7 (C.D. Cal. June 17, 2009), *aff'd sub nom. United Food & Commercial Workers Cent. Pennsylvania & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255 (9th Cir. 2010).

### 4. Lack of Probable Cause - Mistakes of Fact

In addition to the legal deficiency identified by Counterclaimants, the Court must also address their allegations that Outlaw lacked probable cause for its factual claims—i.e., Outlaw could not have had a reasonable belief in the existence of the facts on which it threatened civil proceedings.

Counterclaimants' assertions are multifarious, but they are reducible to one simple proposition: Outlaw could not have known of the existence of any of the facts it alleged in the demand letters, because those facts simply did not exist, and Outlaw knew that they did not. Counterclaimants' arguments hew to the decision in *Rock River Communications*, where the sham exception was held to apply to the plaintiff's claim of copyright infringement because the evidence at summary judgment indicated that plaintiff "knew it did not have exclusive licensing rights," but filed suit anyway. 745 F.3d at 352.

For example, Counterclaimants allege that "there is no reasonable way that [Outlaw] could have plausibly alleged that the [demand letter recipients] are members of any form of RICO enterprise," because there was but a standard chain of distribution between the demand letter recipients, Rhino wholesalers, and Rhino manufacturers. Counterclaimants argue that there is no more a RICO enterprise between the aforementioned than there might exist between distributors, wholesalers, and manufacturers of "Coca-Cola, Snickers, and Wrigley's chewing gum." (ECF No. 32, at 12.) Moreover, they assert that Outlaw "could not have alleged any structure or agreement among even each store and *one* other person, let alone an Enterprise consisting of the *thousands* of stores that received the demand letter." (*Id.*) Counterclaimants also allege that Outlaw could not have believed that it suffered any loss in sales arising from any wrongful conduct attributed to Counterclaimants, because Counterclaimants only ever sold Rhino products over the counter at their brick and mortar stores in California, and Outlaw had not been registered with the California Secretary of State to do any business there. (*Id.* at 14.)

15

In addition, Counterclaimants allege that FDA tests have revealed that one third of all Rhino products sampled did not contain sildenafil or any other prescription drug, making Outlaw's "mass distribution of thousands of demand letters to random stores. . . a stickup that was not individually tailored to the recipients." (*Id.* at 12.) Counterclaimants further contend that Outlaw never tested any of the Rhino products offered for sale at any individual store to ascertain whether those products were among the ones that actually contained sildenafil, but nonetheless "distributed over one thousand copies of the demand letter." (*Id.* at 17.) This conduct, Counterclaimants allege, was designed to indiscriminately and "serially extort small businesses out of money." (*Id.* at 12.)

On this point, Counterclaimants are especially convincing. The Ninth Circuit has consistently invoked the sham litigation exception where the defending party was accused of automatically petitioning governing bodies "without regard to and regardless of the merits of said petitions." *USS-POSCO Indus.*, 31 F.3d at 810, 811 (noting that allegations that defendant union engaged in a "pattern of automatic petitioning of governmental bodies" if proven, "would be sufficient to overcome the unions' *Noerr-Pennington* defense"). Another case cited by Counterclaimants, *Clipper Exxpress*, makes a similar point: allegations that "defendants protested rates automatically, without regard to merit or possible success before the ICC . . . . fall within the sham exception as a matter of law." 690 F.2d at 1254. Here, where Counterclaimants have accused Outlaw of reflexively and repeatedly mailing demand letters without regard to the individual merit thereof, the same conclusion as reached in *USS-POSCO Industries* and *Clipper Exxpress* must apply.

In light of the above, Counterclaimants have adequately alleged that Outlaw did not "reasonably believe[] in the existence of the facts upon which [its] claim [was] based." RESTATEMENT (SECOND) OF TORTS § 675. Taking Counterclaimants' allegations as true, as the Court must, *Sonus Networks*, No. C-15-0322 EMC, 2015 WL 4539814, at *2, the Court concludes that Outlaw lacked probable cause to issue the threats contained

16

in its demand letters.[7]

**5. Counterarguments by Outlaw**

Outlaw, for its part, has not addressed Counterclaimants' allegations of objective baselessness with much granularity. With the exception of its arguments that a scheme to distribute mislabeled and misbranded sildenafil—perpetuated via the U.S. mails and wires—constitutes a predicate act under RICO, Outlaw has resisted Counterclaimants' allegations only in very general (and unavailing) terms.

Outlaw's primary assertion is that "the sufficiency of a hypothetical civil RICO pleading is an exercise in pure speculation – the type of exercise that the application of *Noerr-Pennington* to demand letters in *Sosa* was meant in part to prevent." (ECF No. 46, at 6.) Outlaw instead invites the Court to file away its demand letters and focus instead on the claims asserted by Outlaw in litigation. (*Id.* at 6–7 ("Counterclaimants . . . seek to make the present case about a hypothetical version of a civil RICO claim Counterdefendant decided not to bring instead of the simple and more streamlined case actually presented in Counterdefendant's complaint . . . .").) But Outlaw's attempted misdirection cannot distract the Court from the operative inquiry—i.e., whether the

