UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE OUTLAW LABORATORY, LP LITIGATION | Case No.: 3:18-cv-840-GPC-BGS consolidated with 3:18-cv-1882-GPC-BGS |
| | **ORDER DENYING OUTLAW LABORATORY'S MOTION FOR JUDGMENT ON THE PLEADINGS ON COUNTERCLAIMANTS' FIRST AMENDED CROSS-COMPLAINT [ECF No. 80]** |

Before the Court is Plaintiff/Counterdefendant Outlaw Laboratory, LP's ("Outlaw") motion for judgment on the pleadings on Defendant/Counterclaimant Roma Mikha, Inc., and Third-Party Plaintiffs NMRM, Inc. and Skyline Market, Inc.'s (collectively, "Counterclaimants'") Amended Counterclaim and Third-Party Complaint (the "Amended Cross-Complaint"). (ECF No. 80.) This motion has been fully briefed. (ECF Nos. 82, 83.) After consideration of the moving papers and the applicable law, the Court **denies** Outlaw's motion for judgment on the pleadings.

# I. BACKGROUND[1]

The Court has previously discussed the instant litigation in some detail in its previous Orders dated November 27, 2018 and March 14, 2019 (ECF Nos. 31, 56). The Court will substantially rely on those accounts, supplementing with additional or updated information where necessary.

## A. Outlaw Laboratories LP

Outlaw is a Texas-based manufacturer of male-enhancement products called "TriSteel" and "TriSteel 8 hour." Outlaw's products are made in the United States, and, at least as alleged by Outlaw, are distributed for sale in all 50 states. According to Counterclaimants, Outlaw was formed in Texas in September 2016. Counterclaimants challenge that Outlaw transacts any business in California, since Outlaw had not, at the time, been registered with the California Secretary of State to do any business there.

## B. Outlaw's demand letters

Sometime starting in 2017 and continuing through 2018, Outlaw, through its attorneys at Tauler Smith LLP, began mailing demand letters to proprietors of gas stations, liquor stores, and corner stores in California, and beyond. Those recipients allegedly sold male-enhancement pills designated by the word "Rhino," which Outlaw alleges contain undisclosed sildenafil, a prescription pharmaceutical regulated by the FDA.

Outlaw's demand letters warned recipients that they were "selling illegal sexual enhancement drugs," which "subject your company to legal action for racketeering . . . under RICO (Racketeer Influenced Corrupt Organizations) and the Federal Lanham Act" and obligate the recipients to pay to Outlaw "profits from the sale of Illicit Products dating back four years . . . Attorney's fees . . . Punitive damages . . . Triple damages . . .

---

[1] The parties have asked the Court to take judicial notice of a number of items, including FDA documents, federal indictments, and press releases from the Department of Justice. The Court has previously granted such requests (*see* ECF No. 31, at 8 n.3, 16 n.5), and sees no reason not to grant them with respect to this motion.

.” The letters estimate the recipients' liabilities at "over $100,000" but states that Outlaw is "willing to settle all claims in exchange for a one-time settlement agreement [$9,765, in the sample demand letter enclosed at ECF No. 32-1] and your agreement to stop selling the Illicit Products."

The letters conclude by warning "[i]f this matter is not fully resolved before [a date typically within 30 days]," that a lawsuit will be filed against the recipient. Attached to the letters are three exhibits: (1) "photographs taken at your place of business capturing your sale of the Illicit Products," (2) "notices from the Food and Drug Administration regarding the illegality of the Illicit Products," and (3) a draft complaint which Outlaw indicates will be filed in the absence of settlement. (*Id.*)

A copy of the draft complaint was presented to the Court as an attachment to Counterclaimants' Amended Cross-Complaint. (ECF No. 32-1, at 6.) Notably, the draft complaint lists the letter recipient as the first named defendant, and also designates a redacted list of "Distributor" and "Supplier" defendants as co-conspirators. Outlaw gestures to a purported arrangement between the Supplier defendants (who would offer mislabeled sildenafil pills for wholesale) and the Distributor defendants (who would receive and distribute the same at their stores). The draft complaint pleads two causes of action: a civil RICO conspiracy based on an alleged scheme to defraud the public—through use of the wires and mail—by mislabeling and advertising a prescription drug, and a Lanham Act violation for the conspirators' misrepresentations of their products in commerce.

After issuing the initial demand letter, Outlaw follows up with additional offers to settle, usually for increasingly smaller amounts. (ECF No. 32-1, at 2.) For example, one defendant was initially threatened with "over $100,000" in liability and given an offer of $14,000 for settlement. (*Id.* at 3.) A few weeks later, Outlaw communicated a reduced settlement offer of just $2,800. (*Id.*) Some recipients, like Third-Party Plaintiff Skyline Market, Inc., acquiesced to Outlaw's demands and settled. Others, like defendants Roma Mikha, Inc., and NMRM, Inc., resisted.

