MARK POE (Bar No. 223714)
  mpoe@gawpoe.com
RANDOLPH GAW (Bar No. 223718)
  rgaw@gawpoe.com
SAMUEL SONG (Bar No. 245007)
  ssong@gawpoe.com
VICTOR MENG (Bar No. 254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Defendant Roma Mikha, Inc.
and Third-Party Plaintiffs NMRM, Inc.
and Skyline Market, Inc.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: OUTLAW LABORATORY, LP LITIGATION | Case No.  3:18-cv-840-GPC-BGS **CLASS ACTION** **SECOND AMENDED COUNTERCLAIMS OF ROMA MIKHA, INC. AND THIRD-PARTY CLAIMS OF NMRM, INC. AND SKYLINE MARKET, INC.** **JURY TRIAL DEMANDED** |

Pursuant to Federal Rule of Civil Procedure 15(a)(2), Defendant-Counterclaimant Roma Mikha, Inc. hereby amends its counterclaims, and Third-Party Plaintiffs NMRM, Inc. and Skyline Market, Inc. hereby amend their third-party claims, against Outlaw Laboratory, LP—a member of the association-in-fact Racketeer Influenced and Corrupt Organizations Act ("RICO")  enterprise described below (the "Outlaw Enterprise").

In this amended pleading, the representative victims of the Outlaw Enterprise bring into the case certain other members of the Outlaw Enterprise:  the principals of Outlaw Laboratory, Michael Wear and Shawn Lynch, and the law firm that orchestrated and conducted the affairs of the Outlaw Enterprise that are described herein, Tauler Smith LLP.

### THE STORES' COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

These counterclaims and third-party claims are brought by Roma Mikha, Inc., NMRM, Inc., and Skyline Market, Inc. (together, the "Stores"), on behalf of themselves and all other victims of the scheme to defraud that is described herein. The Stores allege as follows:

### INTRODUCTION

1.     As will be seen, the "litigation" that is being pursued by Outlaw Laboratory and the other members of the Outlaw Enterprise is a scheme to defraud small businesses, reminiscent of the activities of the Trevor Law Group in the early 2000s, or the lawyers and straw men who ran Prenda Law, Inc.

2.     Here, Plaintiff Outlaw Laboratory—an online-only seller of "supplements" based in Texas—works with its fellow enterprise member, Los Angeles-based law firm Tauler Smith LLP, to send demand letters to small (almost always immigrant-run) independent corner stores and liquor stores, threatening the owners for selling over-the-counter "sexual enhancement pills."  The demand letter outlines objectively frivolous claims against the owner for violations of the federal RICO and Lanham Act statutes, claims that "you are liable for over $100,000 if we

prosecute this matter," and then offers to "settle" the phony dispute for varying amounts around $10,000.

3.      If the owner doesn't respond, Outlaw offers increasingly smaller settlements.  In Roma Mikha's case, for example, Outlaw's demand letter threatened liability of "over $100,000," and offered $14,000 to settle.  A few weeks later, it conveyed through a third-party lawyer an offer of just $2,800.  Obviously 99% of rational business-persons (especially immigrants with a first language other than English) are not going to hire a lawyer at $300-500/hour to defend against such a tiny demand, so hundreds of stores around the country have coughed up the money.

## BACKGROUND

4.      Outlaw Laboratory and the other members of an association-in-fact enterprise (hereafter, the "Outlaw Enterprise") have struck upon a get-rich-quick scheme.  The scheme operates by the members contacting small, immigrant-run businesses across California and around the country, with the threat that "you are liable for over $100,000 if we prosecute this matter to a jury trial," and then accepting protection money ("settlements") from these small business owners in amounts as little as $2,500.

5.      The Outlaw Enterprise operates in the same mode as the "protection rackets" in the movies.  It threatens its victims with financial ruin, then offers to solve that "problem" if the store owner is willing to fork over money for protection—protection from the problem that the enterprise itself is threatening.

6.      Whether the perpetrators are armed with law degrees or blackjacks, this type of conduct is exactly the form of racket that the Racketeer Influenced and Corrupt Organizations Act ("RICO") was designed to quash, through creating a private right of action for the racketeers' victims.  Because the members of the Outlaw Enterprise used the U.S. mails in conducting this "scheme to defraud"— committing thousands of predicate acts of mail fraud over a period of many

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

months—they are liable for disgorgement of their ill-gotten gains, three times the damages they caused, and an injunction ordering dissolution of the Outlaw Enterprise.

### Warning Letter and Response

7.     In an effort to protect the Stores and future victims of the Outlaw Enterprise, undersigned counsel sent a detailed letter to the lawyer members of the Enterprise on August 9, 2018, explicitly disavowing any financial demand either for themselves or their clients, and proposing that the Outlaw Enterprise keep what it has extorted so far, but demanding that it cease future stick-ups.  Eleven minutes later, Robert Tauler (of the eponymous Enterprise member Tauler Smith LLP) flippantly responded:

From:        Robert Tauler
Sent:        Thursday, August 9, 2018 12:59 PM
To:          Mark Poe
Cc:          matt.smith@taulersmith.com; leticia.kimble@taulersmith.com; Randy Gaw
Subject:     Re: Notice letter re enhancement pills scheme

Mark,

Just because you don't understand something doesn't mean it's a bad thing.  Do some research on our claims like a real lawyer and stop sending me stupid letters.  Your accusations are a disgrace to our profession.

Robert Tauler, Esq.
Tauler Smith LLP

8.     The research having been done, Roma Mikha, Inc., NMRM, Inc., and Skyline Market, Inc. now bring these claims on behalf of themselves and all other victims of the Outlaw Enterprise, for restitution, damages, and an end to the scheme.

### JURISDICTION

9.     The Court has jurisdiction over the Stores' claims under 28 U.S.C. § 1331, because they arise under a federal statute, the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d).

10.     The Court has personal jurisdiction over Counterclaim-defendant / third-party defendant Outlaw Laboratory, LP because it voluntarily appeared in this District by bringing its claims here.

11.     The Court further has personal jurisdiction over all members of the Outlaw Enterprise under 18 U.S.C. § 1965(b), which provides for nationwide service of process in RICO actions.

## PARTIES

12.     Counterclaimant Roma Mikha, Inc. does business as Bobar #2 Liquor, and operates a small store located at 1777 Palm Avenue, San Diego, California. The store is a typical corner store, selling the full array of products that one would expect to find at any convenience store.

13.     Third-party Plaintiff NMRM, Inc. does business as Sunset Liquor, which operates out of a small strip mall located at 985 Broadway, Chula Vista, California.  Like Bobar #2, Sunset Liquor is a typical corner store, selling the full array of products that one would expect to find at any convenience store.

14.     Third-party Plaintiff Skyline Market, Inc. does business as Skyline Farms Market, which operates out of a retail store located at 1505 Skyline Drive, Lemon Grove, California.  Like the others, Skyline Market is a small retail store that sells an array of food, beverage, and sundry products.

