UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: OUTLAW LABORATORIES, LP LITIGATION, | Case No.: 18CV840 GPC (BGS) |
| . | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL** |
| | [ECF 116] |

## I.    INTRODUCTION

Counter-claimant Roma Mikha and Third Party Plaintiff NMRM, Inc. and Skyline Market, Inc. (collectively the "Stores") move to compel Plaintiff Outlaw Laboratory, L.P. ("Outlaw") to provide full and complete responses to the Stores Document Requests 1-7, 10, 13-16 and 19-20 and Interrogatories 1-3 and 5-8 which encompass: demand letters, communications between Outlaw and class members, identification of law firms that represented Outlaw in conjunction with these demand letters, settlement agreements, amounts paid in settlement, documents identifying Outlaw employees, documents showing Outlaws current and former partners, and documents related to the manufacture

and sale of Tri-Steel.[1]  (ECF 116, 138,[2] 148.)  The Stores argue the discovery requests are relevant to class certification and the Stores' class counterclaims against Outlaw and are proportionate to the needs of the case.  Outlaw primarily argues the requests are overbroad.

## II.    BACKGROUND

The Stores have alleged counterclaims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and a recession claim on behalf of a class of similarly situated stores.[3]  The Stores allege that since at least December 2017, Outlaw, Outlaw's former attorneys Tauler Smith, and Outlaw's principles, Michael Wear and Shawn Lynch, have engaged in a scheme that includes sending demand letters via U.S. mail to small businesses that threaten the store could be held liable for over $100,000 based on false and misleading statements about potential liability for the sale of certain products by the stores.  (SACC ¶¶ 2, 26, 82-88.)  The SACC alleges Outlaw employs "investigators," some hired through craiglist postings by Outlaw's counsel Tauler Smith, who identify stores selling the products, take pictures of storefronts and shelves in the store with the products and provide that information to others participating in the scheme to target these stores.  (SACC ¶¶ 66, 73, 86, 92.)  The SACC alleges that Outlaw and its attorneys then send the demand letters with FDA notice attached that falsely indicate the store is

---

[1] This is only a very brief overview of the discovery topics at issue.  As explained in the analysis below, the definitions of certain terms explicitly define and limit the scope of these requests significantly.  Those definitions and the scope of the requests is detailed below in analyzing each topic.

[2] The Stores have two reply briefs on file with the Court.  The Stores filed a reply brief accurately noting that Outlaw had failed to timely file an Opposition to the Motion to Compel and seeking a ruling in their favor.  (ECF 138.)  After Outlaw requested and was granted an extension to file a late Opposition, the Stores filed an Amended Reply brief.  (ECF 148)  The Court has considered all the briefs.

[3] The Court only briefly summarizes the counterclaims and third-party claims asserted in the Stores' Second Amended Counterclaims ("SACC") as necessary for purposes of ruling on the Motion.

illegally selling products in violation of RICO and the Lanham Act. (SACC ¶¶ 2, 23-24, 26-52, 84-86, 88.) The demand letters also allegedly include pictures taken of receipts for purchase of the products by investigators. (SACC ¶¶ 68, 73, 91.) Follow-up communications then offer to settle for increasingly lower amounts, including as low as $2,500. (SACC ¶¶ 3-4, 56, 72, 87, 98.)

The Stores seek to bring these claims on behalf of a Store Class, "All business entities in the Unites States that received a demand letter substantially similar to the letter received by the class representatives" with three subclasses: (1) Sued Stores;[4] (2) Threatened Stores;[5] and (3) a Payment Class.[6] (SACC ¶¶ 77-81.) These subclasses encompass three different outcomes that have resulted from Outlaw's demand letters. Some stores, like defendant Roma Mikha, received the demand letter, removed the products from their shelves (losing out on those sales) based on their initial belief in the false assertions in the demand letter, but did not pay a settlement and were sued. (SACC ¶¶ 33, 77, 89.) Others, like NMRM, received the demand letter, removed the products

---

[4] Proposed Sued Stores:
> All business entities in the United States that received a demand letter substantially similar to the letter received by Roma Mika, Inc. and that were subsequently named as defendants in the state or federal litigation brought by Outlaw Laboratory, LP.
> (SACC ¶ 77.)

[5] Proposed Threatened Stores:
> All business entities in the United States that received a demand letter substantially similar to the letter received by NMRM, Inc. and that were not thereafter named as defendants in state or federal litigation brought by Outlaw Laboratory, LP.
> (SACC ¶ 78.)

[6] Proposed Payment Class:
> All business entities in the United States that received a demand letter substantially similar to the letter received by Skyline Market and that subsequently paid or agreed to pay money to Tauler Smith LLP, Outlaw Laboratory, or an agent of either.
> (SACC ¶ 79.)

from the shelves, but did not pay the settlement and were not sued.  (SACC ¶¶ 34, 78, 89.)  And, still others, like Third Party Plaintiff Skyline Market, removed the products from the shelves and paid a settlement.  (SACC ¶¶ 4, 22, 35, 69, 71, 89, 97-99.)  The Stores also assert a claim for rescission on behalf of Skyline Market and the class to rescind the settlement agreements entered into with Outlaw  (SACC ¶¶ 96-99.)

The actual discovery requests at issue and related definitions are included below as necessary in analyzing the propriety of the discovery by each topic.

## III.  DISCUSSION

### A.  Legal Standards

The Stores seek to compel responses to both document requests and interrogatories to obtain information and documents the Stores claim is relevant primarily to class certification.  Before analyzing the specific requests, the Court outlines the applicable authority.

#### 1.  Requests for Production of Documents

"A party may serve on any other party a request within the scope of Rule 26(b) to produce any designated documents or electronically stored information."  Rule 34(a)(1)(A).  The request must describe the document sought "with reasonable particularity" and any "objection must state whether any responsive materials are being withheld on the basis of that objection."  Rule 34(b)(2).  The requesting party may move to compel the production of responsive documents if a party fails to produce documents.  Rule 37(a)(3)(B)(iv).

#### 2.  Interrogatories

"An interrogatory may relate to any matter that may be inquired into under Rule 26(b)."  Fed. R. Civ. P. 33(a)(2). "Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath." Rule 33(b)(3).  "The grounds for objecting to an interrogatory must be stated with specificity" Rule 33(b)(4).  The party propounding the interrogatory may move to compel an answer if the party fails to answer.  Rule 37(a)(3)(B)(iii).  "If the answer to an interrogatory may be determined by

4

examining, auditing, compiling, abstracting, or summarizing a party's business records . . . , and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by" producing or providing an opportunity for the moving party to examine records.  Rule 33(d).

### 3.    Rule 26

As the party seeking to compel discovery, the Stores have "the burden of establishing that [their] request[s] satisfy the relevancy requirements of Federal Rule 26(b)(1)." *Louisiana Pac. Corp. v. Money Market 1 Inst. Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012) (citing *Soto v. City of Concord*, 162 F.R.D. 603, 610 (N.D. Cal. 1995)).  Outlaw, as the party opposing discovery, "has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining, and supporting its objections with competent evidence." *Id.* (citing *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002)). "An opposing party can meet its burden by demonstrating that the information is being sought to delay bringing the case to trial, to embarrass or harass, is irrelevant or privileged, or that the person seeking discovery fails to show need for the information." *Colaco v. ASIC Advantage Simplified Pension Plan*, 301 F.R.D. 431, 434 (N.D. Cal. 2014) (citing *Khalilpour v. CELLCO P'ship*, No. C 09-02712 CW (MEJ), 2010 WL 1267749, at *3 (N.D.Cal. April 1, 2010)); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 353 n. 17 (1978).

Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). "District courts have broad discretion in controlling discovery" and "in determining relevancy." *Laub v. Horbaczewski*, 331 F.R.D. 516, 521 (C.D. Cal. 2019) (citing *Hallett*

*v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) and *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005)).

Following the 2015 Amendments to Rule 26, it is clear that "[r]elevancy alone is no longer sufficient—discovery must also be proportional to the needs of the case." *In re Bard IVC Filters Prods. Liability Litig.*, 317 F.R.D. 562, 564 (D. Ariz. 2016). "The court's responsibility, using all the information provided by the parties, is to consider these, [undue burden or expense and importance of information sought,] and all the other factors in reaching a case-specific determination of the appropriate scope of discovery." Fed. R. Civ. P. 26 advisory committee's notes. In deciding whether a request is unduly burdensome, a court must balance the burden to the responding party against the benefit to the party seeking the discovery. *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1032 (E.D. Cal. 2010)(collecting cases).

As discussed more fully below, (III.B.1), the Court's discretion in controlling discovery extends to whether to allow, and the appropriate scope of, class discovery *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) ("District courts have broad discretion to control the class certification process, and '[w]hether or not discovery will be permitted . . . lies within the sound discretion of the trial court.'") (citing *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 209 (9th Cir. 1975)).

Rule 26(b)(2) also requires the court, on motion or on its own, to limit the frequency or extent of discovery otherwise allowed by the rules if it determines that (1) "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;" (2) "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action;" or (3) "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii).

Under Rule 26(c), a party may move for, or the court may issue, a protective order "to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense." Among numerous options under Rules 26(c) are forbidding disclosure,

specifying terms for disclosure, prescribing a different discovery method, and limiting disclosure to certain matters.

### 4.     Rule 23

Most of the discovery requests discussed below concern discovery sought for purposes of certifying and maintaining the Stores' SACCs as a class action. Specifically, the Stores argue the discovery sought is necessary to show numerosity, commonality, and typicality under Rule 23(a) as well as predominance, ascertainability,[7] superiority, and manageability, and that damages are subject to common proof. Because the Stores rely heavily on class issues to demonstrate this discovery is relevant, the Court briefly summarizes Rule 23's requirements.[8]

"Rule 23 of the Federal Rules of Civil Procedure contains two sets of class certification requirements set forth in Rule 23(a) and (b)." *Moyle v. Liberty Mut. Retirement Ben. Plan*, 823 F.3d 948, 964 (9th Cir. 2016) (citations omitted); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (Explaining that in addition to proving Rule 23(a)'s requirements are met, "[t]he party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).").

///

///

---

[7] The Court attempts to include the standards for all the bases the Stores rely on for relevancy, but does not include a standard for "ascertainability," because the Ninth Circuit has "refraine[d] from referring to 'ascertainability' . . . because courts ascribe widely varied meanings to that term," and the Ninth Circuit has explained that there is no "ascertainability requirement" in this Circuit. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 nn.3-4 (9th Cir. 2017). Rather, the Ninth Circuit "address[es] the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues . . . through Rule 23's enumerated requirements." *Id.* at 1124 n.4.

[8] The Court is not setting forth all requirements or inquiries related to class certification. Rather, the Court is briefly summarizing the legal standards for the requirements and factors the Stores rely on for purposes of relevancy as necessary to determine if the sought discovery is relevant.

### a) Rule 23(a)

"Rule 23(a) requires parties seeking class certification to establish: (1) that the class is so large that joinder of all members is impracticable (numerosity); (2) that there are one or more questions of law or fact common to the class (commonality); (3) that the named parties' claims are typical of the class (typicality); and (4) that the class representatives will fairly and adequately protect the interests of other members of the class (adequacy of representation)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, (9th Cir. 2011). (citing Fed. R. Civ. P. 23(a)).

"Rule 23(a)(1) requires the party seeking certification to show the 'class is so numerous that joinder of all members is impracticable." *In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 318 (S.D. Cal. 2019) (quoting Rule 23(a)(1)). While there is no "fixed numerical threshold," the Ninth Circuit has observed that 40 members is generally sufficient and less than 15 is too small. *Rannis v. Recchia*, 380 Fed. Appx 646, 651 (9th Cir. May 27, 2010) (citing *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980)).

Commonality[9] requires a "common contention" that "must be of such a nature that is it capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[A] class meets Rule 23(a)(2)'s commonality requirement when the common questions it has raised are 'apt to drive the resolution of the litigation,' no matter their number." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014) (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*,

---

[9] "The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982).

731 F.3d 952, 962 (9th Cir. 2013) and summarizing cases applying *Dukes* decision with regard to commonality). "Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised." *Id.*

The test of typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992)). A plaintiff can show typicality by "showing [plaintiff's] injuries . . . arose 'from the same event or practice or course of conduct that gave rise to the claims of other class members and [their] claims were based on the same legal theory." *Ramirez v. Transunion, LLC*, -- F.3d --, 2020 WL 946973 at *17 (9th Cir. Feb. 27, 2020).

### b) Rule 23(b)

One[10] of three ways a class action may be maintained is if "the court finds that the questions of law or fact common to the class members *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) (emphasis added).

Among the matters a court may consider in the Rule 23(b)(3) analysis is "the likely difficulties in *managing* a class action." Rule 23(b)(3)(D) (emphasis added); *see also Brisenos*, 844 F.3d at 1127 (describing "the manageability criterion of the superiority requirement" in Rule 23(b)). "Rule 23(b)(3) requires that a class action be 'superior to other available methods for fairly and efficiently adjudicating the controversy,' and it

---

[10] The Court only discusses one of the three options because, based on the requirements they rely on in their Motion, it appears to be the only option the Stores rely on for the discovery sought.

specifically mandates that courts consider the likely difficulties in managing a class action.'" *Briseno*, 844 F.3d at 1127-28 (citing Rule 23(b)(3)). Although the Ninth Circuit has also observed in rejecting the creation of an administrative feasibility requirement that "'courts should not refuse to certify a class merely on the basis of manageability concerns." *Id.* at 1128 (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015) (other citations omitted). "Rule 23(c) enables district courts to divide classes into subclasses or certify a class as to only particular issues." *Briseno*, 844 F.3d at 1128 (citing Rule 23(c)(4)-(5)).

Rule 23(b)(3)'s predominance requirement demands that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016) ("The Supreme Court has noted that, 'if anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).").

