1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE OUTLAW LABORATORY, LP
LITIGATION.

Case No.: 18-cv-840-GPC-BGS

**ORDER DENYING TAULER
SMITH'S MOTION TO DISMISS;
MICHAEL WEAR AND SHAWN
LYNCH'S MOTION TO DISMISS;
AND TAULER SMITH'S ANTI-
SLAPP MOTION.**

**(ECF Nos. 143, 153, 156.)**

This Order addresses two motions to dismiss filed by newly added, third-party
Defendants Michael Wear, Shawn Lynch, and Tauler Smith LLP ("Tauler Smith"). (ECF
Nos. 143, 153.) In short, the third-party Defendants argue that the Second Amended
Countercomplaint ("SACC"), (ECF No. 114), fails to plead RICO or rescission claims
and is barred by the *Noerr-Pennington* doctrine. For the reasons that follow, the Court
finds that these arguments fail and **DENIES** the motions.

This Order also addresses an anti-SLAPP motion filed by Tauler Smith as to the
SACC's rescission claim. (ECF No. 156.) The Court finds rescission is a remedy, not a

1

1  cause of action, and that the anti-SLAPP statute directs itself at causes of actions, not

2  remedies. Consequently, the Court **DENIES** the anti-SLAPP motion.

3  I.      **BACKGROUND[1]**

4          **A. Procedural Background on the Counterclaims.**

5                  **1.  Outlaw Initiates Two Now-Consolidated Lawsuits.**

6          The instant litigation arises out of two complaints filed by Plaintiff Outlaw

7  Laboratory, LP ("Outlaw"). The first case, Case No. 18-CV-840, referred to by the

8  parties as the "*DG in PB* action," was filed in May of 2018. Initially, the defendants in

9  the *DG in PB* action were represented by the Law Offices of Steven A. Elia. The later-

10  filed case, Case No. 18-CV-1882, referred to by the parties as the "*San Diego Outlet*

11  action," was removed to federal court in August of 2018 by defendant Roma Mika, who

12  is represented by the law firm Gaw | Poe LLP ("Gaw Poe"). On June 29, 2019, the Court

13  granted a motion to substitute Gaw Poe as counsel for the defendants who were

14  previously represented by Steven A. Elia in the *DG in PB* action. The two cases have

15  since been consolidated before the Court.

16          With some small differences not relevant here, the complaints in the *San Diego*

17  *Outlet* and *DG in PB* actions were nearly identical. In each, Outlaw alleged that a large

18  number of gas station and corner store defendants conspired to distribute and sell

19  unlawful and misbranded male sexual enhancement drugs—i.e., the Rhino products—in

20  violation of the Lanham Act and California's Unfair Competition Law, and that the

21  scheme had diverted sales away from its legitimate, FDA-approved "TriSteel" male

22  enhancement pill.

23  / / /

24

25  _____

26  [1] The instant matter has a lengthy factual and procedural history that need not be recounted here to
    adjudicate the instant motions. The Court directs the reader to its prior orders for a more background on
27  this matter. (ECF Nos. 28, 32, 56, 85, 113.)

28                                                      2

### 2.  The Stores File RICO-based, Class Action Counterclaims.

On August 24, 2018, Counterclaimants filed a counterclaim and third-party complaint against Outlaw the *San Diego Outlet* action, Case No. 3:18-CV-1882. Counterclaimants sought to represent a class of gas station and corner store owners who received what Counterclaimants characterize as extortionate and demonstrably false demand letters sent by Outlaw. Outlaw's letters warned that sale of Rhino products exposed recipients to RICO and Lanham Act liability for amounts greater than $100,000, which Outlaw would forego for a much smaller settlement sum. According to Counterclaimants, Outlaw's demand letters were designed to coerce settlement, targeted mostly immigrant-run businesses, made allegations of illegality and adulteration which Counterclaimants claim are unfounded, and often included on-site photographs taken by "investigators" of the recipient's storefronts and sale of Rhino products.

The original counterclaims asserted three causes of action: (1) civil RICO, 18 U.S.C. § 1962(c), (2) RICO conspiracy, 18 U.S.C. § 1962(d), and (3) rescission of any settlement agreements entered into as a result of Outlaw's demand letters. Specifically, Counterclaimants described a RICO enterprise between Outlaw, its attorneys, Tauler Smith LLP, and other as-yet-unnamed individuals, aimed at perfecting a legal "shakedown" of small-time San Diego convenience stores. Counterclaimants averred that the "TriSteel" products "were created as artifices" to "found the false advertising claims," and that Outlaw itself was no more than a front for the unlawful enterprise.

### 3.  Outlaw Challenges the Counterclaims.

On November 27, 2018, the Court granted in part and denied in part Outlaw's motion to dismiss the counterclaims. (ECF No. 31.) The Court first concluded that the Counterclaimants were not required to allege a particular false statement to sustain a pleading for a RICO scheme to defraud, but then dismissed the RICO claims on the basis that Counterclaimants insufficiently alleged that Outlaw's demand letters fell within the sham litigation exception to the *Noerr-Pennington* doctrine. *See Sosa v. DIRECTV, Inc.,*

3

437 F.3d 923, 929 (9th Cir. 2006) (explaining that *Noerr-Pennington* generally confers First Amendment immunity against liability arising from a party's pre-litigation, petitioning conduct but that baseless sham litigation conduct is not protected); (ECF No. 31 at 9, 16.) The Court then denied Outlaw's arguments as to rescission, finding that it fell outside Outlaw's anti-SLAPP motion as a remedy. (ECF No. 31 at 20.)

On November 30, 2018, Counterclaimants filed a first amended counterclaim ("FACC"). (ECF No. 32.) Outlaw moved once more to dismiss, and the Court held that, upon amendment, Counterclaimants sufficiently pleaded the sham litigation exception. (ECF No. 56.) The Court denied Outlaw's motion on March 14, 2019. (*Id.*)

Thereafter, Outlaw filed a motion for judgment on the pleadings, which the Court denied on June 4, 2019. (ECF No. 85.) The Court again concluded that "Counterclaimants ha[d] alleged sufficient facts to frustrate *Noerr-Pennington* immunity on the subjective motivation prong" and found that "[j]udgment on the pleadings [was] therefore inappropriate." (*Id.* at 12.)

### 4. The Stores Add Third-Party Defendants and Amend Counterclaims.

On July 1, 2019, Defendant/Counterclaimant Roma Mikha, Inc., and Third-Party Plaintiffs NMRM, Inc. and Skyline Market, Inc. filed a motion for leave to amend their counterclaims and add three new defendants: Michael Wear, Shawn Lynch, and Tauler Smith. (ECF No. 92.) On August 19, 2019, the Court granted the motion, (ECF No. 113), and the counterclaimants subsequently filed the second amended countercomplaint and third-party complaint (the "SACC"). (ECF No. 114.)

This Order addresses three motions directed at the SACC: Tauler Smith's motion to dismiss the SACC, Michael Wear and Shawn Lynch's motion to dismiss the SACC, and Tauler Smith's special motion to strike the rescission claim of the SACC (more

commonly known as an "anti-SLAPP"[2] motion). (ECF Nos. 143, 153, 156.) On January 10, 2020, Defendant Roma Mikha, Inc., and Third-Party Plaintiffs NMRM, Inc. and Skyline Market, Inc. (collectively, the "Stores) filed responses to the two motions to dismiss. (ECF Nos. 158, 159.) On January 23, 2020, Tauler Smith filed a reply. (ECF No. 164.) Michael Wear and Shawn Lynch filed their reply the next day. (ECF No. 167.) As to Tauler Smith's anti-SLAPP motion, the Stores filed a response on February 7, 2020, and a reply from Tauler Smith followed on February 21, 2020. (ECF Nos. 171, 173.)

### B. Allegations of the SACC.

#### 1. The Enterprise and Scheme.

Consistent with the preceding pleadings, the SACC alleges an association-in-fact Enterprise – including Outlaw, its two principals Michael Wear and Shawn Lynch, and its prior counsel Tauler Smith – responsible for a widespread "shakedown" of mom and pop convenience stores around the San Diego. To execute the scheme, the Enterprise members first send demand letters to "small (almost always immigrant-run) independent corner stores and liquor stores" threatening disingenuous, baseless litigation against the stores for selling over-the-counter "sexual enhancement pills." (ECF No. 114 at ¶¶ 2, 30– 31, 36–46.) The demand letters "make a series of false and misleading statements" that are "intentionally designed to be particularly misleading to its target audience" and which are unsupported by individual testing or investigation as to each recipient store. (*Id.* at ¶¶ 26–29, 39.) The demand letters, moreover, fraudulently allege that Outlaw Laboratories is "a manufacturer, distributor and retailer of male enhancement products 'TriSteel' and 'TriSteel 8 hour," but, in fact, the products have "been sold in any stores in this District, in California, or anywhere in the country" and "were created as artifices upon which to found the enterprise's scheme." (*Id.* at ¶¶ 66–67.)

