UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: OUTLAW LABORATORIES, LP LITIGATION, | Case No.:  18CV840 GPC (BGS)<br><br>**ORDER ON JOINT STATEMENT REGARDING FOUR OUTLAW DOCUMENTS**<br><br>[ECF 214] |

## I.     INTRODUCTION

Plaintiff Outlaw Laboratories, LP ("Outlaw") and Counter-claimant Roma Mikha and Third-Party Plaintiff NMRM, Inc. and Skyline Market, Inc. (collectively the "Stores") filed a Joint Statement on May 29, 2020 regarding four documents Outlaw claims are protected from disclosure by attorney-client privilege and the work product doctrine.  (ECF 214.)  The Joint Statement follows the parties' submission of a joint letter brief to the Court with the four documents attached for *in camera* review.

Outlaw claims the documents are privileged and should not be disclosed.  The Stores argue the documents are not subject to attorney client privilege or the work product doctrine and argues even if they are, they are subject to the crime-fraud exception.  The parties' Joint Statement indicates "[t]he Stores and Outlaw agree that *in*

1

*camera* review of the disputed documents is appropriate for resolving this dispute" and that "the documents were submitted by email to Judge Skomal's Chambers on May 11, 2020. (Joint Statement [ECF 214] at 5.[1])

## II.   BACKGROUND

### A.   Claims in Consolidated Action

This consolidated action encompasses two cases brought by Outlaw against retail stores for false advertising under the Lanham Act and as to the *SD Outlet* action, California False Advertising and California Unfair Competition claims.  (Case Nos. 18cv840 ("*DG in PB*") and 18cv1882 ("*SD Outlet*"); ECF 147[2] at 4-5.).  Three of the stores in the *SD Outlet* action have filed counterclaims as a class action on behalf of themselves and other targeted stores against Outlaw and additional parties under the Racketeer Influenced and Corrupt Organizations Act ("RICO") along with a rescission claim. ("Second Amended Counter Claims ("SACC") [ECF 114].)  The Court very briefly summarizes the claims below.

Outlaw's Lanham Act claims are premised on the defendants selling "male-enhancement pills, . . . 'the Enhancement Products'" with packaging that indicate they are all natural, but contain undisclosed drugs with Outlaw claiming it has lost out on sales to those products. (ECF 147 at 1, 3-6; ECF 209 (*San Diego Outlet* action.)  Summary Judgment was granted to defendants in the *DG in PB* action on this claim.  (ECF 147.)  The court found the defendant stores could not be found liable for false advertising for information on the packaging of the products they only sold.  (*Id.* at 9-12.)  As to the *San Diego Outlet* action, Judge Curiel recently granted a motion for judgment on the pleadings dismissing with prejudice on almost all of Outlaw's claims.  (ECF 209.)

---

[1] All citations to the Joint Statement are to the CM/ECF electronic pagination.
[2] In summarizing Outlaw's claims and their status, the Court draws from Judge Curiel's December 3, 2019 Order granting summary judgment to defendants in the *DG in PB* action and his May 29, 2020 Order granting in part defendants' motion for judgment on the pleadings in the *San Diego Outlet* action. (ECF 147 and ECF 209.)

Judgment on the pleadings was granted on the Lanham Act claim as to both direct and contributary liability as well as its California's False Advertising Law ("FAL") claim and the fraudulent and unlawful prongs of Outlaw's California Unfair Competition Claim ("UCL") claim.  Only the unfairness prong of the UCL survived.  (ECF 209 at 24-26.[3])

The Stores have alleged counterclaims under RICO on behalf of a class of similarly situated stores.  (ECF 114.)  The Stores allege that since at least December 2017, Outlaw, Outlaw's former attorneys Tauler Smith, and Outlaw's principles, Michael Wear and Shawn Lynch, have engaged in a scheme that includes sending demand letters via U.S. mail to small businesses that threaten the store could be held liable for over $100,000 based on false and misleading statements about potential liability for the sale of certain products by the stores.  (SACC ¶¶ 2, 26, 82-88.)  The SACC alleges Outlaw employs "investigators," some hired through craigslist postings by Outlaw's counsel Tauler Smith, who identify stores selling the products, take pictures of storefronts and shelves in the store with the products and provide that information to others participating in the scheme to target these stores.  (SACC ¶¶ 66, 73, 86, 92.)  The SACC alleges that Outlaw and its attorneys then send the demand letters, with FDA notice attached, that falsely indicate the store is illegally selling products in violation of RICO and the Lanham Act.  (SACC ¶¶ 2, 23-24, 26-52, 84-86, 88.)

