**Sergenian Ashby LLP**
David A. Sergenian (SBN 230174)
david@sergenianashby.com
1055 West Seventh Street, 33rd Floor
Los Angeles, California 90017
Tel. (323) 318-7771

*Attorneys for Third-Party Defendant*
*Tauler Smith LLP*

# THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **In re Outlaw Laboratory, LP Litigation** | Case No. 3:18–cv–840–GPC–BGS consolidated with 3:18–cv–1882–GPC–BGS |
| | **Reply Separate Statement of Undisputed Facts in Support of Third-Party Defendant Tauler Smith LLP's Motion for Summary Judgment, or in the Alternative, Summary Adjudication** |
| | Date:      September 11, 2020 |
| | Time:      1:30 p.m. |
| | Hon. Gonzalo P. Curiel |
| | Courtroom 2D |

For the Court's convenience, Third-Party Defendant Tauler Smith LLP ("TSLLP") hereby submits the following Reply Separate Statement of Undisputed Facts. Set forth below for each Undisputed Fact ("UF") which is disputed by Counterclaimant Roma Mikha, Inc., Third Party Plaintiffs NMRM, Inc. and Skyline Market, Inc.'s ("Stores"): (1) TSLLP's Undisputed Facts and Supporting Evidence; (2) the Stores' Opposition; and (3) TSLLP's reply.

| Undisputed Facts and Supporting Evidence | Opposition |
| --- | --- |
| 4. In the ordinary course of its practice, TSLLP was engaged to represent Outlaw Laboratory, LP ("Outlaw Labs"), a manufacturer and retailer of nutritional supplements, in November of 2017 regarding legal disputes concerning competing male sexual enhancement dietary supplements sold through a network of distributors in convenience stores (the "Competing Products"). Outlaw Labs is understood by TSLLP to be a successor-in-interest to JST Distribution, another client of TSLLP. Tauler Decl. ¶ 5. | **Disputed.**<br>• Wear Decl. ¶ 2 [157] (Outlaw's founders encountered Tauler Smith after it sent a similar demand letter to one of their other businesses);<br>• *Id.* Ex. C [186] (Tauler Smith purporting to bill for the engagement going back to July 2017);<br>• *Id.* ¶¶ 4-5 [157-58] (the "legal disputes" asserted by Outlaw were a theory inherited from Tauler Smith's representation of JST Distribution and a funding agreement with the Pulaski Law Firm). |

## UF 4 Reply

It is undisputed that Outlaw Labs is a successor-in-interest to JST Distribution.

The Stores do not dispute that TSLLP was engaged to represent Outlaw Labs in the ordinary course of its practice.

The Stores assert that TSLLP represented Outlaw Labs earlier than November 2017 by pointing to an email from TSLLP to Outlaw Labs in which TSLLP sought compensation for work done beginning in July 2017. This assertion is misleading and requires context. TSLLP was first engaged by Outlaw Labs in November 2017. (Tauler Reply Decl., Ex. 30.) Prior to November 2017, TSLLP represented JST Distribution. TSLLP's engagement with JST Distribution was converted to a contingency representation in July 2017. (Tauler Reply Decl., Ex. 31.) TSLLP sent the email attached as Exhibit C to Wear's declaration after Outlaw Labs terminated TSLLP. (Ex. C to Wear Decl.) Accordingly, TSLLP demanded compensation pursuant to *quantum meruit*. (*Id.*) Because Outlaw Labs was the successor-in-interest to JST Distribution, TSLLP was demanding *quantum meruit* compensation from Wear and Lynch for work done representing JST Distribution (from July 2017 until November 2017) and Outlaw (beginning in November 2017). Accordingly, time entries prior to November 2017 that were sent to Lynch and Wear were for time worked for JST Distribution and do not contradict the undisputed fact that TSLLP began working for Outlaw Labs in November 2017.

With respect to the assertion that Outlaw Labs "inherited" legal theories from JST, it should not be surprising that a law firm would assert similar legal theories on behalf of different clients.

| | |
|---|---|
| 12. The sale of these illicit products also led to many reported deaths and frequent warnings from the FDA, which failed to abate the sale of the illicit products. ECF No. 80-10; Tauler Decl. ¶ 16; Ex. 4, Articles on harmfulness of illicit products. | **Immaterial; disputed.** Second article in Tauler Ex. 4 reads "While no deaths have been reported . . . ." (ECF No. 260-7 at 4). |

### UF 12 Reply

The Stores do not dispute that the FDA issued warnings on the illicit products.

The Stores ignore the evidence cited by TSLLP that states that unlabeled prescription drugs have been implicated in the death of a consumer. (Tauler Decl. ¶ 16, Ex. 4 at p. 73 of 84.)

| 14. Outlaw Labs informed TSLLP that it believed it was losing sales and revenues as a result, and that is why it hired TSLLP to pursue legal action against stores and distributors advertising and offering for sale the competing drugs. Stores are the point of sale of the illicit products and—because of the very illegality of the products—information regarding the importers and distributors is not readily available to legitimate competitors such as Outlaw Labs. Tauler Decl. ¶¶ 18, 19. | **Immaterial; disputed.** Cited evidence does not say that Outlaw hired TSLLP because "it believed it was losing sales and revenues" Tauler Smith identified a number of distributors when it attended the ASD trade show in Las Vegas in August 2017. (Decl. of Joseph Valerio ¶ __ [sic]; Wear Decl. Ex. C (Robert Tauler time entry for August 2, 2017).) |
|---|---|

## UF 14 Reply

Outlaw Labs' purported lack of standing (due to alleged lack of harm) was raised by the Stores as a basis for the allegation that Outlaw Labs' demand letters to stores were fraudulent. (SACC (ECF No. 114) ¶ 43.) The evidence offered by TSLLP shows that Outlaw Labs hired TSLLP to pursue claims against stores for sales of competing products, and TSLLP researched the effect of these products on the marketplace. This testimony is undisputed.

