UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: OUTLAW LABORATORIES, LP LITIGATION, | Case No.:  18CV840 GPC (BGS) |
| . | **ORDER ON JOINT STATEMENT REGARDING IN CAMERA REVIEW OF POTENTIALLY PRIVILEGED DOCUMENTS** |
| | [ECF 242] |

## I.      INTRODUCTION

Pursuant to the Court's briefing Order, (ECF 239),[1] counter-claimant Roma Mikha, and third-party plaintiffs NMRM, Inc. and Skyline Market, Inc. (collectively the "Stores") and plaintiff Outlaw Laboratories, LP ("Outlaw"), and third-party defendant

---

[1] The Joint Statement follows the parties' submission of a joint letter brief to the Court. The Court gave the parties the option of seeking *in camera* review or disclosure without *in camera* review.  (ECF 239.)  The Stores have chosen to seek *in camera* review of seven categories of documents based on the crime-fraud exception.  The parties' briefing does not address whether the underlying documents are actually subject to attorney-client privilege or the work product doctrine.  Rather, the Stores appear to take the position that even if they are, they should be disclosed under the crime-fraud exception.

Tauler Smith LLP ("Tauler Smith") have filed a Joint Statement regarding documents Outlaw and Tauler Smith claim are protected from disclosure by attorney-client privilege and the work product doctrine.  (ECF 242 at 8-12.[2])

The Stores seek *in camera* review of documents responsive to ten Requests for Production of Documents (RFPs) that the Stores have grouped into seven "Subject[s]." (ECF 242 at 3-7.)[3]  The Stores request the Court grant *in camera* review of the documents to determine if they are subject to the crime-fraud exception.  (*Id.*)  For the reasons set forth below, the request for *in camera* review is **DENIED**.

## II.    BACKGROUND

### A.    Claims in Consolidated Action

The Court has summarized the claims, counterclaims, and third-party claims of this consolidated action in detail in numerous prior orders on discovery disputes.  The Court incorporates those summaries here and only briefly summarizes the case here.  (ECF 177 at I.; ECF 215 at II.; ECF 230 at II.; ECF 246 at II; ECF 265 at II.)

This consolidated action encompasses two cases brought by Outlaw against retail stores for false advertising under the Lanham Act, and as to the *SD Outlet* action, California False Advertising and California Unfair Competition claims.  (Case Nos. 18cv840 ("*DG in PB*") and 18cv1882 ("*SD Outlet*"); ECF 147 at 4-5.)  Three of the stores have filed counterclaims as a class action on behalf of themselves and other targeted stores against Outlaw and its former counsel, Tauler Smith, under the Racketeer Influenced and Corrupt Organizations Act ("RICO") along with a rescission claim. ("Second Amended Counter Claims ("SACC") [ECF 114].)

///

///

---

[2] All citations to the Joint Statement are to the CM/ECF electronic pagination.
[3] The Court already addressed non-privilege objections to these same RFPs in a prior order.  (ECF 246.)

Outlaw's Lanham Act claims are premised on the defendants selling "male-enhancement pills, . . . 'the Enhancement Products'" with packaging that indicates they are all natural, but allegedly contain undisclosed drugs with Outlaw claiming it has lost out on sales of its products to those products. (ECF 147 at 1, 3-6; ECF 209 (*San Diego Outlet* action).) Summary Judgment was granted to defendants in the *DG in PB* action, and a motion for judgment on the pleadings and subsequent motion for reconsideration in the San Diego Outlet action were recently granted dismissing with prejudice all of Outlaw's claims.  (ECF 147, 209, 251.)

The Stores have alleged counterclaims under RICO on behalf of a class of similarly situated stores.  (ECF 114.)  The SACC alleges Outlaw, Tauler Smith, and Outlaw's principles, Michael Wear and Shawn Lynch, have engaged in a scheme that includes: employing "investigators," some hired by Outlaw's counsel Tauler Smith, to identify target stores; sending demand letters with draft complaints attached to those targeted stores that falsely indicate Outlaw sells a competitive product, TriSteel, in retail stores throughout the United States.  (SACC ¶¶ 2, 23-24, 26-52, 66, 68, 73, 84-86, 88, 91-92.)  The Stores allege Outlaw never sold TriSteel products in retail stores and only started selling it online in October 2017, months after Outlaw had already been documenting sales of the Enhancement Products by stores through investigators in August 2017.  (SACC ¶¶ 66-68.[4])  The false demand letters and draft complaints are then allegedly followed with offers to settle for increasingly lower amounts, including as low as $2,500.  (SACC ¶¶ 3-4, 56, 72, 87, 98.)

