UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

IN RE OUTLAW LABORATORY, LP
LITIGATION.

Case No.: 18-cv-840-GPC-BGS

**ORDER DENYING IN PART AND
GRANTING IN PART TAULER
SMITH'S MOTION FOR SUMMARY
JUDGMENT.**

**(ECF No. 260.)**

Three San Diego area convenience stores – Defendant Roma Mikha, Inc. and Third-Party Plaintiffs NMRM, Inc. and Skyline Market, Inc. (collectively, the "Stores") – have brought a putative class action by means of a counterclaim against Plaintiff Outlaw Laboratory, LLP ("Outlaw"), a company whose primary business is the sale of male enhancement products and other supplements. The Stores allege the existence of a RICO association-in-fact enterprise involving, among others, Outlaw's former law firm, Tauler Smith, LLC ("Tauler Smith"), and Outlaw's two-part owners, Mr. Michael Wear and Mr. Shawn Lynch, which operates a scheme to defraud small businesses through the mailing of fraudulent, baseless demand letters that threaten liability in excess of $100,000 unless a quick settlement can be reached.

1

Before the Court is Tauler Smith's motion for summary judgment which argues that the undisputed facts show no such "Outlaw Enterprise" exists, that Tauler Smith has not directed the conduct of the Enterprise in providing routine legal services, and that one of the Stores' claims were extinguished via its Settlement Agreement. For the reasons articulated in this Order, the Court concludes that the record reveals genuine disputes of material fact as to Tauler Smith's contentions. In the alternative, Tauler Smith challenges the Stores' request for injunctive relief under RICO as a matter of law.  The Court holds that injunctive relief is unavailable under RICO. Accordingly, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## I.      Background

### A. Procedural Background

On August 20, 2019, the Stores filed the operative, second amended counterclaims ("SACC"). ECF No. 114. The SACC added as third-party defendants Tauler Smith, Mr. Wear, and Mr. Lynch. To obtain the "new information" necessary to allege their involvement in the Outlaw Enterprise, Stores' counsel relied on information collected through discovery and a Vice Media news investigation. ECF No. 113 at 5, 8–12. At the time, Mr. Poe filed a declaration noting that he was interviewed by a Vice Media reporter, had communicated with him via email 36 times, as a result learned new information regarding the involvement of Outlaw's partners and Tauler Smith in the Enterprise, and ultimately incorporated those facts into the newly amended complaint. ECF No. 98-1 at ¶ 3. The Stores also included the referenced discovery. ECF Nos. 98-3, 98-4, 98-5.

On July 22, 2020, third-party defendant Tauler Smith filed a motion for summary judgment against the Stores. ECF No. 260. In the motion, Tauler Smith relies on the declarations of Mr. Robert Tauler, ECF No. 260-3 ("Tauler Decl."), and its counsel, Mr. David A. Sergenian. ECF No. 260-13 ("Sergenian Decl.").

On August 14, 2020, the Stores filed an opposition to Tauler Smith's motion. ECF No. 272. The opposition included among its attachments four declarations put forward by Stores' counsel Mr. Mark Poe, ECF No. 272-3 ("Poe Decl."), Outlaw Principal Mr. Michael Wear, ECF No. 272-17 ("Wear Decl."), Outlaw Principal Mr. Shawn Lynch, ECF No. 272-18 ("Lynch Decl."), and former Tauler Smith accountant Mr. Joseph Valerio. ECF No. 272-19 ("Valerio Decl.").

On August 21, 2020, Tauler Smith filed a reply. ECF No. 280. The Court held a hearing on the motion on September 11, 2020.

### B. Factual Background as to the RICO Enterprise Members

Mr. Wear and Mr. Lynch first had contact with Robert Tauler, Managing Partner at Tauler Smith, LLP, upon receiving a demand letter sent by Tauler Smith alleging that their prior business, TF Supplements, was offering for sale a nutritional supplement that contained an undisclosed or illegal ingredient. Wear Decl. at ¶ 2; Lynch Decl. at ¶ 2. TF Supplements settled the suit for about $9,000. *Id.* Mr. Tauler states Outlaw first contacted his firm given its work on nutritional supplement litigation. Tauler Decl. at ¶ 7.

In 2016, Mr. Lynch and Mr. Wear formed Outlaw Laboratory. Lynch Decl. at ¶ 3. Among other products, Outlaw sold TriSteel, a male enhancement pill. Lynch Decl. at ¶ 3. Outlaw Laboratory created, manufactured, and sold TriSteel. Tauler Decl. at ¶ 11. Tauler Smith had no role in starting Outlaw Laboratory or in creating TriSteel. Tauler Decl. at ¶¶ 9, 10, 22. TriSteel was first sold on October 1, 2016 by Outlaw Laboratory. Tauler Decl. at ¶ 22.

Initially, TriSteel was sold only through TF Supplements' retail stores in Texas or as an "add on" to a customer's electronic shopping cart when buying through the website outlawlaboratory.com. Wear Decl. at ¶ 8; Lynch Decl. at ¶ 3. Eventually, Outlaw began selling TriSteel directly on their website, though Mr. Lynch does not recall when they created a TriSteel landing page. Lynch Decl. at ¶ 2. Outlaw did not advertise TriSteel online but did advertise the company. Wear Decl. at ¶ 8.

1       Thereafter, Mr. Wear assisted a friend with starting a company named JST

2  Distribution. Wear Decl. at ¶ 3. JST Distribution engaged Tauler Smith on contingency to

3  pursue litigation against a number of websites that sold male enhancement products

4  online beginning on March 28, 2017. Wear Decl. at ¶ 3; ECF No. 280-2 at 4, 7. When

5  Tauler Smith's legal fees and JST's investigation costs grew too high, another law firm

6  named the Pulaski Law Firm agreed to provide approximately $1 million in funding to

7  continue this litigation. Wear Decl. at ¶ 4.

8       That funding was obtained, in part, because Mr. Lynch knew someone at the

9  Pulaski Law Firm, Mr. Eric Boss. Lynch Decl. at ¶ 4. Outlaw's partners, moreover, had

10  assisted with JST's litigation, including by setting up an internal website and funding the

11  litigation, as JST's founder was their friend. Wear Decl. at ¶ 4; Lynch Decl. at 4. Over the

12  course of the investigation, JST Distribution stored evidence obtained by its contractors

13  on an internal website. Wear Decl. at ¶ 4; Lynch Decl. at ¶ 5.

14       In November 2017, Outlaw took over the project. Wear Decl. at ¶ 5; Lynch Decl.

15  at ¶ 5. Mr. Tauler states that Tauler Smith was engaged in the "ordinary course of its

16  practice" and that Outlaw sought to take legal action against convenience stores and

17  distributors selling competing products. Tauler Decl. at ¶¶ 5, 12. JST Distributions

18  formally assigned all rights and interests in the litigation to Outlaw on November 24,

19  2017 through an updated engagement agreement with Tauler Smith and Outlaw. ECF No.

20  280-2 at 4.

21       The litigation would now be predicated on Outlaw's TriSteel male enhancement

22  product (instead of JST's Powerful Desire product). Wear Decl. at ¶ 5. Mr. Tauler states

23  that Outlaw Laboratories gathered evidence regarding the sales of competing products,

24  that Outlaw identified stores that sold competing products, and that Tauler Smith's

25  attorneys merely verified that information. Tauler Decl. at ¶¶ 13, 20. Tauler Smith asserts

26  that Outlaw conducted its own investigation of the stores. Tauler Decl. at ¶¶ 21, 39.

27

28

Invoice records provide additional detail as to the type of work performed by Tauler Smith's employees during this period. For example, one attorney, Mr. Kevin V., was consistently billing eight hours per day to the "Outlaw Project." ECF No. 272-17 at 29–51. At the same time, Mr. Tauler billed for various tasks including, "attend ASD convention to acquire distributor targets," "review job listings re CRM admin and paralegal," "call with call center," and "research targets for complaints." *Id.* at 30, 33, 34, 37. A third individual, Mr. John L., billed time for conducting "[d]ue diligence" and reviewing "additional evidence." *Id.* at 31.

Mr. Wear explains that, using the data that had been gathered on behalf of JST, Tauler Smith drafted a demand letter that could be sent to retail stores on behalf of Outlaw Laboratory. Wear Decl. at ¶ 5. Mr. Tauler did so because he was an expert on the Lanham Act. Wear Decl. at ¶ 5. Outlaw relied on Tauler Smith. Wear Decl. at ¶ 5; Lynch Decl. at ¶ 5. Mr. Tauler worked on nutritional supplement litigation from 2013 to 2019 and was familiar with the marketplace. Tauler Decl. at ¶¶ 3–4. Mr. Wear states that Tauler Smith expected that "this project" could make as much as $10 million. Wear Decl. at ¶ 5.

The demand letters accused the recipient of selling "illegal" products which could subject the store to liability through "legal action for racketeering and unfair business practices under RICO (Racketeer Influences Corrupt Organizations) and the Federal Lanham Act." ECF No. 272-6 at 3. The letters further stated that Outlaw would be "entitled" to "profits from the sale" of the products dating back four years, attorney's fees, punitive damages, and triple damages. *Id.* The letter estimated liability upwards of $100,000 and then offered a much smaller sum ($14,000 in the case of Skyline Market) to settle and stop selling the products. *Id.* at 4. The letter further threatened that the offer would "double" if Outlaw were "forced to file a formal lawsuit, and the offer [would] be withdrawn if litigation exceeds one motion in duration." *Id.* The letters threatened that recipient stores had two weeks to respond or Outlaw would file suit. *Id.*

The demand letters were also typically accompanied by a draft complaint. The draft complaint that Skyline Market received alleged that Outlaw sold TriSteel at "storefront retail locations across the United States." ECF No. 272-6 at 27, ¶ 29. In response to a request for admission signed by Tauler Smith on behalf of Outlaw, Outlaw later revealed that this was false as of January 31, 2019, stating "TRI-STEEL is not sold at any retail locations other than online." ECF No. 272-7 at 3. And, when Tauler Smith sought verification from Mr. Lynch in December 2017 that TriSteel was "sold in hundreds of retail stores in all 50 US States," Mr. Lynch responded only that TriSteel was "[d]istributed in all 50 states" and that "[w]e don't have 100 retail location selling tri steel but we have shipped everywhere."  ECF No. 280-2 at 10.

