MARK POE (Bar No. 223714)
  mpoe@gawpoe.com
RANDOLPH GAW (Bar No. 223718)
  rgaw@gawpoe.com
VICTOR MENG (Bar No. 254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Roma Mikha, Inc., NMRM, Inc. and Skyline Market, Inc.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: OUTLAW LABORATORY, LP LITIGATION | Case No. 3:18-cv-840-GPC-BGS<br><br>**THE STORES' TRIAL BRIEF**<br><br>Trial:   March 14, 2023<br>Time:   8:30 a.m.<br>Judge:  Hon. Gonzalo Curiel<br>Court:  2D |

# INTRODUCTION

In this trial, three convenience stores (Roma Mikha, Inc.; NMRM, Inc.; and Skyline Market, Inc) will prove that Defendant[1] Tauler Smith LLP violated two provisions of the RICO Act (sections 1962(c) and 1962(d)), by conducting the affairs of an association-in-fact RICO Enterprise to engage in a scheme of mail fraud to obtain quick settlements from hundreds of convenience stores around the country over their offering for sale of so-called "sexual enhancement pills." The Stores will show that the members of the alleged "Outlaw Enterprise" (including Outlaw Laboratory, Tauler Smith LLP, and Outlaw's owners Michael Wear and Shawn Lynch) jointly devised and perpetrated a scheme by which Tauler Smith would send "demand letters" to stores that offered the pills for sale, threatening to sue the stores unless the store would agree to pay a small settlement. The evidence will show that the form Demand Letter and its attachments (all of which were sent by Tauler Smith on its letterhead) contained a series of statements that were by turns false, half-true, and rife with omitted facts, and thereby sufficient to constitute RICO predicate acts of mail fraud under 18 U.S.C. § 1341.

In this trial brief, we recite the relevant procedural and factual background, the issues to be tried, and how we anticipate the trial to unfold.

# PROCEDURAL BACKGROUND

The action was initiated on July 25, 2018, when Tauler Smith, on behalf of Outlaw Laboratory, filed a complaint in San Diego County Superior Court against dozens of convenience stores that had received Tauler Smith's demand letter, but

---

[1] Given that this action began with a complaint filed by Outlaw Laboratory against dozens of convenience stores, the precise party denominations are somewhat complicated. Tauler Smith is technically a third-party counterclaim defendant and the Stores are one defendant-counterclaimant and two third-party plaintiffs. While not precisely correct, in this brief and throughout the trial, we refer to the Stores as the "plaintiffs" and Tauler Smith as the "defendant."

declined to pay. Thereafter, the Stores' counsel were advised by a San Diego client that several of its retail-store customers had received Tauler Smith's demand letter, and that some of them had thereafter been sued in the Superior Court complaint.

In those letters, Tauler Smith threatened to sue the stores over their offering for sale of one or more "sexual enhancement pills." The letter threatened suit under RICO and the Lanham Act, and asserted that the Store would be "liable for over $100,000 if we prosecute this matter to a jury trial." It then offered the store owner an easy way out: It could "settle" the claims Tauler Smith threatened for a far smaller amount (e.g., $14,000 in the case of Plaintiff Skyline Market, $9,765 for NMRM, $9,765 for Roma Mikha). But the stores needed to act quickly, because "the offer will double if we are forced to file a formal lawsuit," and would be withdrawn entirely if that lawsuit lasted for more than a month.

On August 9, 2018, the Stores' counsel wrote a letter to three attorneys from Tauler Smith, advising that their conduct was likely a RICO violation of its own, but offering that if the enterprise members would "abandon further pursuit of this scheme and dismiss all of the enterprise's pending litigation," then "you can go on your way." Tauler Smith's principal Robert Tauler responded by email eleven minutes later, rejecting that proposal: "Just because you don't understand something doesn't mean it's a bad thing. Do some research on our claims like a real lawyer and stop sending me stupid letters."