---

[7] The Court notes that Counterclaimants have alleged other indicia of sham litigation. Some of those pertain to the subjective motivations of Outlaw to "use the governmental process—as opposed to the outcome of that process"—as a tool for extortion. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991). According to Counterclaimants, Outlaw's bad faith is evidenced by, *inter alia*, its failure to actively pursue the litigation once filed, its issuance of an invalidated, defunct state law summons to effectuate service on defendants in this federal case, its calculated selection of mom and pop, mostly immigrant-run convenience stores as the targets of its demand letters, and the notable omission of RICO claims from its actual complaint. Counterclaimants' points are well taken: if the issue of subjective bad faith were before the Court, these allegations would certainly have traction. However, since Outlaw has disputed only the *objective* baselessness of its demand letters, these allegations are beyond the scope of the instant motion.
Counterclaimants have also made several other allegations with respect to objective baselessness: that Outlaw lacked probable cause to accuse Counterclaimants of interstate conduct, and that Outlaw's claims of triple and punitive damages were "blatant, objective misrepresentations of . . . monetary liability," under RICO and the Lanham Act, among others. (ECF No. 42, at 16.) Because the discussion in the main text satisfies the Court that Counterclaimants have adequately pleaded the applicability of the sham exception, the Court will not address these additional arguments.

claims Outlaw articulated in its very concrete and non-hypothetical draft complaint constituted sham pre-litigation conduct. *See Rock Rivers Commc'ns*, 745 F.3d at 351 (explaining that, where sham pre-litigation conduct is alleged, the focus is on any pre-litigation communication issued by the defendant).

Further, to the extent that Outlaw suggests that there should be a higher standard of proof of objective baselessness for claims of sham pre-litigation conduct—as opposed to claims of sham litigation—that notion is devoid of support in the law. While it is true that the Ninth Circuit in *Sosa* remarked upon the especial usefulness of demand letters in streamlining litigation, it never indicated that the salutary nature of demand letters necessitated a greater showing of "baselessness" with respect to the sham exception. *Sosa*, 437 F.3d at 35–36. In fact, the Ninth Circuit noted that "the *established* sham exception to the *Noerr-Pennington* doctrine" applies with equal force to "baseless claims asserted in prelitigation settlement letters." *Id.* at 36 (emphasis added). Although, given Sosa's failure to invoke the sham exception, the Ninth Circuit did not decide how extant caselaw on the sham exception would be applied to the defendant's presuit demand letters, this Court does not discern anything in the *Sosa* opinion that would compel deviation from the "established sham exception" standards.[8]

Finally, Outlaw faults Counterclaimants for making insufficiently specific allegations and resting on conclusory statements. However, the Court is satisfied that the Amended Cross-Complaint abides by the heightened pleading standard applicable to *Noerr-Pennington* cases, since it alleges such things as "exactly what representations [Outlaw] made, [and] to whom; with whom [Outlaw] conspired; [and] what exactly its

---

[8] Indeed, district courts after *Sosa* have consistently relied on established *PRE II* standards to presuit demand letters; none appear to have applied a heightened or modified baselessness standard. *See e.g.*, *Prime Partners IPA of Temecula, Inc. v. Chaudhuri*, No. 5:11-CV-01860-ODW, 2012 WL 1669726, at *5 (C.D. Cal. May 14, 2012) (cease and desist letters); *Martinez v. Optimus Properties, LLC*, No. 216CV08598SVWMRW, 2017 WL 1040743, at *3 (C.D. Cal. Mar. 14, 2017) (eviction notices).

18

'improper and/or unlawful' methods of advocacy were." *Kottle v. Nw. Kidney Centers,* 146 F.3d 1056, 1063 (9th Cir. 1998). Indeed, Counterclaimants' Amended Cross-Complaint "includes the required specifics with extensive factual descriptions," and amply cures the conclusory allegations which mired the Original Cross-Complaint. *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 647 (9th Cir. 2009).

## IV. FRCP 4(m)

Counterclaimants have requested this Court to issue an Order to Show Cause to Outlaw, asking it to demonstrate why its case against yet-unserved defendants should not be dismissed pursuant to Federal Rule of Civil Procedure 4(m). (ECF No. 42, at 19.) Rule 4(m) provides that:

> If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m).

Counterclaimants point out that Outlaw has failed to timely provide service. Outlaw filed the first of its actions on May 2, 2018. Outlaw filed its second action in state court on July 25, 2018, and had that case removed to federal court on August 12, 2018. Since then, Outlaw has registered only one summons returned executed to either docket.[9] Accordingly, noting the considerable passage of time, the Court orders Outlaw to show cause why its complaints should not be dismissed with respect to any defendants whom it has not yet served.

## V. Conclusion

Counterclaimants have pleaded indicia of objective baselessness sufficient to divest Outlaw of its claim to *Noerr-Pennington* immunity. Even if Outlaw disputes

---

[9] One summons was returned executed as to Pacific Beach Gas, Inc. on July 25, 2018. (ECF No. 14.)

19

1 | Counterclaimants' cry of sham litigation, their Amended Cross-Complaint is well-pleaded and Counterclaimants must be afforded an opportunity to test their allegations of objective baselessness on the merits, though Outlaw may elect to raise its arguments again on summary judgment upon fuller development of the record. Resolution of Counterclaimants' RICO claims at this juncture on *Noerr-Pennington* grounds, however, is premature.

Outlaw's motion to dismiss is therefore **DENIED.** (ECF No. 38.) Outlaw is further **ORDERED TO SHOW CAUSE** why its complaint should not be dismissed as to the yet-unserved defendants pursuant to FED. R. CIV. P. 4(m). Outlaw's response must be submitted **no later than 7 days** after the publication of this order.

**IT IS SO ORDERED.**

Dated: March 13, 2019

Hon. Gonzalo P. Curiel
United States District Judge