### C. Outlaw files suit

The present litigation arises out of two complaints filed by Outlaw in 3:18-cv-840-GPC-BGS, and 3:18-cv-1882-GPC-BGS, which have been consolidated before this Court.  (ECF No. 28.)

On May 2, 2018, Outlaw filed its federal complaint in 3:18-cv-840-GPC-BGS, naming a high volume of defendants, all of whom it had previously mailed a demand letter.  Thereafter, Outlaw filed a similar complaint on August 12, 2018 in state court, which was later removed by defendant Roma Mikha, Inc., in 3:18-cv-1882-GPC-BGS. Both complaints allege that the defendants are engaged in a scheme to distribute and sell unlawful Rhino products.[2]  They further claim that laboratory testing and public announcements by the Federal Drug Administration ("FDA"), have revealed that Rhino products contain hidden drug ingredients like sildenafil (a prescription drug found in Viagra), desmethyl carbodenafil (an analogue of sildenafil), dapoxetine (an anti-depressant drug), and tadalafil (a prescription drug found in Cialis).

Outlaw's complaint in 3:18-cv-840-GPC-BGS alleges that, by selling the Rhino products, the implicated stores disseminate the false statements on Rhino products stating that they are "all natural," contain "no harmful synthetic chemicals," "no prescription necessary," and have limited side effects.  Outlaw further asserts that the defendants' schemes have diverted sales away from its legitimate "TriSteel" male enhancement products, in violation of California Business and Profession Code § 17200 (prohibiting unlawful, unfair, or fraudulent business acts), § 17500 (prohibiting false and misleading advertising), and § 43(a)(1)(B) of the Lanham Act (prohibiting false advertising).[3]

Notably, unlike the lawsuit portended by Outlaw's demand letters, the actual

---

[2]  Outlaw's complaint implicates a range of Rhino products, including: Rhino 7 Platinum 5000, Rhino 12 Titanium 6000, Rhino 7 Platinum 3000, Rhino 8 Platinum 8000, Rhino 7 Blue 9000, Rhino 69 Platinum 9000, and Rhino 12 Titanium 6000.

[3]  Meanwhile, the complaint filed in 3:18-cv-840-GPC-BGS articulates only a Lanham Act claim.

lawsuits filed by Outlaw do not state a claim for RICO conspiracy.

### D. Counterclaimants file their original Cross-Complaint

On August 24, 2018, Roma Mikha, Inc., NMRM, Inc., and Skyline Market, Inc., through their attorneys at Gaw | Poe LLP ("Gaw Poe"), filed a Third Party Complaint (the "Original Cross-Complaint") against Outlaw.

The Original Cross-Complaint alleged a class action against Outlaw for (1) a civil RICO violation, 18 U.S.C. § 1962(c), (2) RICO conspiracy, 18 U.S.C. § 1962(d), and (3) rescission of any settlement agreements like the one entered into by Skyline Market. As for RICO, counterclaimants described a RICO enterprise between Outlaw, Tauler Smith LLP, and other as-yet-unnamed individuals, aimed at perfecting a legal "shakedown" of small-time San Diego convenience stores. They claim that the "TriSteel" products "were created as artifices" to "found the false advertising claims," and that Outlaw itself is no more than a front for the unlawful enterprise.

Counterclaimants took especial umbrage with the demand letters sent by Outlaw, claiming that they were aimed at a "vulnerable community of victims," comprised of mostly "small, immigrant-run businesses." They urged that Outlaw's demand letters are not only manipulative, but also fraudulent, because Counterclaimants claimed that the Rhino "products are not illegal to sell." Sending those fraudulent letters through the U.S. Mails, therefore, constitutes mail fraud under 18 U.S.C. § 1341; committing mail fraud multiple times forms a pattern of racketeering under RICO.

Counterclaimants' putative class action was brought on behalf of an overarching "Store Class," comprised of "[a]ll business entities in the United States that received a demand letter substantially similar to the letter received by the class representatives," and subdivided into three subclasses. (Case No. 18-CV-1882, ECF No. 4, at 16.) The "Sued Stores" would include those stores, like Roma Mikha, Inc., that were "subsequently named as defendants in state or federal litigation brought by Outlaw;" the "Threatened Stores," like NMRM, Inc., which would include stores who received a demand letter but were not targeted for litigation; and a "Payment Class," which would encompass those

like Skyline Market, which "subsequently paid or agreed to pay money to Tauler Smith LLP, Outlaw Laboratory, or an agent of either." (*Id.* at 16–17.)