15.     Counterclaim-defendant / third-party defendant Outlaw Laboratory, LP is a Texas business entity, which markets a variety of supplements.  Outlaw alleges that it sells "male enhancement products" called TriSteel and TriSteel 8hour.

16.     According to discovery responses recently obtained by the Stores' counsel, Counterclaim-defendant / third-party defendant Michael Wear is one of two owners of Outlaw Laboratory.  Mr. Wear is further identified in Outlaw Laboratory's Texas Certificate of Formation as "General Partner 1" of Outlaw Laboratory.

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

17. According to discovery responses from Outlaw Laboratory that have recently obtained by the Stores' counsel, Counterclaim-defendant / third-party defendant Shawn Lynch is one of just two owners of Outlaw Laboratory. Mr. Lynch is further identified in Outlaw Laboratory's Texas Certificate of Formation as "General Partner 2" of Outlaw Laboratory.

## FACTUAL ALLEGATIONS

### A. The FDA Advises Consumers to Avoid the Sexual Enhancement Products.

18. This litigation was spawned by a series of "Public Notification[s]" that have been issued by the FDA beginning in March 2015, alerting the public that the "sexual enhancement" products seen near the front of liquor stores and convenience stores may contain "sildenafil," the active prescription in Viagra.[1] Rather than banning the sale of the products at issue, the FDA's "public notifications" merely say that the agency "is advising consumers not to purchase or use [product name], a product promoted for sexual enhancement." *See, e.g.*, https://www.fda.gov/Drugs/ ResourcesForYou/Consumers/BuyingUsingMedicine Safely/MedicationHealth Fraud/ucm615213.htm ("Public Notification" for something called "Gold Rhino 25000").

19. Documents obtained from the FDA demonstrate that not all of the "sexual enhancement pills" at issue contain sildenafil, or any other prescription drug. Counsel for certain other victims of the Outlaw Enterprise submitted a FOIA request to the FDA for documents reflecting its testing of the Rhino products at issue. While two of the three lab analyses included in the FDA's FOIA response indicated the presence of sildenafil, the third did not. Attached hereto as Exhibit B is the lab analysis performed by the FDA on that third sample of "Platinum 3000,

---

[1] A full list can be found at: https://www.fda.gov/Drugs/ResourcesForYou /Consumers/BuyingUsingMedicineSafely/MedicationHealthFraud/ucm234539.htm

Rhino 7." According to the FDA's "Summary of Analysis," "[t]he presence of a male enhancement adulterant could not be confirmed by LC-MS analysis."

20.    There exists no reliable or comprehensive data as to what proportion of any of the various SKUs of sexual enhancement pills at issue in Outlaw Laboratory's claim against the Stores actually contain sildenafil or any other prescription drug. Nor are the Stores aware of any "lot numbers" or other originating information that could be used to segregate the pharmaceutical-containing pills from the adulterated pills.

21.    More to the point, Outlaw Laboratory's complaint makes no allegation as to how it might be able to prove that any package offered for sale by any of these three Stores—or offered by any other *specific* store in the class—in fact contained any prescription drug.

22.    The Outlaw Enterprise's inability to prove any violation of law by the Stores and members of the class explains why its members offer *de minimis* settlements as part of their fraudulent scheme, and illustrates the objective baselessness of the shakedown scheme to begin with.

23.    Notably, neither the FDA nor any other regulator has banned, or otherwise declared it "illegal" for retail stores merely to sell these products. Indeed, as recently as November 27, 2018, the FDA issued a press release that does nothing more than repeat that "[t]he U.S. Food and Drug Administration is warning consumers not to purchase or use Rhino male enhancement products."[2] The FDA has not issued a recall of any of the sexual enhancement products at issue in this case, nor has it issued any order that retail stores must discontinue selling them.

24.    That is because sildenafil is hardly a dangerous pharmaceutical—it is sold over the counter in the United Kingdom, and is currently under consideration

---

[2] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ ucm626723.htm

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

for over-the-counter sales in the United States.  The Stores anticipate that as discovery progresses, the Outlaw Enterprise will be unable to identify even a single adverse health event caused by any of the products upon which the stick-up scheme described herein is predicated, and certainly none resulting from any sale by these Stores or any other member of the class.

25.     Convenience store owners of course have no idea what is contained in these products, any more than they know the list of ingredients found in cigarettes, Coca-Cola, or 5-Hour Energy, let alone the hundreds of other items they stock on their shelves.  Outlaw has not alleged, nor will it be able to find authority for, the notion that store owners have some statutory or common law duty to investigate the actual ingredients in all of their merchandise, nor a duty to monitor the bowels of the FDA's website (let alone those of the dozens of other regulators with purview over the stores' wares) to see what regulatory agencies are saying about the items on their shelves, and what "advice" the FDA is offering to *consumers*.

## B. Members of the Outlaw Enterprise Hatch a Scheme to Run a Shakedown Against a Vulnerable Community of Victims.

26.     Since at least December 2017, and continuing through the present, the Outlaw Enterprise has preyed upon hundreds of independently operated convenience store owners—including the Stores here, and all members of the class they seek to represent—by sending them demand letters that threaten "over $100,000" in liability, based upon a series of false and misleading statements.  A sample of the form letter sent by the Outlaw Enterprise (addressed to the d/b/a of Third Party Plaintiff NMRM, Inc.) is submitted as Exhibit A to this pleading.

27.     The first paragraph of the form letter refers to two "Exhibits":  an "Exhibit A" consisting of a photo of the product allegedly in the recipient's store, and an "Exhibit B," consisting of one or more of the FDA's "Public Notifications" described above.  The letters then make a series of false and misleading statements, including:

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

- "your company [insert name] is selling illegal sexual enhancement products;"
- "Attached as EXHIBIT B are notices from the Food and Drug Administration regarding the illegality of the Illicit Products;"
- "As you can see, the Illicit Products are illegal to sell;"
- "As you can see, the Illicit Products . . . subject your company to legal action for racketeering . . . under RICO (Racketeer Influenced Corrupt Organizations);"
- "[u]nder these federal laws our client is entitled to: [*inter alia*] Your profits from the sale of the Illicit Products dating back four years . . . Attorney's fees . . . Punitive damages . . . Triple [sic] damages . . ."
- "We estimate that you are liable for over $100,000;"
- "If this matter is not fully resolved before [a date typically 30 days out] we file [sic] a lawsuit against your business."

28.     None of those statements were true when made, and they are all misleading.  The products are not "illegal to sell," let alone "as you can see" from the referenced FDA "notifications."  As noted, the FDA's notifications do nothing more than "advis[e] consumers not to purchase" the product.  But if the enterprise's letter stated the true fact that the FDA is merely advising consumers not to purchase the products, the letters would lose their intent to induce fear in these immigrant communities, and the scheme would lose its effectiveness.  Accordingly, after planting the "illegal to sell" seed, the scheme to defraud proceeds with a parade of horribles, including RICO litigation, and financial ruin.

29.     The Outlaw Enterprise's scheme is intentionally designed to be particularly misleading to its target audience, which consists almost exclusively of (as typified by the three Stores here) immigrants for whom English is not their first language.  Particularly for immigrants, the Enterprise's false representations about make-believe government dictates of "illegality" are terrifying.