### 5. RICO

As noted above, the Stores SACC include claims for violation of RICO. In considering whether discovery is relevant for purposes of class certification and maintenance, the underlying claims are important. Accordingly, the Court also sets out the elements of the Stores' RICO claim for the analysis that follows. Because one of the district judge's decisions[11] in this case provides the relevant standard, the Court relies on it here:

> RICO's private right of action is contained in 18 U.S.C. § 1964(c), which provides in relevant part that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost

---

[11] This particular decision dismissed the Stores' RICO claim under the *Noerr-Pennington* doctrine, however, the Stores were later able to amend and add additional parties to this claim.

of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

Section 1962, in turn, prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To recover under § 1962(c), a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation. *See Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).

One type of predicate act of racketeering activity recognized by RICO, 18 U.S.C. § 1961(1) is mail fraud under 18 U.S.C. § 1341. A mail fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States mails or causing a use of the United States mail in furtherance of the scheme; and (3) specific intent to deceive or defraud. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131, 170 L.Ed.2d 1012 (2008) ("Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." (quoting 18 U.S.C. § 1341)). The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck v. United States*, 489 U.S. 705, 712, 109 S. Ct. 1443, 103 L. Ed.2d 734 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information," *id.* at 715, 109 S. Ct. 1443.

*In re Outlaw, LP Litig.*, 352 F.Supp. 3d 992, 1000 (S.D. Cal. 2018).

## B. Analysis

### 1. Class Discovery

Before proceeding to the categories of discovery raised in the Motion and the appropriate scope of that discovery, the Court addresses two overarching issues related to class discovery: (1) Outlaw's assertion that the Stores should be precluded from obtaining

any class discovery prior to class certification and (2) in general whether the Stores need the discovery requested for purposes of class certification.[12]  As explained further below, the Court finds the Stores are entitled to class discovery before class certification and have shown that most of the discovery sought is relevant for class certification.

Many of the discovery requests at issue in this Motion seek discovery for purposes of establishing one of Rule 23's requirements.  In moving to compel further responses to these discovery requests, the Stores have explained how the discovery sought is relevant and necessary to meet specific class certification requirements.  In opposition, Outlaw has not disputed the Stores' relevancy arguments as to the specific class certification requirements.  Instead, Outlaw argues their scope should be limited and argues that the undersigned should refuse to allow class discovery until the Stores' request to certify a class is granted.  It appears Outlaw is arguing that the Stores should not be allowed any class discovery prior to class certification.  The Court addresses these two overarching issues before addressing the parties' arguments on the scope of the discovery requests by topic.  (III.B.3.)

Precertification discovery "lies within the sound discretion" of the court. *Doninger v. Pac. Northwest Bell, Inc*., 564 F.2d 1304, 1313 (9th Cir. 1977); *see also Artis v. Deere & Co.*, 276 F.R.D. 348, 351 (N.D. Cal. 2011) (citing *Vinole*, 571 F.3d at 942).  "Although a party seeking class certification is not always entitled to discovery on the class certification issue, [the Ninth Circuit has] stated that the propriety of a class action cannot be determined in some cases without discovery and that the better and more advisable practice for a District Court to follow is to afford the litigants an opportunity to present

---

[12] The relevancy of the discovery sought for purposes of class certification is discussed in this section and further below, but primarily only to the extent disputed by Outlaw. Because Outlaw's Opposition does not address many of the Stores arguments regarding the need for this discovery for purposes of specific class certification requirements, in the interest of judicial economy, the Court elects not to address those bases not disputed by Outlaw unless otherwise noted.

evidence as to whether a class action was maintainable.'" *Vinole*, 571 F.3d at 942 ("Our cases stand for the unremarkable proposition that often the pleadings alone will not resolve the question of class certification and that some discovery will be warranted.")(internal citations omitted). To deny discovery when "the propriety of a class action cannot be determined . . . without discovery, for example where discovery is necessary to determine the existence of a class or set of subclasses . . . would be an abuse of discretion." *Id.* However, if "the plaintiffs fail to make even a prima facie showing of Rule 23's prerequisites, . . . the burden is on the plaintiff to demonstrate that discovery measures are likely to produce persuasive information substantiating class allegations. *Doninger*, 564 F.2d at 1313.

First, the Court notes that the assigned district judge has already effectively concluded that class discovery is appropriate in this case. (ECF 85 at 12-14 (rejecting Outlaw's request to preemptively deny class certification as premature based in part on the parties not having taken formal discovery).) Given the Stores' class allegations, including the proposed class and subclasses, have already withstood Outlaw's preemptive challenge to class certification through a challenge to the pleadings, and the district judge has already indicated class discovery is appropriate in this case, the Court need not revisit these issues. Class discovery prior to certification is appropriate in this case.

Second, the Court finds, subject to the limitations on scope discussed below, the Stores are entitled to class discovery to, at a minimum, (1) identify class members for purposes of establishing numerosity – "the class is so numerous that joinder of all members is impracticable" (Rule 23(a)(1)); (2) demonstrate that the Stores' claims are typical of the class – "the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and (3) categorize the class members into the alleged subclasses. *Doninger*, 564 F.3d at 1313 (explaining it "would be an abuse of discretion" to deny discovery when "discovery is necessary to determine the existence of a class or set of subclasses"). Additionally, this information is largely solely within Outlaw's possession because only Outlaw has the demand letters it sent to class members and the

settlement agreements with the class members that may or may not have followed. This information is central to identifying how may stores received Outlaw's demand letters with false statements and classifying them into the proposed subclasses of those that were sued (proposed sued subclass), were not sued (threatened subclass), or paid a settlement (proposed payment subclass) following receipt of Outlaw's demand letters.

The appropriate scope of the discovery as to specific topics, requests for production and interrogatories is discussed further below, but the Court finds the Stores are entitled to precertification class discovery and have established that, other than the limitations imposed below, the discovery sought is relevant for purposes of class certification.

## 2. Discovery Requests at Issue

### a) Definitions

The discovery requests at issue are discussed below by topic, however, there are numerous defined terms (capitalized terms) within the requests that are part of numerous requests and accordingly numerous topics. Given their applicability across numerous topics the definitions are provided first and then the topics are discussed.[13]

YOU is defined as:

Plaintiff Outlaw Laboratory, LP, and all of its attorneys, agents, brokers, employees, contractors, officers, directors and all persons or entities acting or purporting to act on its behalf or under its control, including independent contractors[14]

---

[13] Definitions that are only at issue as to one topic are provided in the discussion of that topic.

[14] Although Outlaw has raised no challenge to the scope of this definition with regard to any of the discovery requests that include it, the Court has considered it because of its breadth. The Court concludes that while it is a very broad definition, the allegations of the SACC's provide justification for such a broad definition. The SACC details the ways in which Outlaw and its counsel Tauler Smith used others who could be considered agents, employees, contractors, independent contractors, or other entities acting on Outlaw's behalf. The breadth of the definition is intended to encompass all the possible entities or individuals enlisted to perpetrate the scheme alleged in the SACC.

RETAIL STORE is defined as:

Has the same meaning as it has where YOU use that term in the COMPLAINT, and includes any business entity that sells merchandise to the general public from a "brick and mortar" location.