---

[2] The term "SLAPP" stands for "strategic lawsuit against public participation."

The Enterprise members allegedly offer to settle with each store for a fraction of the "threatened liability of 'over $100,000,'" knowing that "99% of rational business-persons (especially immigrants with a first language other than English) are not going to hire a lawyer at $300-500/hour to defend against such a tiny demand." (*Id.* at ¶¶ 3, 53–56.) The Outlaw Enterprise's shakedown scheme, moreover, depends on that "threatened financial ruin" to dragoon the Stores into quick settlements. (*Id.* at ¶¶ 47–52.) Skyline Market, for example, paid $2,800 to settle the threatened $100,000, and now alleges an injury resulting from lost sales, the settlement payment itself, and "attorneys' fees to coordinate payment of the protection money." (*Id.* at ¶ 35.) Roma Mikha, Inc. and NMRM, Inc. allege "injury to [their] businesses because [they] initially believed the demand letter's false assertions, and removed [the] legal products from its shelves, thereby losing legitimate sales." (*Id.* at ¶¶ 33–35.)

### 2. Allegations Against Wear, Lynch, and Tauler Smith.

In the latest pleading, the Stores offer additional specific facts as to the alleged scheme and the role of the enterprise members. The Stores allege, for example, that "[p]ublic records indicate that Outlaw Laboratory is owned by enterprise members Michael Wear and Shawn Lynch." (ECF No. 114 at ¶ 69.) The Stores accuse them of "conducting the enterprise's affairs, including by creating the 'competing' TriSteel products upon which to found the false advertising claims, and by working with other members to decide the geographies in which to conduct the scheme, and by signing for, and accepting receipt of the ill-gotten gains." (*Id.*) "Michael Wear and Robert Tauler, for example, were the signatories on the 'settlement' that extorted $2,800 from third-party plaintiff Skyline Market." (*Id.*)

The Stores likewise allege Tauler Smith's "role in conducting the affairs of the Outlaw Enterprise exceeds that of mere attorney agents of the 'client' Outlaw Laboratory." (*Id.* at ¶ 70.) The Stores allege that their "additional investigation" confirms Tauler Smith "worked directly with Mr. Wear and Mr. Lynch <u>to orchestrate the very</u>

formation of this shakedown scheme" and worked with other Enterprise members "to create Outlaw Laboratory's 'TriSteel' product based on this experience with JST Distribution," another purveyor of sexual enhancement products. (*Id.* at ¶ 71(a–b) (emphasis in original)). The SACC additionally claims that Tauler Smith "was the architect of all the fraudulent statements in the demand letters;" "drafted the 'draft complaint' that was attached to the demand letters;" "obtain[ed] settlements" in furtherance of the scheme; acted as the "payee of the settlement proceeds;" negotiated a large multi-case resolution of such claims with an association of 7-11 franchisees in July 2018; sent "demand letters in states in which none of its attorneys is a member of the state bar;" and also received and retained "100% of the proceeds generated by the scheme." (*Id.* at ¶¶ 70(c)–(h)). Tauler Smith is further accused of recruiting investigators to further the scheme through advertising on Craigslist. (*Id.* at ¶ 73.)

### 3.  The Causes of Action and Remedies.

The Stores' SACC contains two causes of action, and one remedy styled as a cause of action. As to the first cause of action, the Stores allege that "Outlaw Laboratory, LP, Michael Wear, Shawn Lynch, and Tauler Smith LLP" violated 18 U.S.C. § 1962(c) through the scheme described in the SACC. (ECF No. 114 at ¶¶ 82–89.) The SACC alleges that Michael Smith, Shawn Lynch, and Tauler Smith participated in the association-in-fact Enterprise in the following manner:

> Michael Wear and Shawn Lynch conducted the affairs of the Outlaw Enterprise by coordinating its activities with Tauler Smith LLP, and by using the name of their joint creation, Outlaw Laboratory, LP to be used in the fraudulent mailings that constitute the pattern of racketeering activity (per 18 U.S.C. § 1961(5)) at issue in this case, in violation of 18 U.S.C. § 1962(c). Tauler Smith LLP conducted the affairs of the Outlaw Enterprise by drafting and mailing the fraudulent demand letter and attached "draft complaint," and each of the statements therein. Tauler Smith LLP further conducted the affairs of the Enterprise by negotiating the amounts of protection money it would charge to each of its victims, and by acting as the conduit of those ill-gotten gains. On information and belief, Tauler Smith

shared in the spoils of the Outlaw Enterprise by receiving a percentage of the ill-gotten gains.

(*Id.* at ¶ 84.) The Stores further assert that the Enterprise participated in multiple counts of mail fraud "in drafting and arranging for the mailing of the fraudulent demand letters by which the scheme to defraud was perpetrated." (*Id.* at ¶ 85.) The Stores likewise claim that the Enterprise members "knowingly and intentionally" defrauded the victims through a variety of material "misrepresentations, acts of concealment, and failures to disclose," including the statements in their demand letters. (*Id.* at ¶ 86.)

As to the second cause of action, the Stores allege the Enterprise members conspired in violation of 18 U.S.C. § 1962(d). The members allegedly conspired by "agreeing with [] other members on the structure, purpose, and conduct of the Outlaw Enterprise, and by taking numerous overt acts in furtherance of the scheme to defraud." (*Id.* at ¶ 92.) Such acts include, "drafting and/or approving the fraudulent demand letters and 'draft complaint,' setting and/or approving the minimum amounts of protection money that the victims must pay, and by receiving and sharing in the ill-gotten proceeds from the shakedown." (*Id.*) The Stores further allege, as overt acts to the scheme, that Outlaw and Tauler Smith "hir[ed] and/or direct[ed] the activities of the 'investigators' who were tasked with identifying and selecting the victims of the racket, and/or by making payments to those 'investigators' in furtherance of the scheme." (*Id.*)

Lastly, the Stores claim the remedy of rescission in connection with the RICO counts. Skyline Market claims to "give[] notice of its intention to rescind the 'Confidential Settlement Agreement and Release' that it entered with Outlaw Laboratory, LP, and accordingly rescinds that agreement." (*Id.* at ¶ 97.) Further, Skyline Market asserts that it "signed the agreement . . . under duress," given the difference in the threatened liability and the settlement offer, and as the settlement amount "would have been dwarfed" by the attorneys' fees to defend the action. (*Id.* at ¶ 98.) And, Skyline Market's agreement was "predicated upon a scheme to defraud that was illegal *ab initio*,

8

1    as set forth" in the RICO counts. (*Id.* at ¶ 99.) In closing, the rescission section of the

2    SACC asserts that "Outlaw Laboratory LP, Michael Wear, Shawn Lynch, and Tauler

3    Smith LLP are jointly and severally liable for restitution of the amounts that were

4    illegally taken from Skyline Market and the other members of the class it seeks to

5    represent." (*Id.*)

6    **II.     THE MOTIONS TO DISMISS**

7          The Court first addresses the motions to dismiss. (ECF Nos. 143, 153.) The Court

8    disposes of the Enterprise members' arguments against the RICO claims, finding that the

9    SACC adequately pleads racketeering vis-à-vis mail fraud, the Stores' injury, and the

10   "conduct" element as to Tauler Smith. Then the Court addresses the Enterprise members'

11   arguments as to the *Noerr-Pennington* doctrine, finding once again that the RICO suit

12   threatened in the Enterprise demand letters was objectively baseless and intentionally

13   anti-competitive. Lastly, the Court denies the motion to dismiss the rescission remedy as

14   it is not cognizable as a separate cause of action.

15       **A. Legal Standard on a Motion to Dismiss.**

16          Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a

17   claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule

18   12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient

19   facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't.*, 901

20   F.2d 696, 699 (9th Cir. 1988).

21          To survive a motion to dismiss, a complaint must contain sufficient factual matter,

22   accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

23   556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547

24   (2007)). A claim is facially plausible when the factual allegations permit "the court to

25   draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

26   In other words, "the non-conclusory 'factual content,' and reasonable inferences from

27   that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss*

28                                             9

*v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion, the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). If a court determines that a complaint fails to state a claim, the court should grant leave to amend unless it determines that the pleading could not possibly be cured by the allegation of other facts. *See Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995).

### B. Legal Standards for RICO and Mail Fraud.

RICO's private right of action is contained in 18 U.S.C. § 1964(c), which provides in relevant part that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c).

In turn, section 1962(c) renders it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." To recover under § 1962(c), a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation.