The demand letters also allegedly include pictures taken of receipts for purchase of the products by investigators.  (SACC ¶¶ 68, 73, 91.)  The Stores allege the draft Complaint attached to the demand letters also falsely asserts that Outlaw sells a competitive product, the TriSteel products, in retail stores throughout the United States when it has never sold its products in stores and only started selling it online in October 2017.  (SACC ¶¶ 66-67.)  This commencement of any sales was months after Outlaw had already been documenting sales of the Enhancement Products by stores through

---

[3] A motion for reconsideration was recently filed on that issue.  (ECF 213.)

investigators in August 2017. (SACC ¶ 68.) Outlaw then follows up with offers to settle for increasingly lower amounts, including as low as $2,500. (SACC ¶¶ 3-4, 56, 72, 87, 98.)

### B. The Stores Submissions in Support of Crime Fraud Exception

To support their claim that these four documents are subject to the crime-fraud exception, the Stores rely on portions of the SACC that describe demand letters sent to stores with photos, taken by investigators, of receipts dated August 1, 2, and 4, 2017. (Joint Motion at 12 (citing SACC ¶ 68).[4]) The Stores argue this is significant because it shows Outlaw was targeting stores before Outlaw's TriSteel product was even being sold.[5] (*Id.*) The Stores cite a google index to show TriSteel was not sold online until October 17, 2017 and a spreadsheet produced in discovery by Outlaw. (*Id.* (citing SACC ¶ 67); Poe Decl., Ex. A (spreadsheet).) The Stores describe the spreadsheet as showing funding from the Pulaski Law Firm for the scheme as early as July 2017, months before Outlaw's product was ever sold. (Joint Statement at 12.) The spreadsheet lists JST Distribution, not Outlaw, but as the Stores explain, Outlaw's response to an interrogatory explains that "JST Distribution was an entity that was going to pursue litigation along with Outlaw," initially paying "for investigators to collect evidence." (Poe Decl., Ex. B.) The response also explains that Outlaw obtained the information gathered by JST Distribution after it pulled out of the litigation. (*Id.*)

In further support of the connection between JST Distribution and Outlaw, the Stores provide a link to a news story in which Mr. Tauler of Tauler Smith apparently

---

[4] The Stores reference Outlaw's operative complaint being supported by "the Enterprise's own documents" with citation to the SACC at ¶ 68. Although these documents were not submitted in support of this motion, they are in the record. The three attachments to demand letters show receipts of purchases by investigators in early August 2017. (ECF 90-21 [Ex. Q to the Stores' Motion for Summary Judgment] at 9 (Midway Spirits – 8/2/2017), 74 (New Way Liquor – 8/1/2017), 108 (Main Street Liquor – 8/4/2017).)
[5] As explained below, Outlaw has admitted that its products were never sold in retail stores and only online.

4

admitted in correspondence that Outlaw and JST agreed that Outlaw would carry on the claims of JST Distribution. (Joint Statement at 13.[6]) They also explain that "[t]he website for JST Distribution's litigation vehicle (a purported product called 'Powerful Desire') www.powerfuldesire.com redirects to www.tfsupplements.com whose initial registered agent was Outlaw's owner and third-party defendant Mr. Wear, and which shares the same 6666 Gulf Freeway address as Outlaw Laboratory itself." (Joint Statement at 13 (citing SACC ¶ 71.a).)

Additionally, the Stores represent that in response to a Request for Admission Outlaw admitted that "Tri-Steel is not sold at any retail locations other than online." (Joint Statement at 13.[7]) This again, is significant, because the Stores argue it shows that the draft complaint attached to the demand letters sent to stores was false because it claimed the TriSteel products were sold "through . . . storefront retail locations across the United States." (ECF 114-1 at 13.[8])

Finally, the Stores rely on one of Judge Curiel's Orders denying Outlaw's Motion to Dismiss, asserting the decision found the Stores "met the far higher hurdle of indicating that the legal threats made in the letters were 'objectively baseless.'" (Joint Statement at 14 (quoting Order Denying Motion to Dismiss at 19 [ECF 56].) Additionally, the Stores claim the decision "considers the Stores' allegation (supported by FDA testing results) that the Enterprise threatened the Stores without having even

---

[6] A link to a video is included in the Joint Statement.