Although Valerio's testimony is false, and inadmissible (see concurrently-filed Objection and Request to Strike Valerio Declaration) even if it were considered, it demonstrates that Gaw Poe LLP is seeking to obtain (and believes it has obtained) TSLLP's work product from Valerio. In any event, as discussed in reply to UF 4 above, an August 2, 2017 time entry by TSLLP is not inconsistent with the undisputed fact that JST's arrangement became a contingency fee agreement in July 2018, and that Outlaw Labs assumed the obligations of JST starting from this date. (Ex. 31 to Tauler Reply Decl.) It is also undisputed that Outlaw first hired TSLLP in November 2017. (Ex. 30 to Tauler Reply Decl.) Furthermore, to the extent the Stores are asserting that the August 2, 2017 time entry shows that TSLLP decided which stores would be sued, that is contradicted by Wear's declaration, Paragraph 4, in which he admits that JST Distribution, not TSLLP, selected stores to pursue.

| 15. TSLLP's client Outlaw Labs (not the firm) took on the task of | **Immaterial; disputed.** |
|---|---|

| | |
|---|---|
| identifying stores that sold products identified by the FDA as tainted. Tauler Decl. ¶ 20; Sergenian Decl. ¶¶ 8, 9, Ex. 13, Outlaw's Supp. Responses to Interrogatories, Interrog. No. 6, March 20, 2020. | Target stores were identified by JST Distribution. (Wear Decl. ¶ 4 [157-58].) |

### UF 15 Reply

The Stores' cited evidence does not dispute that TSLLP was not the entity that identified stores to pursue. To the contrary, Wear's declaration proves conclusively that TSLLP did not identify stores to pursue. (*See* Wear Decl. ¶ 4 (JST Distribution handled investigation of claims).)

| | |
|---|---|
| 16. TSLLP's client Outlaw Labs (not the firm) conducted its own investigation of those stores, hired their own investigators, and compiled and produced evidence of the illicit sale of products. Tauler Decl. ¶ 21; Sergenian Decl. ¶¶ 8, 9, Ex. 13, Outlaw's Supp. Responses to Interrogatories, Interrog. No. 6, March 20, 2020. | **Immaterial; disputed.** Target stores were identified by JST Distribution. (Wear Decl. ¶ 4 [157-58].) |

### UF 16 Reply

The Stores do not dispute that TSLLP did not hire investigators or compile or produce evidence of illicit sales by stores.

The Stores' cited evidence does not dispute that TSLLP was not the entity that identified stores to pursue. To the contrary, Wear's declaration proves conclusively that TSLLP did not identify stores to pursue. (*See* Wear Decl. ¶ 4 (JST Distribution handled investigation of claims).)

| | |
|---|---|
| 17. Outlaw Labs gathered evidence regarding the sale of the competing products. Attorneys at TSLLP verified the information provided by Outlaw | **Immaterial; disputed.** Target stores were identified by JST Distribution. (Wear Decl. ¶ 4 [157-58].) |

<table>
<tr><td>Labs, including confirming that the infringing products identified in each photo corresponded to FDA notices, identifying the specific infringing products in each separate letter, and attaching the corresponding FDA notices as an exhibit to the letter. As an additional measure of due diligence, TSLLP also confirmed that the photos taken corresponded to the GPS coordinates of each respective store. Tauler Decl. ¶ 13.</td><td></td></tr>
</table>

**UF 17 Reply**

The Stores' cited evidence does not dispute that TSLLP was not the entity that gathered evidence. To the contrary, Wear's declaration proves conclusively that TSLLP did not identify gather evidence. (*See* Wear Decl. ¶ 4 (JST Distribution handled investigation of claims); *see also* Lynch Decl. (ECF No. 272-18) ¶ 8 ("We relied on our attorneys to make the right decisions about who to sue **based on the evidence we provided**.") (emphasis added).)

<table>
<tr><td>19. TSLLP had no role in developing or creating the TriSteel Products and did not direct Outlaw Labs to create its TriSteel Products, which were first sold on October 1, 2016 by Outlaw Labs, long before TSLLP was engaged in November 2017. Tauler Decl. ¶ 22; Sergenian Decl. ¶¶ 4, 5, Ex. 3, Outlaw's Responses to Interrogatories of Eashou, Inc., Interrog. No. 6, January 31, 2019.</td><td>**Undisputed** that Tauler Smith did not develop or create TriSteel;<br><br>**Objection** to first sale date. Personal knowledge (Tauler Decl. ¶ 22);<br><br>Unverified interrogatory responses.<br><br>**Disputed** Tauler Smith engagement date. Wear Decl. Ex. C (Tauler Smith invoicing Outlaw for work beginning July 2017 [186])</td></tr>
</table>

**UF 19 Reply**

– 5 –

As stated above in reply to UF 4, the fact that TSLLP worked for **JST Distribution** in July 2017 does not contradict the fact that TSLLP did not work for **Outlaw Labs** until November 2017.