///

///

///

///

_____

[4] As discussed below, Outlaw and Tauler Smith have submitted evidence disputing this allegation.

**B.     Documents at Issue**

The Stores identify the following categories of documents:

|  | **RFPS to Tauler Smith** | **RFPs to Outlaw** | **Subject** |
|---|---|---|---|
| 1[5] | 18 |  | Communications with Pulaski relating to the "Outlaw Litigation" (defined). |
| 2 |  | 19 | Communications with Pulaski re: funding of "Outlaw Litigation." |
| 3 | 19 | 20 | Communications with Pulaski or Outlaw [or Tauler Smith] related to actual or potential lost sales of TriSteel. |
| 4 | 21 | 22 | Communications with Pulaski or Outlaw [or Tauler Smith] related to pharmacological testing of products sold by targeted stores. |
| 5 | 24 | 25 | Communications related to Outlaw's decision to retain Tauler Smith. |
| 6 | 25 |  | Notes taken by Tauler Smith related to telephonic calls it had with class members. |
| 7 |  | 31 | Agreements between Outlaw and Pulaski about the project. |

**C.     Prior Court Orders**

The Court issued a prior privilege Order in this case, the June 17, 2020 Order, on the crime-fraud exception, (ECF 230), and an order on non-privilege objections to the RFP categories identified above.  (ECF 246.)  The prior crime-fraud exception Order found the threshold step for *in camera* review was met as to these four documents, the Court exercised its discretion to review the four documents *in camera*, and the Court found the four documents were subject to the crime-fraud exception.  (ECF 230.)  The Order on the non-privilege objections primarily addressed the relevancy of the documents

---

[5] The Court adds category numbers for purposes of referencing them in the analysis below.

4

1  requested, including the categories at issue here, and found the RFPs sought documents

2  relevant to the Stores' claims.  (ECF 246.)

3  **III.    DISCUSSION**

4    **A.    Legal Standards**

5      "Where there are federal question claims and pendent state law claims present, the

6  federal law of privilege applies."  *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839-40 (9th Cir.

7  2005) (citing Fed. R. Evid. 501 advisory committee notes).   In this consolidated case,

8  Plaintiff Outlaw's initial claims in both actions include federal claims under the Lanham

9  Act and the Stores' counterclaims are brought under RICO. (ECF 1, Case No.18cv840, at

10  13-14; ECF 1-2, Case No. 18cv1882, at 34-36; SACC ¶¶ 82-95.)  Accordingly, the Court

11  applies federal privilege law.  Tauler Smith and Outlaw have asserted that the categories

12  of documents listed above are subject to attorney-client privilege or work product.  The

13  Stores' motion seeks *in camera* review of these seven categories of documents to determine

14  if the documents should be disclosed under the crime-fraud exception.

15      **1.    Crime-Fraud Exception**

16      "While the attorney-client privilege is 'arguably most fundamental of the common

17  law privileges recognized under Federal Rule of Evidence 501,' it is 'not absolute.'"  *In*

18  *re Grand Jury Investigation*, 810 F.3d 1110, 1113 (9th Cir. 2016) (quoting *In re Napster,*

19  *Inc. Copyright Litig.,* 479 F.3d 1078, 1090 (9th Cir.2007), *abrogated in part on other*

20  *grounds by Mohawk Indus., Inc. v. Carpenter,* 558 U.S. 100, 130 S. Ct. 599 (2009)).