Lastly, the demand letters were also typically accompanied by photographs of the storefront and the store's packages as well as FDA warnings about the allegedly illicit products and their health risks to consumers. ECF No. 272-6 at 5–19; ECF No. 260-6.  In its order denying Tauler Smith's motion to dismiss the SACC, the Court found that the allegations made in these demand letters against retailers were objectively baseless as a matter of law such that no reasonable litigant could realistically expect success on the merits. ECF No. 190 at 29.

Tauler Smith threatened that the stores could be liable for RICO on the basis that the government had "successfully prosecuted" such claims. Tauler Decl. at ¶¶ 23, 42. Tauler Smith puts forward several documents related to criminal matters in support of that proposition – including Department of Justice press releases, a plea agreement, a charging document – which show government action against distributors and manufacturers. *See generally* ECF No. 260-6. However, not one case includes a RICO charge against a retailer. *Id.* Tauler Smith's allegations that each store's products contained synthetic substances were based on testing conducted as to a subset of products. ECF No. 260-5. Mr. Tauler claims that, in his opinion, consumers purchase male enhancement products with synthetic materials because they are "typically cheaper,

more powerful, and" assumed to be safe. Tauler Decl. at ¶ 17.

Outlaw had little input as to the content of the demand letters that Tauler Smith sent to the retail stores. Wear Decl. at ¶ 6. Outlaw also had "little" role in deciding which stores to send the demand letters to. Lynch Decl. at ¶ 6. Tauler Smith did not provide Outlaw with copies of each letter that it sent nor did Tauler Smith communicate how many were sent. Wear Decl. at ¶ 6; Lynch Decl. at ¶ 6. At most, Mr. Lynch recalls seeing "a copy of the basic form of the demand letter," but believes the letters sent out differed. Lynch Decl. at ¶ 6. Mr. Wear estimates Tauler Smith sent 4,000 demand letters. Wear Decl. at ¶ 6. Outlaw relied on Tauler Smith to the extent that "if one listed off a name of a demand letter recipient, [Mr. Wear] would not know their geographic location, what products they sold, whether they had an online presence, or any other such details." Wear Decl. at ¶ 7; Lynch Decl. at ¶ 6.

In April 2018, Tauler Smith stopped including RICO in its demand letters. Tauler Decl. at ¶ 25. Mr. Tauler explains that his firm did so because the remedies for violations of the Lanham Act were largely duplicative and it believed that RICO claims were more difficult to advance past pleading challenges. Tauler Decl. at ¶ 25.

The demand letters offered a release of all claims in exchange for settlement. Tauler Decl. at ¶ 24. Tauler Smith negotiated and drafted the settlements. Tauler Decl. at ¶¶ 28, 45. Mr. Tauler attests that Tauler Smith always kept Outlaw informed of developments in its cases and that no settlements were ever made without the client's signature and consent. Tauler Decl. at ¶¶ 29, 30. Tauler Smith claims that only Outlaw signed and executed the settlements. Tauler Decl. at ¶ 45. The Parties include one settlement agreement in their briefing, which bears the signatures of Outlaw, Skyline Market, and Tauler Smith (as to "form only"). ECF No. 260-10 at 7.

The Outlaw partners state, however, that they are unaware to this day of how many settlements were obtained or how much money was collected by the scheme. Wear Decl. at ¶ 9; Lynch Decl. at ¶ 7. Outlaw did not keep each individual agreement that "was sent

to [them] for signature." Lynch Decl. at ¶ 7. Tauler Smith also did not provide Outlaw with copies of each signed settlement or a "full accounting" of the scheme, including how all of the income was distributed and to whom. Wear Decl. at ¶ 9; Lynch Decl. at ¶ 7. Tauler Smith also did not provide regular invoices for its work. Wear Decl. at ¶ 9. Instead, Mr. Lynch recalls receiving "some accounting reports" but not "when or how often." Lynch Decl. at ¶ 7. The only time Outlaw received invoices for Tauler Smith's work was after it requested them from the Pulaski Law Firm as a part of the discovery process to the Stores' counterclaims or when Tauler Smith billed toward the end of its engagement. Wear Decl. at ¶ 10; ECF Nos. 292-1, 292-2, 292-3, 292-4. In total, Outlaw received approximately $120,000 in settlements from retail stores. Wear Decl. at ¶ 9.

If stores did not settle, Tauler Smith also filed "numerous" lawsuits across the country. Tauler Decl. at ¶ 26; Wear Decl. at ¶ 11; Lynch Decl. at ¶ 8. Tauler Smith contends that it acted "always with the client's authorization." Tauler Decl. at ¶ 26. Tauler Smith repeats that it did not act without the guidance or direction of Outlaw in prosecuting Outlaw's claims. Tauler Decl. at ¶ 46. Outlaw, however, did not have "specific input" as to the individual stores to be sued. Wear Decl. at ¶ 11. Tauler Smith decided who to sue. Wear Decl. at ¶ 11. Outlaw relied on Tauler Smith "about who to sue based on the evidence we provided." Lynch Decl. at ¶ 8.

Among those retail stores sued, Tauler Smith notes that it also sued at least two distributors. Tauler Decl. at ¶ 24; ECF No. 260-8. As to one of these litigations, Outlaw included a RICO claim in the original complaint but then amended that complaint to drop the RICO claim on May 11, 2018, and thereafter did not oppose a motion to dismiss, resulting in dismissal of the action on May 3, 2019. *See* ECF No. 272-9 at 1; ECF No. 272-10 at 12.

Tauler Smith also "coordinated" other law firms around the country to assist in filing lawsuits against target stores. Lynch Decl. at ¶ 8. Tauler Smith notes that its responsibilities included finding local counsel to prosecute the lawsuits. Tauler Decl. ¶

8

26. Tauler Smith also states, however, that it did not "manage" the affairs of those attorneys. Tauler Decl. at ¶ 32. Instead, Tauler Smith shared its "expertise" when asked. Tauler Decl. at ¶ 32. Tauler Smith was not a party to any legal agreements entered into by Outlaw with other law firms. Tauler Decl. at ¶ 32. Lastly, Tauler Smith conducted other related litigation. For example, Tauler Smith defended motions to dismiss the pleadings, obtained default judgments, and conducted discovery. Tauler Decl. at ¶¶ 27, 28.

In August 2018, the Stores counsel, Mr. Poe, sent a letter to Tauler Smith demanding that Outlaw cease all efforts in the scheme in exchange for keeping all settlement funds obtained to date. Wear Decl. at ¶ 12. Then, less than eleven minutes later, Mr. Tauler responded to the Stores' counsel, "[j]ust because you don't understand something doesn't mean it's a bad thing. Do some research on your claims like real lawyer and stop sending me stupid letters. Your accusations are a disgrace to your profession." SACC at ¶ 7 (containing image of email).

Mr. Wear avers that Tauler Smith did not inform Outlaw that it received this letter at the time. Wear Decl. at ¶ 12. Tauler Smith also did not explain the Stores' demands to Outlaw. Wear Decl. at ¶ 12. To this day, Mr. Wear has never been shown a copy of this letter. Wear Decl. at ¶ 12. At most, Mr. Wear recalls "vaguely" that Mr. Tauler referenced the demand letter during a conference call, the date of which is not clear. Wear Decl. at ¶ 12.

At the end of 2018, or in early January 2019, Mr. Wear became "very frustrated" with Mr. Tauler's "abusive treatment" of Outlaw. Wear Decl. at ¶ 13; Lynch Decl. at ¶ 9. Outlaw notified Tauler Smith they were terminating the representation and Tauler Smith sent Outlaw a "closing invoice for [the] engagement." Wear Decl. at ¶ 13; Lynch Decl. at ¶ 9.  Tauler Smith claims that Outlaw owed Tauler Smith $1,159,908.36 for about 4,504 hours in hourly fees and threatened to sue Outlaw for that amount on the basis of *quantum meruit*. Wear Decl. at ¶ 13; ECF No. 272-17 at 29–51.

9

Outlaw was "shocked" by this invoice given their contingency fee arrangement and coordinated a resolution. Wear Decl. at ¶ 14. Outlaw agreed to pay Tauler Smith $200,000 of settlement proceeds on a go-forward basis from the scheme and persuaded the Pulaski Law Firm to pay $180,000 to Tauler Smith for the majority of its interest in the claims. Wear Decl. at ¶ 14; Lynch Decl. at ¶ 9. Tauler Smith continued to represent Outlaw and retained a small interest in the case. Wear Decl. at ¶ 14; Lynch Decl. at ¶ 9. Mr. Tauler explains that, after Outlaw sought termination, it continued to represent Outlaw in the defense of this action and two other matters still pending. Tauler Decl. at ¶ 33. Mr. Wear and Mr. Lynch both explained that, at the time, they felt Outlaw had little choice to continue prosecuting this lawsuit for fear that Tauler Smith would present yet another large invoice that it could not afford to pay or threaten to sue again. Wear Decl. at ¶ 15; Lynch Decl. at ¶ 10.

Mr. Tauler avers that Tauler Smith had an arms-length contractual relationship for legal services with Tauler Smith before being terminated. Tauler Decl. at ¶ 50. After Tauler Smith's termination, Outlaw continued to pursue claims with other attorneys. Tauler Decl. at ¶ 49.

As to the proceeds from the above actions, four invoices in the record reflect earnings of $1,183,886.13 between April 2017 and December 2018. *See* ECF Nos. 292-1, 292-2, 292-3, 292-4. These invoices also detail disbursements made from those earnings, including (1) $100,000 in payments to Outlaw, (2) $50,000 in payments to Tauler Smith, and (3) hundreds of thousands of dollars in payments to third parties, including direct payments to multiple law firms and one expert, as well as payments for unincluded invoices. *Id.* Tauler Smith was not the "sole" beneficiary of the Enterprise. Tauler Decl. at ¶ 43.