After being engaged by Roma Mikha (among the defendants in the Superior Court action), the Stores' counsel removed the Superior Court action to this Court, and thereafter filed counterclaims against Outlaw Laboratory by Roma Mikha, and third-party claims by NMRM and Skyline Market, alleging a putative class action. Roughly a year later following further factual investigation, the Stores filed the operative pleading, the Second Amended Counterclaims, which added the previously unnamed members of the Outlaw Enterprise—Michael Wear, Shawn Lynch, and Tauler Smith—as defendants. ECF No. 114. Through a motion for summary

judgment and judgment on the pleadings, Outlaw Laboratory's underlying claims against the dozens of stores represented by the Stores' counsel were dismissed. *See* ECF Nos. 147, 251.

After the Stores had filed their motion for class certification but before it was decided, Outlaw Laboratory, Michael Wear, and Shawn Lynch agreed to settle the claims against them on an individual basis. ECF No. 249. The Court thereafter denied the Stores' motion for class certification of their remaining claims against Tauler Smith, and denied Tauler Smith's motion for summary judgment. ECF No. 260. Accordingly, Tauler Smith is the only member of the Outlaw Enterprise that faces trial.

## FACTUAL BACKGROUND

The owners of Outlaw Laboratory first encountered Robert Tauler when Tauler Smith sent them a demand letter alleging that their prior business, TF Supplements, was offering to sell a nutritional supplement that contained an undisclosed or illegal ingredient. Those owners—Michael Wear and Shawn Lynch— agreed to pay Tauler Smith $9,000 to "settle" those threatened claims.

Thereafter, a friend of Mr. Wear's called James Stovall launched a "male enhancement" product called "Powerful Desire," through a company he owned called JST Distribution. JST Distribution engaged Tauler Smith on contingency to pursue litigation against a number of websites that sold male enhancement products online beginning on March 28, 2017, evidently under a version of the same scheme at issue in this case; threatening those websites with the claim that the pills they sold contained prescription ingredients that "unlawfully competed" with Powerful Desire. Mr. Wear and Mr. Lynch assisted Mr. Stovall in handling that litigation. When Tauler Smith's legal fees and JST's investigation costs grew too high, another law firm named the Pulaski Law Firm agreed to provide approximately $1 million in funding to continue this litigation.

As Tauler Smith's former bookkeeper Joseph Valerio has testified by

declaration, an issue that JST faced when sending out demand letters and filing lawsuits was that a number of enterprising defendants called the bluff on JST's *bona fides*, pointing out that the company had only been created on March 22, 2017, and then started filing lawsuits just a month later, in April 2017. To Mr. Valerio's understanding, "that vulnerability was a major reason for why the scheme was turned over to Outlaw Laboratory (whose owners were friends with James Stovall, the owner of JST Distribution)," because "[i]t was expected that Outlaw Laboratory would be less vulnerable to that argument, given that it had been founded in October 2016."

Accordingly, in November 2017, Outlaw Laboratory switched places with JST Distribution, by entering a one-page "Addendum to Engagement Agreement and Assignment of Interests," under which Outlaw would stand in JST's shoes, and agree to be bound by JST's prior engagements of Tauler Smith. The evidence as to the timing of the development of Outlaw Laboratory's "male enhancement" pill TriSteel remains murky. It appears that it may have been developed and offered for sale in the same timeframe as "Powerful Desire," but that evidence remains vague. In any event, once Outlaw had been swapped out for JST, Tauler Smith's demand letters came to be nominally predicated on TriSteel, rather than Powerful Desire. Nevertheless, the targets for the new Outlaw Laboratory demand letters remained those whose identities and locations had been developed when the "client" of the enterprise had been JST Distribution.

Outlaw appears to have taken only minimal effort to monetize TriSteel apart from serving as a predicate for the scheme. TriSteel was sold only through TF Supplements' retail stores in Texas, and evidently through no other physical storefronts. Outlaw also sometimes offered it as an "add on" to a customer's electronic shopping cart when buying through the website outlawlaboratory.com. Eventually, Outlaw began selling TriSteel directly on their website, though Mr. Lynch does not recall when they created a TriSteel landing page. Outlaw did not

advertise TriSteel online. We expect that the evidence at trial will show that Outlaw's marketing of TriSteel came to a complete stop once the Stores' claims gained steam—strongly supporting the inference that TriSteel's only real purpose was as an artifice around which to support the conduct of the Enterprise.