## E. The Court first dismisses, then sustains Counterclaimants' RICO claims against Outlaw under *Noerr-Pennington*

The Court addressed Outlaw's motion to dismiss the original Cross-Complaint in an Order dated November 27, 2018. (ECF No. 31.) The Court held that Counterclaimants' RICO claims must be dismissed because Outlaw was protected by *Noerr-Pennington* immunity, and Counterclaimants insufficiently alleged that Outlaw's demand letters fell within the sham litigation exception thereto. Because Counterclaimants' allegations of sham litigation were but cursorily-stated, the Court held that Counterdefendants failed to plead sufficient facts demonstrating that Outlaw's demand letters were so "objectively baseless . . . that no reasonable litigant could realistically expect success on the merits." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* 508 U.S. 49, 60 (1993) ("*PRE II*"). The Court granted leave to amend so that Counterclaimants could attempt to overcome this deficiency.

On November 30, 2018, Counterclaimants timely filed their Amended Cross-Complaint. (ECF No. 32.) When Outlaw challenged the sufficiency of the Amended Cross-Complaint by way of another motion to dismiss, the Court denied that motion, finding that Counterclaimants had adequately pleaded facts demonstrating that RICO claims threatened in Outlaw's demand letters were not objectively reasonable and therefore might fall within the sham exception and outside of the scope of *Noerr-Pennington* immunity. (ECF No. 56.)

## F. Outlaw files a motion for judgment on the pleadings

On April 15, 2019, Outlaw filed the instant "motion for judgment on the pleadings," which in actuality encompasses two separate motions. (ECF No. 80).

The first part of the motion is a true Rule 12(c) motion for judgment on the pleadings, which argues that the sham litigation exception cannot apply as a matter of law because Outlaw could not have known at the time of its demand letters that a RICO claim

against the stores might be characterized as objectively baseless. The second part of the motion is better construed as a motion to preemptively deny class certification before the start of any formal discovery.[4] The motion has been fully briefed. (ECF Nos. 82, 83.) The Court addresses both parts of the motion in turn.

## II. Motion for Judgment on the Pleadings

### A. Legal Standard

"Rule 12(c) is functionally identical to Rule 12(b)(6) and . . . the same standard of review applies to motions brought under either rule." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (internal quotation marks omitted). A Rule 12(b)(6) motion attacks the complaint as containing insufficient factual allegations to state a claim for relief. "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "detailed factual allegations" are unnecessary, the complaint must allege more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). "Judgment on the pleadings is not properly granted unless the moving party has clearly established that no material issue of fact remains to

---

[4]    While Outlaw styles its motion as falling within Rule 12(c), it is apparent to the Court that the portion of its motion challenging class certification is better construed as a preemptive motion to deny class certification. While out-of-circuit courts have, on some occasions, entertained motions to deny class certifications in a Rule 12(c) posture, *see, e.g.*, *Salvant v. Murphy Oil USA, Inc.*, No. CIV A 06-8700, 2007 WL 2344912, at *1 (E.D. La. Aug. 13, 2007), the practice within the Ninth Circuit is to regard requests such as Outlaws as a motion to deny class certification prior to discovery. *See, e.g.*, *Labou v. Cellco P'ship*, No. 2:13-CV-00844-MCE, 2014 WL 824225, at *3 (E.D. Cal. Mar. 3, 2014).

be resolved and the party is entitled to judgment as a matter of law." *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000).

In making this determination, extrinsic factual material may not be taken into account, but materials properly attached to a complaint as exhibits, or items subject to judicial notice, may be considered without turning the motion into one for summary judgment. *Qwest*, 208 F.R.D. at 291.

## B. The Sham Litigation Exception to *Noerr-Pennington* immunity

Outlaw argues that the pleadings (and judicially-noticeable state-court documents) demonstrate that Outlaw reasonably believed that its demand letter threat of RICO liability against the stores was not objectively baseless. Outlaw's contention is raised with respect to its *Noerr-Pennington* defense, and in response to Counterclaimants' assertion that Outlaw's demand letters fell into the sham litigation exception.

As outlined by the Court in previous orders, *Noerr-Pennington* generally confers First Amendment immunity to liability arising from a party's pre-litigation, petitioning conduct. *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). However, the "sham litigation" exception divests said party of immunity when the party's demand letters and threats of litigation are objectively and subjectively baseless. *Rock Rivers Commc'ns, Inc. v. Universal Music Grp. Inc.*, 745 F.3d 343, 351 (9th Cir. 2014) ("Under the *Noerr-Pennington* doctrine," threats of litigation cannot give rise to statutory liability, and are "immune from suit unless the threatened lawsuit was a sham."). Put another way, the sham litigation exception peels back the protective cloak of *Noerr-Pennington* immunity when litigant threatens a "private action that is not genuinely aimed at procuring favorable government action," as opposed to "a valid effort to influence government action." *PRE II*, 508 U.S. at 58 (quotation marks and citations omitted).