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

30.     The threat of RICO liability is further false and misleading in that the Outlaw Enterprise did not actually sue the Stores under RICO, because any lawyer of ordinary skill knows that there is not even a colorable claim for RICO liability against these stores.

31.     The assertion of imminent RICO liability is knowingly false when made.  The usual signatory on the demand letters is Leticia Kimble (an as-yet-unnamed member of the Outlaw Enterprise who had worked as "counsel" to enterprise member Tauler Smith LLP, on whose letterhead the fraudulent letters are written).  A 2008 graduate of the University of Michigan Law School, Ms. Kimble held herself out on Tauler Smith's website as a "RICO expert."  *See* https://www.taulersmith.com/team/.  Any "RICO expert" knows both that the RICO threats are legally laughable, but terrifying to a lay person, especially the lay members of this target audience.

32.     Viewed differently, the attorney members of the Outlaw Enterprise evidently recognized that stating RICO allegations to the Court would violate Rule 11.  They nevertheless made those same allegations directly to their victims, which caused hundreds of such victims to fork over a few thousand dollars each, because of this scheme.

33.     Roma Mikha, Inc. received, by U.S. Mail, the fraudulent demand letter authored by one or more participants in the Outlaw Enterprise, and signed by Leticia Kimble, on or about February 7, 2018.  It was sued in this action on July 25, 2018.  Roma Mikha has suffered an injury to its business because it initially believed the demand letter's false assertions, and removed these legal products from its shelves, thereby losing legitimate sales.

34.     NMRM, Inc. received, by U.S. Mail, the fraudulent demand letter authored by one or more participants in the Outlaw Enterprise, and signed by Leticia Kimble, on or about December 15, 2017.  NMRM, Inc. has not been sued as part of the scheme.  NMRM has suffered an injury to its business because it initially

believed the demand letter's false assertions, and removed these legal products from its shelves, thereby losing legitimate sales.

35.     Skyline Market received, by U.S. Mail, the fraudulent demand letter authored by the attorney members of the Outlaw Enterprise, and signed by Leticia Kimble.  Fearful of the prospect of facing "over $100,000" in liability as threatened, Skyline Market agreed to pay the Outlaw Enterprise $2,800.  In addition to that amount, Skyline Market suffered further injury to its business because it believed the demand letter's false assertions, and removed these legal products from its shelves, thereby losing legitimate sales.  Skyline Market has been further injured by paying attorneys' fees to coordinate payment of the protection money.

36.     On information and belief, the Outlaw Enterprise has used the U.S. Mail to pursue the scheme against over one thousand victims around the United States, hundreds of whom are in California alone.

### C. The Demand Letters Threaten Objectively Baseless Sham Litigation.

37.     The Outlaw Enterprise's scheme alleged herein is not immunized by its First Amendment right to petition the government, because the First Amendment protects only conduct that is "genuine," not conduct that is designed to serially extort small businesses out of money.  Here, the allegations, threats, and demands set forth in the serial demand letters were not genuine, but were objectively baseless.

38.     There are numerous indicators of the baselessness of the threats set forth in the demand letters.  For example, as alleged in paragraph 16 *supra* and shown in Exhibit B, a reasonable inquiry would have shown that not all "sexual enhancement pills" contain sildenafil or any other prescription drug.  The mass distribution of thousands of demand letters to random stores was thus a stickup that was not individually tailored to the recipients.  Instead, it was a process that would inevitably demand payment both from stores that sold adulterated pills, and from

those that did not.

39.     The Outlaw Enterprise failed to conduct any individualized testing or investigation to determine which of the thousands of recipients of the demand letter actually sold or offered for sale an item that contained a prescription drug.

40.     The baselessness of the letters' threat of financial ruin from RICO liability was further objectively baseless because there was not then, nor now, any plausible basis by which Outlaw Laboratory could have pled the commission of at least two predicate acts by each individual store.  The exclusive list of predicate acts that can form the basis of a RICO violation is set forth in 18 U.S.C. § 1961(1).  The sale of sildenafil does not even arguably constitute any violation of any of the crimes on that list.

41.     Nor could the Outlaw Enterprise have reasonably alleged mail or wire fraud as predicate acts, given that there is no basis to believe that any of the Stores sold any of the products using the mails or wires.  As any reasonable investigation would have shown, all of the stores acquire the products at issue over the counter from their wholesaler, and sell all of their products over the counter to walk-in customers.

42.     The objective baselessness of the RICO threats is further indicated by the fact that there is no reasonable way that the Outlaw Laboratory could have plausibly alleged that the stores are members of any form of RICO enterprise.  The relationship between the stores, the wholesalers, and the unknown manufacturers of the challenged products is nothing more than the standard chain of distribution, identical to the distribution of Coca-Cola, Snickers, and Wrigley's chewing gum.  Outlaw Laboratory could not have alleged any structure or agreement among even each store and *one* other person, let alone an Enterprise consisting of the *thousands* of stores that received the demand letter.

43.     The objective baselessness of the RICO threats is further indicated by the fact that there is no reasonable way that the Outlaw Laboratory could have

11

plausibly alleged that it suffered any harm that was proximately caused by the stores' commission of any (non-existent) predicate acts.  Supreme Court precedent requires the plaintiff to show how his injury was proximately caused by the commission of the (here, non-existent) predicate acts.  The opinion in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), for example, precludes such a showing where one business claims that it was injured by predicate acts of its competitor that were directed at third parties, which is the most that Outlaw Laboratory could allege, even if it could hypothesize that the stores committed two of the violations enumerated in section 1961(1).

44.    Indeed, at the time it sent the fraudulent demand letters to the stores, Outlaw Laboratory did not even transact any business in California, so it could not have lost out on any sales made by the California-based, small convenience store owners like the Stores.  Until the Stores pointed this failing out in their amended pleading, Outlaw Laboratory had not been registered with the California Secretary of State to do business here.

45.    Another indicator of the objective baselessness of the RICO threats is that the Stores do not engage in any interstate commerce.  Their customers are local neighborhood residents, and nobody would have crossed state lines to just to buy a Rhino product from them.  But RICO applies only when the racketeering enterprise is engaged in, or has more than an incidental effect upon, interstate commerce.

46.    As further factual development will show, the threat of Lanham Act liability was also objectively baseless under *Lexmark v. Static Control Components*, 134 S. Ct. 1377 (2014), as the members of the Outlaw Enterprise knew or should have known at the time they sent the demand letters.  That is because there has never been, and will never be, any evidence that Outlaw Laboratory ever actually lost a sale of TriSteel or TriSteel 8 Hour as a result of any store-defendant's conduct in offering the challenged products for sale.