DEMAND LETTER is defined as:

Any written communication YOU sent to anyone in the United States, that (a) concerns one or more ENHANCEMENT PRODUCTS, (b) threatened litigation by YOU against the recipient, and (c) offered any manner of "settlement" of YOUR asserted claims in exchange for money

ENHANCEMENT PRODUCTS are defined as follows:

Any sexual enhancement product which, as alleged by YOU in the COMPLAINT,[15] contains an undisclosed and/or illicit pharmaceutical ingredient. The term ENHANCEMENT PRODUCTS includes all such products that YOU identified in any DEMAND LETTER.[16]

### 3. Discovery Topics Raised by the Parties' Dispute

#### a) Demand Letters and Identities of Recipients

This topic encompasses RFP No. 1 and Interrogatories Nos. 1 and 2.[17] More specifically, the Stores' RFP requests:

A copy of each and every DEMAND LETTER that YOU have sent to a RETAIL STORE in the United States.

---

[15] "Complaint" is in turn defined as "the operative complaint in this action, which was filed in San Diego County Superior Court on July 25, 2018 and removed to this court on August 12, 2018." This is the Complaint on record in the 18cv1882 docket. (ECF 1-2). The Complaint lists a variety of "Rhino Products" described as male enhancement pills that allegedly contain undisclosed pharmaceuticals. (ECF 1-2 ¶ 1.)

[16] The Court notes that it is confusing to define enhancement product by reference to demand letter, which is itself defined by enhancement product. However, the Court understands the definition of enhancement product to be defined by Outlaw's definition of it within the Complaint, (*see* footnote 15) and the products identified in a demand letter.

[17] The Court relies on the requests set forth in the Stores' briefing throughout.

Interrogatories 1 and 2 ask Outlaw to:

> IDENTIFY each RETAIL STORE in the United States to which YOU
> have sent a DEMAND LETTER
> ***
> IDENTIFY each RETAIL STORE in the United States to which YOU
> have sent a DEMAND LETTER that made any reference to the
> Racketeer Influenced and Corrupt Organization Act.

The Stores argue the demand letters and the identities of those the demand letters were sent to are relevant and necessary to identify all class members for purposes of establishing numerosity, the superiority of the class action, manageability, typicality, adequacy, predominance, and ascertainability. Additionally, the Stores assert that the demand letters are needed to classify the class members among the subclasses. The Court first addresses the request for production of the demand letters and then the interrogatories.

Outlaw does not specifically address any of these relevancy arguments. Instead, Outlaw argues the requests are overbroad in two specific ways. Outlaw argues it should only have to produce demand letters that specifically assert a store violated RICO and also resulted in a settlement. Outlaw argues that because the class definition only encompasses class members that received letters that are "substantially similar" to that received by the class representative, only demand letters that assert that the store is violating RICO should be produced. Outlaw also seeks to narrow that narrowed production further to only those demand letters that resulted in a settlement because it asserts that those are the only stores that could have suffered any harm.[18]

---

[18] Outlaw combines its argument regarding the proper scope of the demand letter production with its argument regarding the next topic, its communications with retail stores relating to demand letters. As explained below, the Court's analysis of Outlaw's attempt to limit the demand letters for these two reasons also applies to the communications topic discussed below. (III.B.3.b)

The Court will not delve into every possible way the Stores argue these demand letters are relevant for class certification, particularly when Outlaw has not specifically challenged any of them. In short, the Court finds that the demand letters sought in the request are relevant, at a minimum, for purposes of identifying class members to establish numerosity, categorizing the class members among the defined subclasses in conjunction with other discovery requested, and establishing that the Stores' claims are typical of the class. *See Doninger*, 564 F.3d at 1313 (finding the denial of discovery when "the propriety of a class action cannot be determined . . . without discovery, for example *where discovery is necessary to determine the existence of a class or set of subclasses . . .* would be an abuse of discretion.") (emphasis added). As discussed above, the demand letters are essentially the foundation, or first step, of the scheme alleged in the SACC. (II.) And, because the requests are limited to only demand letters that concern the enhancement products, threaten litigation, and offer settlement, the requests are sufficiently narrowed to conduct that allegedly befell the class. Additionally, knowing who received the demand letters in combination with other information, discussed below, will also allow the Stores to determine which, if any, subclass they belong to. But, at a minimum, the Stores need the demand letters to know how many stores were targeted by the alleged scheme. The next step of the scheme may be different, hence different subclasses, but the demand letters are the common act across all the subclasses and the foundation of the alleged scheme. This discovery is relevant for class certification purposes. *See Hamm v. Cal. Dev. Co.*, 509 F.2d 205, 210 (1975) (Finding denial of discovery "where discovery is necessary to determine the existence of a class or set of subclasses" would be an abuse of discretion); *see also Artis*, 276 F.R.D. at 352 (Finding disclosure of contact information for class members is "common practice in the class action context.") .

Additionally, the Court has considered whether it would be a more proportional course to have Outlaw respond to the interrogatories instead of providing the letters because it could address the numerosity issue sufficiently. However, as the Stores point

out, the demand letters are also important in showing the members of the class all experienced this same conduct by Outlaw, *i.e.* as to the demand letters, that they made uniform assertions and threats. This is relevant to show typicality, *i.e.* that the Stores suffered "the same event or practice or course of conduct that gave rise to the claims of other class members and [their] claims were based on the same legal theory." *Ramirez*, 2020 WL 946973 at *17; *see also Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) ("We do not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries *result from the same, injurious course of conduct*.") (emphasis added).

As to Outlaw's attempt to narrow the requests to only demand letters that assert a store violated RICO and demand letters that resulted in a settlement, the Court is not persuaded. First, limiting the production to only demand letters asserting a RICO violation would have the effect of the undersigned redefining or striking class allegations through a discovery request. Defining a "substantially similar" letter in the class definition to be only a letter asserting a RICO violation changes the scope of the definition from substantially similar to a letter asserting a RICO violation. It changes the class definition. The Court recognizes the SACC places more emphasis on the assertion of a RICO violation in the letters than a Lanham Act violation, but the Court finds for purposes of discovery, the Stores are entitled the scope requested. The Stores counterclaims do include allegations that one of Outlaw's most fear-invoking false statements in their letters to stores is that the store is violating RICO and the allegations go to great lengths to establish this assertion is completely baseless. (SACC ¶¶ 27-28, 30-31, 40-45, 47.) Additionally, the sample form letter attached to the SACC includes a claim the store has violated RICO with a form civil complaint including a RICO claim. (SACC, Ex. A.) However, there is nothing in the SACC that specifically limits the Stores' claims to only those instances where the demand letter sent to a store asserted a RICO violation. On the contrary, the SACC includes a lengthy list of other false and

misleading statements in the letters, including the assertion the store has violated the Lanham Act and Outlaw will be entitled to punitive and triple damages under it. (SACC ¶¶ 27-29, 38-39, 46, 48, 50-52.) Outlaw has selected one allegedly false and misleading statement and attempted to limit the class to that statement when the allegations of the SACC and the class definition are not so narrow. The discovery produced and certification process might ultimately result in that sort of narrowing, but it is not appropriate for the Court to effectively narrow a class definition via the denial of relevant discovery.