10

1  *See Living Designs, Inc. v. E.I. Dupont de Numours & Co*., 431 F.3d 353, 361 (9th Cir.
2  2005).

3          One type of predicate act of racketeering activity recognized by RICO, 18 U.S.C. §
4  1961(1) is mail fraud under 18 U.S.C. § 1341. A mail fraud violation consists of (1) the
5  formation of a scheme or artifice to defraud; (2) use of the United States mails or causing
6  a use of the United States mail in furtherance of the scheme; and (3) specific intent to
7  deceive or defraud. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc*., 806 F.2d
8  1393, 1400 (9th Cir. 1986) ("Mail fraud occurs whenever a person, "having devised or
9  intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of
10  executing such scheme or artifice or attempting so to do.") (quoting 18 U.S.C. § 1341).
11  The gravamen of the offense is the scheme to defraud, and any "mailing that is incident
12  to an essential part of the scheme satisfies the mailing element," *Schmuck v. United*
13  *States*, 489 U.S. 705, 712 (1989) (citation and internal quotation marks omitted), even if
14  the mailing itself "contain[s] no false information." *id.* at 715.

15          **C. RICO Claims**

16          The Enterprise members contest whether the SACC adequately alleges a RICO
17  claim. Specifically, the Enterprise members argue that the SACC fails to allege the
18  element of "racketeering activity," either vis-à-vis mail fraud or the enterprise members'
19  litigation conduct, and the "conduct" element as to Tauler Smith. The Enterprise
20  members also contend that the Stores lack statutory standing in the absence of a precisely
21  defined RICO injury. For the following reasons, the Court finds these arguments
22  unpersuasive, and holds that the SACC adequately alleges a RICO claim.

23          **1.  Mail Fraud as a Pattern of Racketeering Activity.**

24          First, the Court addresses whether the Stores have adequately pled mail fraud to
25  satisfy the racketeering element of their RICO claims. (ECF No. 114 at ¶ 6 ("Because the
26  members of the Outlaw Enterprise used the U.S. mails in conducting this 'scheme to
27  defraud'— committing thousands of predicate acts of mail fraud over a period of many

28                                                    11

months—they are liable for disgorgement of their ill-gotten gains, three times the damages they caused, and an injunction ordering dissolution of the Outlaw Enterprise.")).

Here, again, members of the Enterprise field a variety of arguments predicated on the mistaken notion that mail fraud *must* entail a false or misleading statement. Tauler Smith argues that the SACC fails to adequately plead the predicate acts of mail fraud because Outlaw's demand letters allegedly contained no specific false statements, no actionable omissions, and no statements which together might be misleading. (ECF No. 143-1 at 11–29; ECF No. 164 at 5–7.) Michael Wear and Shawn Smith similarly claim that the SACC does not allege the required elements of mail fraud because the excerpts from Outlaw's demand letters set forth in the SACC cannot be construed as false or misleading; they are merely misrepresentations of law not actionable under RICO. (ECF No. 153-1 at 11–15; ECF No. 167 at 5–7.)

However, as the Court stated in rejecting Outlaw's argument "that a predicate act of mail fraud requires the allegation of a materially-false statement," (ECF No. 31 at 8), and as the Ninth Circuit made clear in *Woods*,

> If a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, *the fact that there is no misrepresentation of a single existing fact is immaterial*. It is only necessary to prove that it is a scheme reasonably calculated to deceive, and that the mail service of the United States was used and intended to be used in the execution of the scheme.

*United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (quoting *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967)) (emphasis added). The Ninth Circuit continued in *Woods*,

> Put another way, [t]he fraudulent nature of the 'scheme or artifice to defraud' is measured by a non-technical standard. Thus, schemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society."

12

1    *Id.* (quoting *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980)) (internal

2    quotation marks and citations omitted); *see also United States v. Ali*, 620 F.3d 1062,

3    1070–71 (9th Cir. 2010) (quoting *United States v. Munoz*, 233 F.3d 1117, 1131 (9th Cir.

4    2000)) ("Under the mail fraud statute the government is not required to prove any

5    particular false statement was made. Rather, there are alternative routes to a mail fraud

6    conviction, one being proof of a scheme or artifice to defraud, which may or may not

7    involve any specific false statements.")

8           Thus, here, the SACC adequately alleges the three elements of mail fraud.

9    Specifically, the Stores allege a RICO enterprise aimed at executing a legal shakedown of

10   small-time San Diego convenience stores between, among others, Outlaw, its two general

11   partners (Defendants Michael Wear and Shawn Lynch), and their former counsel Tauler

12   Smith, whose conduct allegedly "exceeds that of mere attorney agents . . ." (ECF No. 114

13   at ¶¶ 1–6, 16, 17, 70, 71.) They claim that the TriSteel products sold by Outlaw were

14   created as artifices to found the false advertising claims, and that Outlaw itself is no more

15   than a front for the unlawful enterprise. (*Id.* at ¶¶ 64–67.) The Stores further allege that

16   the enterprise effectuates its shakedown by sending demand letters to an especially

17   "vulnerable community of victims," comprised of mostly "small, immigrant-run

18   businesses," which would most likely elect to pay off the enterprise rather than face the

19   prospect of protracted, costly litigation. (*Id.* at ¶¶ 3, 4, 26.) The Stores describe Outlaw's

20   demand letters as manipulative and fraudulent for a variety of reasons, including, that the

21   products are not illegal to sell, that the legal penalties were greatly exaggerated, and that

22   the letters were sent without a genuine intent to pursue RICO litigation. (*Id.* at ¶¶ 26–31.)

23   The Stores further allege that the fraudulent demand letters were sent through the U.S.

24   Mails and, therefore, constitute the RICO predicate act of mail fraud under 18 U.S.C. §

25   1341. (*Id.* at ¶¶ 32–36.)

26

27

28                                                    13

Accordingly, the Court finds that the elements of mail fraud are adequately pled.[3] Moreover, because the allegations of the SACC describe multiple instances of mail fraud, against different convenience stores, and in furtherance of the alleged scheme, the SACC adequately pleads a "pattern of racketeering activity" as required for RICO. *See Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (describing what constitutes a pattern of racketeering)*; Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 n.14 (1985) (same)).

## 2. The Stores' Injury.

In addition to protesting the allegations as to racketeering element, the Enterprise member challenge the Stores' pleadings on the injury element. Specifically, Michael Wear and Shawn Lynch argue that the Stores' RICO claim fails to adequately specify injury from lost sales, and claims attorney costs and fees as injuries contrary to prevailing law. (ECF No. 153-1 at 28–30.) The Stores respond that the Court has already found the loss of sales constitutes an adequate injury. (ECF No. 159 at 14 (quoting ECF No. 113 at 16) (the SACC "articulates a loss of business profits resulting from allegedly unlawful RICO conduct, and is not contradicted by the fact that the two stores may have resumed selling the products after 'initially' withdrawing the products.")) The Stores further respond that, under the circumstances, legal fees and costs are legitimate injuries because it was an "express purpose of the Outlaw Enterprise's scheme was to extract settlement money," thus requiring the Stores to obtain counsel. (ECF No. 159 at 14–15.)

---

[3] The enterprise members, in particular Michael Wear and Shawn Lynch, also argue at length that litigation conduct cannot satisfy the "racketeering" element of RICO. (ECF No. 143-1 at 20–24; ECF No. 153-1 at 15–28). And, it appears at first glance, that the threat of litigation is not a predicate act for RICO purposes in the Ninth Circuit. *See First Pac. Bancorp, Inc. v. Bro*, 847 F.2d 542, 547 (9th Cir. 1988) (finding that the threat of shareholder derivative lawsuit did not qualify as a predicate act of extortion for RICO purposes). However, the Stores do not allege an act of extortion as a predicate act and the Court has found that the SACC adequately alleges a pattern of racketeering activity vis-à-vis multiple instances of mail fraud.

14

For the foregoing reasons, the Court finds that the Stores adequately plead an "injury" within the meaning of RICO.

### a. Loss of Sales.

To successfully plead a RICO injury, Plaintiffs must satisfy two requirements. *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 957 (N.D. Cal. 2018). First, they must plausibly allege "a harm to a specific business or property interest." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc). Second, they must plausibly allege that their injury has resulted in "concrete financial loss." *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008) (quoting *Oscar v. Univ. Students Co-op. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc)), *abrogated on other grounds by Diaz*, 420 F.3d 897.

Here, the Stores adequately plead a proximate injury to a business interest. A reduction to Plaintiff's sales is a "business or property interest." *Leonard v. City of Los Angeles*, 208 F. App'x 517, 519 (9th Cir. 2006). And, the "alleged [RICO] violation led directly to the plaintiff's" loss of sales, *Canyon Cty.*, 519 F.3d at 982, as the Stores allege "believe[ing] the demand letter's false assertions, and remov[ing] these legal products from [their] shelves, thereby losing legitimate sales." (ECF No. 114 at ¶¶ 33–35.) Consequently, the only question as to the alleged loss of sales is whether the Stores' allegations amount to a concrete financial loss.