[7] The Requests for Admission referenced were not submitted, but they are in the record. (ECF 90-7 [Ex. C to the Stores' Motion for Summary Judgment] at 3 [RFA Nos. 1-6] – admitting TriSteel products were never sold in retail stores.)]

[8] Exhibit A to the SACC is a demand letter and attachments sent to a store that includes that threats of liability up to a $100,000, listing of claims under RICO and the Lanham Act, FDA notice, and a draft complaint. Additionally, numerous other demand letters include the same Outlaw draft complaint that claims TriSteel is sold "through . . . storefront locations across the U.S." (ECF 90-21 [Ex. C to the Stores Motion for Summary Judgment].)

confirmed that they were selling pills that actually contain pharmaceuticals in the first place" and "deemed that showing to be 'especially convincing' evidence that the Enterprise's conduct 'was designed to indiscriminately and 'serially extort small businesses out of money.'" (*Id.* at 14.)

### C. Documents at Issue

The documents submitted by the parties are described as follows in the Stores' portion of the Joint Statement:[9]

- OUT_02117-135: partial billing records of Tauler Smith, describing the activities of certain attorney-members of the Enterprise, and the Enterprise's receipt and disposition of the funds obtained through the scheme (filename ending in "DO NOT FORWARD");
- OUT_02692-94: A tabulation of certain settlements (filename ending in – 538);
- OUT_02695-97: A table summarizing the Enterprise's communications with stores (filename ending in -331); and
- OUT_02698-701: An exchange between Mr. Wear (one of Outlaw's owners and a defendant-member of the alleged Enterprise) and the CFO of a law firm that provided funding to the Outlaw Enterprise (filename ending in -895).
- 

(Joint Statement at 6.)

## III. DISCUSSION

### A. Legal Standards

"Where there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839-40 (9th Cir. 2005) (citing Fed. R. Evid. 501 advisory committee notes). In this consolidated case, Plaintiff Outlaw's initial claims in both actions include federal claims under the Lanham Act. (ECF 1, Case No.18cv840, at 13-14; ECF 1-2, Case No. 18cv1882, at 34-36.)

---

[9] Outlaw did not object or dispute these descriptions.

6

Accordingly, the Court applies federal privilege law.

### 1. Crime-Fraud Exception

"While the attorney-client privilege is 'arguably most fundamental of the common law privileges recognized under Federal Rule of Evidence 501,' it is 'not absolute.'" *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (quoting *In re Napster, Inc. Copyright Litig.,* 479 F.3d 1078, 1090 (9th Cir.2007), *abrogated in part on other grounds by Mohawk Indus., Inc. v. Carpenter,* 558 U.S. 100, 130 S. Ct. 599 (2009)). "The protection afforded by the attorney-client privilege does not extend to any communication 'in furtherance of intended, or present, continuing illegality.'" *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996) (citing *United States v. Hodge & Zweig,* 548 F.2d 1347, 1354 (9th Cir. 1977)). "Thus, the crime-fraud exception insures that the confidentiality enveloping the attorney-client relationship does not encompass communications made for the purpose of getting advice for the commission of a fraud or crime, but the exception does not sweep so broadly that it discourages clients from making full disclosure to their attorneys of *past* wrongdoings, in order that the client may obtain the aid of persons having knowledge of the law and skilled in its practice." *Id.* (internal quotations and citations omitted). "Under the crime-fraud exception, communications are not privileged when the client 'consults an attorney for advice that will serve him in the commission of a fraud' or crime." *Id.* (quoting *In re Napster.*, 479 F.3d at 1090).

The party challenging the privilege "under the crime-fraud exception must satisfy a two-part test." *In re Napster*, 479 F.3d at 1090.

> First, the party must show that 'the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme. Second, it must demonstrate that the attorney-client communications for which production is sought are 'sufficiently related to' and were made '*in furtherance of* [the] intended, or present, continuing illegality.'