The Stores—who, as evidenced by the declarations of Wear and Lynch, have the full cooperation of Outlaw Labs in opposing this motion—do not dispute that Outlaw sold TriSteel in 2016. Wear and Lynch have attested that TriSteel had in fact been sold prior to demand letters being sent and the complaints being filed. (Reply Tauler Decl., Ex. 32.)

| | |
|---|---|
| 20. Given that RICO claims had been successfully prosecuted by the government for the sale of the subject products since at least 2013, TSLLP stated in its initial demand letters, sent from November 2017 through April 2018, that the stores could be liable for civil RICO for their sale of the subject products. Tauler Decl. ¶¶ 23, 42, Ex. 3, Criminal Prosecutions; ECF No. 114, SACC, at 14. | **Disputed** that government filed RICO claims for sales of subject products. Personal knowledge (Tauler Decl. ¶ 23) None of the prosecution papers in Tauler Ex. 3 (ECF No. 260-6) references RICO. The unauthorized sale of a prescription drug is not among the exclusive list of RICO predicate acts found at 18 U.S.C. § 1961(1). |

## UF 20 Reply

The Stores' statement that the prosecution papers in Exhibit 3 to the Tauler declaration do not reference RICO is irrelevant. It is also false. Exhibit 3 to the Tauler declaration contains multiple prosecutions of illegal sales of misbranded drugs. (RJN Ex. 16–29 (ECF No. 260-20 through 260-34.) The fact that sale of prescription drugs is not specified in the RICO statute does not preclude suing and prevailing on RICO claims based on the sale of off-label drugs. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 53 (1st Cir. 2013) (reversing order granting summary judgment on claims of RICO based on sale of off-label prescription drugs); *In Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.*, 712 F.3d 21, 2013 WL 1320408 (1st Cir.2013) (affirming court and jury verdict under section 1962 of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68 for fraudulent marketing of off-label uses of drug).

| 22. In April of 2018, TSLLP no longer included RICO in its demand letters since the remedies for violations of the Lanham Act were largely duplicative and since TSLLP believed at that time that RICO claims were more difficult to advance past pleading challenges. Tauler Decl. ¶ 25. | **Disputed.** Demand letters sent after April 2018 continued to threaten "triple damages" and attorneys' fees under 18 U.S.C. § 1964, which is the RICO statute. (*See* Poe Decl. Ex. N.) |

### UF 21 Reply

The letter sent by TSLLP in 2018 attached as Exhibit N to the Poe declaration does not assert RICO liability. The letter asserts only liability under the Lanham Act. The letter does contain a typographical error that refers to attorney's fees under the RICO statute. However, attorney's fees are also available the Lanham Act. 15 U.S.C. § 1117(a). From the context of the letter, it is clear that liability is asserted solely under the Lanham Act.

| 23. If stores did not settle, TSLLP filed lawsuits on behalf of Outlaw Labs on numerous occasions, always with the client's authorization. If the store was located out of state, local counsel was found to prosecute the lawsuit. TSLLP ceased filing lawsuits on behalf of Outlaw Labs after being named as a third-party defendant in the present lawsuit, however, Outlaw Labs continued pursuing claims in other states. Tauler Decl. ¶ 26. | **Disputed.** Mr. Wear and Mr. Lynch attest that it was Tauler Smith who decided who to sue. (Wear Decl. ¶ 11 [159]; Lynch Decl. ¶ 8 [210].)<br><br>**Immaterial**. (Tauler Smith having stopped filing lawsuits after being named a third-party defendant, or that other firms continued to carry on the scheme that it had devised). |

### UF 23 Reply

Wear's testimony that Outlaw Labs that "apparently" unspecified attorneys decided which stores to sue is contradicted by its declaration that JST Distribution—not any attorneys, and not TSLLP—identified which stores to sue. (Wear Decl. ¶ 4.) This allegation also contradicts Lynch's suggestion in Paragraph 8 of his declaration that TSLLP decided which stores to sue. In any event, Lynch admits that the collection of evidence that formed the basis for

– 7 –

deciding which stores to sue was provided by Wear and Lynch. (Lynch Decl. ¶ 8 ("We relied on our attorneys to make the right decisions about who to sue based on the evidence we provided.").)

| 26. TSLLP always kept its clients apprised of developments in its cases and no settlement was ever made without the client's signature and consent. Tauler Decl. ¶ 29. | **Immaterial; Disputed in Part.** Tauler Smith did not provide clients with final counter-signed copies of settlements, nor regular invoices reflecting its accounting for the project. (Wear Decl. ¶¶ 9-10 [159]) Tauler Smith did not promptly alert its clients to the Stores' counsel's demand letter that it cease and desist. (*Id.* ¶ 12 [159-60].) |
| --- | --- |

### UF 26 Reply

The Stores do not dispute that they signed the settlement agreements on behalf of Outlaw Labs. Accordingly, Outlaw Labs necessarily knew what stores it was settling with, and Outlaw Labs, not its attorneys, made the decision to settle the disputed by signings the settlement agreements.