21  "The protection afforded by the attorney-client privilege does not extend to any

22  communication 'in furtherance of intended, or present, continuing illegality.'"  *In re*

23  *Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996) (citing *United States v. Hodge*

24  *& Zweig*, 548 F.2d 1347, 1354 (9th Cir. 1977)).  "Thus, the crime-fraud exception insures

25  that the confidentiality enveloping the attorney-client relationship does not encompass

26  communications made for the purpose of getting advice for the commission of a fraud or

27  crime, but the exception does not sweep so broadly that it discourages clients from

28  making full disclosure to their attorneys of *past* wrongdoings, in order that the client may

obtain the aid of persons having knowledge of the law and skilled in its practice." *Id.*
(internal quotations and citations omitted). "Under the crime-fraud exception,
communications are not privileged when the client 'consults an attorney for advice that
will serve him in the commission of a fraud' or crime." *Id.* (quoting *Napster.*, 479 F.3d at
1090).

Ultimately, the party challenging the privilege "under the crime-fraud exception
must satisfy a two-part test." *Napster*, 479 F.3d at 1090.

> First, the party must show that 'the client was engaged in or planning
> a criminal or fraudulent scheme when it sought the advice of counsel
> to further the scheme. Second, it must demonstrate that the attorney-
> client communications for which production is sought are 'sufficiently
> related to' and were made 'in furtherance of [the] intended, or present,
> continuing illegality.'

*Id.* (quoting *In re Grand Jury Proceedings,* 87 F.3d at 381-83; *see also In re Icenhower*,
755 F.3d 1130, 1141 (9th Cir. 2014) (quoting *Napster*, 479 F.3d at 1090). "The attorney
need not have been aware that the client harbored an improper purpose. Because both the
legal advice and the privilege are for the benefit of the client, it is the client's knowledge
and intent that are relevant." *Napster*, 479 F.3d at 1090 (citations omitted). "The
planned crime or fraud need not have succeeded for the exception to apply. The client's
abuse of the attorney-client relationship, not his or her successful criminal or fraudulent
act, vitiates the privilege. *Id.* (citations omitted)

"The crime-fraud exception may be used to abrogate work-product protection as
well as the attorney-client privilege." *In re Nat'l Mortg. Equity Corp. Mortg. Pool
Certificates Litig.*, 116 F.R.D. 297, 301 (9th Cir. 1987) (citing *In re Antitrust Grand Jury*,
805 F.2d 155, 164 (6th Cir.1986) (collecting cases)). "Courts generally follow the same
two-part approach used in applying the exception to the attorney-client privilege." *Id.*
(citing *In re Antitrust Grand Jury*, 805 F.2d at 168-69 and *In re A.H. Robins Co.*, 107
F.R.D. 2, 15 (D. Kan. 1985)).

///

## 2. *In Camera* Review

The Stores ask the Court to conduct an *in camera* review of seven categories of documents to determine whether the documents should be disclosed under the crime-fraud exception. The Court is required to conduct a two-step analysis to determine whether to review these categories of documents *in camera*. *U.S. v. Zolin*, 491 U.S. 554, 572 (1989). "First, the court must 'require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *In re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 829 (9th Cir. 1994) (quoting and summarizing the standard articulated by the Supreme Court in *Zolin*, 491 U.S. 572); *see also U.S. v. Christensen*, 838 F.3d 763, 800 (9th Cir. 2016). The party opposing the privilege "must present evidence sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability." *Zolin*, 491 U.S. at 574-75.

"Once [the threshold] showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court." *Zolin*, 491 U.S. at 572. "[C]ourts should make the decision to review in light of the amount of material they have been asked to review, the relevance of the alleged privilege material to the case, and the likelihood that *in camera* review will reveal evidence to establish the applicability of the crime-fraud exception." *In re Grand Jury Investigation*, 974 F.2d 1068, 1072-73 (9th Cir. 1992); *see also id.* at 572.

### 3. Analysis

#### a) Parties' Positions

The Court very briefly summarizes the parties' positions here and then discusses them in more depth below in analyzing whether the Stores' have met their burden and whether to exercise discretion to review the seven categories of documents *in camera*.