**C. Factual Background Specific to Skyline Market's Settlement Agreement**

As did many other stores, third-party plaintiff Skyline Market received a demand letter. After receiving the letter, Mr. Mokou attended a meeting of retailers organized by

San Diego Cash & Carry, a local distributor, where an unidentified attorney told them that Skyline Market had two options: "[e]ither fight it or either to settle it." ECF No. 260-19 at 8:11–12. Mr. Mokou stated at his deposition that he "decided to settle" because "[i]t's better to spend that kind of money not going through attorneys." *Id.* at 9:1–3. Mr. Mokou also stated, "Nobody forced me. Of course not. But, you know, the decision that I have to make." *Id.* at 13:17–21. Mr. Mokou was "not aware" of some of the FDA's warnings, *id.* at 6:13–22, and did not investigate Outlaw's claims beyond attending a meeting with a distributor. *Id.* at 19:2–4.

On May 4, 2018, Skyline Market entered into a Settlement Agreement signed by Tauler Smith on behalf of Outlaw. ECF No. 260-10. Skyline Market ultimately paid $2,800 to settle the claim and was represented by an attorney, Mr. Freddie Garmo, in signing the settlement process. ECF No. 260-19 at 8:13–20; ECF No. 260-10 at 9 (photocopy of settlement check). Mr. Garmo has been practicing law since 1995. Tauler Decl. at ¶ 34. The Settlement Agreement contains a general release which states:

> General Release. In consideration of the terms and provisions of this Agreement, the Parties hereto, on behalf of themselves, successors, and assigns, hereby forever relieve, release, and discharge each other, and their respective successors and assigns, and all of their respective present and former attorneys, accountants, agents, employees, representatives, administrators, insurers, partners, directors, officers, shareholders, and heirs of and from any and all claims, debts; liabilities, demands, obligations, promises, acts, agreements, costs, and expenses, including but not limited to attorney's fees, damages, actions, and causes of action of whatsoever kind or nature, specifically including those related to in any way, directly or indirectly, to any alleged past, present, or future claims for violations of any state, federal, or administrative code or statue, or any type of tort or conversion, or indemnification, contribution, or declaratory relief based on any type of allocation of fault, whether now known or unknown, suspected or unsuspected, based on, arising out of, or in connection with anything whatsoever done, omitted, or suffered to be done at any time, relating to, or in any matter connected with, directly or indirectly, the matters, facts or claims related to the Claims, Demand Letters, and matters set forth in the Article of

this Agreement titled "Recitals". This Agreement shall not be interpreted to bar any claims for the enforcement of the provisions of this Agreement.

ECF No. 260-10 at ¶ 3.1. The Agreement refers to Outlaw's demand letter in the recitals portion. *Id.* at ¶ 1.3 (noting that defendants "have each received a demand letter . . ."). The Agreement also indicates that the Parties signing "have not been influenced" by other people's statements or representations, including those of the opposing party and their counsel. *Id.* at ¶ 3.3(a).

Mr. Tauler states that, based on his communication with Mr. Garmo, Skyline Market had an opportunity to review the demand letter prior to executing the Settlement Agreement. Tauler Decl. at ¶ 37. Skyline Market also knew that Tauler Smith was the payee of the settlement. Tauler Decl. at ¶ 38. In addition, Skyline Market's representative, Mr. Mokou, stated in a deposition that a "friend" had "checked into" the FDA warning letter and informed him that "it was warning to be consumer, not to the retailers." ECF No. 260-19 at 19:9–12. It is not clear from the transcript when Mr. Mokou learned that information. *Id.* Counsel for the Stores, Mr. Poe, estimates that it would have cost Skyline Market at least $16,000 to litigate Outlaw's demand letter. Poe Decl. at ¶ 5.

## II. Legal Standard

Federal Rule of Civil Procedure ("Rule") 56 empowers courts to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986). Summary judgment should be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material when it affects the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citation omitted) (emphasis in original). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 247). Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380.

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

When evaluating a motion for summary judgment, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The court may not, however, engage in credibility

determinations, weighing of evidence, or drawing of legitimate inferences from the facts as those functions are for the trier of fact. *Anderson*, 477 U.S. at 255. Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Id.* at 250–51.

## III.   Motion for Summary Judgement as to RICO "Conduct" and "Enterprise"

To state a claim under 18 U.S.C. § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Here, Defendants challenge the first and second elements, arguing that the undisputed facts compel summary judgment in Defendant's favor. For the reasons below, the Court finds that summary judgment is not appropriate as to either element.

### A. The Conduct Element

Proving the "conduct" element of RICO requires that the Stores establish Tauler Smith "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c). As the Supreme Court explained in *Reves*, this language requires that a defendant "have *some* part in directing [the enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original); *see id.* (referring to this as the "operation or management" test).

The "operation or management" test does not limit RICO liability only to those actors who are in charge of the enterprise or who have "significant control over or within [the] enterprise." *Id.* at 179, n.4 (citation omitted). "[I]t is not necessary to be upper management [in the enterprise] to be liable." *Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008). At the same time, a defendant does not "direct" the enterprise's affairs by "simply being involved" or "performing services for the enterprise." *Id.* at 1249; *see also Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (affirming Rule 12(b)(6) dismissal of RICO claims because the Court deemed the attorney-defendants' conduct "was limited to

providing legal services to the limited partnership and EPA"). Nor is it "enough that [a defendant] failed to stop illegal activity" of the enterprise. *Walter*, 538 F.3d at 1248.

Rather, *Reves*' "operation or management" threshold falls somewhere in the middle, and courts look to various considerations in applying the test, including, "whether the defendant occupied a position in the chain of command through which the affairs of the enterprise are conducted, whether the defendant knowingly implemented the decisions of upper management, and whether the defendant's participation was vital to the mission's success." *Kelmar v. Bank of Am. Corp.*, No. CV-12-6826-PSG, 2012 WL 12850425, at *7 (C.D. Cal. Oct. 26, 2012), *aff'd*, 599 F. App'x 806 (9th Cir. 2015) (quotation marks and ellipsis omitted); *see also Walter*, 538 F.3d at 1248 (considering the same factors). In addition, RICO liability requires a "showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Reves*, 507 U.S. at 185.

Here, Tauler Smith argues that the Stores' evidence fails to establish it directed the alleged enterprise conduct. ECF No. 260-1 at 23–28; ECF No. 280 at 10–13. The Stores, in contrast, argue that there are multiple, genuine disputes regarding facts material to the question of whether Tauler Smith "directed" the enterprise's conduct. ECF No. 272 at 16–24. For the reasons explained below, the Court finds that (i) there are several genuine disputes of fact, and that (ii) those disputes are material because, when viewed from the light most favorable to the Stores, they support an inference that Tauler Smith knowingly engaged in fraudulent conduct and did not merely provide professional services.

### i.  The Record Contains Genuine Disputes of Fact Regarding Tauler Smith's Involvement in the Enterprise.

The Court finds there are several facts in dispute that may establish Tauler Smith "ha[d] *some* part in directing [the enterprise's] affairs," including whether Tauler Smith originated the scheme, whether Tauler Smith was the architect of the demand letters, and whether Tauler Smith directed the Enterprise's settlements, sometimes acting even

18-cv-840-GPC-BGS

without direction from Outlaw. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

First, there is a disputed issue of fact as to who originated the scheme advanced by the Outlaw Enterprise. ECF No. 272-1 at ¶¶ 49, 50. On the one hand, Mr. Tauler contends that Outlaw first contacted it "based on [Tauler Smith's] prior work in nutritional supplement litigation." Tauler Decl. at ¶ 7. Outlaw then engaged Tauler Smith "to provide legal services for claims that already existed." Tauler Decl. at ¶ 8. On the other hand, Mr. Wear and Mr. Lynch aver that they "were first contacted by Tauler Smith." Wear Decl. at ¶ 2; Lynch Decl. at ¶ 2. They explain first meeting Mr. Tauler after receiving a demand letter sent by Tauler Smith in another lawsuit similarly alleging the sale of supplements containing "an undisclosed or illegal ingredient." Wear Decl. at ¶ 2; Lynch Decl. at ¶ 2. They claim Tauler Smith was hired by JST Distributions to engage in what appears to be a similar scheme on the basis of a different product, Wear Decl. at ¶¶ 4–5; Lynch Decl. at ¶ 5, and that, after Outlaw "took over" the project from JST, Tauler Smith "used the data that had been gathered on behalf of JST" to "draft[] a demand letter that could be sent to retail stores on behalf of Outlaw Laboratory." Wear Decl. at ¶ 5. Tauler Smith estimated the scheme could yield $10 million. Wear Decl. at ¶ 5.

Mr. Wear and Mr. Lynch's statements conflict with those of Mr. Tauler. They also create the impression that Tauler Smith conceived of the claims instead of merely working to carry out Outlaw's existing claims. Consequently, this creates a genuine dispute of material fact. *See Rubin v. Kirkland Chrysler-Jeep, Inc.*, No. C05-0052C, 2006 WL 1009338, at *5 (W.D. Wash. Apr. 13, 2006) ("Because Defendant's response to Rubin's *prima facie* case boils down to a swearing contest between opposing witnesses, the Court cannot grant summary judgment without improperly weighing the credibility of potential trial witnesses."). This conflict is not resolved, moreover, by Mr. Lynch's assertion that Outlaw later relied on Tauler Smith "to make the right decisions about who to sue based on the evidence [Outlaw] provided." Lynch Decl. at ¶ 8.