In any event, now under the auspices of Outlaw Laboratory, Tauler Smith drafted a demand letter that could be sent to retail stores on behalf of Outlaw Laboratory. Mr. Wear states that Tauler Smith expected that "this project" could make as much as $10 million. The Stores do not know the total dollar volume of *bona fide* sales of TriSteel, but expect Mr. Wear and Mr. Lynch to testify that it was a tiny fraction of the amount Tauler Smith had estimated would by yielded by the Enterprise's "project."

Tauler Smith's demand letters accused the recipient of selling "illegal" products which could subject the store to liability through "legal action for racketeering and unfair business practices under RICO (Racketeer Influences Corrupt Organizations) and the Federal Lanham Act." The letters further stated that Outlaw would be "entitled" to "profits from the sale" of the products dating back four years, attorney's fees, punitive damages, and triple damages. The letter estimated liability upwards of $100,000 and then offered a much smaller sum ($14,000 in the case of Skyline Market, and $9,765 to the other two) to settle and stop selling the products. The letter further threatened that the offer would "double" if Outlaw were "forced to file a formal lawsuit, and the offer [would] be withdrawn if litigation exceeds one motion in duration." The letters threatened that recipient stores had two weeks to respond or Tauler Smith would file suit.

The demand letters were accompanied by a draft complaint that was authored by Tauler Smith. The draft complaint alleged that Outlaw sold TriSteel at "storefront retail locations across the United States." In response to a request for admission signed by Tauler Smith on behalf of Outlaw, Outlaw later revealed that this was false, stating "TRI-STEEL is not sold at any retail locations other than online." The

allegation in the draft complaint was knowingly false. Prior to sending the demand letter to these stores, Mr. Tauler inquired as to where TriSteel was sold, and Mr. Lynch responded only that TriSteel was "[d]istributed in all 50 states" and that "[w]e don't have 100 retail location selling tri steel but we have shipped everywhere." Also telling of the knowing falsity of this allegation is that on the occasions that Tauler Smith ended up filing a complaint against stores that had refused to settle, it omitted the allegation that TriSteel is sold at "storefront retail locations across the United States." In other words, Tauler Smith deemed the allegation useful for tricking its targets' proprietors (and perhaps any attorneys advising them), but deemed it too risky to include that false averment in pleadings filed before a court with Rule 11 powers.

Outlaw's owners have testified by declaration that they had little input as to the content of the demand letters that Tauler Smith sent to the retail stores. They also had little role in deciding which stores to send the demand letters to, and which stores to thereafter sue. Tauler Smith did not provide Outlaw with copies of each letter that it sent nor did Tauler Smith communicate how many were sent. Mr. Wear estimates Tauler Smith sent 4,000 demand letters. Outlaw's role in selecting targets was so limited that "if one listed off a name of a demand letter recipient, [Mr. Wear] would not know their geographic location, what products they sold, whether they had an online presence, or any other such details."

Outlaw's owners have testified by declaration that they were never aware of how many settlements were obtained or how much money was collected by the scheme. They did not receive regular accountings of the scheme's proceeds, nor have they ever received a full accounting of where the money went. While one or another of Outlaw's owners evidently applied his electronic signature to each settlement, Tauler Smith did not provide them with copies of each of the fully executed settlements. From piecing together what seems to be a partial list of Tauler Smith invoices, the Stores have identified at least $1,183,886.13 in proceeds received

between April 2017 and December 2018. *See* ECF Nos. 292-1, 292-2, 292-3, 292-4. At least through that period, it appears that every settlement payment that the scheme yielded was made out to Tauler Smith (even where it was the result of cases filed by law firms in other states). Moreover, the scheme continued operating in other states up through mid-2020, when Outlaw's owners agreed to bring it to an end as part of their settlement. In any event, Mr. Wear has testified by declaration that Outlaw Laboratory received only approximately $120,000 from the scheme, or around 10% of the proceeds received by Tauler Smith. In discovery and despite multiple motions to compel filed by the Stores, Tauler Smith has never been forced to disclose the total amount of the scheme's proceeds that it retained for itself.

The three Stores each had a slightly different experience with Tauler Smith. NMRM ("Sunset Liquor") received the demand letter but was never sued. Roma Mikha ("Bobar #2 Liquor") received the demand letter and was sued in the Superior Court case that underlies this action, and thereafter defeated Outlaw's claims via MJOP. Skyline Market received the demand letter and "settled" the $14,000 demand against it for $2,800, via check payable to Tauler Smith.