A "sham" lawsuit is one where the suit is both (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "attempts to interfere *directly* with the business relationship of a competitor through the use of the government *process*—as opposed to the *outcome* of that process." *Id.* at 61

8

(quotation marks and citations omitted).  Both parts of the "strict two-step analysis" articulated by *PRE II* must be met in order for the sham litigation exception to apply, though the inquiry into the party's subjective motivations does not take place unless the litigation is sufficiently alleged to be objectively baseless.  *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Const.*, 31 F.3d 800, 810 (9th Cir. 1994).

The Court previously denied Outlaw's motion to dismiss Counterclaimants' RICO claim.  Outlaw had asserted that Counterclaimants failed to plead that Outlaw's demand letters were objectively baseless under the first prong of *PRE II*.  In light of the applicable law, however, the Court determined that Counterclaimants had adequately pleaded facts demonstrating that Outlaw engaged in a "pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief."  *PRE II*, 508 U.S. at 62.

Now, Outlaw argues in its Rule 12(c) motion that it should be entitled to a *Noerr-Pennington* defense as a matter of law because the timeline of this litigation, and other similar complaints filed against other defendants in other jurisdictions, demonstrate that "Outlaw reasonably believed its RICO claim was not objectively baseless."[5]  It cites *PRE II* for the proposition that a threatened suit is legitimate if there is probable cause, and that "[p]robable cause to institute civil proceedings requires no more than a 'reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication.'"  508 U.S. at 62.

Outlaw argues it had a good faith reason for threatening RICO litigation in its demand letters until March 7, 2018, because it was not until then that Outlaw lost hope that a RICO suit may be held valid upon adjudication.  On March 7, 2018, the Central District of California dismissed a RICO claim asserted by Outlaw in a similar complaint alleging the sale of misbranded male enhancement drugs.  (*Id.* at 8 (citing an order in *JST*

---

[5]     (ECF No. 80, at 6 (capitalization altered) (citing the complaints filed in *Outlaw Laboratory, LP v. Trepco Imports & Distribution, LTD, et al.*, Case No. 18-CV-369 (D.N.V. 2018), and in *JST Distribution v. CNV, Inc.* ("*CNV*"), 2:17-CV-06264-PSG-MRW (C.D. Cal. 2017).)

9

*Distribution v. CNV, Inc.* (*"CNV"*), 2:17-CV-06264-PSG-MRW (C.D. Cal. 2017), ECF No. 80-5).)  In its ruling, the *CNV* court warned Outlaw that its RICO allegations fell far "short" of the "heightened pleading standard applied to this cause of action," since its "scant descriptions" of the defendants' alleged scheme did not contain even "a *single* specific instance of mail or wire fraud," or "specific allegations as to the time, place, and manner" of alleged misconduct.  *Id.*  Outlaw claims that the *CNV* order prompted it to exclude RICO as a cause of action in the two cases consolidated here.  Outlaw also argues that because no court had decided the validity of its RICO claims until *CNV*, its RICO threats against the defendants in this matter were not objectively baseless at the time it drafted the demand letters.

The Court finds Outlaw's argument unconvincing on three levels.

First, Outlaw has conflated the first inquiry in *PRE II* (whether the threatened lawsuit is objectively baseless) with the second inquiry (whether the plaintiff, in engaging in prelitigation conduct, was subjectively motivated by an improper purpose).  Outlaw's claim that it had a subjective, good faith reason to threaten a RICO suit in its demand letters (but then withdrawing that claim upon filing the two underlying complaints given *CNV*) has little to do with the first inquiry into objective baselessness—whether a hypothesized, "reasonable litigant" could realistically suspect success on the merits.  *PRE II*, 508 U.S. at 60.

Second, as a matter of logic, Outlaw's experience in the *CNV* litigation does not make its demand letters prior to *CNV* any more objectively justifiable.  Recall that this Court's March 14, 2019 order determined that Outlaw lacked, *inter alia*, a "reasonable belief in the existence of the facts on which it threatened civil proceedings."  (ECF No. 56, at 15.)  Specifically, the Court found convincing Counterclaimants' argument that Outlaw had no reason to believe (1) that any RICO enterprise existed between the many stores it alleges were part of the conspiracy, and (2) that any particular store had sold Rhino products containing sildenafil (FDA testing revealed that only one third of all Rhino products sampled contained sildenafil or other prescription drugs).  (*Id.* at 15–16.)