47.    The objective baselessness of the threat of RICO liability was crucial

12

to the effectiveness of the Outlaw Enterprise's shakedown scheme, because the economic devastation to the small businesses that the demand letters threatened is primarily predicated upon that claim.  To wit, the threatened financial ruin for each recipient of the demand letter is set forth as follows:

> As you can see, the Illicit Products are illegal to sell and subject your company to legal action for racketeering and unfair business practices under RICO (Racketeer Influenced Corrupt Organizations) and the Federal Lanham Act.  Accordingly, under these federal laws our client is entitled to:

> - Your profits from the sale of the Illicit Products dating back four years.  (15 U.S.C. § 1117)
> - Attorney's fees. (18 U.S.C. § 1964)
> - Punitive damages. (15 U.S.C. § 1117)
> - Triple damages. (18 U.S.C. § 1964 & 15 U.S.C. § 1117)

(*See* Ex. A.)

48.     The first item asserting Lanham Act liability is objectively baseless in threatening that Outlaw is "entitled to [y]our profits from the sale of the Illicit Products dating back four years."  Outlaw has claimed in interrogatory responses that TriSteel was first sold in October 2016 (although it does not show up in Google's history index until October *2017*).  Under either date, it was fraudulent, deceptive, and objectively baseless for the Outlaw Enterprise to threaten the stores that they were liable for profits dating back to (in NMRM's case) December *2013*.

49.     The second item threatens that the store will be liable for Outlaw Laboratory's "attorney's fees" under "18 U.S.C. § 1964," which is the RICO statute.  In addition, Outlaw threatened that if the store did not cough up the money, it would be liable for "triple damages" under RICO.  As set forth above, there was neither then nor now any objectively reasonable way for the Outlaw Enterprise to have believed that such threats of RICO liability were "genuine."

50.     Also objectively baseless is the threat that the stores would be liable for "triple damages" under 15 U.S.C. § 1117 if they refused to pay the ransom.

13

Liability for treble damages under section 1117 is limited to the "knowing" use of "a counterfeit mark," or cases in which the judge determines that "the circumstances of the case" warrant an increase in the default measure of "actual damages." *Id.* On information and belief, the members of the Outlaw Enterprise knew at the time, and know now, that there has never been any basis to accuse these small stores of trading in counterfeit marks, and could not reasonably expect that a judge would treble the stores' liability in the exercise of his or her discretion. Even if the members of the Outlaw Enterprise were deluded, such a threat was *objectively* baseless.

51.     Finally, the chart threatens the stores with "punitive damages" under section 1117. But section 1117 specifically prohibits the imposition of money damages as a "penalty," and well-established caselaw holds that punitive damages are not allowed under section 1117. *See, e.g.*, *Falcon Stainless, Inc. v. Rino Companies, Inc.*, No. 08-CV-0926-AHS-MLGX, 2011 WL 13130487, at *4 (C.D. Cal. Aug. 2, 2011).

52.     In contrast to what the members of the Outlaw Enterprise knew or should have known regarding the objective baselessness of the threatened financial ruin, it *was* reasonable for the members of the Enterprise to expect that the immigrant proprietors of these small stores would *not* know the ins and outs of RICO liability and predicate acts, nor the scope of 15 U.S.C. § 1117, nor whether Outlaw had been selling TriSteel since 2013. Indeed, it was that asymmetry of knowledge and sophistication that made the stores' so vulnerable to the Enterprise's depredations and fraudulent statements. That is what transforms the demand letters from "genuine" petitions for relief, into sham litigation.

**The Objectively Baseless Threats of Financial Ruin Were the Only Thing that Made this Shakedown Scheme Effective in Extorting Hundreds of Small Settlements.**

53.     As the evidence is developed, it will become apparent that none of

14

Outlaw Laboratory's claims was genuine, and that the entire litigation is a sham, but the Stores' claims are focused more directly on the fraudulent demand letters.

54. The demand letters were effective in the Outlaw Enterprise's fulfillment of the fraudulent scheme precisely because of the objectively baseless claims of financial ruin. As illustrated *supra*, none of the final three components of liability threatened in the chart has any genuine basis. But the combination of those three baseless items is the only way that the Outlaw Enterprise could have "estimate[d] that you are liable for over $100,000 if we prosecute this matter to a jury trial." (Ex. A at 2.)

55. That is, the first bullet point threatens liability only for "Your profits from the sale of the Illicit Products." (*Id.* at 1.) But Roma Mikha, for example, made a profit of only around $3 on each packet of sexual enhancement pills it sold. Even assuming Outlaw Laboratory could ever adduce evidence of proximate causation sufficient to satisfy *Lexmark*, and assuming (contrary to fact, *see* Ex. B) that every such packet contained sildenafil, and further assuming that there could be any evidence by which to prove so, Roma Mikha's maximum profits (and therefore Outlaw's maximum recovery) would have been no more than a couple hundred dollars.

56. The demand letters would not have yielded $2,800 - $4,000 settlements, however, if the Outlaw Enterprise had made the only "genuine" threat that could have been alleged on these facts: "under these federal laws we estimate that you will be liable for $300 if we prosecute this matter to a jury trial." So the Outlaw Enterprise spiked the demand letters with objectively baseless misrepresentations and threats, to trick the stores into paying up several thousand dollars to avoid the financial ruin that was baselessly threatened.

### D. The Outlaw Enterprise Has Undertaken a Series of Lawsuits and Activities Incidental to Litigation, Without Regard to the Individual Merits

57.     The unprotected nature of the Outlaw Enterprise's conduct is further illustrated by its blunderbuss conduct in distributing thousands of demand letters to its victims, but following through on only some of those claims.  NMRM, for example, received the demand letter but has never been sued.  Similarly, until this litigation had been pending for nearly four months, Outlaw Laboratory had never bothered to pursue it even through the first step of obtaining and serving a summons on *any* of the 50 defendants.

58.     On information and belief, Outlaw Laboratory has distributed over one thousand copies of the demand letter, and has filed at least six actions in different jurisdictions.  Some of the demand letters have resulted in lawsuits that have survived the pleading stage in other jurisdictions, but that is no indication that any *individual* claim has merit; it means only that if one accepts the allegations as true, some courts have determined that Outlaw's form pleading states a plausible claim (at least as against whatever arguments were mustered for dismissal in the adjudicated motions).

59.     More recently, Outlaw's fraudulent claims have been dismissed in its action that had been filed in the District of Nevada, in its action filed in the Southern District of Texas, and in both actions it filed in the Northern District of Texas.  In the transcript of the hearing on the victim-stores' motion to dismiss in one of the Northern District of Texas cases, Judge Boyle sagely put her finger on the issue:

> "It looks like a shakedown to me.  It really does.  It looks like you're shaking down these little mom and pop stores to get them to settle out of court real quick so they don't have to mess with you, because its expensive for them, five, ten, $15,000 just to hire an attorney, if not more.  So I think you are getting settlements. I have looked through the cases throughout the country in San Francisco and other places, and I have seen them settle out real fast. And I think that's what you are looking for, and I don't think you are entitled to it."

60.     These demands and lawsuits have been initiated without regard to the

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

merits.  For example, when it comes time for Outlaw to present evidence as to any particular retail store, it will be unable to trace any conduct by that store to any lost sale of TriSteel or TriSteel 8 hour by Outlaw Laboratory.  The reviewing court will thereupon dismiss the Lanham Act claim for lack of proximate cause, resulting in dismissal of the remaining causes of action, which are predicated upon it.