The Court is also not persuaded that the demand letters should be limited to only those that resulted in a settlement. The SACC alleges that the class representatives suffered injuries other than paying a settlement. (SACC ¶¶ 33-35, 89.[19]) Roma Mika, NMRM, and Skyline all initially believing the false demand letter, removed the products from their shelves and lost legitimate sales. (SACC's ¶¶ 33-34.) Given the scope of the allegations in the SACC and the scope of the class definitions, the Court finds the demand letters requested are relevant and should not be limited to only those asserting a RICO violation that resulted in a settlement.

The next question is whether the request is proportional to the needs of the case. As discussed above, the demand letters are a foundational part of the RICO claim because they are a common part of the pattern of conduct by Outlaw that all the class members allegedly experienced. Additionally, this discovery has the potential to factor significantly in numerosity. The subclass divisions would divide them further, but if the number of stores that received uniform demand letters is small, it would weigh heavily in determining whether class treatment is appropriate. In this respect, it is discovery that goes to a very important issue in the case and is likely to be very beneficial. *See* Rule 26(b)(1) (listing among factors to consider for proportionality, "the importance of the

---

[19] These three categories correspond to the three subclasses, threatened, sued, and paid settlement.

discovery in resolving the issues" and "whether the burden or expense of the proposed discovery outweighs its likely benefit"). Outlaw asserts that the production will be "unduly burdensome" and "will require significant resources" but provides the Court with no other explanation. This is not an instance where the burden of the production is readily apparent. Outlaw does not explain how the documents are kept, if they are searchable electronically, or otherwise provide the Court with any explanation that would even suggest the burden is significant enough that the discovery should be limited because the burden of it "outweighs its likely benefit." Rule 26(b)(1). Additionally, this information, like most of the information sought in this Motion is likely exclusively in the possession of Outlaw. *See id.* (listing among factors to consider for proportionality "the parties' relative access to relevant information"). Here, the Stores have crafted a relatively narrow document request that will allow them to identify the members of the class and, in conjunction with responses to other discovery, categorize them into subclasses.

As to the interrogatories, the Court finds they are largely duplicative of the letters that will be produced. *See* Rule 26(b)(2) ("On motion or on its own, the court must limit the frequency or extent of discovery otherwise allow by the rules or by local rule if it determines that . . . the discovery sought is unreasonably cumulative or duplicative, . . . or the party seeking discovery has had ample opportunity to obtain the information by discovery in the action.") The most persuasive bases for producing the demand letters is identification of class members and classification of them into subclasses based on the demand letters in combination with other discovery responses. The identities of the retail stores that have been sent a demand letter (Interrogatory No. 1) and the identifies of retail stores that have been sent a demand letter that included a RICO violation (Interrogatory No. 2) will be contained in the demand letters produced. In this respect the responses to the interrogatories are duplicative and will already be available to the Stores from the demand letter production itself. As the Stores allege, they should be able to provide notice to class members, if the class is certified, from the addresses "set forth at the top of

each of the fraudulent demand letters." (SACC ¶ 81.) The only additional information that would be disclosed by responding to the interrogatories is present and last known contact information for the recipients of the letters.[20] The only possible benefit of obtaining responses to the interrogatories in addition to the document production is expediting notice to the class members if the case reaches that stage. However, the benefit of that additional information at this point is minimal. It is also not particularly important to resolving issues in the case. Rule 26(b)(1) (listing among factors to consider for proportionality "the importance of the discovery in resolving the issues.").

Outlaw must respond to RFP No. 1. Outlaw is not required to respond to Interrogatories 1 and 2.

### b) Communications with Class Members

This topic encompasses RFP No. 10. More specifically, this RFP requests:

> ALL COMMUNICATIONS YOU sent to or received from any RETAIL STORE or its counsel in the United States RELATING TO a DEMAND LETTER

---

[20] IDENTIFY is defined as:

When used with reference to a person, means to state:
  a. the name of such person if known, or if not known, as complete a description of such person as is possible
  b. the present address, if known, or if not known, the last known address of such person;
  c. the present telephone number, including area code, or if not known, the last known telephone number of such person; and
  d. the capacity of such person (whether individual, partnership, corporation, or otherwise).
When used in reference to a business entity, means to state:
  e. the name of such business;
  f. the address of the business'
  g. the name of YOUR contact at that business, whether the proprietor or the business's attorney;
  h. the telephone number including area code.

RELATING TO means:

referring to, concerning, pertaining to, discussing, mentioning,
containing, reflecting, evidencing, constituting, describing, displaying,
showing, identifying, proving, disproving, consisting of, arising out
of, supporting or contradicting

COMMUNICATION means

any transmission of information from one person to another, including
without limitation by personal meeting, telephone, letter facsimile, e-
mail, instant messaging service, Skype, text message, posts and
messages on social media platforms such as Facebook and LinkedIn,
and other similar forms of electronic correspondence

The Stores argue that this discovery is relevant to show how Outlaw operates the
scheme and identify class members for purposes of class certification.  More specifically,
they argue that these documents will show that Outlaw starts by threatening liability of
$100,000 and then, through subsequent communications, lower settlement offers are
made.  They also contend that the communications will identify class members and
support typicality, adequacy, commonality, manageability, and predominance as well as
confirm Outlaw co-conspirators' knowledge that settlements were purely nuisance rather
than true disputed claims.  The Stores additionally argue the communications will
identify other members of Outlaw's conspiracy.

In Opposition, Outlaw again does not address the relevancy of this discovery for
purposes of class certification or otherwise, as is their obligation.  As the party opposing
the discovery, Outlaw has the burden of "clarifying, explaining, and supporting its
objections with competent evidence." *Louisiana Pac.*, 285 F.R.D at 485 (explaining
obligations of party opposing discovery).  As noted above, Outlaw combines its argument
regarding this topic with its argument regarding the demand letters.  In this respect,
Outlaw argues that it should only produce communications regarding demand letters that
asserted a RICO violation and also resulted in a settlement.  The Court rejects those
arguments for the same reasons set forth above.  (III.B.3.a).)

However, the Court has independently considered the relevancy of this discovery and finds it is relevant. First, the limitation that communications relate to a *demand letter* is a significant limitation on the scope of the discovery requested because demand letter is narrowly defined. The universe of communications with the retail stores is broad, particularly given the vague definition the Stores provide for retail stores,[21] however, by requiring the communication relate to a demand letter, the scope is significantly smaller because a demand letter must threaten litigation, concern an enhancement product, and offer settlement in exchange for money. This limitation, already built into the definition, narrows the scope. However, to be sure the scope is limited to relevant discovery, the Court clarifies and narrows the request to communications that relate to demand letters that threaten litigation based on statements about enhancement products[22] and offer to settle in exchange for money. This would include communications that follow a demand letter about the demand letter or about settlement of claims originally identified in the demand letter. These communications will likely evidence the course of conduct described in the SACC.

As narrowed, this discovery is relevant to showing the class members suffered a common course of conduct by Outlaw in violation of RICO. As discussed above with regard to the demand letters, showing the class members experienced a similar course of conduct by Outlaw is relevant to show typicality, *i.e.* that the Stores suffered "the same event or practice or course of conduct that gave rise to the claims of other class members and [their] claims were based on the same legal theory." *Ramirez*, 2020 WL 946973 at *17; *see also Parsons*, 754 F.3d at 685 ("We do not insist that the named plaintiffs'

---

[21] Like the definition of enhancement products, the Stores rely on the definition of retail stores in the July 25, 2018 Complaint filed in San Diego Superior Court and then removed to this Court on August 12, 2018. (*See infra* note 15.) However, in contrast to the definition of enhancement product based on the Complaint, how Outlaw defined "retail stores" in the Complaint is not so clear.