As to this question, "it is important to distinguish between uncertainty in the fact of damage and in the amount of damage." *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (citing *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir.1976) ("Different standards govern proof of the fact and proof of the amount of damages."). While the Enterprise members correctly state that the SACC does include a precise calculation of the damages, the fact that there was an injury, assuming the allegations are true, is unambiguous and specifically alleged. (ECF No. 114 at ¶¶ 33–35.) At this stage, the Stores need not plead more specific facts as to which items were removed from the

15

Stores shelves, and for how long they were removed, in each store. *See, e.g.*, *Leonard*, 208 F. App'x at 519 (finding sufficient to establish a RICO injury that "[plaintiffs'] computers, business inventory, and financial records were seized illegally, causing them to incur replacement costs, and that they lost profits as a result of the improper criminal investigation" without detailing which specific items were seized or their value); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL-2672-CRB, 2017 WL 4890594, at *6 (N.D. Cal. Oct. 30, 2017) (finding that Franchise Dealers plausibly alleged the injury of lost profits from a stop-sale order without reference to specific cars that went unsold, their value, or the order's duration). After all, "[i]n the RICO context, and '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" *Leonard*, 208 F. App'x at 519 (quoting *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 256 (1994)).

### b.  Attorneys' Fees Incurred to Settling Sham Lawsuits.

"Whether incurring legal fees constitutes an injury to a plaintiff's 'business or property' is a question as yet unanswered by the Ninth Circuit." *See Dunmore v. Dunmore*, No. 2:11-CV-2867-MCE, 2013 WL 5569979, at *6 (E.D. Cal. Oct. 9, 2013), *report and recommendation adopted*, No. 2:11-CV-2867-MCE, 2014 WL 466257 (E.D. Cal. Feb. 5, 2014) (collecting cases which find that attorneys' fees do, and do not, qualify as an injury for the purposes of RICO); *see also Thomas v. Baca*, 308 F. App'x 87, 88 (9th Cir. 2009) (stating that the Ninth Circuit "has not recognized the incurment of legal fees as an injury cognizable under RICO" in considering an injury to "property" ). Michael Wear and Shawn Lynch contend that they do not, (ECF No. 153-1 at 29–30), and thus take issue with the allegation that "Skyline Market has been further injured by paying attorneys' fees to coordinate payment of the protection money." (ECF No. 114 at ¶ 35.) The Stores assert that, here, the collection of settlements was central to the

16

Enterprise's scheme and thus the Stores' attorneys' fees incurred in pursuing settlement are a direct injury of the scheme. (ECF No. 159 at 14–15.) Because, the subject attorney fees were directly incurred by the convenience stores after receiving the demand letters, the Court finds that they are cognizable as an injury to the Stores' "business" for the purposes of RICO.

In reaching this conclusion, the Court relies largely on the reasoning of *Bankers Trust* and *Handeen*. In *Bankers Trust*, the Second Circuit held that plaintiff's past legal fees could confer standing as to a RICO violation because those fees were incurred in fighting "frivolous lawsuits" initiated by the defendants, i.e., the very wrongful conduct that comprised the RICO claim. *See Bankers Tr. Co. v. Rhoades* ("*Bankers Trust*"), 859 F.2d 1096, 1099, 1105 (2d Cir. 1988); *accord Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2d Cir. 1993) ("legal fees may constitute RICO damages when they are proximately caused by a RICO violation"). As *Bankers Trust* observed, the RICO statute "contains no special limitation on standing; all that is required is that plaintiff suffer injury in fact . . . [i.e.,] that the plaintiff be 'injured in his business or property by the conduct constituting the violation,' . . . and that the injury be caused by defendants' RICO violation." *Bankers Trust*, 859 F.2d at 1100 (quoting *Sedima v. Imrex Co.*, 473 U.S. 479, 495 (1985)). Likewise, in *Handeen*, the Eighth Circuit determined that "attorneys' fees [] incurred in objecting to the [the scheme's] supposedly fraudulent claims" were concrete injuries within the meaning of RICO. *Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997). The *Handeen* court relied on the fact that those fees were "proximately caused by a predicate act of racketeering." *Id.*

Here, the attorney fees were, per *Bankers Trust*, incurred in the process of litigating a potential lawsuit that was part and parcel of the Enterprise's scheme. *Bankers Trust*, 859 F.2d at 1100. After all, the SACC alleges that obtaining such settlements was one of the purposes of the scheme and the most probable response by any convenience store owner reading the demand letters. (ECF No. 114 at ¶¶ 3, 4, 22, 56, 59.) Likewise,

17

per *Handeen*, the attorneys' fees incurred in settling are also the result of a predicate act of racketeering, namely mail fraud, because the allegations in the allegedly fraudulent demand letters prompted the convenience stores to settle. *Handeen*, 112 F.3d at 1354. As such, the Court finds that the fees alleged by Skyline Market create an injury compensable under RICO, in line with several decisions by other district courts of the Ninth Circuit. *See Lauter v. Anoufrieva*, 642 F. Supp. 2d 1060, 1084–85 (C.D. Cal. 2009) ("This court concludes that plaintiff's RICO claim should not be dismissed on [the] basis [that no injury is alleged] because plaintiff adequately alleges that defendants' racketeering activity proximately caused . . . the expenditure of attorneys fees' and legal expenses in the criminal proceedings resulting from the Menlo Park Police investigation . . ."); *Burger v. Kuimelis*, 325 F. Supp. 2d 1026, 1035 (N.D. Cal. 2004) (quoting *Chaset v. Fleer/Skybox Int'l*, LP, 300 F.3d 1083, 1086–87 (9th Cir. 2002)) (dismissing RICO claim for inadequately pleading an injury of legal expenses, but recognizing that "[l]egal expenses are concrete financial losses, 'not mere injury to a valuable intangible property interest,'" and are thus recoverable under RICO").

The Court, moreover, finds that other, in-circuit decisions concluding that attorneys' fees and expenses are *not* an injury under the RICO statute can be readily distinguished. *See, e.g.*, *Holloway v. Clackamas River Water*, No. 3:13-CV-01787-AC, 2014 WL 6998069, at *9 (D. Or. Sept. 9, 2014), *report and recommendation adopted*, No. 3:13-CV-01787-AC, 2014 WL 6998084 (D. Or. Dec. 9, 2014) (finding legal fees are not injuries under RICO in light of *Baca* and because plaintiff did not "establish that racketeering activity was the proximate cause of her injury") (citing *Baca*, 308 Fed. Appx. at 88); *Cobb v. Adams*, No. C 13-04917 JSW, 2014 WL 2212162, at *9 (N.D. Cal. May 28, 2014) (finding that "legal fees, bail fees, court ordered restitution fees, probation fees, and 'class fees'" did not create a RICO injury, even if that were possible in general, because plaintiff had "not alleged facts showing that a predicate act caused him to incur

18

those fees."). Here, unlike the above district court cases, the Stores have alleged facts showing that the fraudulent scheme had caused them to incur attorney fees.

In light of the foregoing reasons, the Court finds that both the loss of sales and the attorneys' fees arising from the settlement process are compensable as injuries to the instant RICO scheme. Furthermore, the factual allegations giving rise to these two injuries are adequately alleged in the SACC.

### 3.  The "Conduct" Element as to Tauler Smith.

Lastly, the Court considers the "conduct" element as challenged by Tauler Smith. The Court has already found that Tauler Smith's conduct constituted "a moving, active conscious force" in the alleged RICO scheme. (ECF No. 113 at 17.) Tauler Smith, nonetheless, argues now that it was merely "the agent of its client, not the other way around." (ECF No. 143-1 at 24.) Tauler Smith attacks the factual allegations of the SACC, arguing that "the mere fact that Outlaw Laboratory LP hired the same litigation counsel that JST Distribution had hired" does not show control; that the Stores do not allege Tauler Smith created TriSteel "based on any specific facts;" that "the pedestrian fact that" Tauler Smith held its clients' settlement funds in trust does not evince control; that Tauler Smith did not engage "in the unauthorized practice of law in Arizona;" and that the Stores have overreached by speculating that Tauler Smith LLP received 100% of the settlement proceeds obtained on behalf of Outlaw. (ECF No. 143-1 at 24–26.)

In order to plead a violation of RICO, the pleading instrument must also allege sufficient facts to establish the "conduct" element. *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at 179 (quoting 18 U.S.C. § 1962(c)). "Of course . . . RICO liability is not limited to those with primary responsibility for the enterprise's affairs . . . [or] to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.*

19

(emphasis in original). In other words, "one must participate in the operation or management of the enterprise itself." *Id.* at 185.