*Id.* (quoting *In re Grand Jury Proceedings,* 87 F.3d at 381-83; *see also In re Icenhower*, 755 F.3d 1130, 1141 (9th Cir. 2014) (quoting *In re Napster*, 479 F.3d at 1090). "The attorney need not have been aware that the client harbored an improper purpose.  Because both the legal advice and the privilege are for the benefit of the client, it is the client's knowledge and intent that are relevant." *In re Napster*, 479 F.3d at 1090 (citations omitted).  "The planned crime or fraud need not have succeeded for the exception to apply. The client's abuse of the attorney-client relationship, not his or her successful criminal or fraudulent act, vitiates the privilege. *Id.*  (citations omitted)

"The crime-fraud exception may be used to abrogate work-product protection as well as the attorney-client privilege."  *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Litig.*, 116 F.R.D. 297, 301 (9th Cir. 1987) (citing *In re Antitrust Grand Jury*, 805 F.2d 155, 164 (6th Cir.1986) (collecting cases)). "Courts generally follow the same two-part approach used in applying the exception to the attorney-client privilege." *Id.* (citing *In re Antitrust Grand Jury*, 805 F.2d at 168-69 and *In re A.H. Robins Co.*, 107 F.R.D. 2, 15 (D. Kan. 1985)).

### a)  Burden of Proof

Up to this point, the parties appear to agree on the standard the Court must apply. However, as to the applicable burden of proof to establish the crime-fraud exception, the parties disagree.  Neither of them attempts to explain why the standard advanced by the other is wrong.  Instead they both just state different standards and cite different Ninth Circuit cases.

The Stores argue the Court need only "find 'reasonable cause to believe' that the attorney's services were 'utilized . . . in furtherance of the ongoing unlawful scheme.'" (ECF 214 at 11 (quoting *In re Grand Jury Proceedings*, 87 F.3d at 381.[10])  This is the

---

[10] In the Joint Statement, the Stores attribute the quoted language to a district court decision.  In their June 10, 2020 filing, (ECF 224), the Stores explain they erred in this citation and correct it.

*prima facie* standard for disclosure in *grand jury cases* in the Ninth Circuit. *In re Napster*, 479 F.3d at 1078, 1094-94 (emphasis added). After summarizing the circuit court of appeals' many standards for *Zolin*[11]'s meaning of a *prima facie* case to disclose communications to a grand jury, the Ninth Circuit explains, [t]he standard in our circuit for grand jury cases is 'reasonable cause to believe' that the attorney's services were utilized in . . . in furtherance of the ongoing unlawful scheme." *Id.* The court goes on to discuss why it may be appropriate to apply different standards of proof in civil cases and grand jury cases. *Id.* at 1094 (citing *Laser Industries, Ltd. v. Reliant Technologies, Inc.*, 167 F.R.D. 417, 426-27 (N.D. Cal. 1996). The court then concludes "that in a civil case the burden of proof that must be carried by a party seeking outright disclosure of attorney-client communications under the crime-fraud exception should be preponderance of the evidence." *Id.* at 1094-95; *see also In re: Bard IVC Filters Prods. Liability Litig.*, MDL No. 2641, 2016 WL 537587, at *10 (D. Ariz. Feb. 11, 2016) (Rejecting a plaintiff's argument that the crime fraud exception can be established by "showing 'reasonable cause' to believe the legal services were used to promote an unlawful scheme" and explaining the lower standard was only for grand jury cases, not civil cases).

      Outlaw argues the Stores must "establish the crime-fraud exception by a preponderance of the evidence; a mere *prima facie* showing, as claimed by the Stores, is insufficient." (ECF 214 at 18 (citing *In re Napster*, 479 F.3d at 1094-95).) Outlaw is partially correct. As discussed above, the preponderance of the evidence standard does apply, but not until the court reaches the point of terminating the privilege based on the

---

[11] *U.S. v. Zolin*, 491 U.S. 554 (1989) and its standard for *in camera* review is discussed further below.

9

crime-fraud exception.[12] Here, as explained below, the parties seek *in camera* review, but have not followed the multistep process for *in camera* review that applies.[13]

The parties are seeking *in camera* review which, as explained below, entails a multistep process before the privilege is terminated on a preponderance of the evidence showing. The threshold inquiry to examine documents *in camera* is lower than the standard for disclosure. *In re Napster*, 479 F.3d at 1092 ("But the procedural posture and consequences of an *in camera* inspection of the disputed communications are fundamentally different from those of an order requiring their outright disclosure."). And, for good reason, "the problem of limited access to proof by the party seeking to vitiate the attorney-client privilege is mitigated by the possibility of *in camera* review of the communications by the district court under the far less demanding standard of *Zolin*." *Id.* at 1096.