The Stores have no evidence to dispute the fact that Outlaw kept its clients apprised of developments in its cases. The Stores point to Gaw Poe LLP's demand letter; however, the Wear declaration does not deny that TSLLP informed Outlaw Labs of the demand letter from Gaw Poe LLP. To the contrary, Wear admits that Tauler informed him of the letter. (*See* Wear Decl. ¶ 12 ("I vaguely remember Tauler bringing up the demand letter during a conference call, but I cannot recall any specifics").

| 27. Outlaw Labs engaged different law firms to represent it in similar litigation against convenient stores located in different states. Tauler Decl. ¶ 31; Sergenian Decl. ¶¶ 7, 9, Ex. 13, Outlaw's Supp. Responses to Interrogatories, Interrog. No. 5, March 20, 2020. | **Immaterial.** Those actions were all predicated on the same Tauler Smith demand letter. (Wear Decl. ¶ 6 [158].) |
| --- | --- |

**UF 27 Reply**

The Stores assert that Paragraph 6 of the Wear declaration shows that Outlaw Labs' engagement of law firms other than TSLLP to pursue claims against stores was "predicated on the same Tauler Smith demand letter." Nothing in Paragraph 6 of the Wear declaration supports that assertion. Paragraph 6 only states that Outlaw Labs relied on TSLLP with respect to the law and merits of the claims. In that respect, Wear affirms that TSLLP was doing nothing more than what attorneys who receive facts from a client that has engaged the attorney does in the course of providing legal services.

| | |
|---|---|
| 28. TSLLP did not manage any of the affairs of Outlaw's other attorneys. TSLLP would in some instances share its expertise with nutritional supplement litigation and the Outlaw's claims with other attorneys when asked. TSLLP understands that Outlaw entered into their own engagement agreement with those law firms, to which TSLLP was not a party. Tauler Decl. ¶ 32; Sergenian Decl. ¶ 9, Ex. 13, Outlaw's Supp. Responses to Interrogatories, Interrog. No. 5, March 20, 2020. | **Disputed**. As the architect of the Scheme, Tauler Smith identified firms in other states that would act on the demand letters Tauler Smith had sent, and Tauler Smith held weekly meetings to manage the work of those other firms. (Valerio Decl. ¶ 3 [213-14].) |

**UF 28 Reply**

Valerio, who was an independent contractor at TSLLP, does not establish any foundation for his allegations that TSLLP directed the affairs of the other law firms, held weekly meetings, or that TSLLP selected the law firms. Valerio does not, for example, claim he was part of any purported meetings, was on any phone calls between attorneys (which would be odd and is not true), or any other basis for making his allegations. Even if Valerio had personal knowledge, the identification and recommendation of other independent counsel for Outlaw to hire, or holding meetings with Outlaw's other counsel are not activities outside of normal activities of a law firm.

| | |
|---|---|
| 40. Skyline's representative under Rule 30(b)(6) testified that Skyline | **Disputed**. Mr. Mokou's transcript reads: "He didn't give me that advice. |

– 9 –

Reply Separate Statement of Undisputed Facts ISO                    Case No. 3:18–cv–840–GPC–BGS
Tauler Smith's Motion for Summary Judgment                    Consolidated with 3:18–cv–1882–GPC–BGS

| | |
|---|---|
| sought and obtained advice from its counsel, who advised Skyline about the allegations in the demand letter, including Tauler Smith's statement that selling the products at issue was illegal based on FDA warnings: "We did follow up … and they [Skyline's counsel] told me it was a warning to [the] consumer, not to the retailers." Sergenian Decl. ¶ 11, Ex. 15, Mokou Deposition at 19:9–12. | He gave me the option, and I made my decision." (Sergenian Decl. Ex. 15 [ECF No. 260-19 at 9].<br><br>Mr. Mokou in fact testified that it was "some friend of mine" who "told me it was warning to [the] consumer, not to the retailers." ([*Id.* at 20].) |

## UF 40 Reply

It is undisputed that Skyline was represented by counsel in negotiating the settlement agreement. Whether Mokou characterizes consultation from an attorney as "advice" or providing options, it is undisputed that Skyline consulted with an attorney in deciding whether to enter into the settlement agreement.

Moreover, the settlement agreement, approved by Skyline's counsel, expressly warrants that Skyline obtained advice regarding the settlement agreement. The Settlement Agreement warrants that Skyline "relied solely upon their own judgment, belief and knowledge, and the **advice and recommendations of their own independently selected counsel**, if any, concerning the nature, extent, and duration of their rights and claims, and that they have not been influenced to any extent whatsoever in executing the same by any representations or statements covering any matters made by the other party hereto or by any person representing him or it." (ECF No. 360-10 § 3.3(a) (emphasis added.)

The Settlement Agreement also states neither of the Parties have made any statements or representations regarding any fact relied upon in entering into this Agreement, and the Parties specifically do not rely on any statements, representations, or promises in executing this Agreement, or in making the settlement provided for herein, except as expressly stated in this Agreement; (ECF No. 360-10 § 3.3(b).)

The Settlement Agreement also states "[t]he Parties, and their attorneys, if desired, have made such investigation of the facts pertaining to this

– 10 –

Agreement and all of the matters pertaining thereto, as they deem necessary." (ECF No. 360-10 § 3.3(c).)