///

///

7

### (1)      The Stores' Position

As to the threshold inquiry for *in camera* review, the Stores argue that the evidence that has been offered to date is sufficient to support a good faith belief that documents responsive to each category might reveal evidence establishing the applicability of the crime-fraud exception.  (ECF 242 at 4-5.)  They rely almost exclusively on the Court's prior privilege order to establish a factual basis for the fraud they rely on the crime-fraud exception—that the members of the scheme were targeting stores before they began selling TriSteel.  (*Id.* at 5 (citing ECF 230 at 14).)  The Stores also challenge evidence submitted by Outlaw and Tauler Smith.  (ECF 242 at 5.)

As to the second step, where the Court decides whether to exercise its discretion to engage in the *in camera* review, the Stores address two factors, the amount of documents and the relevancy of the documents to the claims in the case.  (*Id.* at 5-7.)  The Stores dispute Outlaw and Tauler Smith's estimates of the volume of documents at issue and argue the RFPs are narrowly drawn not to yield a large number of documents.  (*Id.* at 5-6.)  As to relevancy, the Stores assert the responsive documents will show: when and how much funding Outlaw received from Pulaski to target stores, how those funds were allocated, and provide insight into the inception of the scheme; whether the members of the scheme were communicating about any topics (competing products or testing of those products) that would provide an objective basis for the threats against the stores or, that they were not communicating about the topics, suggesting they were only focused on targeting stores; and how Tauler Smith transitioned from the JST Distribution client (pursuing litigation against sellers of a similar product), with a body of developed targets, to Outlaw, with a new vehicle for litigation in TriSteel.  (*Id.* a 7.)

### (2)      Tauler Smith's Position

In opposition to *in camera* review, as to the initial inquiry, Tauler Smith argues the Stores fail to make any evidentiary showing in support, relying instead on the Court's prior Order.  (*Id.* at 8.)  Additionally, Tauler Smith argues the Court must find the threshold for *in camera* review met for a specific course of conduct by Tauler Smith, *i.e.*

that it did something other than participate in "pre-litigation and litigation conduct as a mere attorney agent of Outlaw." (*Id.* at 9.) Tauler Smith also challenges the Stores' claim that Outlaw was targeting stores before it was selling products. (*Id.* at 10 (citing Decl. of David Sergenian ("Sergenian Decl."), Ex. A, B, and C).) Tauler Smith also argues the Stores have failed to establish their products were free of illegal ingredients. (Sergenian Decl., Ex. B).) As to the second step, Tauler Smith estimates responsive documents would exceed 3,000 and are unlikely to cast light on the issue of crime-fraud.

### (3)   Outlaw's Position

As to the initial step, Outlaw argues three exhibits contradict the Stores' basis for the crime fraud exception—that Outlaw was targeting stores before it began selling TriSteel. (*Id.* at 11 (referencing Exhibits A, B, and C[6]).) Outlaw asserts that these exhibits show it began selling TriSteel online in 2016 before any stores were being investigated or any demand letters were sent. (*Id.*)

As to the second step, Outlaw focuses on the amount of material involved, arguing it will be significant. (*Id.* at 11-12.) Outlaw estimates documents responsive to the RFPs concerning Pulaski's funding of Outlaw's litigation will consist of thousands of emails largely regarding mundane litigation activity. (*Id.*)

### b)   Step One – Threshold Inquiry

Before the Court can even consider whether to exercise its discretion to review these documents *in camera*, the Stores "must present evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." *Zolin*, 491 U.S. at 574-75; *id.* at 572 (Party moving for in camera review must "show[] a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."); *see also Christensen*, 838 F.3d at 800.

---

[6] The Court presumes Outlaw intends to reference the exhibits that appear at ECF 242-5, 242-6, and 242-7. Outlaw failed to cite or submit these exhibits through a declaration.

"[T]he threshold showing to obtain *in camera* review may be met by using any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged" without consideration of the privileged documents. *Zolin*, 491 U.S. at 575; *United States v. Chen*, 99 F.3d 1495, 1502-03 (9th Cir. 1996) (finding courts may not consider the potentially privileged documents in deciding whether the threshold inquiry for *in camera* review has been met). The evidence need not be "independent of the contested communications." *Zolin*, 491 U.S. at 574. The "threshold is set sufficiently low to discourage abuse of privilege and to ensure that mere assertions of the attorney-client privilege will not become sacrosanct." *In re Grand Jury Investigation*, 974 F.2d at 1072. It allows some speculation, but prohibits fishing expeditions. *Id.* at 1073 ("The *Zolin* threshold is designed to prevent 'groundless fishing expeditions,' not to prevent all speculation by the district court.")