16

Second, the Parties dispute Tauler Smith's role as the architect of the demand letters, i.e., the enterprise's racketeering conduct. ECF No. 272-1 at ¶¶ 28, 54. Tauler Smith contends that it "*could not* have conceived of the demand letters since they were acting on behalf of their client" in reliance on *Baumer*. ECF No. 260-1 at 24 (emphasis added) (quotation omitted). However, *Baumer* is inapposite as it describes conduct more innocuous, and in much smaller scale, than that shown here. *See also Baumer*, 8 F.3d at 1344 (finding that an attorney's drafting of four letters, preparation of a partnership agreement, and assistance in Chapter 11 proceedings "does not suffice to impute liability under *Reves*"). There is no prohibition on finding that a law firm is liable for RICO. *See Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997) ("Neither *Reves* nor RICO itself exempts professionals, as a class, from the law's proscriptions . . . .") Rather, the question is whether the "attorney . . . crosses the line between traditional rendition of legal services and active participation in directing the enterprise," and the answer to that question is, at this stage, a factual one. *Id.*

The Stores' evidence could support a finding that Tauler Smith crossed the line. ECF No. 272 at 18–19. Mr. Wear states "Outlaw had little input as to the content of the demand letter that Tauler Smith sent to the retail stores." Wear Decl. at ¶ 6. Mr. Lynch states that "Outlaw had little role in deciding which stores to send the demand letters to." Lynch Decl. at ¶ 6. Both partners profess a lack of knowledge as to how many letters were sent and aver that Outlaw did not receive copies of the demand letters. Wear Decl. at ¶ 6; Lynch Decl. at ¶ 6. Mr. Wear further states that he is so unfamiliar with the target stores that, if "one listed off a name of a demand letter recipient, [he] would not know their geographic location, what products they sold, whether they had an online presence, or any other such details." Wear Decl. at ¶ 7. Instead, both partners "relied" on Mr. Tauler's purported expertise as a Lanham Act expert, Wear Decl. at ¶ 6; Lynch Decl. at ¶ 6, and the facts indicate that Tauler Smith drafted the demand letters and then mailed "out over 4,000 demand letters, using a mailing service called the Capture Group." Wear Decl.

at ¶ 6. Moreover, Mr. Lynch states that Tauler Smith "coordinated" the work of other members of the Outlaw Enterprise. Lynch Decl. at ¶ 8. These statements support the inference that Tauler Smith directed the design and mailing of the demand letters, as opposed to merely being "presented with claims of its client and assert[ing] those claims on behalf of the client." ECF No. 260-1 at 24.

Tauler Smith, moreover, cannot show the absence of a disputed fact here. ECF No. 280 at 11. Tauler Smith asserts that JST directed the investigators and that Outlaw provided evidence to Tauler Smith to use in the demand letters, such that Tauler Smith only acted at Outlaw's behest. *Id.* But, the Wear and Lynch Declarations repeatedly state that Outlaw had "little" to no input in deciding which stores to send the demand letters, which stores to sue, or with which stores to settle (and for what amounts). *See* Wear Decl. at ¶¶ 6–12; Lynch Decl. at ¶¶ 6–8. Second, Tauler Smith claims "that Outlaw Labs confirmed facts in [Tauler Smith's] drafts" of the demand letters. ECF No. 280 at 11. But, Tauler Smith relies on a single e-mail. ECF No. 280-2 at 10–11, Ex. 32. That is hardly conclusive. Thus, the extent of Tauler Smith's involvement with the demand letters remains in dispute based on the Parties' "competing declarations." *See Kong v. Lopez*, No. CV-18-2538-MWF, 2019 WL 1751826, at *1 (C.D. Cal. Feb. 15, 2019).

**Third,** there is a factual dispute as to how Tauler Smith obtained settlements and whether that occurred in service of its client. ECF No. 272-2 at ¶¶ 59, 61, 62. Mr. Tauler states that "Outlaw permitted [Tauler Smith] to negotiate settlements," and that Tauler Smith drafted complaints and settlement agreements "on behalf of Outlaw, which only Outlaw signed and executed with the businesses." Tauler Decl. at ¶ 45. Mr. Tauler states that Tauler Smith never "act[ed] without the guidance or direction of Outlaw Labs in prosecuting claims on behalf of its clients." *Id.* at ¶¶ 46, 51.

The Outlaw Partners disagree. Mr. Lynch avers that he does not know how many "settlements that were obtained," "the total amount of money Tauler Smith took in from the project," or where the settlement agreements are. Lynch Decl. at ¶ 9. In fact, "Tauler

1   Smith did not provide [Outlaw] with a finalized copy of each fully-signed settlement." *Id.*

2   Nor does Mr. Lynch recall Tauler Smith providing a "full accounting" of the settlements.

3   *Id.* Mr. Wear swears to the same facts. Wear Decl. at ¶ 9. Thus, the Stores argue Mr.

4   Wear and Mr. Lynch's limited involvement shows that Tauler overstepped its role as

5   counsel, including by "merely sen[ding] settlements it had already agreed to [Outlaw] for

6   signing." ECF No. 272-1 at ¶ 61. This presents a genuine dispute of material fact.

7          Mr. Wear and Mr. Lynch's other statements exacerbate this doubt. For example,

8   Mr. Wear avers that Outlaw had no "specific input as to the individual stores to be sued;

9   the decisions of who to sue were evidently made by the lawyers after reviewing the

10  evidence collected." Wear Decl. at ¶ 11; *see also id.* at ¶ 8 (indicating Tauler Smith

11  selected "the retailers that would be sent demand letters"). Mr. Lynch also affirmed that

12  Outlaw had "little role" in selecting the recipients of the demand letters, Lynch Decl. at ¶

13  6, and that Tauler Smith made decisions "about who to sue." Lynch Dec. at ¶ 8.

14         In addition, as the Stores observe in response, Tauler Smith also allegedly failed to

15  confer with their client, Outlaw, regarding an offer from the Stores to end the litigation in

16  August of 2018. ECF No. 272 at 21. On August 9, 2018, the Stores' counsel "sent a

17  detailed letter to the lawyer members of the Enterprise, explicitly disavowing any

18  financial demand either for themselves or their clients, and proposing that the Outlaw

19  Enterprise keep what it has extorted so far, but demanding that it cease future stick-ups."

20  SACC at ¶ 7. Then, as shown through a screenshot of Mr. Tauler's e-mail in the

21  Complaint, and less than eleven minutes later, Mr. Tauler responded to the Stores'

22  counsel, "[j]ust because you don't understand something doesn't mean it's a bad thing.

23  Do some research on your claims like real lawyer and stop sending me stupid letters.

24  Your accusations are a disgrace to your profession." *Id.*

25         Now, Mr. Wear corroborates the Stores' accusation. Mr. Wear remarks that he has

26  "never seen a copy" of the Stores' demand letter. Wear Decl. at ¶ 12. He avers that

27  Outlaw was not shown a copy of it "at the time it was received." *Id.* And, despite Tauler

28

19

Smith's arguments to the contrary, the Court finds Mr. Wear's further statement that he "vaguely remember[s] Tauler bringing the demand letter up during a conference call" does not show Tauler Smith consulted its client in a timely manner, as it is unclear when that conference call occurred or what was said by the participants. ECF No. 280 at 12–23 (citing Wear Decl. at ¶ 12). Thus, this evidence bolsters the Stores' claim that Tauler Smith conducted some of the affairs of the Enterprise without guidance from Outlaw.

Based on the above cited evidence, the Court finds that there is a dispute of fact as to how the Outlaw Enterprise's settlements were conducted. The evidence also rebuts Tauler Smith's assertion that it acted only at the guidance of Outlaw, thus creating a genuine dispute of fact as to the extent to which Tauler Smith acted independently to advance the Enterprise's scheme. *See Kerrigan v. Lowe's Home Centers, LLC*, No. ED-CV-1500088-VAP, 2015 WL 12669869, at *5 (C.D. Cal. Sept. 15, 2015) ("It may be that Plaintiff will fail to establish this fact at trial, but for purposes of Defendant's motion for summary judgment, it suffices to note that Defendant has not demonstrated the absence of a genuine dispute as to this fact.") (dash removed).

### ii. These Disputes Pertain to Material Facts and Do Not Merely Show a Law Firm Providing Professional Services to the Enterprise.

Tauler Smith further argues that its overall conduct amounts to nothing more than providing litigation services to the enterprise. ECF No. 260-1 at 25. However, when viewed in the light most favorable to the non-moving party, as is required at summary judgment, the evidence shows that Tauler Smith "knowingly" undertook the Enterprise's scheme. *See Kelmar v. Bank of Am. Corp.*, No. CV-12-6826-PSG, 2012 WL 12850425, at *7 (C.D. Cal. Oct. 26, 2012). That is, in part, because the record contains sufficient evidence to permit the inference that Tauler Smith fraudulently drafted the demand letters at the heart of the Outlaw Enterprise. *See In re Duramax Diesel Litig.*, 298 F. Supp. 3d 1037, 1087 (E.D. Mich. 2018) (concluding that an entity's conduct met the RICO threshold by programming a device that was "core" to the enterprise); *accord In re*

*Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 983 (N.D. Cal. 2018).

First, Tauler Smith's knowing participation in the enterprise can be inferred from the information available to it when it drafted the demand letters alleging RICO. As a law firm, Tauler Smith had a responsibility to communicate truthfully in the demand letters. *See* Model Rules of Prof'l Conduct, Rule 4.1. Tauler Smith also had a responsibility not to exercise its own "professional judgment in rendering such legal services." *See* Model Rules of Prof'l Conduct, Rule 5.4(c). Thus, Tauler Smith also had a corresponding responsibility to assure itself that its letters were not false. Mr. Tauler explains that, to do so, his firm "verified the information provided by Outlaw Labs," including by matching photographs of products taken by the Enterprise's investigators to FDA notices and confirming the photographs were taken at the store receiving the demand letter. Tauler Decl. at ¶ 18.

The demand letters, however, accuse the recipient stores of selling illicit products, and there is nothing in the record to suggest Tauler Smith had evidence of that as to each store. Tauler Smith, for example, would not test a target store's products before sending a demand letter and instead relied on "various FDA public notices and the client's own independent testing" to determine that store's products were not "dietary supplement[s]." Tauler Decl. at ¶ 6. Tauler Smith, moreover, determined that the products were falsely advertised as "all natural" based on "Laboratory test records provided by" its clients. Tauler Decl. at ¶ 14. However, the results of these tests show that the Enterprise tested only 32 pills between May 2016 and December 2017, despite sending over 4,000 letters. ECF No. 260-5; Wear Decl. at ¶ 6. And, even those tests showed that at least one sexual enhancement product contained *no* illicit substances. ECF No. 260-5 at 17. A test offered by Tauler Smith at the deposition of one of the stores, Roma Mikha, Inc, likewise showed that another product, "Horny Rhino 6000," did not contain any prescription drugs, only zaprinast. *See* Poe Decl. at ¶ 3; ECF No. 272-5 at 2. Consequently, the allegations

21

1    contained in the demand letters were not grounded in fact.