## I.   ISSUES TO BE TRIED

In the Stores' view, there are only four main issues to be tried:

(1) Tauler Smith's liability for conducting the affairs of a RICO enterprise through a pattern of mail fraud in violation of 18 U.S.C. § 1962(c);

(2) Tauler Smith's liability for conspiring to violate § 1962(c), in violation of 18 U.S.C. § 1962(d);

(3) Whether Skyline Market is entitled to rescission-by-fraud of the release language in the settlement agreement between it and Outlaw Laboratory; and

(4) If Tauler Smith is found liable, the Stores' damages.

Each of these issues is covered by a clear model jury instruction that the Stores have proposed. The RICO instructions come from the Eleventh Circuit's March 2022 Pattern Jury Instructions, which are referenced by the Ninth Circuit's Manual of

Model Civil Jury Instructions. The rescission-by-fraud instruction comes from the Judicial Council of California Civil Jury Instructions (2020 ed.), and the damages instruction comes from the Ninth Circuit's Manual of Model Civil Jury Instructions.

The jury should be charged with each element of the model instructions that the Stores have proposed, since to the Stores' understanding none of them has yet been decided as a matter of law. While it seems unlikely that any of the elements of these instructions will be resolved as a matter of law as the evidence comes in at trial, the parties would of course be free to debate the details of the final instructions at the instruction settlement conference.

## II.   TRIAL EXPECTATIONS

### A.   The Stores' Witnesses

As their party witnesses, the Stores will call Raid ("Roy") Mikha as the corporate representative for Roma Mikha (which will be referred to by its DBA of "Bobar No. 2 Liquor") and NMRM (referred to by its DBA "Sunset Liquor"). For Skyline Market they will call its corporate representative Fred Mokou.

As third parties, the Stores intend to call corporate representatives for three other exemplary recipients of Tauler Smith's demand letter, who were also named as defendants in the underlying Superior Court action. The Stores will also call Mr. Wear and Mr. Lynch to explain the origins and operations of the scheme from their perspectives, and the contours of the Outlaw Enterprise. For that same purpose, the Stores will also call Joseph Valerio, who had served as Tauler Smith's independently contracted bookkeeper during the main time period of the scheme's operations, and thereby had first-hand knowledge of its operation from within Tauler Smith. The Stores also intend to call Robert Tauler in their case in chief, to cross examine him about Tauler Smith's role in conducting the affairs of the Outlaw Enterprise.

The Stores expect to complete their case in chief by the middle to end of the day on the 16th, depending largely on (A) how long it takes to seat the jury, and (B) the length of Tauler Smith's cross examinations.

### B. Motions in Limine

The Court has granted five important motions *in limine* that the Stores filed back when the case had been set for trial in March 2022. *See* Order Vacating Trial Date and Granting Plaintiff's Motions In Limine (ECF No. 397). In the ordinary case it might not be necessary to recite such rulings in a trial brief. But the Court may recall that there had been some trouble at Mr. Tauler's deposition with respect to decorum and rule-following. As Outlaw Laboratory's counsel described it in a subsequent declaration:

> 3. As noted in Paragraph 1, I have tried 39 cases in my career, and by extension, I have attended hundreds of depositions. Mr. Tauler's conduct during his deposition was one of the most shocking displays of unprofessional behavior by an attorney that I have seen in my 15-year career. As I explained in a brief to the Court shortly after the deposition concluded, in addition to the matters captured in the transcript, Mr. Tauler for a time displayed a picture of Mr. Poe from Mr. Poe's personal Facebook account as his virtual background, and proclaimed that he had "wiped [his] ass" with a letter that counsel had sent him. Dkt. No. 253 at 2.

ECF No. 275-01 at 1.