Outlaw's failure to survive dismissal in *CNV*—because it failed to meet the heightened pleading burden applicable to RICO claims, and because it had not bothered to include key factual allegations—does not establish as a matter of law that Outlaw possessed an objectively reasonable basis to make RICO threats against the Counterclaimants prior to the entry of that order. In other words, just because the Central District did not invalidate Outlaw's RICO claim until March 7, 2018 does not mean that Outlaw had a reasonable belief that its earlier demand letter claims might be "held valid upon adjudication." *PRE II*, 508 U.S. at 62. Certainly, *CNV* concretized the deficiencies in Outlaw's RICO claims, but, as outlined in this Court's March 14, 2019 order, those elements which made Outlaw's RICO demand letters objectively unreasonable existed irrespective of the decision in *CNV*.

On the contrary, by referring this Court to the strongly-worded dismissal order in *CNV*, Outlaw is hoisted by its own petard. *CNV* reprimanded Outlaw for its slipshod and plainly-inadequate RICO allegations and cautioned that as pleaded, the RICO claim fell far from passing muster. One key hallmark of vexatious and sham litigation is the automatic and reflexive petition of governing bodies "without regard to and regardless of the merits of said petitions." *USS-POSCO Indus.*, 31 F.3d at 810; *see also Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc*., 690 F.2d 1240, 1254 (9th Cir. 1982) (holding that allegations that "defendants protested rates automatically, without regard to merit or possible success before the ICC . . . . fall within the sham exception as a matter of law."). Thus, Outlaw's unavailing attempts to raise RICO claims in other jurisdictions actually undercuts its bid for *Noerr-Pennington* immunity.

Third and finally, to the extent that Outlaw contends it lacked an improper *subjective* purpose in issuing the RICO demand letters, that argument is belied by Counterclaimants' pleadings to the contrary, which have pointed to other actions indicating an attempt to use governmental process improperly. As observed by the Court in its March 14, 2019 order,

Counterclaimants have alleged other indicia of sham litigation. Some of those

pertain to the subjective motivations of Outlaw to "use the governmental process—as opposed to the outcome of that process"—as a tool for extortion. *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991). According to Counterclaimants, Outlaw's bad faith is evidenced by, *inter alia*, its failure to actively pursue the litigation once filed, its issuance of an invalidated, defunct state law summons to effectuate service on defendants in this federal case, its calculated selection of mom and pop, mostly immigrant-run convenience stores as the targets of its demand letters, and the notable omission of RICO claims from its actual complaint. Counterclaimants' points are well taken: if the issue of subjective bad faith were before the Court, these allegations would certainly have traction. However, since Outlaw has disputed only the *objective* baselessness of its demand letters, these allegations are beyond the scope of the instant motion.

(ECF No. 56, at 17.) Thus, as this Court has previously recognized, Counterclaimants have alleged sufficient facts to frustrate *Noerr-Pennington* immunity on the subjective motivation prong. Judgment on the pleadings is therefore inappropriate. *See, e.g.*, *Qwest*, 208 F.R.D. at 291 ("Judgment on the pleadings is appropriate when, even if all material facts in the pleading under attack are true, the moving party is entitled to judgment as a matter of law." (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989)).

Outlaw's motion to for judgment on the pleadings with respect to the *Noerr-Pennington* defense is accordingly **DENIED.**

## III. Motion to Deny Class Certification

In the second part of its motion, Outlaw contends that Counterclaimants' proposed class action cannot be certified as a matter of law. Outlaw argues that the class and subclasses identified in the Amended Cross-Complaint are improper, that there is no predominance of common questions of fact, that the class is unascertainable, and that class counsel is inadequate. Counterclaimants oppose Outlaw's motion, arguing that their suit may be able to proceed as a class action, and that class certification cannot be determined before formal class-based discovery.

### A. Preemptive Motions to Deny Certifications are Disfavored

The Ninth Circuit has held that a defendant may file a motion to deny class

12

certification before the close of fact discovery and before the pretrial motion deadline. *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) ("Rule 23 does not preclude a defendant from bringing a 'preemptive' motion to deny certification."). "However, such a motion is disfavored and may be denied as premature." *Keck v. Alibaba.com, Inc.*, No. 17-CV-05672-BLF, 2018 WL 4181955, at *2 (N. D. Cal. Aug. 30, 2018).

"District courts have broad discretion to control the class certification process," *Vinole*, 571 F.3d at 942, and routinely deny preemptive motions to deny certification when plaintiffs have not been afforded adequate time for discovery. *See, e.g.*, *Holt v. Globalinx Pet LLC*, No. SACV13-0041 DOC JPRX, 2013 WL 3947169, at *3 (C.D. Cal. July 30, 2013) (concluding that the court "must not rule on the adequacy of the class certification until both parties have been afforded an adequate opportunity for discovery on the issue"); *In re Wal-Mart Stores, Inc. Wage and Hour Litig.*, 505 F. Supp. 2d 609, 615–16 (N.D. Cal. 2007) (concluding that "plaintiffs should at least be given the opportunity to make the case for certification based on appropriate discovery," even though "plaintiffs' class definitions [were] suspicious and may in fact [have] been improper"). Only if courts are satisfied that the plaintiff has obtained meaningful discovery is an early disposition of the class certification question appropriate. *See, e.g.*, *Vinole*, 571 F.3d at 943 (proceeding on to the certification issue because plaintiffs admitted that they "had conducted significant discovery and did not intend to propound any additional discovery seeking information from Countrywide regarding the propriety of class certification").