61.     Another example of Outlaw's disregard for the merits of any individual claim is seen in the fact that, on information and belief, Outlaw Laboratory has not timely served any of the hundreds of defendants with even a single piece of written discovery.

62.     Still another example that the Outlaw Enterprise knew that the claims were objectively meritless from the get-go is the fact that, once this case was removed to federal court, its law-firm member continued to serve invalid state-court summons on the Stores' co-defendants, at the direction of the principals of Tauler Smith.  They did this even after being informed by counsel for the Stores that such service was invalid under federal law.  Such behavior demonstrates that the Outlaw Enterprise and its attorney members have no interest in meritoriously litigating Outlaw Laboratory's claims, but were simply hoping to intimidate a few additional class members into reaching a quick settlement before those stores learned about the existence of these counterclaims.

63.     The docket indicates that at least seven stores paid settlements to Outlaw Laboratory between the date that the Outlaw Enterprise was informed of the invalidity of the summons, and the date that the Court ordered Enterprise member Tauler Smith to inform its victims of the summons' invalidity.  Four of these settlements appear to have been obtained even after Outlaw Laboratory admitted the invalidity of the summons by filing a non-opposition to the motion of Midway Shell to quash the summons served upon it.

**E. Structure and Roles of the Outlaw Enterprise**

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

64.     The Outlaw Enterprise consists of multiple members, the exact identities of whom will be obtained in discovery.  The Outlaw Enterprise was created prior to December 2017, and has continuously operated its scheme since that time.

65.     Outlaw Laboratory, LP, is a principal member of the Outlaw Enterprise.  According to the Texas Secretary of State, Outlaw Laboratory was formed in September 2016.  It apparently operates out of a single retail location at 6666 Gulf Freeway, in Houston, which is not a business that displays any signage for "Outlaw Laboratory."  Instead, it is a storefront that operates under a sign reading "TF Supplements.com."

66.     Although the fraudulent letters and the Complaint allege that Outlaw Laboratory is "a manufacturer, distributor and retailer of male enhancement products 'TriSteel' and 'TriSteel 8 hour,'" recent discovery that has been obtained by other parties reveals that that product has never been sold in any stores in this District, in California, or anywhere in the country.  None of the Stores (nor other store owners with whom they have discussed the case) has either seen or heard of any such product, until seeing the fraudulent letters at issue here.

67.     On information and belief, TriSteel and TriSteel 8 Hour were created as artifices upon which to found the enterprise's scheme.  The first recorded appearance of Outlaw Laboratory's website (per the WayBackMachine available through www.archive.org) is July 13, 2017.  Beyond that, Google's search platform indexes the history of websites, allowing a user to determine when a particular website first surfaced.  That tool shows that the supposed TriSteel product was not listed for sale even on the internet until October 17, 2017.[3]  Prior to that date, there

---

[3]
https://www.google.com/search?q=https%3A%2F%2Fwww.outlawlaboratory.com%2Fstore%2Fproduct%2F6684%2Ftristeel.html&safe=active&source=lnt&tbs=cdr%3A1%2Ccd_min%3A%2Ccd_max%3A10%2F20%2F2017&tbm=

is no mention of the word "tristeel" as a sex product, at all.  As shown on Exhibit A hereto, the attorney members of the Outlaw Enterprise began sending the fraudulent demand letters less than two months later (if not before then).

68.   Furthermore, the demand letters served on absent class members Zaya Enterprises, Fountain Trading, and Main Calif., Inc. included photos of receipts that purport to have been taken by the "investigator" who visited those stores to document their sale of the products at issue in preparation for sending the fraudulent demand letters.  Those receipts are dated August 1, 2, and 4, **2017**, respectively.  This means that Outlaw Enterprise member Tauler Smith LLP had dispatched "investigators" to document potential victims of the scheme <u>more than two months before Outlaw's supposedly competing product was first offered for sale</u>.

69.   Public records indicate that Outlaw Laboratory is owned by enterprise members Michael Wear and Shawn Lynch.  On information and belief, these individuals participate with the other members of the Outlaw Enterprise in conducting the enterprise's affairs, including by creating the "competing" TriSteel products upon which to found the false advertising claims, and by working with other members to decide the geographies in which to conduct the scheme, and by signing for, and accepting receipt of the ill-gotten gains.  Both Michael Wear and Robert Tauler, for example, were the signatories on the "settlement" that extorted $2,800 from third-party plaintiff Skyline Market.

70.   The Los Angeles law firm Tauler Smith LLP is another member of the Outlaw Enterprise.  On information and belief, the firm is a partnership owned by Robert Tauler and Matthew Smith, who direct the affairs of Tauler Smith and are independent members of the enterprise in their own right.  Tauler Smith's and Mr. Tauler's role in conducting the affairs of the Outlaw Enterprise exceeds that of mere attorney agents of the "client" Outlaw Laboratory.  For example, in response to the undersigned's letter requesting that the Outlaw Enterprise curb its conduct,

19

Mr. Smith responded on behalf of the Tauler Smith and the enterprise just 11 minutes later, directing the undersigned to, "[d]o some research on our claims like a real lawyer and stop sending me stupid letters," and advising that "[y]our accusations are a disgrace to our profession." On information and belief, this decision to continue to pursue the affairs of the Outlaw Enterprise was done without receiving direction from either Mr. Wear or Mr. Lynch (the nominal owners of the nominal "client"). Rather, Mr. Smith's response shows that the affairs of the enterprise are independently conducted by the law firm and its principals.

71.    Additional investigation further shows that Tauler Smith's role in the Outlaw Enterprise far exceeded that of merely serving as its legal counsel, instead extending to full operation and conduct of the affairs of the Outlaw Enterprise as a joint conspirator, including through the following:

a.    On information and belief, Tauler Smith worked directly with Mr. Wear and Mr. Lynch to orchestrate the very formation of this shakedown scheme. In the spring of 2017, prior to launching the Outlaw scheme, Tauler Smith's principal Robert Tauler acted as counsel for a Texas company called JST Distribution, which ostensibly marketed a sexual enhancement product called "Powerful Desire," and launched a series of over a dozen similar shakedowns against adult novelty shops for their sales of "sexual enhancement products."[4] According to records of the Texas Secretary of State, the "Governing Person" of JST Distribution is a man named James Stovall. Mr. Stovall is listed in public records as a past resident of a house located at 3202 Gatesbury Ct., Houston, Texas. Outlaw Laboratory's general partner Michael Wear is also identified as a past resident of that

---

[4] *See, e.g.*, *JST Distribution, LLC v. Love Thingz* (Case No. 17-cv-0829-W-WVG (S.D. Cal. Apr. 24, 2017).