[22] See footnote 16.

injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries *result from the same, injurious course of conduct*.") (emphasis added).[23]  Outlaw's scheme extends beyond the initial demand letter.  As set forth above, the SACCs allege Outlaw scared businesses with demand letters containing false and misleading statements and alleging liability at $100,000 and then followed them with offers to settled for increasingly smaller amounts.  (II.)  Outlaw might then obtain a settlement, sue the target store, or maybe take no further action.  (*Id.*)

Although, as discussed above, the demand letters are the first conduct the stores experienced, the scheme alleged involves the next steps by Outlaw that would be evidenced in their follow-up communications with the stores.  The course of this conduct might show Outlaw was engaging in a uniform course with all stores or that some stores were treated differently for particular reasons.  These consistencies from uniformity or unique treatment could establish (or destroy) commonality and show whether "questions of law or fact common to class members predominate over any questions affecting individual members" for purposes of Rule 23(b)(3)'s predominance requirement. *Vaquero*, 824 F.3d at 1154; *see also* Rule 23(a)(2) (One or more members of a class may be sued as representative parties on behalf of all members only if  . . . there are questions of law or fact common to the class.")

The Court also notes that the Stores will be required to show that their "damages resulted from [Outlaw's] conduct" to establish predominance.  *Vaquero*, 824 F.3d at 1154.  The subclasses in the SACC and the respective class representatives appear intended to deal with the diverging ways class members' damages will be proven

---

[23] As with other topics at issue, the Court's conclusion that the discovery is relevant for purposes of one issue, for instance typicality, does not necessarily mean it is not relevant for other class certification requirements, for instance the similar requirement of commonality or related issue of predominance.

(threatened, sued, paid settlement) and Outlaw's communications with class members may provide the evidentiary proof the Stores will need to show which subclasses the class members fall into and whether there are enough members in the subclasses for numerosity. Even if the communications were not necessary to establish numerosity for the class as a whole, the communications are important in determining how many class members fall into each subclass and whether numerosity is met for each subclass. *See Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 587 (S.D. Cal. 2010) (citing *Betts. v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1982) and Rule 23(c)(5) (Explaining Rule 23(a)'s "requirements must be satisfied with respect to each class and subclass.").

The Court has also considered whether this discovery is proportional to the needs of the case. Given Outlaw addressed this topic in conjunction with its argument regarding the demand letters, it makes the same unexplained and unsupported assertions that responding "will require significant resources" and that it is "unduly burdensome." The Court again rejects these assertions for the same reasons discussed above. (III.B.3.a) Additionally, the Court finds this discovery is important to the resolving numerous issues in the case, *i.e.* the class certification issues discussed above and Outlaw's communications with the retail stores are likely to be only realistically obtainable through Outlaw. Rule 26(b)(1) ("importance of resolving discovery issues" and "parties' relative access to the relevant information" are factors in proportionality).

Outlaw shall respond to RFP No. 10 as clarified and narrowed by the Court.

### c) Identities of Law Firms That Have Represented Outlaw

This topic addresses Interrogatory No. 5. More specifically, the Stores' request Outlaw:

> IDENTIFY each law firm that has represented YOU in
> conjunction with either a DEMAND LETTER or any litigation
> YOU have filed RELATED TO ENHANCEMENT
> PRODUCTS

///

The Stores argue Outlaw's production of only demand letters sent by Tauler Smith to the defendants in *this* litigation and only law firms Outlaw used to pursue *this* litigation are insufficient. Additionally, the Stores argue the law firms are both witnesses and potential members of the Outlaw scheme, *i.e.* co-conspirators. They contend that if Tauler Smith is the only firm that has represented Outlaw, then Outlaw should be compelled to provide that answer.

Outlaw argues this interrogatory, like the demand letters discussed above, should be limited to law firms that represented Outlaw in conjunction with demand letters that include a threat of a RICO violation by the target store. Outlaw also seems to argue that this discovery should not be allowed because the Stores might use it to identify additional members of the scheme and attempt to add them as parties in the case. Finally, Outlaw argues that the identity of Outlaw's attorneys is a matter of public record and available on PACER[24] which the Stores' counsel should have access to. The Court presumes this last argument only regards the second portion of the interrogatory seeking the identity of firms that have represented Outlaw in any *litigation* related to enhancement products given only law firms associated with the litigation component would be in PACER.

The Court agrees that only responding as to defendants in this litigation is incomplete and insufficient because it does not fully respond to this interrogatory absent a declaration indicating that Tauler Smith is the only law firm that has represented Outlaw in conjunction with a demand letter or any litigation regarding the enhancement products. However, the Court must also consider Outlaw' other challenges to this interrogatory.

---

[24] "Public Access to Court Electronic Records (PACER) is an electronic public access service that allows users to obtain case and docket information online from federal appellate, district, and bankruptcy courts and the PACER Case Locator." PACER, http://www.pacer.gov (last visited 3/2/2020).

The Court finds this interrogatory is largely properly limited in scope. The first portion of Interrogatory No. 5 is because it only seeks the names of law firms representing Outlaw in conjunction with demand letters.[25] Demand letters are limited to those that threatened litigation, concern an enhancement product, and sought money in exchange for settlement. Limiting it to law firms that provided representation in conjunction with a demand letter confines the interrogatory to relevant information. Given the SACC allegations that attorneys for Outlaw have participated in the scheme of sending false and misleading demand letters with claims of $100,000 in liability followed by lower settlement offers through counsel, the Stores have alleged that Outlaw's attorneys may be participants in the scheme, making identification of them relevant. The Court is not persuaded that the interrogatory should be limited only to law firms that represented Outlaw in conjunction with demand letters that alleged a RICO violation for the same reasons set forth above. (III.B.3.a) The Court is also not persuaded that the potential for this discovery to lead to additional parties that the Stores might attempt to add as parties is a basis to deny discovery. Outlaw cites no authority, case or rule, for the proposition that identifying additional defendants to ultimately name, if approved by the court, is a basis to deny discovery about those parties.

The Court further finds that the availability of some of this information in PACER is not a sufficient basis to deny the Stores this discovery. *See Hill v. Asset Acceptance, LLC*, No. 13-cv-1718 BEN (BLM), 2014 WL 3014945, at *7 (S.D. Cal. July 3, 2014) (collecting cases rejecting the availability of public documents as a basis to deny discovery). There may be instances where the ease of obtaining documents from a public source might factor into the proportionality analysis, however, here, it is not at all clear that the information sought would necessarily be obtainable through PACER, depending on whether all Outlaw's litigation related to the enhancement products has been filed in

---

[25]The Court's reference to the first portion is: "IDENTIFY each law firm that has represented YOU in conjunction with . . . a DEMAND LETTER."

federal court given PACER provides electronic access to federal cases. Additionally, there are cost associated with PACER and it is not clear why the Stores should be required to incur that cost when the information is available from Outlaw.