"In the Ninth Circuit, to assess whether a defendant had a sufficient role in operation or management to meet the standard of § 1962(c) [and *Reves*], courts consider whether the defendant (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper management; or (4) was indispensable to achievement of the enterprise's goal in that the defendant's position is 'vital' to the mission's success." *Tatung Co., Ltd. v. Hsu*, No. SA-CV-13-1743-DOC, 2015 WL 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (quoting *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008)) (citations omitted).

In light of this disjunctive, multi-factor test, Tauler Smith's argument is unpersuasive. For one, it is simply not true that the RICO claim fails if "Tauler Smith did not manage or control Outlaw Laboratory, LP . . . because the alleged RICO enterprise is not just sending demand letters, but also selling supplements that compete with those sold by Counterclaimants." (ECF No. 164 at 10.) Rather, a subordinate in the enterprise may satisfy the "conduct" element by demonstrating some control over the scheme. *See United States v. Diaz*, 649 F. App'x 373, 383 (9th Cir. 2016) (quotation omitted) (finding that "lower rung participants in the enterprise who are under the direction of upper management" can also meet the conduct threshold). Likewise, an "enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Reves*, 507 U.S. at 184. Consequently, Tauler Smith does not need to be a "partner, shareholder, beneficial owner, director, officer, [or] employee" of Outlaw to held liable for conducting the affairs of the enterprise. (ECF No. 143-1 at 24.)

Instead, the Court looks to whether the allegations against Tauler Smith are sufficient to establish that it "participate[d] in the operation or management of the

20

enterprise," and the Court finds that they do. *Reves*, 507 U.S. at 185. As a starting point, Tauler Smith is correct that "[s]imply performing [legal] services for the [association-in-fact] enterprise" cannot, of course, create RICO liability. *See Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) (finding that the lawyerly conduct of "wr[iting] emails, g[iving] advice, and t[aking] positions on behalf of [one's] clients" does not constitute "conduct" within the meaning of RICO); *see also Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (finding that an attorney's preparation of two letters and a partnership agreement in 1982, and assistance in a bankruptcy proceeding in 1987, "[did] not suffice to impute liability under *Reves*").

However, unlike the attorneys' conduct in *Walter* or *Baumer*, here the allegations against Tauler Smith repeatedly indicate that the firm was "giving, or taking, direction" and became "indispensable to achiev[ing] of the enterprise's goal." *Walter*, 538 F.3d at 1249. As previously noted, Tauler Smith's conduct here allegedly encompasses "the firm's genesis of the scheme, its creation of 'TriSteel' as a front product, and its dispatch of 'investigators' to take photos of storefronts to identify new demand letter recipients." (ECF No. 113 at 18). The SACC, moreover, also alleges that Tauler Smith conceived of the demand letters, threatened RICO liability without a genuine intent to pursue such litigation, became the sole financial beneficiary of the enterprise, sent baseless subpoenas, enforced settlements predicated on fraudulent conduct, and, at times, acted without the guidance or direction of Outlaw. (ECF No. 114 at ¶¶ 68–71). If true, such conduct is enough to establish the firm's influence and control over some of the operations of the Enterprise and exceeds the conduct inherent in a firm's representation of Outlaw as a client. *See, e.g.*, *Tatung*, 2015 WL 11072178, at *10, 20 (C.D. Cal. Apr. 23, 2015) (finding attorney defendant Woo allegedly, among other actions, gave or took directions in "drafting unreasonable [legal] agreements" and was "indispensable" to the scheme, as Tauler Smith allegedly did here); *Cohen v. Trump*, 200 F. Supp. 3d 1063, 1072 (S.D. Cal. 2016) (finding an issue of material fact as to the conduct element of

21

RICO where the defendant "reviewed and approved" the precise "marketing materials" that "form[ed] the basis of the fraud alleged by Plaintiff"); *Valadez v. Aguallo*, No. C 08-03100 JW, 2009 WL 10680865, at *3 (N.D. Cal. Aug. 28, 2009) (finding "conduct" element satisfied where defendants "indirectly influenced the decisions as to which independent contractor would obtain contracts or associations with Avis").

Tauler Smith likewise errs in assailing the veracity of the factual allegations before the Court. (ECF No. 143-1 at 24–26.) After all, on a motion to dismiss, the Court is to presume the truth of the allegations, and instead assesses whether those allegations, if true, would adequately plead the claims stated in the complaint. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002). Consequently, the Court finds that the SACC adequately alleges the "conduct" element of RICO as to Tauler Smith.

### D. Rescission Remedy to the RICO Cause of Action.

The Enterprise members also challenge the rescission remedy in their motions to dismiss, arguing that they are not parties to the settlement agreements and thus cannot be sued for rescission. (ECF 143-1 at 31; ECF 153-1 at 31.) The Stores argue that, pursuant to California state law, the Enterprise members are "jointly and severally liable for restitution of the amounts that were illegally taken from Skyline Market and the other members of the class it seeks to represent," (ECF No. 114 at ¶ 99), as "an ancillary remedy to the principal remedy of rescission restoring plaintiffs to their status quo ante." (ECF No. 158 at 17 (quoting *Snelson v. Ondulando Highlands Corp.*, 5 Cal. App. 3d 243, 252–54 (1970)). The Enterprise members reply that the Stores' cited precedents are applicable only to claims for consequential damages, and that any remedy of rescission inherently presupposes that the subject entities are parties to the to-be-rescinded agreement. (ECF No. 164 at 13–14; ECF No. 167 at 12.)

As a threshold matter, the Court again finds that Tauler Smith's anti-SLAPP motion fails as inapplicable here because rescission is a remedy, not a cause of action, consistent with its prior ruling on November 27, 2018. *See* (ECF No. 31) (published as *In*

*re Outlaw Labs., LP Litig.*, 352 F. Supp. 3d 992, 1010–12 (S.D. Cal. 2018)). On that basis, the Court does not "dismiss" it for failing to state a claim to which relief can be granted because it is not a stand-alone cause of action. *Cf. Ozuna v. Home Capital Funding*, No. 08-CV-2367-IEG, 2009 WL 4544131, at *11 (S.D. Cal. Dec. 1, 2009) (dismissing a claim for "rescission" precisely because, as a remedy, it could not survive a motion to dismiss where all other causes of action were dismissed). Consequently, the Enterprise members' motions to dismiss the "claim of rescission" fail.

Skyline Market's rescission allegations do no more than provide notice of rescission and seek restoration of benefits provided to Outlaw Laboratory under the Settlement Agreement. (ECF No. 114 at ¶¶ 96–99.) The Court finds it unnecessary at this time to address the substance of the Parties' dispute as to the scope of a rescission remedy.[4] Consequently, the motion to dismiss the rescission claim under Rule 12(b)(6) is denied.

**E. The *Noerr-Pennington* Doctrine.**

The Court is also asked to assess whether the Enterprise members' alleged conduct is protected from suit by the *Noerr-Pennington* doctrine. "Under the *Noerr–Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*,

---

[4] Rescission is a permissible remedy for civil RICO. *See* 5B John Bordeau et. al., *Federal Procedure, Lawyer's Edition* § 10:281 (2020) ("Availability of rescission in RICO actions") (citing *DeMent v. Abbott Capital Corp.*, 589 F. Supp. 1378 (N.D. Ill. 1984) ("Generally, even if the relief sought is characterized as equitable rescission, such relief is still available to a private plaintiff under the Racketeer Influenced and Corrupt Organizations Act (RICO).")). Though some courts of the Ninth Circuit have limited the availability of rescission in complex civil RICO actions where rescission would require more than a "simple return of out-of-pocket loss," *see State Comp. Ins. Fund v. Khan*, 2012 WL 12887395, at *4 (C.D. Cal. Dec. 28, 2012) (limiting rescission where the subject agreements were "relatively complex, concerning thousands of liens"); *Volckmann v. Edwards*, 642 F. Supp. 109, 115 (N.D. Cal. 1986) (limiting rescission where the subject agreements "were relatively complex, multi-party transactions"), such does not appear to be the case here.

437 F.3d 923, 929 (9th Cir. 2006). The *Noerr–Pennington* doctrine extends to sending demand letters, *id.* at 932–33, unless the letters are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Id.* at 938 (quoting *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)). The sham litigation exception applies where (1) the lawsuit is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.* ("*Pre II*"), 508 U.S. 49, 60–61 (1993).

For the following reasons, and in line with the Court's prior rulings on the *Noerr-Pennington* doctrine, the Court finds that the SACC adequately pleads both elements of the sham litigation exception.