### b)     *In Camera* Review

Here, the parties seek *in camera* review of four documents, (ECF 214 at 5),[14] but neither party addresses the steps or standards for *in camera* review. "*Before engaging in in camera* review to determine the applicability of the crime-fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a

---

[12] "District courts may find a *prima facie* case of crime-fraud either by examining privileged material *in camera* or by examining independent, non-privileged evidence." *In re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (citing *In re Napster*, 479 F.3d at 1093 and *United States v. Chen,* 99 F.3d 1495, 1503 (9th Cir.1996).

[13] The assertion that a "mere prima facie showing . . . is insufficient" is also not entirely accurate. (ECF 214 at 18.) In adopting the preponderance of the evidence standard for terminating the privilege, that Outlaw advances here, the court explains "the phrase '*prima facie* case" used in *Clark* and *Zolin* "is not inconsistent with a preponderance of the evidence standard." *Napster*, 479 F.3d at 1095. In this respect, the court equates preponderance of the evidence with *prima facie* case

[14] Only the Stores' portion of the Joint Statement explicitly states that the parties agree to *in camera* review. (ECF 214 at 5.) However, Outlaw did not disagree, and it was required to address the Stores' position in its portion of the Joint Statement. From this, the Court deduces that Outlaw is also seeking *in camera* review.

reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572; *see also U.S. v. Christensen*, 838 F.3d 763, 800 (9th Cir. 2016). "[T]he threshold for *in camera* review is 'considerably lower' that that 'for fully disclosing documents.'" *In re Napster*, 479 F.3d at 1092. This is the standard of proof that neither party addresses.

This "threshold is set sufficiently low to discourage abuse of privilege and to ensure that mere assertions of the attorney-client privilege will not become sacrosanct." *In re Grand Jury Investigation*, 974 F.2d 1068, 1072 (9th Cir. 1992). It is not a high bar. "The *Zolin* threshold is designed to prevent 'groundless fishing expeditions,' not to prevent all speculation by the district court." *Id.* at 1073. Finding the threshold showing unmet because the court was required to engage in speculation would be a misapplication of *Zolin*. *Id.*

Significantly here, this threshold decision must be made without consideration of the privilege documents. *United States v. Chen* explains that considering the allegedly privileged documents in determining whether to conduct an *in camera* review to decide whether the crime fraud exception applies would be error. 99 F.3d 1495, 1502 (9th Cir. 1996) ("The Supreme Court established in *Zolin* that the parties seeking to strip attorney-client communications of their privilege under the crime-fraud exception must satisfy the court with some showing *prior to* judicial *in camera* review of the privileged material.") (emphasis added). "[O]therwise privileged material" cannot be shown "to the judge unless and until the judge has made this preliminary judgment." *Id.* at 1503.[15] However, the party opposing the privilege may use any *nonprivileged evidence* in support of its

---

[15] The Court recognizes that the parties were attempting to raise both the issue of whether the documents were subject to the privilege or work product doctrine and the crime fraud exception simultaneously, but in *Zolin*, the court specifically found that the two separate inquiries should be raised separately, first to show the documents should be reviewed *in camera* without consideration of the documents and second to decide if the crime fraud exception applied. *Chen*, 99 F.3d at 1503.

11

request for *in camera* review, even if its evidence is not 'independent' of the contested communications." *Zolin*, 491 U.S. at 574 (emphasis added). The parties did not identify or address this standard.

"Once [the threshold] showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Zolin*, 491 U.S. at 572. "[C]ourts should make the decision to review in light of the amount of material they have been asked to review, the relevance of the alleged privilege material to the case, and the likelihood that *in camera* review will reveal evidence to establish the applicability of the crime-fraud exception." *In re Grand Jury Investigation*, 974 F.2d at 1072-73. The parties also skipped this step.

Only if the threshold has been met and the court exercises its discretion to engage in *in camera* review does the court review the documents to determine if the crime-fraud exception applies. At this point, the preponderance of the evidence standard *Napster* set for terminating the privilege in a civil case applies. *In re: Bard IVC Filters Prods. Liability Litig.*, 2016 WL 5377587, at *10 (D. Ariz. Feb. 11 2016) ("The Ninth Circuit has held that a party in a civil case must establish the crime-fraud exception by a preponderance of the evidence when challenging attorney-client privilege."); *Natural-Immunogenics Corp. v Newport Trial Group*, Case No. 8:16 CV-2034-JVS (JCGx), 2018 WL 6137634, at *9 (C.D. Cal. Aug. 23, 2018) (Concluding the crime fraud exception applied after "having conducted an *in camera* review . . . , having weighed and considered all evidence presented by the parties, and having applied *the preponderance of the evidence standard* of proof.") (emphasis added); *see also In re Napster*, 479 F.3d at 1096 ("[J]udicious use of *in camera* review, combined with a preponderance burden for terminating privilege, strikes a better balance between the importance of the attorney-client privilege and deterrence of its abuse than a low threshold for outright disclosure.")