Notably, Skyline offers no testimony (not even a declaration from Skyline or Mokou) to contradict TSLLP's assertion that Skyline was represented by counsel and that the warranties in the settlement agreement are true.

| | |
|---|---|
| 41. Skyline was in as good a position as anyone to know the ingredients of its products and whether they contained unlabeled drugs. ECF No. 114 ¶ 21. | **Disputed.** The members of the Enterprise performed limited testing on certain of the subject products, which included a negative test for a product called "Red Mamba." (Tauler Decl. Ex. 2 [ECF No. 260-5 at 17].) |

### UF 41 Reply

The Stores' response does not address UF 41. UF 41 states that Skyline was in as good position to know the ingredients of the products it sold as anyone else and whether they contained unlabeled drugs, as any seller of a product. Exhibit 2 to the Tauler declaration does not contradict that assertion. The Stores offer no challenge to the assertion that Skyline was as capable as anyone else to determine the ingredients of products it sold. Finally, Skyline Market does not contend that it was ever accused it of selling "Red Mamba."

| | |
|---|---|
| 42. Skyline and its counsel had an opportunity to review the allegations of the demand letter and the truth or falsity of its allegations and legal assertions. ECF No. 114 ¶¶ 26–28, 31, 32, 35, 37–43, 46–51, 54; Tauler Decl. ¶ 37. | **Disputed**. Discovery of Tauler Smith's role in the Enterprise only became available through written discovery performed by the Elia Law Firm, and through investigative reporting by Vice News. (See Order Granting Counterclaimants' Mot. for Leave to File a Sec. Am. |

| | Counterclaim and Third-Party Compl. at 5, 8-12.) |
|---|---|

### UF 42 Reply

No evidence is presented to establish a dispute of material fact. For example, no declaration from Skyline is provided stating that Skyline relied on any other source. UF 42 reiterates what Mokou testified to and what was stated in the settlement agreement itself; i.e., that Skyline and its counsel had an opportunity to review and verify the allegations in the demand letter. The Stores' response does not demonstrate why any other discovery or reporting had an impact on Skyline or when Skyline learned it had claims against TSLLP. UF 42 concerns only the allegations in the demand letter and whether Skyline and its counsel had an opportunity to review them and make an independent conclusion as to the truth or falsity of the allegations. It is undisputed that Skyline and its counsel had that opportunity.

| | |
|---|---|
| 43. Whether Outlaw offered products for sale was, according to the Stores, a matter of public knowledge, as was the date that Outlaw was registered with the California Secretary of State and the Texas Secretary of State, ownership of Outlaw and JST Distribution, Tauler Smith's representation of JST Distribution, and property ownership records. ECF No. 114 ¶¶ 44, 45, 48, 65, 67, 69, 71(a) (relying on publicly available information, including Secretary of State filings, Google indices, and the Way Back Machine). | **Disputed in part**. <br><br> • The Stores' claims against *Tauler Smith* are not dependent on any of the cited information. <br> • The cited information constitutes only a fraction of the basis of the Stores' claims against Outlaw Laboratory. |

### UF 43 Reply

The Stores do not dispute that the alleged facts in UF 43 were matters of public record.

The Stores' assertion that its claims against TSLLP are not dependent on any of the cited information is not accurate. The SACC clearly alleges a RICO Enterprise and seeks to hold TSLLP liable based on its supposed participation in an alleged RICO enterprise. Accordingly, the claims against TSLLP are dependent on the allegations in the SACC against Outlaw Labs.

The Stores' assertion that UF 43 is purportedly a fraction of the basis for the Stores' claims against Outlaw Labs is not responsive to UF 43. UF 43 refers to matters of public record that show that Skyline had access to the specific facts enumerated in UF 43 that purportedly show the demand letters were part of a fraudulent scheme.

| | |
|---|---|
| 47. Skyline Market's Rule 30(b)(6) representative Fred Mokou testified that he freely made the decision to settle rather than litigate: "Nobody forced me" to take the settlement option. Sergenian Decl. ¶ 11, Ex. 15, Mokou Deposition at 13:17–21. | **Disputed**. <br><br> • Mr. Mokou in fact testified that it was "the decision that I have to make." (Sergenian Decl. Ex. 15 [ECF No. 260-19 at 9 (13:18)] <br> • Mr. Mokou testified that his brother (who signed the agreement) did so "under duress". [Id. at 13 (12:16-19).] <br> • Mr. Mokou further testified that he attended a meeting of stores where a lawyer advised that "if we fight it . . . it's going to be very costly for us. We're going to spend more money at the time. . . . It's better to spend that kind of money not going through attorneys." [*Id.* at 9 (8:21-9:3).] |

## UF 47 Reply

The Stores imply that UF 47 is not an accurate quotation of the deposition, but it is a direct quote. It is therefore undisputed.

With respect to the additional cited testimony, the settlement agreement signed by Skyline and approved by its counsel precludes their claims. The Settlement Agreement warrants that it was "signed **freely** by each person executing this Agreement and each person executing this Agreement is empowered to do so…" (ECF No. 360-10 § 3.3(f) (emphasis added).)