The Stores advance the same argument they did in the prior privilege motion (ECF 214) as the basis for the crime-fraud exception—that the documents may show that members of the scheme were targeting stores before TriSteel was being sold. (ECF 242 at 5 (citing ECF 230 (Court's prior privilege Order) at 14).) However, even the low standard for the threshold inquiry requires a *factual* showing by the Stores that is lacking here.

The Stores attempt to rely almost exclusively on the Court's prior crime-fraud ruling. That decision addressed only four documents that were described sufficiently to give the Court a clear understanding of what they were and what they might reveal. (*See* ECF 230 at 6 (describing four documents).) Here, the Court is presented with seven *categories* that would encompass many different documents. Different materials mean a different analysis. The Court is determining if the Stores have shown that review "*of the materials* may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (emphasis added). Additionally, the opposition to this motion is significantly different than the prior motion. Unlike the prior motion, here,

Outlaw and Tauler Smith[7] both oppose *in camera* review.  Tauler Smith, and now Outlaw, dispute the Stores' contention that stores were targeted before TriSteel was even sold—the Stores' basis for the crime-fraud exception in that motion and this one.  And, as discussed below, they also both submit evidence to dispute this contention.[8]  Outlaw submitted no evidence as to the prior motion and did not directly address the Stores' contention that it was targeting stores before TriSteel was sold.  (ECF 214 at 15-19.)  Here, the Stores must provide a *factual basis* in *this motion* showing that review of *these seven categories of documents* may reveal evidence to establish the crime-fraud exception applies.[9]

The most significant deficiency of the Stores' motion is the lack of evidence.[10]  As the party moving for *in camera* review, the Stores "must *present evidence* sufficient to support a reasonable belief that *in camera* review may yield evidence that establishes the exception's applicability."  *Zolin*, 491 U.S. at 574-75.  In seeking *in camera* review of these seven categories of documents, the Stores state that "*the evidence that has been adduced to date* is sufficient to support a good faith belief that documents responsive to each of the disputed requests might reveal evidence further establishing the availability of the crime-fraud exception."  (ECF 242 at 4 (emphasis added).)  However, they do not cite

---

[7] Tauler Smith did not brief the prior motion.

[8] Out of an abundance of caution, the Court considers Outlaw and Tauler Smith's evidence only for purposes of determining whether to exercise its discretion to conduct and *in camera* review.  (*See* III.A.3.c).)  If the Court considered it for the first step of the inquiry, it would only serve to undermine, subject to the limitations of it discussed below, the Stores' position. (*Id.*)

[9] Although not addressed by the parties, the Court also notes that the Court's finding that documents responsive to these RFPs are relevant to the Stores' claims under Rule 26(b)(1) is not a substitute for the Stores making the required *factual* showing that they may reveal evidence the crime-fraud exception applies.

[10] The absence of evidence is a particularly glaring omission in this motion because Outlaw and the Stores have both opposed *in camera* review and submitted evidence in opposition.  That evidence is discussed further below. (III.A.3.c))

any evidence in support of this statement or otherwise submit evidence in support of this assertion.[11] (*Id.* at 4-5.)  Although these documents are likely relevant to the claims in the Stores claims in this case, as discussed below, relevance is not a substitute for a factual showing.

The Court "must be bear in mind that the party challenging the privilege may lack sufficient evidence to prove crime or fraud to a *liability* standard." *Napster* 479 F.3d at 1090 (emphasis added).  However, here the Stores have not submitted evidence at all to support their claim that *in camera* review of these materials may reveal evidence the crime-fraud exception applies.  The Stores could have submitted "any relevant evidence, lawfully obtained, that has not been adjudicated to be privileged," but they did not.[12] *Zolin*, 491 U.S. at 575.  The Court is not going to fill that substantial gap for the Stores.