2         Tauler Smith's draft complaint likewise contained at least one misleading

3    allegation, namely, that Outlaw's TriSteel products were sold at "storefront retail

4    locations across the United States." ECF No. 272-6 at 27, ¶ 29. This allegation renders

5    the alleged harm to Outlaw from the stores' sales more proximate and implies that

6    Outlaw's products were sold at stores in the same state as the store reviewing the

7    complaint. However, Outlaw's partners aver that the only storefronts selling TriSteel

8    were in Texas. Wear Decl. at ¶ 8; Lynch Decl. at ¶ 8. Also, Outlaw has admitted that, as

9    of January 31, 2019, TriSteel was sold only online. ECF No. 272-7 at 3. Thus, again, at

10   least one allegation in the draft complaint was not grounded in fact and suggests that

11   Tauler Smith knowingly participated in the enterprise.

12        The evidence suggests that Tauler Smith lacked the factual predicate necessary for

13   sending each of its demand letters. Tauler Smith's reasoning regarding its litigation

14   strategy reveals similar concerns. For example, Tauler Smith explains that the demand

15   letters were directed at convenience stores because "information regarding the importers

16   and distributors is not readily available." Tauler Decl. at ¶ 18. However, the evidence

17   shows that Mr. Tauler, in fact, attended a conference for twelve hours specifically "to

18   acquire distributor targets" on August 2, 2017. ECF No. 272-17 at 30 (noting time entry

19   by Mr. Tauler). The Enterprise likewise twice sued distributors. *See generally* ECF No.

20   260-8. Tauler Smith also explains that it "pursue[d] legal action" on behalf of Outlaw

21   because it believed Outlaw "was losing sales and revenues" from the stores' sales. Tauler

22   Decl. at ¶ 18. But, the record is devoid of any information regarding Outlaw's revenue.

23   Thus, again, the record challenges the factual basis for Tauler Smith's litigation conduct

24   and, thus, supports the conclusion that Tauler Smith participated in the enterprise by

25   being an architect of the scheme.

26        A reasonable trier of fact could also infer Tauler Smith knowingly participated in

27   the Enterprise's fraudulent conduct because the RICO claims in the demand letters have

28                                              22

no basis in law. Mr. Tauler indicates his firm believed "the stores could be liable for civil RICO for their sale of the subject products" because "RICO claims had been successfully prosecuted by the government for the sale of the subject products." Tauler Decl. at ¶ 23. Tauler Smith relies on several press releases, charging documents, and plea agreements in from those prosecutions. Tauler Decl. at ¶ 15. However, *none* of these documents refer to a prosecution for RICO. *See generally* ECF No. 260-6. Most, moreover, concern prosecutions against overseas importers and nationwide distributors of the illicit substances contained in some sexual enhancement products – *not* mere retail sale by local convenience stores. *Id.* Thus, a juror could conclude that Tauler Smith participated in the enterprise by knowingly drafting fraudulent demand letters to further the scheme. This inference gains additional support from the fact that Tauler Smith's conduct was led by Mr. Tauler, someone who has held himself out to be an expert in "nutritional supplement litigation." Tauler Decl. at ¶¶ 3, 4, 32.

In addition, the Enterprise's threats to file suit under RICO would support the position that Tauler Smith was the architect of the scheme and participated in the enterprise by authoring demand letters that were unsupported by the law. Notwithstanding the fact that RICO "has become a tool for everyday fraud cases, "*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985), courts still emphasize that "an attorney's responsibility to conduct a reasonable prefiling investigation is particularly important in RICO claims." *Burnette v. Godshall*, 828 F. Supp. 1439, 1448 (N.D. Cal. 1993), *aff'd sub nom. Burnette v. Lockheed Missiles & Space Co.*, 72 F.3d 766 (9th Cir. 1995). That is because RICO nevertheless invokes the image of "the archetypal, intimidating mobster" and exposes defendants to treble damages. *Odom v. Microsoft Corp.*, 486 F.3d 541, 546 (9th Cir. 2007) (quotation omitted); *see also Mason v. AshBritt, Inc.*, 2020 WL 127666, at *6 (N.D. Cal. Jan. 10, 2020) ("RICO was intended to combat organized crime . . . .") (quotation omitted).

In light of the foregoing facts, there is sufficient evidence here for a trier of fact to conclude that Tauler Smith had "*some* part in directing [the enterprise's] affairs." *Reves*, 507 U.S. at 179 (emphasis in original). Given the factual and legal baselessness of the demand letters, Mr. Tauler's reputation as an expert, and the particularly intimidating nature of RICO claims, it is possible for a rational trier of fact to conclude that Tauler Smith did not merely render a professional service to the Enterprise, and instead "knowingly" participated in the Enterprise's scheme, even if at the direction of Outlaw. *See Kelmar v. Bank of Am. Corp.*, No. CV-12-6826-PSG, 2012 WL 12850425, at *7 (C.D. Cal. Oct. 26, 2012); *cf. Walter*, 538 F.3d at 1249 (finding enterprise member "[s]imply perform[ed] [legal] services for the enterprise" where she did not "knowingly implement[] decisions of upper management").

Separately, the Court also concludes that the facts support a finding that Tauler Smith was "vital" to the Enterprise. *Walter*, 538 F.3d at 1249. The Enterprise's alleged racketeering conduct would not exist were it not for Tauler Smith designing and mailing all the demand letters, particularly given how little input Outlaw offered per Mr. Wear and Mr. Lynch's declarations. Wear Decl. at ¶ 2; Lynch Decl. at ¶ 2. That Tauler Smith was vital, moreover, would be underscored by a finding that they originated the scheme. Wear Decl. at ¶ 5. As the demand letters are the first step in the scheme, Tauler Smith would also be "vital to the achievement of the enterprise's primary goal" of obtaining settlement payments from the targeted stores. *See MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 979 (7th Cir. 1995).

When viewed from the light most favorable to the Stores, facts likewise show that Tauler Smith was part of the "chain of command" of the Enterprise, having directed multiple individuals and entities associated with the Outlaw Enterprise. *Walter*, 538 F.3d at 1249 (quoting *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994)). For example, in mailing the demand letters, Outlaw would have directed the mail service Capture Group and the actions of Kimble Legal Consulting. Wear Decl. at ¶ 6; ECF No. 276-6 at

3–4, 32. Moreover, in bringing forward claims, Outlaw allegedly "coordinated" other law firms to "file[] multiple lawsuits around the country against certain stores." Lynch Decl. at ¶ 8. And, if Mr. Wear and Mr. Lynch's comments as to the settlements are believed by the trier of fact, it was Tauler Smith that directed Outlaw to sign some of the settlements, not the other way around. ECF No. 272-1 at ¶ 61; Lynch Decl. at ¶ 9; Wear Decl. at ¶ 9. Accordingly, the Stores would also have shown that Tauler Smith "conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Reves*, 507 U.S. at 185.

Collectively, and when interpreted in the light most favorable to the Stores, the foregoing evidence shows that Tauler Smith did more than "perform[] services for the enterprise." *Walter*, 538 F.3d at 1249. The cases cited by Tauler Smith, moreover, do not persuade the Court otherwise because each involved facts or allegations which, unlike here, did not permit an inference that the defendant lawyers knowingly participated in fraudulent conduct, were vital to the Enterprise, or took part in the Enterprise's chain of command. *Cf., e.g.*, *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (finding attorneys' "sporadic" involvement in eleven-year scheme, which consisted only of preparing a few letters, one agreement, and assisting on a bankruptcy matter, did not establish RICO liability); *Domanus v. Locke Lord LLP*, 847 F.3d 469, 482 (7th Cir. 2017) (dismissing RICO conspiracy as attorneys lacked actual knowledge, and were not willfully blind, to a RICO scheme); *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051–52 (D.C. Cir. 2012) (dismissing RICO conspiracy where allegations were "insufficient to establish a plausible inference that Freshfields was aware of anything corrupt relevant to its provision of legal services"); *Gilmore v. Berg*, 820 F. Supp. 179, 183 (D.N.J. 1993) (treating as "common professional services" attorney's conduct of "[p]reparing documents for the purchase and sale of real estate, attending closings, preparing and filing Certificates of Limited Partnership and Incorporation, and serving as agent for the receipt of process for legal entities").

In arriving at its decision, the Court recognizes that several allegations in the Complaint are not disputed. ECF No. 272-1 at ¶¶ 18, 19, 53, 55, 57, 58.[1] For example, based on Mr. Tauler's unrebutted declaration, Tauler Smith did not create Outlaw or create TriSteel, and was not the sole beneficiary of the Outlaw Enterprise. Tauler Decl. at ¶¶ 9–11, 43. Moreover, the Stores do not create a genuine dispute on whether Tauler Smith directed the collection of evidence against target stores because, at most, they offer invoices showing that Tauler Smith's employees billed time to JST Distributions and Outlaw contemporaneously with the investigation. ECF No. 272 at 18; ECF No. 272-17 at 29–51; *see LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1136 (9th Cir. 2009) ("While we must draw all reasonable inferences in favor of the non-moving party, we need not draw inferences that are based solely on speculation."). Lastly, there is no genuine dispute as to whether Tauler Smith filed a lawsuit which included a RICO claim. ECF No. 272-1 at ¶ 55; Tauler Decl. at ¶ 41; ECF No. 260-12. However, this evidence only shows that a genuine dispute of facts exists whether Tauler Smith knowingly participated in the enterprise. Consequently, the Court DENIES Tauler Smith's motion for summary judgment.

## B. The Enterprise Element

The Court next considers Tauler Smith's argument that the facts do not show the existence of a RICO Enterprise. ECF No. 260-1 at 26–28. The RICO statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The statute thus provides for two types of RICO enterprises: "legal entities" and groups "associated in fact." *See Shaw v. Nissan N. Am., Inc.*, 220 F. Supp.

---

[1] As the Advisory Committee Notes to Rule 56 explain, this holding applies only for the purposes of this motion. Fed. R. Civ. P. 56, advisory committee's note, 2010 amendments ("The fact is considered undisputed only for purposes of the motion; if summary judgment is denied, a party who failed to make a proper Rule 56 response or reply remains free to contest the fact in further proceedings.").

3d 1046, 1053 (C.D. Cal. 2016) (quoting *United States v. Turkette*, 452 U.S. 576, 581–82 (1981)). To establish an associated-in-fact enterprise as the Stores allege exists here, the Ninth Circuit requires proof of three criteria: that the enterprise consist of "a group of persons associated together for a common purpose of engaging in a course of conduct," that the organization be "ongoing," whether "formal or informal," and that the enterprise's "various associates function as a continuing unit." *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (*en banc*) (quotation omitted).