At the risk of sounding defensive—but as necessary to alleviate any "both sides" suspicions the Court may have—Mr. Reagan (*i.e.*, the Stores' opposing counsel) further declared:

> 4. Page 3 of Tauler Smith's opposition brief claims that "[d]uring the deposition, Mr. Poe was mocking and taunting of Mr. Tauler." I attended the entire

> deposition, and watched it live on my monitor. The only mocking and taunting that was going on was by Mr. Tauler himself, who did so throughout his deposition. Mr. Poe, in contrast, remained remarkably reserved and professional throughout. I don't know if I would have displayed such patience if I were the one questioning Mr. Tauler. As for Tauler Smith's claim that counsel made a "kissing gesture" at Mr. Tauler, I didn't see Mr. Poe making any face that could be described as a "kissing gesture." I would describe Mr. Poe's reaction as being confused, or perhaps amused, by Mr. Tauler's extended rant about his plans to "destroy" Mr. Poe, in response to a question that merely asked him to authenticate an exhibit. To my perception he made no reaction that could fairly be described as a "kissing gesture."
>
> 5. Over the eight months between the time that I appeared in this case for Outlaw and our settlement with the Stores, Mr. Poe and I engaged in numerous meet-and-confer discussions, and had many other interactions both over email and in person. I found Mr. Poe to be consistently cordial and professional in all of those interactions, despite our clients being adversaries. For example, Mr. Poe routinely granted extension requests with respect to briefing and other deadlines, and was continuously understanding of the difficulties myself and my clients faced in producing documents, in light of Tauler Smith's unwillingness to provide its own former clients with their case file, or any accounting of the money taken in through the project, as described at length in the declaration I filed with the Court on June 23, 2020. Dkt. No. 241.

*Id.* at 1-2.

All of this is to say only that the Stores' counsel is anxious that Mr. Tauler will have trouble abiding by the Court's orders as to the several matters that are not to be presented to the jury in this case as a result of the order on the Stores' *in limine* motions. It thus seems useful for the Court to have those rulings at hand via this trial brief. The Court ordered the following matters excluded:

### 1. Motion in Limine No. 1: Amount of Outlaw Settlement

The Court ordered that while the fact of the settlement between the Stores and Outlaw and its owners is admissible, the amount of that settlement is to be excluded. ECF No. 397 at 2.

### 2. Motion in Limine No. 2: Criminal Prosecutions of Others

The Court excluded two categories of evidence relating to criminal proceedings: (1) the prosecutions of any persons related to the sale or distribution of pills similar to those at issue in this case, and (2) "Michael Wear's indictment for conspiracy to distribute marijuana and an order setting Wear's bail conditions." *Id.* at 2-3.

### 3. Motion in Limine No. 3: Denials of Demurrers and Motions to Dismiss in Other Outlaw Cases

The Court excluded evidence that any other complaints filed by Outlaw Laboratory had survived pleadings challenges. Tauler Smith had apparently sought to introduce such evidence to bolster the legitimacy of the assertions it made in the demand letters, but the Court deemed such proceedings to "have very little probative value" as to the issues in this case, and to "have a high likelihood of confusing the jury." *Id.* at 4.

### 4. Motion in Limine No. 4: Health Effects Attributed to Subject Pills

The Court excluded "evidence or arguments as to adverse health effects allegedly caused by the sexual enhancement pills at issue." *Id.* at 5.

### 5. Motion in Limine No. 5: Matters Relating to Gaw Poe LLP

Strictly speaking, the Court's order on this point excluded only (1) Tauler Smith's proposed Exhibit Z (a wire transfer to Gaw | Poe related to another case), and (2) calling the undersigned as a witness. *Id.* at 6-8.

Nevertheless, the spirit of that exclusion order would seem to extend to testimony by Mr. Tauler that denigrates or otherwise attacks counsel for the Stores. Because requiring the undersigned to "object" to such testimony comes with the risk

of lending credence to the anticipated accusations, the Stores respectfully request that the Court independently keep a close watch on Mr. Tauler's testimony, and be prepared to intervene when it crosses the line of relevance to the disputed issues.

Dated: March 1, 2023              GAW | POE LLP

                                  By:   s/ *Mark Poe*
                                        Mark Poe
                                        Attorneys for the Stores

**CERTIFICATE OF SERVICE**

Case No. 3:18-cv-840-GPC-BGS

I HEREBY CERTIFY that on the date stamped in the header above, I filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the following document is being served this day either by Notice of Electronic Filing generated by CM/ECF or by U.S. mail on all counsel of record entitled to receive service.

GAW | POE LLP

By:  s/ *Mark Poe*
Mark Poe
Attorneys for the Stores