In this case, Counterclaimants represent that the putative class had not thus far had any opportunity to take formal discovery.[6] (ECF No. 82, at 8.) Given this, Outlaw's

---

[6] The Court recognizes that the parties have jointly moved to amend the scheduling order (ECF No. 25) which stated that the putative class action's fact discovery period closed on January 4, 2019, thirty-five days after they filed their Amended Cross-Complaint and before any Rule 26(f) or Rule 16(b)

request for denial of class certification must be denied as premature.

Notwithstanding the Court's determination that determining class certification preemptively is improper, there are additional reasons why Outlaw's arguments against certification are unavailing. The Court turns to address them below.

### B. Putative Class and Subclasses Pass Muster under Rule 23(c)(4)

As an initial matter, Outlaw takes issue with the way Counterclaimants have categorized the class. They contend that the overarching class—i.e., the "Store Class"—is only loosely coagulated together by virtue of their having "received a demand letter substantially similar to the letter received by the class representatives." (ECF No. 80, at 8.). Outlaw claims that this bare association "does not explain in any way how receipt of a letter by itself would entitled a class member for remuneration in any way . . ." and is improper on that basis. (*Id.*)

Counterclaimants counter that the "Store Class" must be understood in light of the three issues subclasses comprising it, which are subdivided, in accordance with Fed. R. Civ. P. 23(c)(4), according to "three discrete circumstances": "Sued Stores," who, upon receipt of a demand letter, were subsequently named as defendants in litigation brought by Outlaw, "Threatened Stores," who were not, and a "Payment [sub]Class," members of which subsequently paid or agreed to pay money to Tauler Smith LLP or Outlaw. (ECF No. 82, at 5, ECF No. 32, at 20).) All three subclasses, Counterclaimants assert, depend on common issues appropriate for class treatment, *e.g.*, whether Outlaw's demand letters constituted a "scheme to defraud." (*Id.*) If that question is concluded in Counterclaimants' favor, then "that classwide adjudication could then be taken as *res judicata* for any victims of the scheme who thereafter desire to prove their damages, or to rescind their 'settlements' . . . ." (*Id.*)

The Court finds that the class and subclasses as formulated by Counterclaimants

_____

could be held concerning the class claim. (*See* ECF No. 81 ("Joint Motion to Amend Scheduling Order and Convene Scheduling Conference").)

are not waylaid by Outlaw's premature motion to deny certification.  Rule 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues."  FED. R. CIV. P. 23(c)(4).  "Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23[(c)(4)] authorizes the district court in appropriate cases to isolate the common issues . . . and proceed with class treatment of these particular issues."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Thus, when "one common issue can be identified as appropriate for class treatment, that is enough to justify application of the provision so long as the other Rule 23 requirements are met."  *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 632–33 (N.D. Cal. 2015).

Here, Counterclaimants are asserting an overarching "Store Class" to obtain a determination on common issues, such as whether Outlaw engaged in a scheme to defraud.  This they are permitted to do under the aegis of Rule 23(c)(4).  The separate issues subclasses asserted thereunder are also impervious to challenge at this early juncture before any formal discovery.  Outlaw challenges the subclass of "Sued Stores," arguing that those stores could, theoretically, counterclaim individually in the cases against Outlaw instead of being joined in a class action, and that the "Payment Class" cannot proceed because the constituent stores have signed releases with Outlaw.  (ECF No. 80, at 8–9.)  But as Counterclaimants persuasively point out, the very essence of Outlaw's alleged RICO scheme relies on the collective action failure of individual stores to resist their demands, and the Court has previously sustained Counterclaimants' contention that any settlement agreements might be subject to rescission under the doctrine of economic duress.  These sub- and issues- classes may be undermined or bolstered after appropriate discovery, but at this early juncture, cannot be vitiated simply by Outlaw's bare assertions of impropriety.

### C. Asserted Lack of Preponderance does not Derail the Putative Class at this Juncture

Outlaw also complains that the class action proposed by Counterclaimants fails for lack of preponderance of common questions of fact. The primary thrust of this argument appears to be[7] that there would be no uniformity or predominance on the question of damages, because damages would depend on each store's particularized reaction to receiving the demand letter—i.e., did they settle with Outlaw, did they pull Rhino products off their shelves?—an inherently factual inquiry. (ECF No. 80, at 10.) Outlaw also contends that because the Counterclaim sounds in fraud, each prospective class member would need to demonstrate proof of reliance or a particular state of mind, making class certification improper. (*Id.*) Outlaw also takes issue with the ascertainability, or definitional delimitation, of the class. The Court finds that Outlaw's arguments are insufficient to deny certification at this early stage.