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

1    property.  Moreover, the website for www.powerfuldesire.com
2    redirects to the website for www.tfsupplements.com, whose store
3    location is at 6666 Gulf Freeway, the same storefront that supposedly
4    houses Outlaw Laboratory.  In turn, Texas Secretary of State
5    documents for TFSupplements, LP show that its registered agent at
6    creation was Michael Wear, and that its General Partner is a company
7    called C&S Supplements Incorporated, whose "Managing
8    Shareholder" is third-party defendant and Outlaw Enterprise member
9    Shawn Lynch.

10   b.    On information and belief, Tauler Smith collaborated with fellow
11   enterprise members Shawn Lynch and Michael Wear to create Outlaw
12   Laboratory's "TriSteel" product based on this experience with JST
13   Distribution, and thereupon launched the plan to shake down the
14   Stores and members of their classes via the fraudulent demand letters.

15   c.    Tauler Smith was the architect of all of the fraudulent statements in the
16   demand letters upon which the Stores' claims are based, while—as
17   lawyers—knowing that those statements were false.

18   d.    Tauler Smith drafted the "draft complaint" that was attached to the
19   demand letters.  Among the dozens of false and deceptive statements
20   in that document is the allegation in paragraph 29 that "Plaintiff sells
21   TriSteel and TriSteel 8hour through its website www.outlawlaboratory
22   .com, as well as through many other online and storefront retail
23   locations across the United States."  That allegation tended to make the
24   draft complaint's threats more compelling, by suggesting that TriSteel
25   is in fact a competing product of those products by which the Stores
26   were threatened.  Yet in response to Requests for Admissions served in
27   this action by counsel for other defendants, Tauler Smith authored
28   responses admitting that "TRI-STEEL is not sold at any retail

locations other than online."

e.   When Outlaw Laboratory obtains "settlements" such as the one it prepared for third-party plaintiff Skyline Market, Tauler Smith is listed as the payee of the settlement proceeds, not Outlaw Laboratory.

f.   An umbrella association of 7-11 franchisees published an announcement in July 2018 that Tauler Smith had sent demand letters to 354 franchisees, and that it had negotiated a "global resolution" of these claims for $2,500 a piece, with all payments to be made out to "Tauler Smith, LLP."[5]

g.   Tauler Smith further fails to restrict itself to the ordinary role of counsel by serving demand letters in states in which none of its attorneys is a member of the state bar.  The service of demand letters and negotiation of "settlements" is deemed to be the practice of law, such that Tauler Smith's conduct of the Outlaw Enterprise's affairs is the unauthorized practice of law.  For example, the Stores have been contacted by an Arizona victim who received a demand letter in the U.S. Mail that was signed by Tauler Smith's partner Mathew Smith.  On information and belief Mr. Smith is not a member of the Arizona bar.  Arizona Supreme Court Rule 31(a)(2)(A) defines the practice of law to include "[n]egotiating legal rights or responsibilities for a specific person or entity," and Rule 31(b) restricts the authority to practice law in Arizona to the members of its bar.

h.   The Stores propounded several interrogatories in this case, including No. 8, which asked Outlaw to state the total amount of money it has received through its "Settlement Agreements" with the members of the putative class.  Outlaw Laboratory, responding strictly on behalf of the

---

[5] https://ncasef.com/10197-resolution-of-outlaw-laboratory-claims/

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

"Responding Party," stated that it in this matter, the company responded that it "has not received any money as a result of the demand letters at issue in this case."  In a subsequent call with Magistrate Skomal's chambers, Mr. Tauler asserted that the owners of Outlaw Laboratory have not received any money either.  The obvious implication is that 100% of the proceeds generated by the scheme have been received and retained by enterprise member Tauler Smith.

72.   On information and belief, Leticia Kimble acted as an independent member of the Outlaw Enterprise.  Before Ms. Kimble separated from the firm, Tauler Smith's website described her as "Of Counsel" to the firm, apparently operating as the "Founder of Kimble Legal Consulting."  Ms. Kimble participated in and directed the affairs of the enterprise as seen in the fact that she is the signatory on the fraudulent letters, and the person who directs the victims of the scheme to "contact our office" to coordinate the necessary amount of protection money.

73.   Other members of the Outlaw Enterprise include an unknown number of independently operating "investigators," who cruise urban communities in search of potential victims, and then take photos of the victims' storefronts and shelf space, forwarding those photos to the other members of the Outlaw Enterprise, so that the scheme can be launched against new victims.  The Stores have been advised through counsel representing other victims of the Outlaw Enterprise that Mr. Tauler has admitted that Tauler Smith recruited these individuals through advertising on Craigslist.

74.   As further information is developed as to the identities and roles of the enterprise members other than Outlaw Laboratory, LP, the Stores reserve their right to amend this pleading to name those persons and entities as defendants.

## CLASS ALLEGATIONS

75.   The Stores bring these class claims on behalf of themselves and all

23

2ND AM. COUNTERCLAIMS / THIRD-PARTY
CLAIMS

other victims of the Outlaw Enterprise who have been subject to an identical pattern of racketeering activity.

76.   As representatives of all similarly situated business entities the Stores propose an overarching "Store Class" defined as follows:

> All business entities in the United States that received a demand letter substantially similar to the letter received by the class representatives.

77.   Roma Mikha, Inc. further proposes certification of a subclass (the "Sued Stores") on behalf of itself and all similarly situated business entities, defined as follows:

> All business entities in the United States that received a demand letter substantially similar to the letter received by Roma Mikha, Inc., and that were subsequently named as defendants in state or federal litigation brought by Outlaw Laboratory, LP.

78.   NMRM, Inc. further proposes certification of a subclass (the "Threatened Stores") on behalf of itself and all similarly situated business entities, defined as follows:

> All business entities in the United States that received a demand letter substantially similar to the letter received by NMRM, Inc., and that were not thereafter named as defendants in state or federal litigation brought by Outlaw Laboratory, LP.

79.   Skyline Market further proposes certification of a subclass (the "Payment Class") on behalf of itself and all similarly situated business entities, defined as follows:

> All business entities in the United States that received a demand letter substantially similar to the letter received by Skyline Market, and that subsequently paid or agreed to pay money to Tauler Smith LLP, Outlaw Laboratory, or an agent of either.

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

80.     The proposed Store Class and each of the proposed subclasses are appropriate for certification under both subsections (b)(2) and (b)(3) of Federal Rule of Civil Procedure 23 because:

(a)     The proposed classes are so numerous and geographically dispersed throughout the United States that the joinder of all Class Members is impracticable;

(b)     The members of the proposed classes are readily ascertainable from the records on file with one or more members of the Outlaw Enterprise;

(c)     There are numerous questions of law and fact common to the proposed classes, and those common issues of law and fact will predominate over any questions that may affect the claims of only individual members of the class.  Such common questions include but are not limited to:

(i)     Whether the statements made in the demand letters constitute a scheme to defraud, within the meaning of 18 U.S.C. § 1341;

(ii)     Whether the members of the Outlaw Enterprise constitute an "associated-in-fact" enterprise, and whether each of the named defendants participated in conducting the affairs of the enterprise;

(iii)     Whether the Outlaw Enterprise used the U.S. Mails in conducting the alleged scheme to defraud;

(iv)     Whether the named-defendant members of the Outlaw Enterprise acted with a sufficiently culpable mental state to warrant liability under RICO;

(v)     Whether the alleged scheme to defraud was a proximate cause of the injuries alleged by the classes;

(vi)     Whether the members of the proposed Payment Class are entitled to rescind their "settlements" with the Outlaw Enterprise, and if so, whether they are entitled to restitution of the ill-gotten funds;

(v)     Whether the members of the proposed classes are entitled to injunctive relief to stop the Outlaw Enterprise from continuing to perpetuate

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

the scheme.