The scope of the second portion[26] of the interrogatory as drafted is overbroad. The answer is not necessarily limited to law firms that are involved in the scheme because it lacks the connection to demand letters. The identity of law firms that have represented Outlaw in conjunction with litigation Outlaw has filed related to the enhancement products is not necessarily connected to the scheme. A law firm's representation of Outlaw that relates to an enhancement product, but not to the scheme, would have no relevance. However, in an effort to ensure the Stores obtain the relevant information sought, the Court modifies this second portion of the interrogatory from "or any litigation YOU have filed RELATED TO ENHANCEMENT PRODUCTS" to "or any litigation YOU have filed in conjunction with a DEMAND LETTER." Although it may yield duplicative discovery given the other responses the Stores will receive, this should provide the Stores with the identities of law firms that have been involved in the scheme alleged whether prior to or in litigation related to the scheme.

Outlaw shall respond to Interrogatory No. 5 as modified by the Court.

### d) Settlement Agreements and Total Sum Outlaw Has Received from Settlement Agreements

This topic[27] encompasses RFP Nos. 2 and 7 and Interrogatory Nos. 3 and 8. More specifically, the Stores' request Outlaw provide:

> A copy of each and every SETTLEMENT AGREEMENT between YOU and any RETAIL STORE in the United States.

_____

[26] The Court's reference to the second portion is: IDENTIFY each law firm that has represented YOU in . . . any litigation YOU have filed RELATED TO ENHANCEMENT PRODUCTS

[27] The Stores addressed this single topic as two separate topics in their Motion. They are combined here for ease of analysis.

DOCUMENTS sufficient to show the total sum of money YOU have received in connection with SETTLEMENT AGREEMENTS.

The interrogatories ask Outlaw to:

IDENTIFY each RETAIL STORE in the United States with which YOU have entered a SETTLEMENT AGREEMENT, and state the dollar amount of such settlement

State the total amount of money YOU have received in conjunction with all SETTLEMENT AGREEMENTS.

SETTLEMENT AGREEMENT is defined as:

any written agreement, whether or not fully executed, pursuant to which anyone who received a DEMAND LETTER agreed to pay YOU money, whether directly to YOU or indirectly to any law firm or other agent.

The Stores argue this discovery is relevant to identify those stores that paid Outlaw for purposes of establishing numerosity, superiority, and manageability for the payment subclass alleged in the SACC. The Stores also argue the actual terms of the settlement agreements are relevant to show the settlement agreement terms are uniform to establish predominance, and that the dollar amounts in the settlement agreements are needed to show damages are subject to common proof for the payment class.[28] The Stores offer, in the alternative to accept Outlaw's stipulation that all of its settlement agreements with stores are identical or substantially identical for purposes of class certification.

Outlaw again does not address any of the Stores' relevancy arguments. Instead, Outlaw makes the same argument to limit the scope to settlements that followed after a

---

[28] The Stores also argue this information is needed to confirm jurisdiction under the Class Action Fairness Act ("CAFA") if the RICO claim ultimately fails. However, the Court declines to reach this argument given the Court finds the Stores are entitled to this discovery on other bases.

demand letter with an assertion of a RICO violation.  Outlaw also raises confidentiality.  However, Outlaw's argument on confidentiality consists of the following "Next, these settlement agreements and the amounts of these settlements are confidential."[29]  Outlaw does not even affirmatively state that the settlement agreements should not be disclosed because they are confidential, although it is sufficiently implied that is what they are arguing.  There is no citation of any authority addressing when confidential documents, assuming they are actually confidential, should or should not be disclosed or indication whether any confidentiality concerns could be addressed through a protective order.  There is no indication if the settlement agreements at issue contain confidentiality provisions or what they are.  Finally, Outlaw dedicates most of its briefing on this topic to arguing merits issues like the propriety of the Stores attempts to undue or rescind settlement agreements and how this undermines the policy behind alternative dispute resolution.  Again, there is no citation of any authority for the proposition that the Court can deny the Stores' discovery based on Outlaw's unfavorable view of the merits of their claims.

The Court addresses this last argument first and in conjunction explains why the Court finds the settlement agreements are relevant.  The Court is not persuaded, particularly in the absence of any authority in support, that the Court should deny the Stores relevant discovery based on Outlaw's unfavorable view of the Stores' allegations.  The Stores allege that the settlements were "protection money" paid as a result of the RICO scheme, what one court has referred to as a "shake down" threatening huge liability for small businesses and then getting them to settle quickly to avoid the expense of hiring an attorney.  (SACC ¶¶ 3, 56, 59, 62, 80.)  And, as with the prior requests, this one is limited to settlement agreements that followed a demand letter, bringing it squarely

_____

[29] The only other two sentences on this issue indicate that other stores have already breached confidentiality clauses and that Outlaw expects the Stores now hope to do so on a much larger scale.

into the category of relevant discovery. The Court cannot deny relevant discovery because Outlaw thinks the Stores' claims lack merit.

The Court can limit relevant discovery based on proportionality, including under Rule 26(b)(1) based on the "importance of the issues at stake in the action" and the importance of the discovery in resolving the issues." But the Court cannot deny a party discovery on an issue as critical to their case as damages, particularly in a class action with a payment subclass defined as having "received a demand letter" and subsequently "*paid or agreed to pay money* to Tauler Smith LLP, Outlaw Laboratory or an agent of either." (SACC ¶ 79 (emphasis added).) Damages are an important issue in this case, not just for proving the counterclaims, but for class certification. *See Vaquero*, 824 F.3d at 1154 ("If the plaintiffs cannot prove damages resulted from the defendant's conduct, then the plaintiffs cannot establish predominance.") Additionally, as the Stores explain, the uniformity or lack thereof, of the terms of the settlement agreements are relevant to show that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.* The Court will not deny this discovery based on Outlaw's unfavorable view of the merits or proportionality because the discovery is relevant and important to resolving important issues in the case.

As to confidentiality, Outlaw has in no way carried its burden. As the party opposing discovery, Outlaw "has the burden of showing that discovery should not be allowed, and also has the burden of clarifying, explaining, and supporting its objections with competent evidence." *Louisiana Pac. Corp*, 285 F.R.D. at 485. Outlaw has fallen far short of this burden. It provides no legal argument in favor of denying this discovery based on confidentiality. And, it provides no factual information from which the Court could attempt to analyze the issue itself. Outlaw says simply that "these settlement agreements are confidential." In the alternative, Outlaw could have moved for a protective order under Rule 26(c), but it did not. Based on the foregoing the Court would order the settlement agreements disclosed without limitation.

However, the Court cannot ignore that these settlement agreements were entered into with third parties. Based on the limited information provided by Outlaw, it seems highly likely that the settlement agreements allow production when ordered by a court because, as the Stores explain in Reply, Skyline's includes a provision that confidentiality applies "unless ordered by the court."[30] Additionally, as pointed out by the Stores, Outlaw has failed to move for a protective order despite the opportunity to do so. This all weighs in favor of ordering the settlement agreements produced without restriction. However, out of an abundance of caution, particularly given the minimal information provided by Outlaw (the only party that could provide the court with information on the agreements), the Court finds a protective order is the most efficient way to resolve the issue. Rule 26(c)("The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.)