### 1. The Objective Prong of *Noerr-Pennington*.

Here, the Enterprise members offer two arguments for the Court to reconsider its prior ruling that the subject demand letters alleged sham litigation in threatening to bring objectively baseless RICO lawsuits against the Stores. (*See* ECF No. 56 at 7–19 (order denying a motion to dismiss the FACC)). First, the Tauler Smith argues that there was probable cause to threaten a RICO suit because, contrary to the Court's prior rulings, Outlaw's alleged harm could have been proximately caused by the Stores' alleged misconduct. (ECF No. 143-1 at 27–29; ECF No. 164 at 11–12). Second, Michael Wear and Shawn Lynch argue that the demand letters cannot be said to threaten sham litigation in light of a recent default judgment entered by the District Court of Michigan. (ECF No. 153-1 at 30–31; ECF No. 167 at 11–12.)

In light of the applicable law and the Court's own rulings in this matter, the Court finds that the Enterprise members' arguments fail for the subsequent reasons.

///

### a.  RICO Proximate Cause.

Among other elements, a successful claim for RICO requires that the subject enterprise's conduct "must be [] the proximate cause of harm to the victim." *Eclectic Props. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496–97 (1985)). In denying Outlaw's motion to dismiss the FACC, the Court found the RICO claim in the demand letters "legally untenable" as there was no probable cause to contend Outlaw was proximately harmed by the Stores' alleged scheme, in light of *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). (ECF No. 56 at 14); *see PRE II*, 508 U.S. at 62 ("The existence of probable cause to institute legal proceedings . . . precludes a finding that an antitrust defendant has engaged in sham litigation.")

Citing to *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), Tauler Smith now asserts that it "would have been able to establish proximate cause in asserting RICO claims on behalf of its client . . . because Outlaw Laboratory LP directly competes in the same natural male enhancement industry" as the Stores. (ECF No. 143-1 at 29.) Tauler Smith argues, moreover, that the Stores refutation of this argument equates "a court disagreeing with a legal theory with that theory lacking probable cause." (ECF No. 164 at 11.) On these points, Tauler Smith is incorrect. The RICO suit threatened in the demand letters objectively lacks any basis for proximate cause pursuant to *Anza*, *Bridge*, and the related precedents.

In *Bridge*, the Supreme Court addressed a RICO suit alleging that defendants had obtained a disproportionate share of liens in a tax sale by using agents to place concurrent, winning bids, with the knowledge that the county awarded winning bids on a rotational basis, and in violation of the tax sale's rules. *Bridge*, 553 U.S. at 642–44. The Court concluded that, in order to allege a RICO violation, plaintiffs did not need to show they relied on the defendants' misrepresentations to the auctioneer that they had complied with the single-bidder rule. *Id.* at 661 ("For the foregoing reasons, we hold that a plaintiff

25

asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."). The *Bridge* Court, however, only attributed proximate harm in this "zero-sum" scenario because, each time the fraud was perpetrated, a legitimate bidder like the plaintiffs was "necessarily passed over," and, moreover, the losing bidders were "the *only* parties injured by [defendants'] misrepresentation." *Hemi Grp., LLC v. City of New York, N.Y.*, 559 U.S. 1, 14–15 (2010) (quotation omitted) (referring to *Bridge*); *see Bridge*, 553 U.S. at 658 ("And here, unlike in *Holmes* and *Anza*, there are no independent factors that account for respondents' injury, there is no risk there are no independent factors that account for [the party's] injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.")

*Bridge* does not support a colorable argument that "Tauler Smith LLP would have been able to establish proximate cause in asserting RICO claims on behalf of its client." (ECF No. 143-1 at 29.) First, a loss to Outlaw's sales is not "necessarily" the result of the Stores' sales. *See Hemi Grp., LLC*, 559 U.S. 1 at 14. The "natural male enhancement industry" is not zero-sum in nature, *see id.*, and there are a number of "independent factors" that could explain Outlaw's loss of revenue (e.g., the quality, availability, or brand recognition of Outlaw's products), even if that loss were concurrent with an increase in the Stores' sales. *Bridge*, 553 U.S. at 658; *see also JST Distribution, LLC v. CNV.com, Inc.*, No. CV-17-6264-PSG, 2018 WL 6113092, at *8 (C.D. Cal. Mar. 7, 2018) (finding no proximate RICO injury where a loss of sales could have been explained by "some other factor, such as price, productive effectiveness, familiarity with the seller, or purchasing habits of customers"). Also, in contrast to *Bridge*, Outlaw would certainly not be the "*only* party" injured by the sale of products containing illegal substances.

Likewise, under *Anza*, it seems exceedingly clear that the amorphous harm alleged by Outlaw is too "attenuated" to be proximately caused by Stores' alleged conduct. *Anza*,

26

547 U.S. at 459–60. In *Anza*, the Court found that a defendant's alleged RICO scheme to not charge sales tax on steel and then to file false tax returns reflecting diminished sales, did not proximately cause harm to the plaintiff competitor vis-à-vis defendants' lower prices. *Id.* at 459–60. Here, the draft RICO complaint attached to the demand letters likewise alleges a distant harm resulting from lost sales and participation in the same industry. (ECF No. 114-1 at ¶ 45 ("[Outlaw] has been injured . . . [by] the massive diversion of sales to [the Stores], which sell product directly in competition with Plaintiff's products . . ."). In addition, as in *Anza*, the Court recognizes "the speculative nature of the proceedings that would follow" if Outlaw's alleged RICO suit could establish proximate cause merely based on being competitors in the same or similar industry, as Tauler Smith now suggests. (ECF No. 143-1 at 29); *see Anza*, 547 U.S. at 459–60 (citing *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 269 (1992)) ("A court considering the claim would need to begin by calculating the portion of [defendant's] price drop attributable to the alleged pattern of racketeering activity. It next would have to calculate the portion of [plaintiff's] lost sales attributable to the relevant part of the price drop. The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation.")

Consequently, Tauler Smith's "theory" as to proximate cause gains no traction from these cases and thus the threatened RICO suit is objectively baseless.

### b.  Default Judgments.

Michael Wear and Shawn Lynch also "respectfully request that the Court reconsider its prior ruling on the *Noerr–Pennington* doctrine (ECF 56) and enter a dismissal order in" light of a recent default judgment in Outlaw's favor, entered on October 30, 2019 in the Eastern District of Michigan, Southern Division. (ECF No. 153-1 at 30–31); *see PRE II*, 508 U.S. at 58 (a successful lawsuit generally "cannot be characterized as a sham"). The Stores offer two responses. First, they argue that a default judgment says nothing as to whether the threatened RICO suit is a sham because a default

judgment is, by definition, "uncontested." (ECF No. 156 at 15.) Second, the Stores argue that the Enterprise members' pre-litigation conduct evinces an effort to defraud that cannot be "immunize[d]" by *Noerr–Pennington*, even if Outlaw ultimately wins some lawsuits when its defendants "fail to show up to defend themselves." (*Id.* at 15–16.) In reply, the Enterprise members contend that the Stores' response ignores the facts that, even absent a defense, the District Court "considered Outlaw's evidence of damages, found it persuasive, and rendered a significant judgment." ( ECF No. 167 at 11–12.)

The Court finds that the Stores are correct here. Though it appears the Ninth Circuit has not expressly decided this issue, and the Parties cite to no case addressing whether the entry of a default judgment precludes a finding that a claim is baseless within the meaning of *Noerr–Pennington*, at least one court, the District Court of Massachusetts, has addressed the issue. *See California Ass'n of Realtors, Inc. v. PDFfiller, Inc.* ("*CAR*"), No. CV-16-11021-IT, 2018 WL 1403330, at *15 (D. Mass. Mar. 2, 2018), *report and recommendation adopted*, No. 16-CV-11021-IT, 2018 WL 1399296 (D. Mass. Mar. 19, 2018). There, the court found counterclaimants' allegations that the plaintiffs initiated baseless lawsuits as an anticompetitive weapon satisfied both prongs of the sham litigation test, even though a number of cases brought by the plaintiffs in California had already "resulted in default judgments for failure to appear . . ." *CAR*, 2018 WL 1403330, at *15. Taking judicial notice of those cases, the court pointed out that "none of the cases resulted in a judicial decision on the merits." *Id.*

Notwithstanding Defendants' arguments that the District Court of Michigan had to review Outlaw's requested damages in issuing its October 30, 2019 default judgment, the Court adopts the reasoning of *CAR* and finds that it comports with *PRE II*. *PRE II* approvingly cites to two cases, *Allied Tube* and *Vendo*, in stating that "a successful 'effort to influence governmental action . . . certainly cannot be characterized as a sham.'" *See PRE II*, 508 U.S. at 58 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 502 (1988); *Vendo Co. v. Lektro–Vend Corp.*, 433 U.S. 623, 645 (1977)). Both

28

matters addressed actions unlike an uncontested, default judgment. *See Allied Tube*, 486 U.S. at 502 (finding that petitioner's efforts to influence a private association's nationally-recognized product code were ineligible for *Noerr-Pennington* protection, but that, if such conduct were eligible as "incidental to a valid effort to influence governmental action," then it would not be a sham "given the actual adoption of the 1981 Code into a number of statutes and local ordinances"); *Vendo*, 433 U.S. at 645 (addressing the "protracted litigation [of a] state-court action, [in which] the Illinois Supreme Court affirmed a judgment in petitioner's favor in an amount exceeding $7 million.") And, as recently noted by a sister court in the Ninth Circuit, a decision "on the merits" precludes a finding of baselessness. *See Keys v. Pearson Affiliated, Inc.*, No. CV-12-5244-PA, 2013 WL 12205581, at *5 (C.D. Cal. May 14, 2013) (finding that the *Noerr-Pennington* doctrine shielded a landlord and his attorneys from various claims by a tenant, including a RICO claim, on the basis that the "underlying unlawful detainer action was successful on the merits in state court").