In contrast to the first step, at this step, courts "*must* examine the individual documents themselves to determine that the specific attorney-client communications for which production is sought are 'sufficiently related to' and were made 'in furtherance of

the intended, or present, continuing illegality." *In re Grand Jury Investigation*, 810 F.3d at 1114. Failing to do so is error by the district court. *Id.* at 1113-14.[16]

### B. Analysis

#### 1. *In Camera* Review

The Stores seek *in camera* review of four documents.[17] It also appears that resolution of the crime-fraud exception will likely be required to resolve whether these documents will be produced to the Stores. (*See* Joint Statement at 11 ("The more significant issue presented in this motion is whether Outlaw's privilege arguments need even be addressed on their merits, or whether the documents are exempt from privilege claims under the 'crime-fraud exception.'") Even if the Court found all of them were subject to the attorney-client privilege or work product, the issue of the crime-fraud exception would still have to be resolved.

As noted above, neither party addressed the standard to determine whether to conduct an *in camera* review – a showing of a "factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal

---

[16] Even in a case where *in camera* review is not necessary "to establish a *prima facie* case that 'the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme, a district court must examine the individual documents themselves to determine that the specific attorney-client communications for which production is sought are 'sufficiently related to' and were made 'in furtherance of the intended, or present, continuing illegality.'" *In re Grand Jury Investigation*, 810 F.3d at 1114 (vacating and remanding for the district court to determine "which documents contained communications in furtherance of the crime-fraud.")

[17] The Stores indicate that "[t]he Stores and Outlaw agree that *in camera* review of the disputed documents is appropriate for resolving this dispute." (ECF 214 at 5.) Outlaw does not address *in camera* review in the Joint Statement, however, the documents were attached to the Joint Letter Brief the parties submitted. The parties identify the documents as: OUT_02117-135 (filename ending in "DO NOT FORWARD"); OUT_02692-94 (filename ending in – 538); OUT_02695-97 (filename ending in -331); OUT_02698-701 (filename ending in -895). They are summarized above.

evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572. This approach has invited error by the Court because the Court must determine whether *in camera* review is appropriate without considering the documents the parties have already put before the Court. However, despite the parties not addressing the proper standard, the Court can find the low threshold for the Court to consider *in camera* review has been met.

The general descriptions of the documents reflect that they concern the funding of Outlaw's activities, its communications with stores targeted with demand letters, the settlements obtained from those stores, and how funds obtained were directed. (Joint Statement at 6.) The Stores submissions reflect that Outlaw, either directly or through JST, began developing a plan to target stores with threats of RICO and Lanham Act liability when Outlaw was not even selling any product. Based on the foregoing, and without reviewing the actual documents the Court can conclude the Stores have shown a "factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572.

Again, despite the parties not addressing it, the Court exercises its discretion to review the documents *in camera*. *In re Grand Jury Investigation*, 974 F.2d at 1072-73 ("[C]ourts should make the decision to review in light of the amount of material they have been asked to review, the relevance of the alleged privilege material to the case, and the likelihood that *in camera* review will reveal evidence to establish the applicability of the crime-fraud exception."). The amount of material the Court has been asked to review is not great, consisting of only four documents that are not of any great length. Based on the descriptions of the documents alone, the Court can conclude the documents are relevant to the case. Tables summarizing communications with stores and settlements

received could evidence how stores were targeted and the results obtained.[18] Additionally, when and how much funding Outlaw received to target stores and how those funds were allocated, particularly in relation to the timing and methods of Outlaw's own product sales, could shed light on the inception of the scheme alleged in the SACC. It appears, based on the general descriptions the Stores provided in the public docket and that Outlaw did not dispute, that the allege privileged material is relevant. And, as discussed about, the Court believes the documents will likely support the Stores claim that the crime-fraud exception applies to them.

Accordingly, the Court exercises its discretion to conduct an *in camera* review of the documents.