Furthermore, the Settlement Agreement warrants that the parties "specifically do not rely on any statements, representations, or promises in executing this Agreement." (ECF No. 360-10 § 3.3(b).)

| | |
|---|---|
| 49. It is undisputed that TSLLP was first contacted by Outlaw, Mike Wear and Shawn Lynch, based on TSLLP's prior work in nutritional supplement litigation. Tauler Decl. ¶ 7. | **Disputed**. Mr. Wear and Mr. Lynch were first contacted by Tauler Smith, through a demand letter sent to their business TF Supplements. (Wear Decl. ¶ 2 [157].) |

### UF 49 Reply

The Stores' evidence does not create a material dispute of fact because the Stores' evidence does not show that TSLLP contacted Wear and Lynch. TSLLP contacted one of Wear and Lynch's companies, TF Supplements. It is undisputed that Wear and Lynch then reached out to TSLLP based on TSLLP's prior work in nutritional supplement litigation. (*See* Wear Decl. ¶ 3 (JST Distribution "engaged Tauler Smith to seek to go after a number of websites that sold male enhancement products online.").) Nothing in the Wear or Lynch declarations disputes that it was Outlaw Labs' idea to engage TSLLP, not the other way around; the declarations only confirm the fact established in UF 49 that Outlaw Labs reached out to TSLLP.

| | |
|---|---|
| 50. TSLLP was engaged to provide legal services for claims that already existed. Tauler Decl. ¶ 8. | **Disputed**. Tauler Smith devised the claims. (Wear Decl. ¶ 6 [158].) |

### UF 50 Reply

The Stores' evidence does not support the assertion that TSLLP "devised the claims." To the contrary, Paragraph 6 of the Wear declaration merely states that "Outlaw had little input as to the demand letter" because it "relied on

– 14 –

Reply Separate Statement of Undisputed Facts ISO          Case No. 3:18–cv–840–GPC–BGS
Tauler Smith's Motion for Summary Judgment          Consolidated with 3:18–cv–1882–GPC–BGS

Tauler's purported expertise …" This vague statement, in context of the entire declaration, is best understood as stating that TSLLP applied the law to the facts that were supplied to it. Specifically, Wear's declaration explicitly states that the investigation of facts was not done by TSLLP but instead that the factual basis for the claims was supplied to TSLLP. (Wear Decl. (ECF No. 272-17) ¶¶ 3 (JST Distribution engaged TSLLP), 4 (JST investigated and gathered evidence supplied to TSLLP), 5 (Outlaw Labs used information gathered by JST). This process (a client engaging an attorney to pursue claims on its behalf and providing facts to the attorney) describes nothing more than a typical attorney-client relationship. *See also* Lynch Decl. (ECF No. 272-18 ¶ 8 ("We relied on our attorneys to make the right decisions about who to sue **based on the evidence we provided**.") (emphasis added)

| | |
|---|---|
| 51. When Outlaw Labs hired TSLLP, it had been selling its TriSteel Products in online retailers and in its brick and mortar store, TF Supplements. Sergenian Decl. ¶¶ 3–5; Ex. 10, Outlaw's Responses to Requests For Admission, Request No. 3, May 18, 2020; Ex. 11, Outlaw's Responses to Interrogatories of Eashou, Inc., Interrog. No. 6, January 31, 2019. | **Objection**. Personal knowledge. (Sergenian Decl. ¶ 4 (testifying that "Outlaw had been selling its TriSteel Products in online retailers and in its brick and mortar store, TF Supplements."). <br><br> Admissions can only be used *against* the admitting party. (fn 3: *Walsh v. McCain*, 81 F.3d 722, 726 (7th Cir. 1996) ("It is only when the admission is offered against the party who made it that it comes within the exception to the hearsay rule for admission[] of a party opponent."). <br><br> Unverified interrogatory response. |

### UF 51 Reply

The Stores are mistaken that an admission may only be used against an admitting party in a summary judgment motion. *Walsh v. McCain*, a Seventh Circuit case, is inapposite as it addressed admissibility at trial. The Ninth Circuit has ruled that courts can consider inadmissible evidence in reviewing a Rule 56 motion, so long as the evidence at issue could be presented in admissible form at trial. *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d

– 15 –

Reply Separate Statement of Undisputed Facts ISO                    Case No. 3:18–cv–840–GPC–BGS
Tauler Smith's Motion for Summary Judgment            Consolidated with 3:18–cv–1882–GPC–BGS

1098, 1110 (9th Cir. 2016) ("at summary judgment a district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial"); *Force v. Advanced Structural Techs., Inc.*, 2020 WL 4539026, at *2 n.3 (C.D. Cal. Aug. 6, 2020). Because Outlaw Labs is a party (and will continue to be so even if the Court permits the named plaintiffs to dismiss their claims against Outlaw Labs). Therefore, Wear and Lynch can be compelled to testify at trial and confronted with their prior inconsistent statements and party admissions. Notably, although Outlaw Labs' principals submitted lengthy declarations, they were unable and/or unwilling to contradict the substance of UF 50.

| | |
|---|---|
| 52. Outlaw Laboratory, LP is a partnership that was registered in Texas on September 12, 2016, long before TSLLP represented Outlaw Labs. Sergenian Decl. ¶ 6; Ex. 12, Outlaw corporate documents. | **Disputed in part.** September 2016 is not "long" before July 2017. |

## UF 52 Reply

The Stores' disputation in part does not create a dispute of material fact: The Stores do not dispute that Outlaw was a registered partnership before TSLLP represented it as counsel.