The Court cannot find the Stores have shown "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* at 572.[13]

---

[11] The only evidence submitted with the Joint Statement by the Stores is a listing of Pacer search results showing cases JST Distribution has filed.  (Decl. of Mark Poe, Ex. A.)
[12] The Court is aware there is other evidence on file in this case that might bear on this decision. The Stores do not even submit the four documents that were the subject of the Court's prior privilege order despite trying to rely on them in this motion.  (*Id.* at 5 (citing ECF 230 at 14).)  However, the Court cannot rule in the Stores favor based on evidence the Stores have not submitted.  To do so would deny Outlaw and Tauler Smith the opportunity to challenge it.  "As the Court has previously explained, any joint statement must fully set out the party's own position and its response to the opposing parties' arguments."  (ECF 239 n.2.)  Additionally, the Stores cannot just leave it to the Court to rummage through the extensive filings in this case.  It is not the Court's burden, it is the Stores'.
[13] Because the Court finds the Stores have not made the threshold showing, the Court need not reach Tauler Smith argument that the crime-fraud exception would only apply to it for a very specific and different course of conduct.  (ECF 242 at 10.)  However, the Court finds this doubtful given responsive documents would likely belong to Tauler Smith's client, Outlaw, and "it is the client's knowledge and intent that are relevant" for

### c)  **Step Two – Court's Discretion to Conduct *In Camera* Review**

The Court need not reach whether to exercise its discretion to review the documents *in camera* because the Stores have not met the threshold showing. Notwithstanding, even if the Court found the threshold inquiry was met, the Court would nonetheless decline to exercise is discretion to review these seven categories of documents *in camera*.  "Once [the threshold] showing is made, the decision whether to engage in *in camera* review rests in the *sound discretion* of the district court."  *Zolin*, 491 U.S. at 572 (emphasis added).  "[C]ourts should make the decision to review in light of the amount of material they have been asked to review, the relevance of the alleged privilege material to the case, and the likelihood that *in camera* review will reveal evidence to establish the applicability of the crime-fraud exception."  *In re Grand Jury Investigation*, 974 F.2d at 1072-73; *see also id.* at 572 ("The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.").

The amount of material the Court has been asked to review weighs against *in camera* review.  The Stores dispute the assertions of Outlaw (thousands of emails) and Tauler Smith (3,000 pages of documents) as to the volume of documents involved based on the RFPs being narrowly tailored.  The Court would agree that these RFPs were drafted to only obtain relevant discovery.  (ECF 246.)  However, that does not mean they will not result in the production of thousands of documents.  Five of the seven categories

---

purposes of the crime-fraud exception.  *Napster*, 479 F.3d at 1090.  "The attorney need not have been aware that the client harbored an improper purpose."  *Id.*

seek all communications between Outlaw or Tauler Smith and Pulaski on five topics. Any one of these could easily result in production of hundreds, if not thousands, of emails. The Stores argue that there will not be many, or even any, emails concerning testing of competitor products or lost sales (categories 3 and 4) because Outlaw and Tauler Smith were not actually concerned about either. However, Tauler Smith has produced evidence that Outlaw did conduct testing. (Sergenian Decl., Ex. B (five lab reports from July and December 2017.)

Based on the categories, the Court does not doubt that the Court would be required to review thousands of pages of documents, particularly given Tauler Smith has provided a declaration stating as much. The Stores' request for *in camera* review appears to be an attempt to have the Court do the work not only of finding the evidence in the record it has failed to submit to justify *in camera* review, discussed above, but also review thousands of pages of documents to determine if the documents are subject to the crime-fraud exception. As explained in *Napster*, blanket use of *in camera* review could result in many problems, including "plac[ing] significant burdens upon district courts." 479 F.3d at 1096 (Discussing dangers of blanket use of *in camera* review). The court goes on to explain this is why the *Zolin* court "was very careful to leave the decision whether to conduct an *in camera* review within 'the sound discretion of the district court.'" *Id.* (quoting Zolin, 491 U.S. at 572). Even if the Stores had met the threshold showing, the Court would decline to exercise its discretion based on the volume of materials to review alone.