Here, when viewing the evidence in the light most favorable to the Stores, the evidence satisfies the *Odom* criteria. First, the facts show that the Enterprise proceeded with "a common purpose of engaging in a course of conduct." *Odom*, 486 F.3d at 552. As explained above, there is sufficient evidence to show that Tauler Smith knowingly engaged in fraudulent conduct alongside Outlaw in the course of drafting and sending its demand letters. No one disputes, moreover, that Outlaw and Tauler Smith obtained settlements, filed lawsuits, and won default judgments from target stores around the country as a result of the demand letters. Wear Decl. at ¶¶ 5–11; Lynch Decl. at ¶¶ 5–8; Tauler Decl. at ¶ 18, 26. The record includes examples of these lawsuits and settlements. *See, e.g.*, ECF No. 260-12 (containing two complaints filed in California and in Nevada); ECF No. 260-10 (containing a settlement agreement signed by Outlaw, Tauler Smith, and Skyline Market). Based on this conduct, the Enterprise obtained at least one million dollars in proceeds, which were distributed to its members and agents including Outlaw and Tauler Smith. ECF Nos. 292-1, 292-2, 292-3, 292-4. The Court thus concludes that each of the Outlaw Enterprise members named as defendants in the SACC acted with a "common purpose," as would be required to execute a scheme of this magnitude.

Second, the evidence also shows an "ongoing organization." *Odom*, 486 F.3d at 552. An ongoing organization is "a vehicle for the commission of two or more predicate crimes." *Id.* (quoting *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983)). Here, as discussed, the RICO predicate acts are the Enterprise's mailing of fraudulent

27

demand letters with the purpose of obtaining payments from the letters' recipients through thousands of small-dollar settlements or default judgments. *See also* ECF No. 190 at 10–13 (finding SACC adequately pleaded mail fraud involving the demand letters). Tauler Smith, at a minimum, played a significant role in drafting and sending the demand letters, after which the Enterprise filed suit against many of the stores as threatened in the letters. Wear Decl. at ¶ 6; Lynch Decl. at ¶ 6; Tauler Decl. ¶ 23. And, Mr. Wear avers that more than 4,000 letters were sent. Wear Decl. at ¶ 6. Most importantly, the above conduct was carried out by the Enterprise's agents or members "around the country" and "coordinated" by Tauler Smith. Lynch Decl. at ¶ 8; *Cf. Wimo Labs LLC v. eBay Inc.*, No. SA-CV-151330-JLS, 2016 WL 11507382, at *3 (C.D. Cal. Jan. 28, 2016) (finding that plaintiffs failed to allege "ongoing organization" where they alleged using sellers' use of eBay and PayPal's services, and not that the sellers, eBay, and PayPal worked together "in furtherance of a fraudulent or unlawful purpose"). This "coordinated" effort reflects an "ongoing organization" to the Enterprise. *Odom*, 486 F.3d at 552 (quoting *United States v. Qaoud*, 777 F.2d 1105, 1117 (6th Cir. 1985)).

Lastly, that the Enterprise's members operated as a continuing unit is not in dispute. As the Ninth Circuit remarked in *Odom*, an "almost two-year time span is *far more than adequate* to establish that [the Enterprise] functioned as a continuing unit." *Odom*, 486 F.3d at 553 (emphasis added). Here, Tauler Smith was engaged by Outlaw no later than November 2017 and terminated no earlier than January 2019. Tauler Decl. 5, 33. In addition, Tauler Smith also worked with JST Distribution, which it views as Outlaw's predecessor-in-interest, from at least July 2017. Tauler Decl. at ¶ 5; ECF No. 272-17 at 29–51 (wherein Tauler Smith bills Outlaw for work performed on behalf of JST). And, Tauler Smith provides evidence that Outlaw obtained some default judgments as recently as January 2020. Sergenian Decl. at ¶ 10; ECF No. 260-18 (containing various default judgments obtained as of January 3, 2020 in Michigan). Hence, the Enterprise's "various associates function[ed] as a continuing unit." *Odom*, 486 F.3d at 553.

The Court, moreover, finds Tauler Smith's arguments to the contrary unpersuasive. As to Tauler Smith's first argument, it is not clear to the Court why Tauler Smith's termination would indicate the non-existence of the Enterprise. ECF No. 260-1 at 26. The Court is unaware of any decision to support this argument. Rather, as the Supreme Court recognized in *Boyle*, "[m]embers of the [Enterprise] need not have fixed roles; different members may perform different roles at different times." *Boyle v. United States*, 556 U.S. 938, 948 (2009). And, "nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id.*

The Court is also unpersuaded by Tauler Smith's assertion that the Enterprise does not exist because the firm "only provided legal services to Outlaw Labs." ECF No. 260-1 at 27. In the Ninth Circuit, "entities engaged in 'ordinary business conduct and an ordinary business purpose' do not necessarily constitute an 'enterprise' bound by common purpose under RICO." *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016) (quoting *In re Jamster Mktg. Litig.*, No. 05-cv-0819-JM, 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009)). Where only that is shown or alleged, courts dismiss RICO actions. *See Gomez v. Guthy-Renker, LLC*, No. ED-CV-14-01425-JGB, 2015 WL 4270042, at **9–11 (C.D. Cal. July 13, 2015) (collecting cases).

However, that is not the case here. As the Court has already found, the Enterprise's conduct of sending fraudulent demand letters to further its scheme, if true, amounts to mail fraud, which in turn forms the basis of the Enterprise's pattern of racketeering conduct. ECF No. 190 at 10–13. Tauler Smith, moreover, does not contest preparing and mailing the fraudulent letters. Wear Decl. at ¶ 6; Lynch Decl. at ¶ 6; Tauler Decl. ¶ 23. The evidence also shows that Tauler Smith pursued litigation, obtained settlements, and won default judgments that resulted from the letters. Tauler Decl. at ¶¶ 23, 26, 28. And, one of the Outlaw principals, Mr. Lynch, avers that Tauler Smith "coordinated" the activities of other members of the Enterprise in this process. Lynch Decl. at ¶ 8. Thus, it does not appear that the Enterprise members, Tauler Smith included, engaged in

"ordinary business conduct" pursuant to "an ordinary business purpose." *Shaw*, 220 F. Supp. 3d at 1054. And, again, to the extent that any of these facts are disputed, they must be put to a trier of fact. *See Jones*, 2014 WL 12589550, at *5.

The slew of cases put forward by Tauler Smith do not support a different conclusion here. ECF No. 260-1 at 26–28. Each of these cases is distinguishable precisely because, unlike here, the subject allegations or facts did not provide a basis from which to find the RICO members acted in concert to do anything more than perform routine commercial activity. *Cf., e.g.*, *Shaw*, 220 F. Supp. 3d at 1057 (concluding that Defendants' sale of vehicles with a defective part did not evince a common, fraudulent purpose under RICO as plaintiff's allegations lacked "any specific facts" and defendants even attempted to correct the defect); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) (finding allegations evinced "a fraud perpetrated by [the defendant], not an association-in-fact enterprise directed and controlled by" that defendant, as plaintiff's allegations showed the other alleged member was "merely a conduit" for defendant's malfeasance); *In re Jamster Mktg. Litig.*, No. 05-CV-0819-JM, 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009) (finding that plaintiffs failed "to set forth sufficient allegations to distinguish ordinary business conduct from fraudulent conduct" as to the enterprise members individually); *Chagby v. Target Corp.*, No. CV 08-4425-GKH, 2008 WL 5686105, at *3 (C.D. Cal. Oct. 27, 2008), *aff'd*, 358 F. App'x 805 (9th Cir. 2009) (dismissing complaint where allegations did not support finding advertising agency member of the enterprise shared a common, fraudulent purpose with defendant); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, No. 2:11-CV-07166-MRP, 2012 WL 10731957, at *9 (C.D. Cal. June 29, 2012) (observing the various lenders' conduct did not evince an enterprise because they engaged in "arms-length business transaction[s], with each party pursuing its own independent economic interests").

Moreover, Tauler Smith's argument that there is no Enterprise because the alleged conduct falls within Tauler Smith's "primary business activities" – i.e., that Tauler Smith

and the Enterprise are not distinguishable – also fails. ECF No. 260-1 at 27. "To establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (a) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). Here, there is no distinctness concern in view of the Ninth Circuit's decision in *Living Designs, Inc.*, wherein the Ninth Circuit concluded that defendant DuPont and the law firms it employed were distinctive entities that could form an "associated-in-fact" enterprise. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361–62 (9th Cir. 2005). As in *Living Designs*, there is a "fundamental" difference between Outlaw's business – i.e., selling supplements – and the law firms it employed. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 826 F. Supp. 2d 1180, 1203 (C.D. Cal. 2011) (citing *Living Designs, Inc.*, 431 F.3d at 362). Also, as the Ninth Circuit observed in *Living Designs, Inc.*, the Model Rules of Professional Conduct govern all law firms, such that every firm is required to exercise independent, professional judgment. *Living Designs, Inc.*, 431 F.3d at 362 (citing Model Rules of Prof'l Conduct, Rule 5.4). Consequently, the Court concludes that "[t]his is not a situation where the enterprise cannot be either formally or practically separated from" its members. *Id.* (quoting *United States v. Benny*, 786 F.2d 1410, 1416 (9th Cir. 1986)).

For the foregoing reasons, the Court finds genuine issues of disputed fact on the existence of the Outlaw Enterprise.

### C. Injunctive Relief

Tauler Smith raises a final RICO challenge and argues that "injunctive relief is not available to private parties under the civil RICO statute." ECF No. 260-1 at 14. The Stores do not dispute this legal conclusion but instead argue that the issue is moot in the face of the proposed stipulated injunction between Outlaw Laboratories and the Stores.