First, the issue of non-uniform damages is addressed, at least in part, by Counterclaimants' issues sub-classes: the Payment subclass distinguishes between those stores who have paid Outlaw settlement moneys following receipt of a demand letter and those who have not, as permitted by Rule 23(c)(4). *See In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006) (holding that Rule 23(c)(4) may be used "to separate the issue of liability from damages"); *see also* FED. R. CIV. P. 23(c)(4), 1966 advisory committee notes (explaining that "in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims"). Further, any factual question with respect to whether stores suffered different damages (either because they withdrew Rhino products from the shelves, or altered their sales, etc.) is a question to be determined after at least some discovery on the issue. *See, e.g. Amey v. Cinemark USA Inc.*, No. 13-CV-

---

[7] It is somewhat difficult to follow Outlaw's argument since its briefing on the matter concludes abruptly mid-sentence. (*See* ECF No. 80, at 10.) The Court surmises based on the extant briefing that Outlaw primarily objects to the facts that damages for the three subclasses would depend on each store's individual, subsequent conduct.

5669WHO, 2014 WL 4417717, at *3 (N.D. Cal. Sept. 5, 2014) (holding, notwithstanding "the potential strength of defendants' arguments" and the potential expense of class-wide discovery, that a class purporting to include 10,000 members and 16 different employment positions could not be defeated preemptively before discovery).

Second, the reliance and particular state of mind requirements attendant to a RICO suit does not necessarily doom Counterclaimants' putative class. As observed in *Murphy v. Gospel for Asia, Inc.*, which granted certification of a RICO class, reliance needs not be settled by "extensive individualized inquiries" where "reliance could be proven by class-wide proof and where it was logical to infer that the class members relied on similar representations made by defendants." 327 F.R.D. 227, 239–40 (W.D. Ark. 2018). In many cases, "district courts have found that the predominance requirement was satisfied, notwithstanding that reliance is an element that must be proven, where proof could be made on a class-wide basis as a result of the nature of the representations made to the putative class and the ability of class-wide proof to establish an inference of reliance and causation." *Id.* at 240. Here, the Court agrees with Counterclaimants that it is premature to decide the issue of reliance prior to discovery, but that in any event, assuming as true Counterclaimants' allegations that Outlaw sent similar demand letters to all putative class members, Outlaw's speculations that individual stores may have differently relied on those misrepresentations does not necessarily preclude class certification in light of *Murphy*.

Third, Outlaw also argues that the alleged classes are not "ascertainable." [8] (ECF

_____

[8] The Ninth Circuit does not recognize "ascertainability" as a stand-alone challenge to class certification. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125 (9th Cir. 2017). Instead, the Ninth Circuit has "addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues, through analysis of Rule 23's enumerated requirements." *Id.* (citation omitted). Overbreadth and vagueness challenges are generally addressed under Rule 23(b)(3)'s predominance requirement. *See, e.g., Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136–39 (9th Cir. 2016) (addressing claim that class definition was overbroad—and thus arguably contained some members who were not injured—as a Rule 23(b)(3) predominance issue); *Probe v. State Teachers' Ret. Sys.*, 780 F.2d

No. 80, at 8–9.) According to Outlaw, "Store Class," which by its terms encompasses "all business entities in the United States that received a demand letter substantially similar to the letter received by the class representatives," is vague and overbroad because it can be construed to include any demand letter received, "whether or not the letter came from Outlaw or some other party." (*Id.* at 9.)

The Court finds this argument unavailing. As argued by Counterclaimants, and as might be verified upon adequate discovery on the issue, "[t]he members of the proposed classes are readily ascertainable from the records on file with one or more members of the Outlaw Enterprise." (ECF No. 32, at 21.) In other words, it is not unthinkable that Outlaw and its alleged co-conspirators might have maintained records of the businesses that they have issued demand letters to, making the putative class inherently circumscribed and discoverable. (ECF No. 82, at 11.) Moreover, even if Outlaw did not maintain such records, Counterclaimants have alleged that the demand letters are "form letters" which follow a specific format. (ECF No. 32, at 8 (describing the demand letters, enumerating their representations, and describing how each letter is accompanied by a photo of the product allegedly in the recipient's store and FDA Public Notifications").) With those parameters, there is little danger that the putative class would encompass an amorphous or open-ended group of defendants.