(d)     The Stores' claims are typical of the overarching "Store Class," and of each of the subclasses that each Store seeks to represent.  Each Store has been injured by the same wrongful conduct of the Outlaw Enterprise and each of its members, and accordingly their claims arise from the same practices and conduct that gives rise to the claims of all of their fellow members;

(e)     The Stores will fairly and adequately protect the interests of the classes and all of their members, in that they have no interests that are antagonistic to those of their fellow class members.  The Stores have engaged counsel who have a depth of experience in both prosecuting and defending class action claims;

(f)     A class action is superior to other available methods of adjudicating this dispute for at least the following reasons:

(i)     Given the size of the individual class members' claims and the expense of litigating those claims, few, if any, class members could afford to or would seek legal redress individually for the wrongs that the Outlaw Enterprise committed against them.  Indeed, as alleged, that was precisely the enterprise's purpose in first asserting "liability" of "over $100,000," but then offering "settlements" for as little as $2,500—to make this shakedown too good of an offer to dispute in the courts;

(ii)     Any pending litigation that exists against the class members is only in its initial stages, and to the Stores' knowledge, no other class member has thus far brought its own claims against the Outlaw Enterprise or any of its members;

(iii)     Concentrating these claims in this forum is desirable because there is no particular regional or jurisdictional interest in trying such claims in any other forum.  Such concentration of all of the Outlaw Enterprise's victims in this action will instead promote efficiency of the courts;

(iv)     The Stores do not know of any difficulty in managing their

claims as a class action, given the uniformity and consistency of the Outlaw Enterprise's conduct as against each member of the classes.

81.    Sufficient information to provide notice to each class member can be accessed from the Outlaw Enterprise's records.  Indeed, the specific address of each member of the class is set forth at the top of each of the fraudulent demand letters.

**FIRST CAUSE OF ACTION**
**(Violation of the Racketeer Influenced Corrupt**
**Organizations Act, 18 U.S.C. § 1962(c))**

82.    The Stores re-allege and incorporate by reference each of the allegations contained in the paragraphs above as if fully set forth herein.

83.    Section 1962(c) provides in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

84.    At all relevant times, Outlaw Laboratory, LP, Michael Wear, Shawn Lynch, and Tauler Smith LLP were "persons" under the meaning of 18 U.S.C. § 1961(3), because they are all "capable of holding a legal or beneficial interest in property."  Outlaw Laboratory, LP was associated with the association-in-fact enterprise described herein as the "Outlaw Enterprise," because it was the vehicle upon which the scheme to defraud predicated its legal threats.  Michael Wear and Shawn Lynch conducted the affairs of the Outlaw Enterprise by coordinating its activities with Tauler Smith LLP, and by using the name of their joint creation, Outlaw Laboratory, LP to be used in the fraudulent mailings that constitute the pattern of racketeering activity (per 18 U.S.C. § 1961(5)) at issue in this case, in violation of 18 U.S.C. § 1962(c).  Tauler Smith LLP conducted the affairs of the Outlaw Enterprise by drafting and mailing the fraudulent demand letter and

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

attached "draft complaint," and each of the statements therein.  Tauler Smith LLP further conducted the affairs of the Enterprise by negotiating the amounts of protection money it would charge to each of its victims, and by acting as the conduit of those ill-gotten gains.  On information and belief, Tauler Smith shared in the spoils of the Outlaw Enterprise by receiving a percentage of the ill-gotten gains.

85.    Outlaw Laboratory, LP, Michael Wear, Shawn Lynch, and Tauler Smith LLP have committed or aided and abetted the commission of at least two acts of racketeering activity (i.e., mail fraud in violation of 18 U.S.C. § 1341) by assisting the other members of the Outlaw Enterprise in drafting and arranging for the mailing of the fraudulent demand letters by which the scheme to defraud was perpetrated.  These acts of racketeering activity that the Outlaw Enterprise members committed and/or conspired to, or aided and abetted in the commission of, were related to each other, and are ongoing, such that they pose the threat of continuing racketeering activity.

86.    On information and belief, the Outlaw Laboratory partnership entity, through its principals Michael Wear and Sean Lynch, further participated in and conducted the affairs of the Outlaw Enterprise by assisting members Tauler Smith LLP and Leticia Kimble in identifying and choosing the enterprise's victims (i.e., the Stores and the members of the classes they seek to represent).

87.    On information and belief, the Outlaw Laboratory partnership entity, through its principals Michael Wear and Sean Lynch, and in consultation with Tauler Smith LLP, further participated in and conducted the affairs of the Outlaw Enterprise by determining the reservation prices of the scheme's victims, at which point those victims would be more likely to cough up protection money than to retain counsel to defend their legal rights.

88.    Outlaw Laboratory, Michael Wear, Shawn Lynch, and Tauler Smith LLP knowingly and intentionally made the misrepresentations, acts of concealment, and failures to disclose that constitute the Outlaw Enterprise's scheme to defraud,

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

and either knew or recklessly disregarded that the misrepresentations (such as the assertion that one "can see" from the FDA notifications that the challenged products are "illegal to sell and subject your company to legal action for racketeering . . . under RICO," and that the TriSteel product was supposedly sold "through many other online and storefront retail locations across the United States") would be material to the victims of the scheme, and knew and intended that the Stores and all members of the classes would rely on the misrepresentations upon which the scheme is predicated.

89.    Outlaw Laboratory, Michael Wear, Shawn Lynch, and Tauler Smith LLP have obtained money belonging to the Payment Class as a result of these violations.  These members of the Outlaw Enterprise have further caused members of the Store Class, the Sued Stores Class, the Threatened Stores Class, and the Payment Class to lose money by causing those stores to remove the challenged products from their shelves, thereby losing sales and revenue from those products. In the absence of the Outlaw Enterprise scheme, none of the class members would have suffered these injuries.  Accordingly, the Stores and all of the class members' losses were directly and proximately caused by the Outlaw Enterprise, and the scheme to defraud alleged herein.

**SECOND CAUSE OF ACTION**
**(Violation of the Racketeer Influenced Corrupt**
**Organizations Act, 18 U.S.C. § 1962(d))**

90.    The Stores re-allege and incorporate by reference each of the allegations contained in the paragraphs above as if fully set forth herein.