Accordingly, the Court orders as follows. Outlaw must either stipulate that all of its settlement agreements are substantially identical or produce the settlement agreements subject to the following protective order limitations. Each page of the settlement agreement must include a legend or label designating it as CONFIDENTIAL. The settlement agreements may only be used for prosecuting, defending, or attempting to settle this litigation and the settlement agreements may only be disclosed to the Stores counsel of record in this action and counsel of record's employees as reasonably necessary.[31]

---

[30] The Court would expect that Outlaw would have explained if the settlement agreements contained any more restrictive confidentiality provisions or notice requirements to third parties and that they have already followed those procedures if they exist.

[31] Nothing in this order precludes the parties from seeking to modify these terms or enter into a more comprehensive protective order. However, given the record before the Court it does not appear the parties have been successful in resolving discovery related matters and ordering the parties to meet and confer on this issue appears futile and likely to cause even further delays in this case.

If the settlement agreements are produced, Outlaw is not required to respond to RFP No. 7 (requesting documents sufficient to show the total sum received in connection with settlement agreements), Interrogatory No. 3 (requesting the identity of each store with which Outlaw has entered a settlement agreement and the dollar amount of the settlement), or Interrogatory No. 8 (requesting the total amount received in conjunction with all settlement agreements). The production of the settlement agreements will provide all this information. *See* Rule 26(b)(2) (court must limit the extent of discovery otherwise allowed if it determines "the discovery sought is unreasonably cumulative or duplicative"). However, if any of the settlement agreements lack the amount of the settlement, or if Outlaw elects to provide a stipulation as to the uniformity of its settlement agreement terms, *i.e.* that they are substantially identical, Outlaw must respond to Interrogatory No. 3 and 8 to identify the stores and settlement amounts.

### e)     Documents Identifying Outlaws Investigators and Employees

This topic encompasses RFPs Nos. 13 and 14 and Interrogatories Nos. 6 and 7. More specifically, the Stores' RFPs request:

> DOCUMENTS sufficient to show each and every person or entity that YOU hired or otherwise engaged to investigate whether any RETAIL STORE in the United States carried ENHANCEMENT PRODUCTS for sale.

> DOCUMENTS sufficient to IDENTIFY all YOUR current or former employees

The Stores' interrogatories request:

> IDENTIFY each and every person, business, or entity that YOU hired or otherwise engaged to investigate whether any RETAIL STORE in the United States carried ENHANCEMENT PRODUCTS for sale

> IDENTIFY each of YOUR employees

The Stores argues the identities of Outlaw investigators is relevant to its allegations that Outlaw dispatched "investigators" to purchase and take photos of the Rhino Products to use to shake down the stores. The Stores claim these investigators are either witnesses to the scheme or members of it. Similarly, the Stores argue the identities of Outlaw's employees are relevant to the allegation that Outlaw uses its employees to carry out the scheme. Outlaw argues the requests are overbroad in that they seek the identity of every Outlaw employee regardless of whether they had anything to do with this case and argue that if the Court is inclined to compel Outlaw to disclose this information it should be limited to those employees or independent contractors involved in issuing demand letters.

The Court finds RFP No. 14 and Interrogatory No. 7 are overbroad because they seek information about anyone employed by Outlaw for any reason. These requests would encompass irrelevant discovery not relevant to any claim in this case. As discussed at length and in relation to numerous requests above, limiting the requests by connecting them to the demand letters and its associated limitations narrowed those requests to discovery that is relevant. But here, there is no similar tether. All employees do not necessarily have anything to do with the scheme or know anything about it. However, Interrogatory No. 7 can be limited to employees or independent contractors that were involved in issuing demand letters. Because this should provide the Stores with the relevant information, Outlaw need not also respond to RFP No. 13.

### f) Protective Order Objections

The Stores indicate that Outlaw agreed to provide responses to RFP Nos. 3-6, 15-16, and 19-20,[32] but only once a protective order was entered. They also indicate that

---

[32] These RFPs encompass Outlaw business records regarding TriSteel and the documents showing the partners in Outlaw. As to the TriSteel products, the SACC alleges: that the TriSteel products "were created as artifices upon which to found the enterprise's scheme;" that the demand letter claims of Lanham Act liability were objectively baseless because Outlaw had never sold these products; that the draft complaint attached to demand letters falsely claimed Outlaw sold TriSteel products in stores; and that Outlaw's

they indicated to Outlaw that the Stores would treat the documents at "Attorneys' Eyes Only" in the event the Stores eventually sought a protective order. The Stores contend this indicates the assertion of a need for a protective order was just a delay tactic and Outlaw failed to provide responses. Outlaw has never moved for a protective order. And, Outlaw has not addressed any of these requests in its Opposition to the Motion to Compel.

Out of an abundance of caution, before finding waiver by Outlaw based on the foregoing, the Court Orders Outlaw and the Stores to meet and confer by March 11, 2020 and attempt to come to a resolution on these requests.[33] If the parties are unable to resolve the issue, Outlaw must file a two-page response addressing these discovery requests. It must be filed by March 13, 2020. The Stores must file a two-page reply by March 17, 2020.

## C.     Rule 37(a)(5)

The Stores ask the Court to order Outlaw to pay the Stores' attorneys' fees incurred in bringing the Motion to Compel pursuant to Federal Rule of Civil Procedure 37(a)(5). Outlaw opposes, arguing the discovery requests were overbroad in seeking documentation and information that was not actually relevant.

Rule 37(a)(5) provides that if a motion to compel discovery is granted, as it was in part here,

> the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:
> (i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

---

claims as to when they first sold TriSteel are false. (SACC ¶¶ 46, 48, 52, 60, 66-67, 71, 88.)

[33] The Court notes that as to each RFP at issue, Outlaw indicated it" will produce documents responsive to this request once a protective order is entered."

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or
(iii) other circumstances make an award of expenses unjust.

A party's conduct is substantially justified "if reasonable people could differ as to whether the party requested must comply." *Reygo Pac. Corp. v. Johnston Pump Co.*, 680 F.2d 647, 649 (9th Cir. 1982), *overruled on other grounds as stated by Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1055 n.2 (9th Cir. 2007); *see also Pierce v Underwood*, 487 U.S. 552, 565 (1988) (Interpreting substantially justified to mean "there is a 'genuine dispute' or 'if reasonable people could differ as to the appropriateness of the contested action."); *see also Liew v. Breen*, 640 F2d 1046, 1050 (9th Cir. 1981) (Addressing whether conduct was substantially justified under Rule 37(b) and finding "a good faith dispute concerning a discovery question might, in the proper case, constitute 'substantial justification.")

Here, the Motion to Compel was granted in part and denied in part. Some of the requests for production and interrogatories must be fully responded to while others have been narrowed and still others need not be responded to all because they are not proportional to the needs of the case based on proportionality. Given this outcome, the Court DENIES the request for attorneys' fees under Rule 37(a)(5).

## IV. CONCLUSION

Outlaw must respond to the discovery requests as set forth above by **March 20, 2020.**

**IT IS SO ORDERED.**

Dated: March 5, 2020

Hon. Bernard G. Skomal
United States Magistrate Judge