In light of the applicable law on this issue, and the Parties' arguments, the Court finds that, despite the default judgment cited by Michael Wear and Shawn Lynch, the RICO suits threatened in the demand letters were "objectively baseless in the sense that no reasonable litigant could realistically expect success *on the merits*." *PRE II*, 508 U.S. at 60 (1993) (emphasis added).

### 2.  The Subjective Prong of *Noerr-Penningnton*.

In addition to demonstrating baselessness, the Stores must also show that the subject litigation is "an attempt to interfere directly with the business relationships of a competitor" when invoking the sham litigation exception to the *Noerr-Pennington* doctrine. *PRE II*, 508 U.S. at 60–61; *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998) ("First, if the alleged anticompetitive behavior consists of bringing a single sham lawsuit (or a small number of such suits), the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with

the plaintiff's business relationships.") (citation omitted). Here, Tauler Smith contends that the Stores "cannot establish the subjective prong of the sham-litigation exception because Tauler Smith LLP is not a competitor of stores that sell male enhancement supplements." (ECF No. 143-1 at 30–31; ECF No. 164 at 12–13.) The Stores argue that (1) the *Noerr-Pennington* doctrine nonetheless applies to this case because the "competitor" requirement arises from a different context and (2) that Tauler Smith acted as a competitor in generating the scheme, creating "TriSteel," and dispatching investigators in connection with the scheme. (ECF No. 158 at 16.)

The Court finds the Stores are correct for various reasons. First, whether Tauler Smith is strictly a "direct competitor" to the Stores misses the point of the subjective prong of the sham litigation test. This prong encompasses situations in which people "use [] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *PRE II*, 508 U.S. at 61 (quoting recognition *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991)); *see also Sosa*, 437 F.3d at 938 ("To establish that a petition to the court is a sham, the party seeking to impose liability must establish both that the legal claim is objectively baseless and that the suit was brought for an anticompetitive purpose."). And, the Court has already twice held that the Enterprise's scheme is adequately pled with respect to that test because it is predicated on an anticompetitive purpose. (*See* ECF No. 85 at 11–12; ECF No. 56 at 17.)

The allegations of the SACC satisfy that same threshold with respect to Tauler Smith by alleging, in detail, the firm's involvement in the anti-competitive conduct central to the scheme, including that Tauler Smith (1) dispatched investigators to find targets for the scheme, (2) at times acted without the direction of Outlaw in defending the demand letters, (3) collaborated with Shawn Lynch and Michael Wear to create "TriSteel" products, (4) designed the "fraudulent statements" in the demand letters, (5) drafted the threatened RICO complaint which the Stores allege falsely claimed to sell "TriSteel" in storefronts around the United States, (6) settled cases on behalf of the

Enterprise, (7) sent demand letters to stores in states whether its attorneys are not admitted to practice, and (8) received and retained all proceeds generated by the scheme. (ECF No. 114 at ¶¶ 68–71.) Such conduct, if true, would at a minimum "interfere[] with [the Stores'] business by, for example, sapping their financial resources or distracting their attention." *See Freeman v. Lasky, Haas & Choler*, 410 F.3d 1180, 1185 (9th Cir. 2005). Such conduct, moreover, is directly attributed to Tauler Smith in the SACC.

In addition, as an independent reason, the Court sees no reason for distinguishing Tauler Smith from the Enterprise members for the purposes of this inquiry, and thus treats the *Noerr-Pennington* doctrine as applicable to all third-party defendants to the Stores' counterclaims. Afterall, Tauler Smith is now a third-party defendant to the Stores' counterclaims and alleged to be part of the association-in-fact Enterprise selling TriSteel. (ECF Nos. 113, 114.) And, if applied, the *Noerr-Pennington* doctrine would immunize the litigation conduct of the enterprise – not just one member. *See Freeman v. Lasky, Haas & Choler*, 410 F.3d 1180, 1186 (9th Cir. 2005) (affirming a district court's application of *Noerr–Pennington* to a law firm's defense of their client, and noting that the doctrine extends to the defendants generally, including "their employees, law firms, and lawyers, as their agents in that litigation").

Consequently, the SACC adequately alleges that Tauler Smith, as a member of the Enterprise, "use[d] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon" through its alleged conduct, and thus evidently intended to "interfere directly with the business relationships of a competitor" to the Enterprise. *PRE II*, 508 U.S. at 60–61.

## III.   THE ANTI-SLAPP MOTION

Lastly, the Court turns to Tauler Smith's anti-SLAPP motion. In light of California's laws and jurisprudence on rescission, as well as the Parties' briefing, the Court finds that a suit to enforce a party's unilateral contract rescission is not a "cause of action" within the meaning of the Anti-SLAPP statute.

31

**A. Legal Standard**

"California passed its Anti-SLAPP statute in 1992 to address a spike in lawsuits aimed at chilling the exercise of the rights to free speech and to petition for redress of grievances." *Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 764 (9th Cir. 2017) (citing Cal. Civ. Proc. Code § 425.16(a)). "SLAPP" stands for strategic lawsuits against public participation. *See Batzel v. Smith*, 333 F.3d 1018, 1023–24 (9th Cir. 2003). As a result, section 425.16 has come to be known as the "Anti-SLAPP statute." *Braun v. Chronicle Publishing Co.*, 52 Cal. App. 4th 1036, 1042 (1997).

The Anti-SLAPP statute provides that:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1).

California courts employ a two-part inquiry for assessing anti-SLAPP motions. *See Commonwealth Energy Corp. v. Investor Data Exchange, Inc.*, 110 Cal. App. 4th 26, 31 (2003). At step one of the anti-SLAPP analysis, "the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *Makaeff v. Trump Univ.*, LLC, 715 F.3d 254, 261 (9th Cir. 2013). At step two, if showing has been made, the burden shifts to the plaintiff "to establish a reasonable probability that it will prevail on its claim[s]." *Id.*

**B. Applicability to Remedy of Rescission**

Consistent with its prior ruling on November 27, 2018, the Court again finds that the anti-SLAPP statute is inapplicable here because rescission is a remedy, not a cause of action. (*See* ECF No. 31) (published as *In re Outlaw Labs., LP Litig.*, 352 F. Supp. 3d 992, 1010–12 (S.D. Cal. 2018)).

32

Section 425.16 applies only to "causes of action." Cal. Civ. Proc. Code § 425.16(b)(1) (stating that "[a] cause of action against a person . . . shall be subject to a special motion to strike"). For the purposes of section 425.16, "[a] cause of action is comprised of a primary right of the plaintiff, a corresponding primary duty of the defendant, and a wrongful act by the defendant constituting a breach of that duty." *Marlin v. AIMCO Venezia, LLC*, 154 Cal. App. 4th 154, 162 (2007) (citations and quotation marks omitted). Tauler Smith makes no effort to explain how the remedy of rescission qualifies as a cause of action under the *Marlin* test. The Court finds that Tauler Smith's failure to identify a primary right and corresponding duty relating to rescission supports the conclusion that rescission does not meet the definition of a "cause of action." *In re Outlaw Labs., LP Litig.*, 352 F. Supp. 3d 992, 1010 (S.D. Cal. 2018); *see Wong v. Jing*, 189 Cal. App. 4th 1354, 1360 n.2 (2010) (declining to apply § 425.16(b)(1) to a request for specific performance / injunctive relief); *Dep't of Fair Employment & Hous. v. 1105 Alta Loma Rd. Apartments, LLC*, 154 Cal. App. 4th 1273, 1281 n.3 (2007) ("However, damages are remedies, not causes of action or claims. Accordingly, the statute was inapplicable for Alta Loma's purpose.").