### 2. Crime-Fraud Determination

Having found *in camera* review appropriate, the Court next considers whether the privilege should be terminated. The Stores rely on the RICO scheme alleged in their SACC as the fraud underlying the crime-fraud exception. As the assigned district judge explained in one of his decisions in this case, to succeed on a RICO claim:

> a plaintiff must prove (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"), (5) causing injury to the plaintiff's "business or property" by the conduct constituting the violation. *See Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005).
> One type of predicate act of racketeering activity recognized by RICO, 18 U.S.C. § 1961(1) is mail fraud under 18 U.S.C. § 1341. A mail fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States mails or causing a use of the United States mail in furtherance of the scheme; and (3) specific intent to deceive or defraud. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986); *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131, 170 L.Ed.2d 1012 (2008) ("Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice

---

[18] The Court addressed the relevance of settlements in a prior discovery order and will not repeat it here. (ECF 177.)

15

to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do." (quoting 18 U.S.C. § 1341)).

*In re Outlaw, LP Litig.*, 352 F. Supp. 3d 992, 1000 (S.D. Cal. 2018). The requirement of specific intent under this statute is satisfied by "the existence of a scheme which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' and this intention is shown by examining the scheme itself." *United States v. Green,* 745 F.2d 1205, 1207 (9th Cir. 1984) (quoting *United States v. Bohonus,* 628 F.2d 1167, 1172 (9th Cir. 1980)).

From their Joint Statement, the dispute revolves around whether the Stores have proven by a preponderance of the evidence that Outlaw formed a scheme to defraud the Stores. According to the SACC, the alleged scheme to defraud, *i.e.*, predicate acts that constitute the pattern of racketeering activity, were Outlaw drafting, signing and mailing fraudulent demand letters and draft complaints to the Stores in order to extort money from them. For this Court to find that prong 1 of the crime fraud exception applies to these four submitted documents, the Stores would have to prove by a preponderance of the evidence that Outlaw performed these alleged acts which were "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Green,* 745 F.2d at 1207 (quoting *Bohonus,* 628 F.2d at 1172).

The Stores contend they have met their burden by establishing Outlaw and other members of the scheme began targeting stores to defraud them of settlements long before Outlaw was selling any product and that they did so by sending demand letters through U.S. mail that were false. Outlaw asserts that the Stores cannot succeed under the crime-fraud exception based solely on their pleadings.

As discussed above, the Stores rely in part on allegations in their SACCs and Judge Curiel's conclusions in an Order denying a motion to dismiss by Outlaw. The Stores assert Judge Curiel "deemed the Stores not merely to have alleged a 'plausible' basis for showing that the Demand Letters were fraudulent, but that they met the far higher hurdles of indicating the legal threats made in the letters were 'objectively baseless.'" (Joint

16

Statement at 14 (citing Order on Outlaw's Motion to Dismiss at 19 [ECF 56].) This is somewhat accurate. Judge Curiel found the Stores "have pleaded indicia of objective baselessness sufficient to divest Outlaw of its claim of *Noerr-Pennington* immunity." (ECF 56 at 19.) This conclusion was based on the court's finding that the Stores had sufficiently pled Outlaw's prelitigation conduct (demand letters it sent threatening litigation) were a sham. (ECF 56 at 11.) The court found the Stores "adequately alleged that Outlaw did not reasonably believe in the existence of the facts upon which its claim was based," including among others, that: Outlaw could not have believed it lost sales to the Stores' sales of the Rhino products because the Stores only sold the products in brick and mortar stores in California and Outlaw is not registered to do business in California; and that Outlaw threatened stores with selling pills containing an undisclosed pharmaceutical without confirming as much. (*Id.* at 15-16.)

This leads into the Stores other assertion about Judge Curiel's decision, that he "deemed that showing, [discussed above], to be 'especially convincing' evidence that the Enterprise's conduct was designed to indiscriminately and serially extort small businesses out of money." (Joint Statement at 14 (quoting ECF 56 at 16).) The "especially convincing" phrase is accurate; however, the court did not reach any conclusion based on evidence. The conclusion was based on the sufficiency of the pleadings. In this respect, Outlaw raises a valid point. The Stores may not simply rely on the sufficiency of their pleadings or conclusions on them to obtain privileged documents under the crime-fraud exception when a preponderance of the evidence standard applies. Given the Stores' heavy reliance on allegations rather than evidence, the Court certainly would not agree the Stores have shown anything "in spades," (Joint Statement at 12), but when the documents are considered in conjunction evidence they have submitted, they have managed to establish the crime-fraud exception applies to these four documents.