| | |
|---|---|
| 53. It was Outlaw Labs, not TSLLP, that gathered evidence to support its legal claims against the Stores. Tauler Decl. ¶ 39. | **Immaterial**; **disputed**. Target stores were identified by JST Distribution. (Wear Decl. ¶ 4 [157-58].) |

## UF 53 Reply

The Stores do not dispute that TSLLP did not gather evidence to support Outlaw Labs' legal claims against the Stores. The evidence in the Stores' response only refers to identifying stores. In any event, whether JST Distribution or Outlaw Labs identified the stores, it is undisputed that TSLLP did not identify the stores.  (*See also* Lynch Decl. (ECF No. 272-18 ¶ 8 ("We relied on our attorneys to make the right decisions about who to sue **based on the evidence we provided**.") (emphasis added).)

| 54. TSLLP did not and could not have "conceived of the demand letters" since they were acting on behalf of their client. Tauler Decl. ¶ 40. | **Disputed**. Tauler Smith drafted the demand letter with "little input" from Outlaw. (Wear Decl. ¶ 6 [158].) |

## UF 54 Reply

The Stores do not dispute that the genesis of Outlaw Labs' claims against the stores came from Outlaw Labs and/or JST, not TSLLP. Paragraph 6 of the Wear declaration merely states that "Outlaw had little input as to the demand letter" because it "relied on Tauler's purported expertise …" This vague statement, in context of the entire declaration, is best understood as stating that TSLLP applied the law to the facts that were supplied to it. Specifically, Wear's declaration explicitly states that the investigation of facts was not done by TSLLP but instead that the factual basis for the claims was supplied to TSLLP. (Wear Decl. (ECF No. 272-17) ¶¶ 3 (JST Distribution engaged TSLLP), 4 (JST investigated and gathered evidence supplied to TSLLP), 5 (Outlaw Labs used information gathered by JST); s*ee also* Lynch Decl. (ECF No. 272-18 ¶ 8 ("We relied on our attorneys to make the right decisions about who to sue **based on the evidence we provided**.") (emphasis added). This process (a client engaging an attorney to pursue claims on its behalf and providing facts to the attorney) describes nothing more than a typical attorney-client relationship.

| 55. TSLLP did pursue RICO litigation on behalf of Outlaw Labs as evidenced by multiple lawsuits filed on its behalf in January and February of 2018. Tauler Decl. ¶ 41, Ex. 9, Complaints. | **Disputed**.  Cited evidence includes only two suits that include a RICO claim. In one of those there is no indication of "pursuit" of a RICO claim (*Outlaw v. Bargain Line Wholesale*, et al. (N.D. Cal. No. 18-cv-01565, Dkt. 1-29), and in the other Tauler Smith amended to drop the claim when challenged by a defendant's motion to dismiss. (Poe Decl. Ex. E (Trepco MTD); F (Am. Compl.).) |

**UF 55 Reply**

The Stores do not dispute that TSLLP pursued RICO litigation on behalf of Outlaw Labs. Instead, the Stores merely take issue with how long during the litigation TSLLP pursued RICO claims, which the moving declaration states TSLLP stopped doing around April 2018. (Tauler Decl. ¶ 25.) This is therefore undisputed.

| | |
|---|---|
| 56. These RICO lawsuits were predicated on theories advanced in criminal prosecutions related to the same products. Tauler Decl. ¶ 42; Ex. 3, criminal prosecutions; Request for Judicial Notice ¶¶ 16–21, 29. | **Disputed**.  Cited evidence includes only two suits that include a RICO claim. In one of those there is no indication of "pursuit" of a RICO claim (*Outlaw v. Bargain Line Wholesale*, et al. (N.D. Cal. No. 18-cv-01565, Dkt. 1-29), and in the other Tauler Smith amended to drop the claim when challenged by a defendant's motion to dismiss. (Poe Decl. Ex. E (Trepco MTD); F (Am. Compl.).) |

**UF 56 Reply**

The Stores do not dispute that RICO claims are predicated on successful prosecution of criminal actions for the same conduct. *See* RJN Exhibit 29 (ECF No. 260-34 at pp. 21–27) (*USA v. Almuntasser Hbaiu*) charging criminal conspiracy (Count 1) against owner and operator of "1 Stop Sunoco Gas Station and Convenience Store" and alleging as one of the "objects of the conspiracy" the "marketing and distributing products, including "Libigrow" "Mojo Nights" and Blue Diamond" as all natural male enhancement products and supplements when, in fact, the products contained aildenafil or tadalafil." (*Id.* at ¶ 20); *see also* ECF No. 260-26 at pp. 21–27 (*USA v. El Dorado*) (charging under 18 USC § 371 (Conspiracy) based on FDA Notifications (*id.* at 23:25–13) and detailing overt acts (*id.* at p. 24:14 (overt acts); *see In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 51, 53 (1st Cir. 2013) (reversing order granting summary judgment on claims of RICO based on sale of off-label prescription drugs); *In Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc.*, 712 F.3d 21, 2013 WL 1320408 (1st Cir.2013) (affirming court and jury verdict under section 1962 of

the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68 for fraudulent marketing of off-label uses of drug).

| | |
|---|---|
| 59. TSLLP never "enforced settlement agreements predicated on fraudulent conduct." At no time did TSLLP "enforce" any settlement agreements to which Outlaw Labs was a party through subsequent litigation. Tauler Decl. ¶ 51. | **Disputed**. *All* of the settlement agreements were the product of fraudulent conduct. |