The relevance of these categories of documents to the case weighs in favor of *in camera* review. The Court already addressed relevance in a prior order on non-privilege objections to these RFPs and found they sought documents that were relevant to the Stores claims. (ECF 246.) As the Court explained, responsive documents might explain: when and why Pulaski was funding Outlaw and Tauler Smith's activities which could show the formation of the scheme (categories 1-2 and 7); Outlaw and Tauler Smith's intentions in targeting stores with demand letters and subsequent litigation (lost sales and

tainted competitive products or extracting quick settlements with false threats) (categories 3-4); whether Outlaw and Tauler Smith intended to deceive or defraud (category 5); and how the scheme was carried out by Tauler Smith (category 6).  (ECF 246 at 7-17.)

The "relative importance to the case of the privileged information" is a closer question.  *Zolin*, 491 U.S. at 572.  As noted above, these documents might shed some light on the early steps taken by Outlaw and Tauler Smith that might explain their intentions.  However, as discussed below, the evidence submitted by Tauler Smith and Outlaw casts doubt on the claim that Outlaw existed only to run this scheme rather than sell products.  Ultimately, the Court finds these documents may have some importance to the case, but not so much that it weighs very heavily in favor of *in camera* review.

The likelihood that *in camera* review will reveal evidence to establish the applicability of the crime-fraud exception, taking into account the evidence before the Court, weighs against *in camera* review, although not as strongly as the amount of material involved.  As discussed above, the Stores have failed to establish any evidentiary basis for their contention that these categories of documents will reveal evidence members of the scheme were targeting stores before TriSteel was being sold or on any other basis.  Additionally, Outlaw and Tauler Smith have both submitted evidence to undermine this unsupported assertion.[14]  As discussed below, there are limitations to Outlaw and Tauler Smith's evidence, but it still suggests these documents may not reveal evidence the crime-fraud exception applies.

///

---

[14] The Court is allowed to consider countervailing evidence in determining whether to conduct an *in camera* review.  *Napster*, 479 F.3d at 1092.  The Court did not consider this evidence in considering the threshold inquiry because in a grand jury case, *In re Grand Jury Subpoena 92-1(SJ)*, the court stated "the first step of the analysis should focus only on evidence presented by the party seeking *in camera* review."  31 F.3d 826, 829 (9th Cir. 1994) (Concluding the district court was not required to consider evidence from the party opposing in camera review under the first step of *Zolin*).

Outlaw asserts "Outlaw began *selling Tri-Steel* online in 2016—before any investigations were done and before any demand letters were issued in mid-to-late 2017" to challenge the Stores' crime-fraud premise—that Outlaw was targeting stores before it was selling TriSteel.  (ECF 242 at 11.)  Outlaw then includes a cite that indicates the Court should compare Exhibits A and B with Exhibit C.  (*Id.*)  Outlaw argues these exhibits show the Court's prior order on the crime-fraud exception addressing four documents was based on a faulty premise—that members of the scheme started targeting stores before Outlaw started selling TriSteel.  (ECF 242 at 11.[15])  Although not explained, it appears Outlaw is arguing Exhibit C shows stores were not being targeted until August 2017 and Exhibit B and C show Outlaw was selling TriSteel as early as November 2016. None of these exhibits were submitted by declaration.

Outlaw's Exhibits A and B show historical monthly sales of various categories of products from November 2016 to December 2016 and February 2017[16] to June 2017 with each, with the "Men's Libido" category marked for each month except February 2017. (ECF 242-5, 242-6.)  Although the Stores correctly note that the records do not specifically refer to TriSteel,[17] they do indicate that Outlaw was likely selling TriSteel

---

[15] Outlaw now characterizes it as a "faulty premise" underlying the Court's prior Order. The Court would agree that the premise, that Outlaw did not begin selling TriSteel until after the members of the scheme began targeting stores, was important to the Court's prior analysis.  The Court would not agree with Outlaw's characterization of it as a "faulty premise" or "false premise" based on the briefing before the Court for that motion.  (ECF 242 at 11.)  Outlaw failed to even address this argument in the prior briefing and submitted no contrary evidence that would have suggested the premise was incorrect.