The Court has yet to approve the proposed injunctive relief stipulation and, as such, the issue is not moot. Moving to the merits of this challenge, a "[c]ourt cannot

issue injunctive relief based on a civil RICO claim." ECF No. 250 at 7 (quoting *Hamana v. Kholi*, 2010 WL 3292953, at \*2 (S.D. Cal. Aug. 19, 2010)); *see also Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088 (9th Cir. 1986) ("Thus we conclude that Congress did not intend to give private RICO plaintiffs any right to injunctive relief."); *Cohen v. Trump*, No. 3:13-CV-2519-GPC, 2017 WL 1135556, at \*3 n.6 (S.D. Cal. Mar. 27, 2017) ("[I]njunctive relief is not available to private parties under the civil RICO statute.")  Accordingly, the Court finds that injunctive relief is not available under RICO and GRANTS Tauler Smith's motion for summary adjudication of this issue.

## IV.     Motion for Summary Judgement as to Skyline Market's Release

Tauler Smith contends that Skyline Market's RICO claim (and relief upon rescission) were extinguished the moment it signed the Settlement Agreement. ECF No. 260-10. The Stores contend, to the contrary, the Settlement Agreement is void as a product of economic duress and fraud or, in the alternative, that it does not extend to Skyline Market's counterclaim. For the reasons below, Tauler Smith's motion for summary judgment as to the rescission remedy is **DENIED**.

### A. The Settlement Agreement is Not Void for Economic Duress.

Skyline Market contends that the Settlement Agreement is void because it was obtained by means of economic duress. ECF No. 272 at 10–12; SACC at ¶¶ 47, 98. Tauler Smith argues that the undisputed facts show no evidence of duress: Skyline Market had a reasonable choice to litigate Outlaw's claim, and it instead settled. ECF No. 260-1 at 19–21. Tauler Smith is correct.

"Economic duress requires an unlawful or 'wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure.'" *See Hester v. Pub. Storage*, 49 Cal. App. 5th 668, 679, 263 Cal. Rptr. 3d 299, 308 (2020), *reh'g denied* (June 19, 2020), *review filed* (July 1, 2020) (citing *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1158, 1159 (1984)). "The wrongful act need not be "in the nature of a tort or crime." *Rich &*

1   *Whillock, Inc.*, 157 Cal. App. 3d at 1158. Rather, "[t]he assertion of a claim known to be

2   false or a bad faith threat to breach a contract or to withhold a payment may constitute a

3   wrongful act for purposes of the economic duress doctrine." *Id.* at 1159. Further, the

4   party must have had "no reasonable alternative to the action it now seeks to avoid

5   (generally, agreeing to contract)." *Lanigan v. City of Los Angeles*, 199 Cal. App. 4th

6   1020, 1034 (2011) (quotation omitted). And, "conclusory allegations of economic

7   hardship are insufficient to satisfy the second element of economic duress under

8   California law." *Osanitsch v. Marconi PLC*, No. CV-05-3988-CRB, 2009 WL 5125821,

9   at *6 (N.D. Cal. Dec. 21, 2009).

10       The party seeking relief from the contract bears the burden of showing that the

11   opposing party committed a "wrongful act" and that the act was sufficiently coercive.

12   *Ferdinando v. Intrexon Corp.*, No. 16-CV-01826-BTM, 2016 WL 6947060, at *6 (S.D.

13   Cal. Nov. 28, 2016) (quotation omitted). Hence, to prevail at summary judgment, Tauler

14   Smith must "either produce evidence negating an essential element of [economic duress]

15   or show that the nonmoving party does not have enough evidence of an essential element

16   to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz*

17   *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If Tauler Smith meets this initial

18   burden of production, Skyline Market must "produce enough evidence to create a

19   genuine issue of material fact" to survive summary judgment. *Id.* at 1103.

20       The Parties do not dispute the presence of a "wrongful act." The Court finds that

21   the Enterprises' sending of objectively baseless demand letters rises to this threshold

22   because the demand letters are the basis for the Stores' claim of mail fraud at the core of

23   the Enterprise's racketeering conduct. The act, moreover, need not be "in the nature of a

24   tort or crime." *Rich & Whillock, Inc.*, 157 Cal. App. 3d at 1158.

25       As to the second factor, Tauler Smith has met its burden. After receiving the

26   Outlaw Enterprise's demand letter, Mr. Mokou attended a meeting of retailers organized

27   by San Diego Cash & Carry, a local distributor, where an unidentified attorney told them

28

33

that Skyline Market had two options: "[e]ither fight it or either to settle it." ECF No. 260-19 at 8:11–12. Skyline market opted for the latter. Mr. Mokou explained that he "decided to settle" because "[i]t's better to spend that kind of money not going through attorneys." *Id.* at 9:1–3. Mr. Mokou also stated, "Nobody forced me. Of course not. But, you know, the decision that I have to make." *Id.* at 13:17–21. And, when Skyline Market ultimately paid $2,800 to settle the claim, it was represented by an attorney. *Id.* at 8:13–20; ECF No. 260-10 at 9 (photocopy of settlement check). These facts do not present a situation appropriate for voiding an agreement based on economic duress. *See In re Executive Life Ins. Co.*, 32 Cal. App. 4th 344, 391 (1995) ("Merely being put to a voluntary choice of perfectly legitimate alternatives" is the "antithesis of duress.")

In response, the Stores argue that litigating the action would not have been a reasonable alternative and rely on their counsel's estimate that doing so would have cost Skyline Market, at least, $16,000 in legal fees. Poe Decl. at ¶ 5; ECF No. 272 at 11. The Stores also argue that the settlement exploited Skyline Market's circumstances and offered no value by settling claims that was not truly actionable. ECF No. 272 at 12 n.5 (quoting *San Diego Hospice v. Cty. of San Diego*, 31 Cal. App. 4th 1048, 1058 (1995)).

This, however, does not create a genuine dispute of material fact because Skyline Market nonetheless failed to prove that litigating the action may have resulted in its "bankruptcy or financial ruin." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1119 (9th Cir. 2018) (quoting *Rich & Whillock, Inc.*, 157 Cal. App. 3d at 1158). Skyline Market has not shown that it could not afford Mr. Poe's estimated litigation costs at the time that the Parties signed the Settlement Agreement. In fact, Skyline Market offers *no* evidence of its income, assets, or liabilities at the time. Hence, the Court has no means of evaluating whether the cost of litigation would have been "unreasonable." *See Hester*, 49 Cal. App. 5th at 680 (finding that movant's claim of financial hardship lacked evidence in the record); *Osanitsch*, 2009 WL 5125821, at *7 (considering the party's financial status, earnings, and accumulated savings in determining whether the alternatives presented

34

were reasonable). At most, the record shows Mr. Mokou thought litigation could be financially onerous. ECF No. 260-10 at 13:17–21. But, that is not enough. *See Johnson v. Int'l Bus. Machines Corp.*, 891 F. Supp. 522, 529 (N.D. Cal. 1995) (requiring more than what movant "may subjectively have believed" to establish an unreasonable alternative).

The Stores' "conclusory allegations of economic hardship are insufficient to" show economic duress threshold. *Osanitsch*, 2009 WL 5125821, at *6. Accordingly, Court summarily adjudicates this issue in favor of Tauler Smith. The Stores' Settlement Agreement was not the product of economic duress.[2]

## B. There is a Genuine Dispute of Material Fact as to whether the Settlement Agreement May be Void for Fraud.[3]

The Stores argue that there is a genuine dispute of material fact as to whether the Settlement Agreement is void for fraud because the Enterprise obtained the Settlement Agreement without disclosing material facts that were not reasonably available to Skyline Market at the time and of which it was aware. ECF No. 272 at 13. For the reasons stated below, the Court concurs with the Stores.

A party may rescind a contract if its consent "was given by mistake, or obtained through duress, menace, fraud, or undue influence." Cal. Civ. Code § 1689(a). For

---

[2] Some California courts also require the party seeking relief for economic duress to show (1) that the other party "knew of [their] economic vulnerability" and (2) that the wrongful act "actually caused or induced" them to act. *Johnson v. Int'l Bus. Machines Corp.*, 891 F. Supp. 522, 529 (N.D. Cal. 1995); *see also San Diego Hospice v. County of San Diego*, 31 Cal. App. 4th 1048 (1995) (inferring four-part test from *Rich & Whitlock*). Because Skyline Market has failed to meet its burden in showing litigating Outlaw's claim would have been an unreasonable alternative, the Court need not reach these factors.

[3] The Court finds that this issue is properly before it now. Though the Stores contend that Tauler Smith "offers no argument against [fraud as a] basis for rescission," ECF No. 272 at 13, Tauler Smith makes a clear, if cursory, reference to the fraud argument in stating, "Skyline's allegations of fraud as a basis for rescission also fail." ECF No. 260-1 at 21. While Tauler Smith's argument could have been more developed, the Court is satisfied that Tauler Smith intended to raise it, especially given the relevance of the Parties' RICO discussions to an allegation of fraud. *See* ECF No. 280 at 8 n.4 (offering, in reply, that Tauler Smith views its discussion of RICO as "necessarily directed to Skyline Market's fraud allegations because the allegations of mail and wire fraud are the predicate bases for the Stores' RICO claims.").

fraudulent nondisclosure, the party seeking relief must show the opposing party "(1) failed to disclose a material fact which he knew or believed to be true; and (2) had a duty to disclose such fact." *Platypus Wear, Inc. v. Bad Boy Europe LTD*, No. 16-CV-02751-BAS, 2020 WL 375947, at *5 (S.D. Cal. Jan. 23, 2020) (citing *San Diego Hospice*, 31 Cal. App. 4th at 1055). "The duty to disclose arises when two elements are present: (1) the material fact is known to (or accessible only to) the defendant; and (2) the defendant knows the plaintiff is unaware of the fact and cannot reasonably discover the undisclosed fact." *Id.* (quotation omitted). "A duty to disclose may also arise in the so-called 'half truth' context—that is, when a speaker makes a representation which, though not false, he knows will be misleading absent full disclosure of additional facts known to him which qualify the initial representation." *San Diego Hospice*, 31 Cal. App. 4th at 1055 n.4 (quoting *McCue v. Bruce Enterprises, Inc.*, 228 Cal.App.2d 21, 25–26 (1964)). A fact is material if "a reasonable person would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question." *Weinstock Porter Dev., LLC v. Teixeira Farms, Inc.*, No. 2D-CIV-B-253455, 2016 WL 4155767, at *2 (Cal. Ct. App. Aug. 3, 2016) (quoting *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 977 (1997)) (brackets omitted). Materiality "is ordinarily a question of fact unless the nondisclosure is so obviously unimportant that the trier of fact could not reasonably find that a reasonable person would have been influenced by it." *Id.* (quotation marks omitted).