### D. Speculations as to the Inadequacy of Class Counsel are Inadequate to Defeat a Putative Class before Discovery

Finally, Outlaw argues that the class should be dismissed because Gaw Poe is inadequate as class counsel. (ECF No. 80, at 9–11.) Under Rule 23(a)(4), Counterclaimants must establish that they will "fairly and adequately protect the interests of the class," FED. R. CIV. P. 23(a)(4), which entails an inquiry into whether "representative plaintiffs and their counsel have any conflicts of interest with other class

---

776, 780 (9th Cir. 1986) (recognizing that a class must not be vaguely defined and must be "sufficiently definite to conform to Rule 23").

members." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). "An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class." *Rodriguez v. W. Publishing Corp.*, 563 F.3d 948, 959 (9th Cir. 2009).

Outlaw urges that Gaw Poe cannot simultaneously represent Eashou, d/b/a San Diego Cash & and Carry, who is an alleged supplier of Rhino pills, and other retail stores, because the interests of supplier and retail sellers of Rhino products are inherently adverse. According to Outlaw, retail stores might find it expedient to "mitigate their culpability by simply blaming their supplier (who Gaw Poe also represents) for their sale of the illicit pills," and "Gaw Poe would not be able to represent both interests adequately." (ECF No. 80, at 12.) As proof of this potential conflict, Outlaw directs the Court to the answer of defendant Zaya Enterprise. (ECF No. 11, at 9.) Outlaw argues that Zaya's Eighteenth Affirmative Defense, which asserts that Outlaw's damages are barred because they were "caused by the acts of Plaintiff and others," (*id.*), indicates that retail stores may seek to hold suppliers like Eashou responsible as part of a third party liability affirmative defense.

At this stage of the litigation, the Court is not prepared to conclude that there is any disqualifying conflict of interest in Gaw Poe's service as class counsel. Apart from Outlaw's speculation that such a conflict might develop, there has been no indication that the Zaya, or any other retail defendant, desires to assert third-party liability against suppliers like Eashou.[9] Indeed, Counterclaimants are persuasive that any third-party liability defense potentially asserted would more likely take aim at manufacturers of Rhino products, rather than suppliers, since suppliers are more or less in the same boat as

_____

[9] If retailers like Zaya had objections to representation by Gaw Poe in the class action counterclaim, it would have an opportunity, through its own counsel, the Law Offices of Steven A. Elia, to raise its concerns at a later point in time, for example, upon a motion by the putative class representatives to certify the class. The fact that no objections have been raised in the litigation to date is at least suggestive that Gaw Poe is not hopelessly conflicted.

retail stores. (ECF No. 82, at 12.) In any event, the overwhelming consensus of courts is that "speculative" conflicts resting on "string[s] of suppositions . . . do not preclude a finding that class counsel is adequate." *In re BearingPoint, Inc. Securities Litigation*, 232 F.R.D. 534, 541 (E.D. Va. 2006); *see also Sandoval v. M1 Auto Collisions Ctrs.*, 309 F.R.D. 549, 569 (N.D. Cal. 2015) (finding that the purported conflict of interest did not merit disqualification in part because the conflict was "illusory and speculative"). The Court finds that Outlaw's arguments herein as to purported conflicts are speculative and do not render class counsel inadequate.

Outlaw further contends that Gaw Poe has filed self-contradictory pleadings on behalf of the various stores in this case. For example, Outlaw point out that in one instance, Gaw Poe represented that Roma Mikha, Inc. had been harmed by Outlaw's demand letter representations regarding the Rhino products—because it "removed these legal products from its shelves,"—but also claimed elsewhere that Roma Mikha, Inc. had no knowledge about whether it in fact sold adulterated products. (ECF No. 80, at 12.) However, Outlaw points to no authority that inconsistent allegations within the pleadings for any putative class member gives rise to inadequacy of counsel in the Rule 23(a)(4) sense. The only case cited by Outlaw in support of its position, *i.e.*, *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.*, 6 Cal. 5th 59 (2018), lends it no succor. There, Sheppard Mullin was deemed to have violated California Rule of Professional Conduct 3-310(C)(3) (embodying a "core aspect of the duty of loyalty" and prescribing "the disclosure for informed consent to dual representation"), because it represented both the defendant in a qui tam action and a claimant in the same action (albeit on a different subject matter). *Id.* at 84–86. That is emphatically not the factual situation which Outlaw asserts is before the Court.

The Court finds no prohibitive conflicts of interest warranting premature disqualification at this juncture, though Outlaw is welcome to press the issue subsequent to class-action discovery.

**IV.    Conclusion**

In light of the above, the Court **DENIES** Outlaw's motion for judgment on the pleadings in its entirety.  (ECF No. 80.)

**IT IS SO ORDERED.**

Dated:  June 4, 2019

Hon. Gonzalo P. Curiel
United States District Judge