91.    Section 1962(d) provides:

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

92.    At all relevant times, Outlaw Laboratory, LP, Michael Wear, Shawn

Lynch, and Tauler Smith LLP were "persons" under the meaning of 18 U.S.C. § 1961(3), because each was "capable of holding a legal or beneficial interest in property."  Outlaw Laboratory, LP was associated with the association-in-fact enterprise described herein as the "Outlaw Enterprise," because it was the vehicle upon which the scheme to defraud predicated its legal threats.  Outlaw Laboratory, LP conspired with Michael Wear, Shawn Lynch, and Tauler Smith LLP to violate subsection (c) of § 1962, through agreeing with those other members on the structure, purpose, and conduct of the Outlaw Enterprise, and by taking numerous overt acts in furtherance of the scheme to defraud, including drafting and/or approving the fraudulent demand letters and "draft complaint," setting and/or approving the minimum amounts of protection money that the victims must pay, and by receiving and sharing in the ill-gotten proceeds from the shakedown.  On information and belief, Outlaw Laboratory, LP and Tauler Smith LLP took additional overt acts in conformance with the conspiracy by hiring and/or directing the activities of the "investigators" who were tasked with identifying and selecting the victims of the racket, and/or by making payments to those "investigators" in furtherance of the scheme.

93.     Outlaw Laboratory, LP, Tauler Smith LLP, and their fellow conspirators and members of the Outlaw Enterprise have committed or aided and abetted the commission of at least two acts of racketeering activity (i.e., mail fraud in violation of 18 U.S.C. § 1341) by drafting, signing, and mailing the fraudulent demand letters and "draft complaints" by which the scheme to defraud was perpetrated.  These acts of racketeering activity were related to each other, and are ongoing, such that they pose the threat of continuing racketeering activity.

94.     Outlaw Laboratory LP, Michael Wear, Shawn Lynch, Tauler Smith LLP, and the other members of the Outlaw Enterprise knowingly and intentionally agreed to make the misrepresentations, acts of concealment, and failures to disclose that constitute this scheme to defraud, and either knew or recklessly disregarded

that the misrepresentations (such as the assertion that one "can see" from the FDA notifications that the challenged products are "illegal to sell and subject your company to legal action for racketeering . . . under RICO" and that the TriSteel product was supposedly sold "through many other online and storefront retail locations across the United States") would be material to the victims of the scheme, and knew and intended that the Stores and all members of the classes would rely on the misrepresentations upon which the scheme is predicated.

95.     Outlaw Laboratory LP, Michael Wear, Shawn Lynch, Tauler Smith LPP, and the other members of the Outlaw Enterprise have obtained money belonging to the Payment Class as a result of these violations.  Outlaw Laboratory LP, Michael Wear, Shawn Lynch, Tauler Smith LLP, and the other members of the Outlaw Enterprise have further caused members of the Store Class, the Sued Stores Class, the Threatened Stores Class, and the Payment Class to lose money by causing those stores to remove the challenged products from their shelves, thereby losing sales and revenue from those products.  In the absence of the Outlaw Enterprise scheme, none of the class members would have suffered these injuries. Accordingly, the Stores and all of the class members' losses were directly and proximately caused by the Outlaw Enterprise, and by Outlaw Laboratory, LP's agreement to conspire with the other members of the Outlaw Enterprise to perpetuate the scheme.

### THIRD CAUSE OF ACTION
### (Rescission)

96.     The Stores re-allege and incorporate by reference each of the allegations contained in the paragraphs above as if fully set forth herein.

97.     Skyline Market hereby gives notice of its intention to rescind the "Confidential Settlement Agreement and Release" that it entered with Outlaw Laboratory, LP, and accordingly rescinds that agreement.

98.     There are numerous sufficient grounds upon which Skyline Market is

entitled to rescission of the agreement.  At the time Skyline Market signed the agreement, it did so under duress, given that it had been threatened with liability of "over $100,000 if we prosecute this matter," and was then presented with an offer to get out of that jam for a mere $2,800, or 2.8% of the asserted liability. Defending its legal rights would have cost Skyline Market hundreds of dollars per hour, such that the amount of the minimal demand would have been dwarfed before Skyline Market's attorneys even showed up to the initial case management conference in the threatened action.

99.     Skyline Market and the other members of the class it seeks to represent are also entitled to rescission and restitution of the benefits they conferred on the Outlaw Enterprise because at the time they entered the "Confidential Settlement Agreement and Release," they did not know that their agreement had been predicated upon a scheme to defraud that was illegal *ab initio*, as set forth above, and in Counts 1 and 2.  Accordingly, the agreements entered by Skyline Market and the members of the class it seeks to represent are now void and/or voidable, and those entities are entitled to a return of the amounts that were illegally taken from them.  Outlaw Laboratory LP, Michael Wear, Shawn Lynch, and Tauler Smith LLP are jointly and severally liable for restitution of the amounts that were illegally taken from Skyline Market and the other members of the class it seeks to represent.

## PRAYER FOR RELIEF

**WHEREFORE**, the Stores pray for judgment as follows:

1.     For judgment against Outlaw Laboratory, LP, Michael Wear, Shawn Lynch, and Tauler Smith LLP;

2.     For compensatory and treble damages award jointly and severally against those parties;

3.     For rescission of the agreements entered into between Outlaw Laboratory, LP and Skyline Market and the other members of the Payment Class;

2ND AM. COUNTERCLAIMS / THIRD-PARTY CLAIMS

4.    For restitution to Skyline Market and the other members of the
       Payment Class of the benefits they conferred upon Outlaw Laboratory,
       LP and the other members of the Outlaw Enterprise, to be awarded
       jointly and severally against Outlaw Laboratory LP, Michael Wear,
       Shawn Lynch, and Tauler Smith LLP;

5.    For preliminary and permanent injunctive relief dissolving the Outlaw
       Enterprise, and ordering Outlaw Laboratory, LP, Michael Wear,
       Shawn Lynch, and Tauler Smith LLP not to engage in any further such
       schemes;

6.    For attorneys' fees;

7.    For costs; and

8.    For such other and further relief as the Court deems just and proper.


Dated:  August 20, 2019                        GAW | POE LLP


                                               By:  _____
                                                    Mark Poe
                                                    Attorneys for Roma Mikha, Inc.,
                                                    NMRM, Inc. and Skyline Market,
                                                    Inc.

2ND AM. COUNTERCLAIMS / THIRD-PARTY
CLAIMS

# CERTIFICATE OF SERVICE

### Case No. 3:18-cv-840-GPC-BGS

I HEREBY CERTIFY that on August 20, 2019, I filed the following documents with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day either by Notice of Electronic Filing generated by CM/ECF or by U.S. mail on all counsel of record entitled to receive service.

**SECOND AMENDED COUNTERCLAIMS OF ROMA MIKHA, INC. AND THIRD-PARTY CLAIMS OF NMRM, INC. AND SKYLINE MARKET, INC.**

**EXHIBIT A (DEMAND LETTER)**

**EXHIBIT B (NEGATIVE FDA LAB RESULT)**

GAW | POE LLP

By:

Mark Poe
Attorneys for Roma Mikha, Inc.,
NMRM, Inc., and Skyline Market,
Inc.

CERT. OF SERVICE