Under California law, rescission does not fall within the ambit of the anti-SLAPP statute. As the California courts have repeatedly held, "[r]escission is not a cause of action; it is a remedy." [5] *Nakash v. Superior Ct.*, 196 Cal. App. 3d 59, 70 (1987); *see also*

---

[5]     As background, it is edifying to review how the remedy of rescission has evolved under California law. Prior to 1961, a party seeking rescission in California had two options: unilateral rescission or judicial rescission. *Runyan v. Pac. Air Indus., Inc.*, 2 Cal. 3d 304, 311 (1970). The former required a party to unilaterally rescind the agreement and then bring an "action to enforce a rescission," while the later relied upon the court's equitable powers to rescind the contract through an "action to obtain a rescission." *Id.* at 312. Vis-à-vis the latter, parties seeking rescission of a contract used to be able to file an equitable suit stating a cause of action for rescission under California law. *S. Ins. Co. v. Workers' Comp. Appeals Bd.*, 11 Cal. App. 5th 961, 971 (Ct. App. 2017).
          In 1961, the California legislature made significant statutory changes intended to reduce the "complex duality of rescission procedures by" enacting a single procedure. *Runyan*, 2 Cal. 3d at 312–13. Pursuant to the post-1961 rules, rescission is now to be effected "by notice and [an] offer to restore the

*Hailey v. California Physicians' Serv.*, 158 Cal. App. 4th 452, 468 (2007), *as modified on denial of reh'g* (Jan. 22, 2008) (holding that "rescission . . . is an equitable remedy"). Indeed, a court "does not rescind contracts but only affords relief based on a party's rescission." *Wong v. Stoler*, 237 Cal. App. 4th 1375, 1385–86 (2005), *as modified on denial of reh'g* (June 23, 2015).

Thus, the mere fact that rescission is inartfully pled as a "claim" or "cause of action," *see, e.g.*, *Guan v. Hu*, 228 Cal. Rptr. 3d 169, 176–77 (Ct. App. 2018), *as modified* (Feb. 7, 2018), *review denied and ordered not to be officially published* (Mar. 28, 2018) (repeatedly referring to the rescission as a "cause of action" but clarifying that, as a legal matter, rescission is a remedy), or that cases describe suits to enforce rescission as "actions," *Runyan v. Pac. Air Indus., Inc.*, 2 Cal. 3d 304, 311 (1970), does not transform a claim for rescission into a "cause of action" for the purposes of Section 425.16. Instead, under California pleading principles, "the nature and character of a pleading is to be determined from its allegations, regardless of what it may be called . . ." *McDonald v. Filice*, 252 Cal. App. 2d 613, 622 (Ct. App. 1967).

The decision in *Forever 21, Inc.* clarifies this distinction. *Forever 21, Inc. v. Nat'l Stores Inc.*, No. 2:12-CV-10807-ODW, 2014 WL 722030 (C.D. Cal. Feb. 24, 2014). There, "Forever 21 move[d] to dismiss four of Ultimate's counterclaims for breach of contract, unfair competition, rescission, and fraud." *Id.* at *4. Forever 21 likewise filed an anti-SLAPP motion seeking to strike all the counterclaims except one for declaratory relief. *Id.* at *6. Though the counterclaims pled rescission separately, the court reasoned that the rescission was "related to Forever 21's allegedly fraudulent conduct," and thus

consideration." *S. Ins. Co. v. Workers' Comp. Appeals Bd.*, 11 Cal. App. 5th 961, 971 (Ct. App. 2017) (quotation omitted); *see also* 1 Witkin, Summary 11th Contracts § 960 (2019) ("Pursuant to a recommendation of the Law Revision Commission, the equitable action to have a rescission adjudged was abolished in 1961, and the statutes now deal solely with unilateral rescission by notice and offer to restore the consideration.").

34

recognized that "[r]escission is a remedy and not a separate claim." *Id.* at *6 (citing Cal. Civ. Code § 1689(b)). Consequently, in considering the claims' probability of success under the second prong of the two-step framework for an anti-SLAPP motion, the court looked only to the parties' allegations and understanding of fraud. *Id.* at *8. In other words, because rescission was a remedy, the "claim" for rescission rose and fell with the claim for fraud as the Court could not apply the anti-SLAPP framework to it. *Id.* ("Ultimate will not be able to prove its fraud claim and will therefore also have no basis for rescission.").

So too here. Though the Stores separately pled a third "cause of action" for rescission in the SACC, the pleading's plain language demonstrates that it is merely a remedy to the RICO causes that preceded it. The Stores expressly plead as much in stating that they are entitled to rescission because, "at the time they entered the 'Confidential Settlement Agreement and Release,' they did not know that their agreement had been predicated upon a scheme to defraud that was illegal ab initio, as set forth [in the RICO counts]." (ECF No. 114 at ¶ 99.) In addition, the Stores state that they are entitled to rescission because, at "the time Skyline Market signed the agreement, it did so under duress, given that it had been threatened with liability of 'over $100,000 . . .' and was then presented with an offer to get out of that jam for a mere $2,800, or 2.8% of the asserted liability." (ECF 114 at ¶ 98.) And, that is precisely the intended effect of the Enterprise's fraudulent scheme as alleged in connection with the RICO counts. (*See, e.g.*, ECF at ¶¶ 3, 4, 56, 59.)

Tauler Smith's arguments in reply are unpersuasive. Tauler Smith asserts that *Nakash* "must be understood in context." (ECF No. 173 at 7.) In its view, *Nakash* stands for the proposition that a "party may seek rescission multiple times (if the facts permit), not that a party may never pursue an independent cause of action for rescission." (*Id.*) While parties sometimes plead rescission as a separate claim, *see, e.g.*, *Forever 21, Inc.*,

35

2014 WL 722030, at *4, an action brought to enforce a unilateral rescission nonetheless amounts to a remedy, not a cause of action, within the meaning of Section 425.16.

In its reply, Tauler Smith also relies on *Suarez v. Trigg Labs., Inc.*, 3 Cal. App. 5th 118, 125 (Ct. App. 2016), to support its position that "California courts properly dismiss rescission claims pursuant to California's anti-SLAPP statute." (ECF No. 173 at 4.) However, this unremarkable proposition does not relate to the salient issue of whether rescission is a cause of action. It merely recognizes that, in granting an anti-SLAPP motion that challenges a cause of action, accompanying claims for rescission, restitution, specific performance will be dismissed. *See, e.g.*, *Forever 21*, 2014 WL 722030, at *8 ("the Court finds that Ultimate will not be able to prove its fraud claim and will therefore also have no basis for rescission.") Importantly, the *Suarez* court had no occasion to decide whether a rescission claim constituted a "cause of action" for purposes of the Anti-SLAPP statute.

Tauler Smith also reads *Suarez* as holding that rescission was a cause of action in its own right because it did not relate to the original quantum meruit action. (ECF No. 173 at 4.) In doing so, Tauler Smith ignores the fraudulent concealment cause of action that was added to the case and which supports the rescission claim. *See Suarez*, 3 Cal. App. 5th at 121–22 ("Suarez filed this action against Trigg in May 2014, seeking rescission of the settlement agreement in Suarez I based on Trigg's fraudulent concealment of the prospects for sale of the company, and quantum meruit.") And, Tauler Smith does not account for the unique procedural history of *Suarez*, which does not lend itself to the broad statement of law that Tauler Smith infers. (*Id.* at 120–22.)

California case law, moreover, expressly contradicts Tauler Smith's interpretation of the rescission allegations in the SACC. *See Runyan*, 2 Cal. 3d at 318; *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 959 (2005) ("Plaintiff has attempted to plead a separate cause of action for rescission. She is not entitled to that remedy."); *Guan*, 228 Cal. Rptr. 3d at 178 (quoting *Nakash*, 196 Cal. App. 3d at 70) ("'Rescission,'

36

however, 'is not a cause of action; it is a remedy.'"); *see also Taguinod v. World Sav. Bank, FSB*, 755 F. Supp. 2d 1064, 1072 (C.D. Cal. 2010) ("Rescission is a remedy, not a cause of action.").

Consequently, Tauler Smith's anti-SLAPP motion fails in that the Stores seek rescission, which is a "remedy," and not a cause of action, for the purposes of Section 425.16. *See Nakash*, 196 Cal. App. 3d at 70; *see also Runyan*, 2 Cal. 3d at 311.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Tauler Smith's motion to dismiss, Michael Wear and Shawn Lynch's motion to dismiss, and Tauler Smith's special anti-SLAPP motion. (ECF Nos. 143, 153, 156.)

**IT IS SO ORDERED.**

Dated:  April 23, 2020

Hon. Gonzalo P. Curiel
United States District Judge