The Stores do largely cite to allegations in the SACC, including allegations that stores were being targeted well before TriSteel was being sold, that TriSteel was not sold at any retail stores, and that JST Distribution is closely connected to Outlaw by way of a

17

prior litigation vehicle and a shared address. (Joint Statement at 12-13.) However, the stores do submit some evidence in support, including a spreadsheet showing significant funding of the scheme through JST Distribution as early as July 2017. (Poe Decl., Ex. A) The Stores also submit an Outlaw response to an interrogatory that connects these early JST's activities to Outlaw. (Poe Decl., Ex. B.) This suggests that Outlaw and those it was working with set out to put this plan targeting stores in motion before TriSteel was every being sold.

      The allegations the Stores cite in the Joint Statement are also supported by evidence in the record. As discussed above, Outlaw's responses to Requests for Admissions Nos. 1-6 indicate that Outlaw never sold its products in retail stores anywhere, certainly not across the United States.[19] In this respect, Outlaw has made this misrepresentation to target stores, from the inception of this scheme, about selling a competitive product in retail stores. Additionally, the receipts included with at least three demand letters dated in early August 2017 indicate that someone working on behalf of the enterprise was targeting stores months before Outlaw was even offering its product for sale online. This evidence indicates that Outlaw was lying to stores in demand letters about its own product and sales of it long before Outlaw was even offering its product for sale online. The documents submitted for *in camera* review also support the Stores' position, particularly the -895 document. It, like the spreadsheet referenced above

---

[19] Exhibit A to the SACC includes a demand letter that opens with: "We represent Outlaw Laboratory, LP ("Plaintiff"), a manufacturer, distributor and retailer of male enhancement products 'TriSteel' and 'TriSteel 8 hour.'" (ECF 114-1 at 2.) It also includes a draft complaint which alleges in paragraph 29 in pertinent part that "…Plaintiff sells TriSteel and TriSteel 8 hour through its website…as well as through many other online and storefront retail locations across the United States." (*Id.* at 13.) Paragraph 35 asserts that defendants false advertising has negatively impacted Outlaw's sales of both its products, and therefore has suffered both an ascertainable economic loss of money and reputational injury. (*Id.* at 14.)

indicates that this scheme was being pursued in July 2017 long before Outlaw was selling any product and explains how the investigators were hired and paid to target stores.[20]

Collectively, the evidence indicates that Outlaw was engaging in a scheme to defraud these stores of settlements by mailing false demand letters through U.S. mail. In this respect, the preponderance of the evidence reflects that Outlaw was engaged in and planning a fraudulent scheme when it sought the advice of counsel to further the scheme. *See In re Napster*, 479 F.3d at 1090 ("First, the party must show that the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme.").

The Court also finds the Stores have "demonstrate[d] that the attorney-client communications for which production is sought are sufficiently related to and were made '*in furtherance of* [the] intended, or present, continuing illegality.'" *Id.* (internal quotations omitted). The Court finds all the documents are sufficiently related to and in furtherance of the scheme in that they summarize scheme activities, including communications with "target" stores, the status of settlements, settlements obtained, and references to the disposition of settlements. The -538 document provides a partial summary of targeted stores and resulting settlements and the -331 document summarizes communications with targeted stores, efforts to obtain settlements from them, and some settlements obtained. Similarly, although not as to specific stores, the -135 document shows the efforts to obtain and dispose of settlements. And, as discussed above, the -895 document shows how early the scheme began and how it was carried out using investigators to target stores.

The Court need not additionally address the parties' arguments regarding whether the documents are subject to attorney-client privilege or the work product doctrine. Even

---

[20] Outlaw, in it portion of the Joint Statement, does not address these misrepresentations which were sent to the Stores as part of a prelitigation plan to achieve settlements.

if they all are, they are subject to the crime-fraud exception and must be disclosed to the Stores.

## IV. CONCLUSION

The Stores have established the crime-fraud exception applies to these four documents. Accordingly, the four documents, -135 document, -538 document, -331 document, and -895 document, shall be produced to the Stores.

**IT IS SO ORDERED.**

Dated:  June 17, 2020

Hon. Bernard G. Skomal
United States Magistrate Judge