### UF 60 Reply

The Stores do not dispute the fact that TSLLP did not enforce any of Outlaw's settlement agreements through subsequent litigation. The Stores address a different issue: whether the settlement agreements were the product of fraudulent conduct (and provide no evidence in support of their assertion). Accordingly, UF 60 is undisputed.

| | |
|---|---|
| 61. As is standard with any attorney-client representation, TSLLP had to (and did) obtain its client's approval before agreeing to any settlements on behalf of Outlaw Labs. Tauler Decl. ¶ 30. | **Disputed**. Tauler Smith merely sent settlements it had already agreed to to Mr. Lynch and/or Mr. Wear for signing. (Lynch Decl. ¶ 7 [210].) |

### UF 61 Reply

The Stores mischaracterize Paragraph 7 of the Lynch declaration. Lynch does not state that TSLLP agreed to any settlements. He states that Outlaw Labs did not retain copies of settlement agreements it signed. An attorney cannot unilaterally agree to settle a clients' case; an attorney may only communicate that a client is willing to settle by signing a settlement agreement. Nothing in Paragraph 7 of the Lynch declaration states that TSLLP deviated from standard practice in this regard.

| | |
|---|---|
| 62. At no time did TSLLP act without the guidance or direction of Outlaw | **Disputed**. Tauler Smith decided who to send demand letters to, and |

| | |
|---|---|
| Labs in prosecuting claims on behalf of its clients. Tauler Decl. ¶ 46. | who to sue. (Wear Decl. ¶¶ 7, 11 [158-59]; Lynch Decl. ¶¶ 6, 8 [210].) |

## UF 62 Reply

The Stores' cited evidence does not support the characterization that TSLLP decided which stores received letters and which ones were sued. First, Paragraph 7 of the Wear declaration vaguely states that Outlaw Labs "largely relied on" TSLLP with respect to which retailers received demand letters. However, Wear admits that TSLLP did not perform initial investigation or identify retailers. (*See* Wear Decl. ¶¶ 4 (JST Distribution handled investigation of claims), 5 (Outlaw Labs used information gathered by JST); s*ee also* Lynch Decl. (ECF No. 272-18 ¶ 8 ("We relied on our attorneys to make the right decisions about who to sue **based on the evidence we provided**.") (emphasis added).)) Wear's assertion in Paragraph 11 of his declaration does not state that TSLLP acted without guidance or direction from Outlaw Labs in filing lawsuits against stores. Instead he vaguely states that Outlaw Labs did not provide "specific input." In fact, TSLLP behaved as any attorney would by receiving input from the client and acting on its behalf pursuant to its direction, including, *e.g.*, by verifying allegations in complaints. (Reply Tauler Decl., Ex. 32 (TSLLP seeking and receiving verification of allegations regarding sales of TriSteel products from Outlaw Labs).)

| | |
|---|---|
| 66. TSLLP engaged in an arms-length contractual relationship for legal services that TSLLP provided before being terminated. Tauler Decl. ¶ 50. | **Disputed**. The relationship was not "arms-length" as shown by the fact that when Outlaw sought to terminate the nominally contingent engagement, Tauler Smith presented it with a bill for $1,159,908.36 and "threatened to sue us fsor that amount." (Wear Decl. ¶ 13 [160], Ex. C. [186] Tauler Smith then used that threat to force a resolution of $180,000, plus $200,000 in future settlements. (*Id*. ¶ 14 [160].) *(See also* Lynch Decl. ¶ 9 [210].) |

– 20 –

Reply Separate Statement of Undisputed Facts ISO          Case No. 3:18–cv–840–GPC–BGS
Tauler Smith's Motion for Summary Judgment          Consolidated with 3:18–cv–1882–GPC–BGS

**UF 66 Reply**

TSLLP's demand for *quantum meruit* compensation from Outlaw Labs **after** the engagement was terminated was TSLLP's contractual and common-law right when a law firm is terminated from a contingency fee contract, as was the case when TSLLP was terminated in January 2019. *See Fracasse v. Brent*, 6 Cal.3d 784, 790–792 (1972) (When a contingency attorney is discharged, the general measure of recovery is the reasonable value of attorney's services rendered to the time of discharge.). The *quantum meruit* claim referenced supports the fact that Outlaw Labs and TSLLP had an arms'-length relationship.


Dated: August 21, 2020                    Respectfully submitted,

                                          **Sergenian Ashby LLP**

                                          By: */s/David A. Sergenian*
                                          David A. Sergenian
                                          *Attorneys for Third-Party Defendant*
                                          *Tauler Smith LLP*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

*In Re: Outlaw Laboratory, LP Litigation*, Case No.: 3:18-cv-00840-GPC-BGS

I hereby certify that on August 21, 2020, copies of **Reply Separate Statement of Undisputed Facts in Support of Third-Party Defendant Tauler Smith LLP's Motion for Summary Judgment, or in the Alternative, Summary Adjudication** were filed electronically through the Court's CM/ECG system, and served by U.S. mail on all counsel of record unable to accept electronic filing.

**Sergenian Ashby LLP**

By: *_/s/David A. Sergenian_*
David A. Sergenian
*Attorneys for Third-Party Defendant*
*Tauler Smith LLP*