[16] February 2017 is additionally lacking in other respects.  There is no title on this document indicating the time period covered leaving only the "2/17" handwritten on the pages to rely on.  Additionally, this document lacks a "Men's Libido" category.  (*Id.*)  For this time period "Test Booster" is marked.  (*Id.* at 5-6.)

[17] Given Outlaw's assertion that this evidence shows it was selling TriSteel with citation to these sales records, if the sales records marked "Men's Libido" were not for TriSteel it would be, at best, intentionally misleading the Court.

before it began targeting stores based on Exhibit C. Outlaw's Exhibit C is an August 31, 2017 JST Distribution invoice[18] that bills for the costs of creation of an application to track investigations and the costs of investigating target stores, including expenses of field agents. (ECF 242-7.) It exceeds $ 240,000 and shows 5,600 targets with a total cost per target. Significantly, it is dated August 31, 2017, well after the sales and purchase records discussed above and below indicate Outlaw was selling its products. (ECF 242-7.)

Tauler Smith's evidence reflects Outlaw was purchasing products in December and July 2017. (Sergenian Decl., Ex. A.) It is not a tremendous leap to deduce Outlaw went on to sell these products it purchased, although there is no indication the invoices were specifically to purchase TriSteel. The invoices themselves only refer to "Private 12ct" and the Sergenian Declaration submitting Exhibit A does little to rectify this. (ECF 242-3 at 3-10.) It states only that "Exhibit A are true and correct copies of documents showing that Outlaw was selling *its products* well before September 1, 2017." (ECF 242-3 at 2 (emphasis added).) This certainly supports the idea that Outlaw was purchasing and likely selling products, but it does not establish Outlaw was selling TriSteel specifically.

Collectively, the evidence submitted by Outlaw and Tauler Smith reflects that Outlaw was purchasing and selling products in 2016 and 2017 before stores were being targeted, likely including TriSteel,[19] before Stores were targeted. This undermines the

---

[18] Outlaw's responses to Interrogatories Nos. 18 and19 explain that JST Distribution incurred these expenses to collect information on target stores and that information was then "obtained" by Outlaw. (Sergenian Decl., Ex. C, ECF 242-3 at 21.) Outlaw explains that JST Distribution "was going to pursue litigation along with Outlaw" but "eventually decided against joining or continuing the litigation." (*Id.*) "JST Distribution initially paid for the investigators to collect evidence" and "[a]fter JST Distribution pulled out of the litigation, Outlaw obtained information JST Distribution had gathered." (*Id.*)

[19] As noted above, the sales records submitted by Outlaw do not specifically identify TriSteel as the product sold. However, they do mark the "Men's Libido" category on the sales records, and Outlaw's counsel asserts in their brief that these records reflect that "Outlaw began selling Tri-Steel online in 2016" and then cites these sales records.

Stores' contention that these seven categories of documents will show the members of the scheme were targeting stores before TriSteel was launched—the fraud the Stores rely on for applying the crime-fraud exception.  The Stores, on the other hand, have submitted no evidence to contradict the evidence submitted by Outlaw and Tauler Smith or, as discussed at length above, to support their contention that members of the scheme were targeting stores before TriSteel was being sold.  The Court finds the likelihood that the evidence produced through *in camera* review will reveal evidence to establish the applicability of the crime-fraud exception weighs against the Court exercising its discretion to conduct an *in camera* review.

In summary, the Court need not reach the second step because the Stores have not met their burden at the first step.  However, even if the Stores made the initial threshold showing, the Court would still decline to exercise its discretion to review these seven categories of documents *in camera* at the second step based on the very large volume of documents the Stores are seeking to have reviewed *in camera* and the minimal likelihood these documents will show the crime-fraud exception applies.

## IV.   CONCLUSION

The Stores' motion seeking *in camera* review is **DENIED** for the reasons set forth above.

**IT IS SO ORDERED.**

Dated:  September 11, 2020

Hon. Bernard G. Skomal
United States Magistrate Judge

---

Counsel could not represent to the Court that these records show it was selling TriSteel with citation to exhibits of sales records with a particular category marked if counsel did not know that those sales were for TriSteel without intentionally misleading the Court.

18