Applying this standard, the Stores are correct that there is sufficient evidence for the "factfinder" to conclude the Settlement Agreement is subject to rescission based on fraud. First, the draft complaint attached to Outlaw's demand letter claimed that Outlaw sold TriSteel at "storefront retail locations across the United States." ECF No. 272-6 at 27, ¶ 29. However, Outlaw later revealed that "TRI-STEEL is not sold at any retail locations other than online." ECF No. 272-7 at 3. Skyline Market could not have known this fact at the time, and this fact is material because it may have influenced Skyline

Market's assessment of Outlaw's claims, as the Stores contend. *See* ECF No. 272 at 13 (arguing that the allegation "bolster[s] the proximate cause nexus between Skyline Market's sale of the challenged products and 'TriSteel'").

While Outlaw's admission occurred about nine months after Skyline Market settled, *compare* ECF No. 272-2 at 4 (admission dated January 31, 2019) *with* ECF No. 260-10 at (Settlement Agreement dated May 4, 2018), it nonetheless provides for circumstantial evidence supporting Skyline Market's argument. *See Platypus Wear, Inc.*, 2020 WL 375947, at *5 (identifying conflict where party's response to request for admission contradicted other evidence). Mr. Wear and Mr. Lynch's declarations provide further evidence, as they aver that Outlaw sold "Tristeel in TF Supplements' retails stores in Texas or as an 'add on' to their electronic shipping car when buying through [the Outlaw] website" before the demand letters were sent. Wear Decl. at ¶ 8; Lynch Decl. at ¶ 8 (TriSteel "[i]nitially" only sold in storefronts located in Texas)

Alternatively, the Complaint's allegation can be understood as a misleading "half-truth" because it implied that Outlaw's products were sold in brick and mortar stores in California, and in many other states, while that may not have been true.[4] *See San Diego Hospice*, 31 Cal. App. 4th at 1055 n.4; *see also Cicone v. URS Corp.*, 183 Cal. App. 3d 194, 201 (1986) ("One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud."). This is supported by Tauler Smith's own evidence. In reply, Tauler Smith provides a December 2017 email from Mr. Tauler to Mr. Lynch asking to confirm whether "Plaintiff is the manufacturer of competing products called 'TriSteel' and 'TriSteel 8hour,' which are all natural male enhancement products made in the USA and sold in hundreds of retail stores in all 50 US States." ECF No. 280-2 at 10. Mr. Lynch responded, "[d]istributed in all 50 states" and

---

[4] At the September 11, 2020 hearing on this motion, counsel for Tauler Smith acknowledged that other than a brick and mortar location in Texas, there were no other retail locations in the United States.

"[w]e don't have 100 retail location selling tri steel but we have shipped everywhere." *Id.* This response is plainly different than stating the product was sold at "storefront retail locations across the United States." ECF No. 272-6 at 27, ¶ 29. Moreover, that Mr. Lynch did not expressly confirm TriSteel was sold at storefronts in all 50 states, and instead was only "[d]istributed" nationally, undercuts the veracity of Outlaw's allegation in the complaint that Skyline Market received. ECF No. 280-2 at 10.

This evidence creates a genuine dispute issue of material fact as to whether Outlaw failed to disclose a material fact that it knew to be true and had a duty to disclose because Skyline Market could not have reasonably discovered it at that time or because Outlaw offered a misleading "half-truth."[5] *San Diego Hospice*, 31 Cal. App. 4th at 1055.

## C. There is a Genuine Dispute of Material Fact as to whether the Settlement Agreement Released Skyline Market's RICO Claim.

Lastly, the Court considers whether the Release at issue reaches Skyline Market's RICO claim. "An obligation is extinguished by a release therefrom given to the debtor or the released party by the creditor or releasing party, upon a new consideration, or in writing, with or without new consideration." Cal. Civ. Code § 1541. "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party." Cal. Civ. Code § 1542.

---

[5] Tauler Smith also argues briefly that Skyline Market has not shown reliance. ECF No. 280 at 8. Tauler Smith offers no authority to suggest reliance is required, which seems suspect in the context of a *non*disclosure. *Cf. Azam v. Wells Fargo Bank, Nat'l Ass'n*, No. 8:14-CV-00456-PSG, 2015 WL 13446785, at *9 (C.D. Cal. Jan. 13, 2015), *aff'd sub nom. Azam v. Wells Fargo Bank, N.A.*, 677 F. App'x 326 (9th Cir. 2017) (requiring "justifiable reliance" as the fourth element of a cause of action for *intentional* misrepresentation). Nonetheless, to the extent reliance is required here, the Court concludes that Mr. Mokou's acknowledgment of reviewing Outlaw's demand letter (which included the complaint) is sufficient to create a reasonable dispute of fact as to reliance. ECF No. 260-19 at 8; ECF No. 272-6 at 27, ¶ 29.

A "general release can be completely enforceable and act as a complete bar to all claims (known or unknown at the time of the re-lease) despite protestations by one of the parties that he did not intend to release certain types of claims." *Wallack v. Idexx Labs., Inc.*, No. 11-CV-2996-GPC, 2015 WL 1727875, at *6 (S.D. Cal. Apr. 15, 2015), aff'd, 726 F. App'x 567 (9th Cir. 2018) (quoting *San Diego Hospice*, 31 Cal. App. 4th at 1053; *see also Winet v. Price*, 4 Cal. App. 4th 1159, 1173 (1992). "In determining the enforceability of a release, courts consider (1) whether the parties are represented by counsel; (2) whether the releasor was aware of any potential claims, and (3) whether the releasor with this awareness of the second factor, and advice of counsel, the releasor agreed to release unknown claims explicitly waiving the protection of Civil Code section 1542." *Wallack*, 2015 WL 1727875, at *6 (citation omitted).

First, Tauler Smith has met its initial burden in showing that the Settlement Agreement may extend to Skyline Market's claim pursuant to Cal. Civ. Code § 1541. On May 4, 2018, Skyline Market executed a Settlement Agreement with Outlaw Laboratory, ECF No. 260-10, in which the Parties mutually released one another and their "present and former attorneys" from "claims related to the Claims, Demand Letters, and matters set forth" in the Settlement Agreement's "Recitals" section. ECF No. 260-10 at ¶ 3.1. Tauler Smith represented Outlaw at the time, and thus is covered by the express terms of the release clause. Skyline Market's RICO counterclaim, moreover, is predicated on the Enterprise's demand letter, which it received and which is referenced in the "Recitals" section of the Settlement Agreement. *Id.* at ¶ 1.3.

The Stores, nonetheless, raise a disputed issue of material fact as to the second factor in *Wallack*. First, the record supports an inference that Skyline Market was unaware of the facts to support a RICO counterclaim. As the Court observed in granting the Stores' motion to amend their counterclaims and add Tauler Smith, Mr. Wear, and Mr. Lynch as third-party defendants, written discovery and investigative reporting by Vice News, which took place after the Settlement Agreement was signed, produced "new

information" regarding the roles of the Enterprise members. ECF No. 113 at 5, 8–12. It is irrelevant, as Tauler Smith observes, that the Court made this observation in the context of considering delay. ECF No. 280 at 8–9. And, the evidence advanced by the Stores creates a factual dispute here. *See* ECF No. 98-1 at ¶ 3 (declaration of Mr. Poe explaining how he obtained the information); ECF Nos. 98-3, 98-4, 98-5.

Here, Tauler Smith claims that the deposition shows Mr. Mokou's counsel informed him that the FDA letters were "a warning to [the] consumer, not to the retailers," and thus the threats in the demand letters were false. ECF No. 260-1 at 18, 19 (quoting ECF No. 260-19 at 19:9–12.) The transcript, however, indicates that the advice actually came from a "friend" and does not state when that occurred. In addition, the transcript also shows Mr. Mokou was "not aware" of a specific FDA warning, ECF No. 260-19 at 6:13–22, and did not investigate Outlaw's claims beyond attending a meeting with a distributor. *Id.* at 19:2–4. Thus, the transcript evinces the presence of a disputed issue of material fact insofar as it supports both Tauler Smith's and the Stores' positions as to what Mr. Mokou knew.

The Court thus finds there is a genuine dispute of material fact as to whether Skyline Market was aware of its RICO claim at the time the settlement was reached. *Wallack*, 2015 WL 1727875, at *6.

**V.     Evidentiary Objections**

Both Tauler Smith and the Stores have included numerous objections to each other's factual arguments in the statements of undisputed fact. *See generally* ECF No. 272-1, 280-1, 280-3. The Court notes these objections. To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence. To the extent that the evidence is not proper, the Court did not consider it.

Separate from these objections, Tauler Smith briefed a specific objection to the declaration of Mr. Joseph Valerio. ECF No. 280-4; ECF No. 272-19. There, Tauler Smith argues that Mr. Valerio's statements rely upon and reveal attorney work product, and thus

40

cannot be considered by the Court. Tauler Smith requests that the declaration be stricken. Assuming without deciding that Tauler Smith's arguments are correct, and because the Court does rely on Mr. Valerio's declaration for the purposes of deciding this Order, the Court **GRANTS** Tauler Smith's request to strike the declaration.

The Court presumes that Stores will rely on Mr. Valerio's testimony at trial and that Tauler Smith will object. The Court will take up any such objection during the motions *in limine* phase leading up to trial.

## VI.   Conclusion

For the reasons explained in this Order, the Court **DENIES** Tauler Smith's motion for summary judgment, except as to the unavailability of injunctive relief under RICO. First, there are genuine disputes of material fact as to the "conduct" and "enterprise" elements of RICO. Consequently, summary adjudication on the RICO causes of action is inappropriate. Second, the Court finds that there are genuine disputes of material fact as to whether Skyline Market's release extends to its RICO counterclaim, and whether the Release is void for fraudulent non-disclosure. Consequently, summary adjudication on Skyline Market's rescission remedy is also inappropriate. As to the settlement, the Court does summarily adjudicate one issue in this Order: Skyline Market's settlement agreement was not the product of economic duress.

**IT IS SO ORDERED.**

Dated:  September 16, 2020

Hon. Gonzalo P. Curiel
United States District Judge