MARK POE (Bar No. 223714)
  mpoe@gawpoe.com
RANDOLPH GAW (Bar No. 223718)
  rgaw@gawpoe.com
VICTOR MENG (Bar No. 254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for the Stores

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE OUTLAW LABORATORY, LP LITIGATION | Case No. 3:18-cv-840-GPC-BGS<br><br>**THE STORES' OPPOSITION TO TAULER SMITH'S MOTION FOR JUDGMENT AS A MATTER OF LAW**<br><br>Trial Date: June 16, 2023<br>Time: 1:30 a.m.<br>Judge: Hon. Gonzalo Curiel<br>Courtroom: 2D |

# INTRODUCTION

Tauler Smith's motion for judgment as a matter of law ("JMOL") presents only a single argument: That the Court should vacate the jury's verdict because the evidence before the jury was insufficient for it to find that Tauler Smith "acted with the intent to defraud" the Stores. Mem. at 5. In the same breath, however, Tauler Smith recognizes that in the context of the mail fraud statute at issue, "'[t]he intent to defraud may be inferred from a defendant's statements and conduct.'" *Id.* (quoting *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992)). Of course there was abundant evidence from which the jury could have (and did) infer that Tauler Smith acted with fraudulent intent, from the firm's misleading description of the FDA notice letters, to its unfulfilled threat of a "legal action for racketeering," to its "estimate" that Sunset Liquor, Bobar 2, and Skyline Market would *each* be "liable for over $100,000," if Tauler Smith sued them, to the phony claim in the draft complaint that TriSteel was sold in "storefront retail locations across the United States." Cole Decl. Ex. B at 21 (ECF No. 438-4).

On top of that series of deceptive statements from the demand letters, the jury was further entitled to infer Tauler Smith's deceptive intent from its failure to present any firm partner or employee to deny such intent. *See Winckler & Smith Citrus Prod. Co. v. Sunkist Growers, Inc.*, 346 F.2d 1012, 1015 (9th Cir. 1965) ("Appellant, by its failure to deny or repudiate has made available an inference that appellee was correct."). Because Tauler Smith chose not to call any witnesses to testify as to its intent one way or the other, the jury was left to make inferences about Tauler Smith's intent from the deceptive statements it wrote. The Stores recognize that different juries could come out differently on that question, but the Court can only grant a post-trial JMOL if it concludes that there was *no* evidence from which the jury could have inferred that Tauler Smith "acted with the intent to defraud; that is, the intent to deceive and cheat." Jury Inst. 14 (ECF No. 426 at 19). Based on the abundant evidence before it, this jury was eminently reasonable in inferring such intent.

## LEGAL STANDARD

The Stores agree with Tauler Smith's recitation of the legal standard on Rule 50, and agree that Tauler Smith preserved at the 50(a) stage the argument it now makes in its 50(b) motion. So the only issue before the Court is embodied in the following rule: "A renewed motion for judgment as a matter of law is properly granted only 'if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.'" *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1036 (9th Cir. 2018) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016)).

## ARGUMENT

**I.  TAULER SMITH'S DECEPTIVE STATEMENTS IN THE DEMAND LETTER ARE A SUFFICIENT BASIS TO INFER AN INTENT TO DECEIVE.**

A curious part about Tauler Smith's argument is that while it recognizes that "'[t]he intent to defraud may be inferred from a defendant's statements,'" (Mem. at 5 (quoting *Peters*, 962 F.2d at 1414)), the body of its brief ignores the main source of Tauler Smith's statements: the demand letters that were the genesis of this entire action. Tauler Smith declares only that "nor could that intent be inferred from the demand letters themselves," Mem. at 5, and then launches into an inventory of the testimony from the several witnesses, arguing that none of *them* testified that Tauler Smith acted with deceptive intent. But why *couldn't* deceptive intent be inferred from the text of the demand letters? As noted above, the controlling precedent holds that it can be. *Peters*, 962 F.2d at 1414; *see also Eclectic Properties East v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014) (quoting *Peters*). Tauler Smith's brief nowhere explains why the jury was prohibited from using its statements to infer its intent.

To assess whether there was sufficient evidence from which the jury could have inferred fraudulent intent by Tauler Smith, it is important first to bear in mind

the liberal standard for liability under the mail fraud statute. Ninth Circuit authority is very clear that "'[i]t is only necessary to prove that it is a scheme reasonably calculated to deceive.'" *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (quoting *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967)). Under that standard, "'schemes are condemned which are contrary to public policy or which fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.'" *Id.* (quoting *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980)). And as the jury was correctly instructed, "[d]eceitful statements of half-truths may constitute false or fraudulent representations." Jury Inst. 14 (ECF No. 426 at 18).

The question then, is only whether a reasonable juror could review the several challenged statements in the demand letters that formed the heart of the Stores' claims, and conclude—by a preponderance of the evidence—that Tauler Smith had the intent to "deceive" when it wrote them. *Id.* This is not even a close question. We now inventory the several statements from the demand letters that the Stores argued were deceptive, explaining why each of them (or all of them combined) could have supported an inference of deceptive intent by Tauler Smith, the letter's author. *See* Poe Decl. Ex. B (3/15 Tr. 334:25-335:3) (Mr. Valerio testifying that Mr. Tauler "drew up" the "form letter").

### A. "As you can see, the Illicit Products are illegal to sell"

After identifying Tauler Smith's client and the subject matter of the correspondence, the demand letters referenced attached pictures from the target store as "Exhibit A," and as "Exhibit B" referenced attached "notices from the Food and Drug Administration regarding the illegality of the Illicit Products." In the very next sentence Tauler Smith told the stores: "*As you can see*, the Illicit Products are illegal to sell **and** subject your company to legal action for racketeering[.]" Cole Ex. B at 2

(emphasis added) (ECF No. 438-4).[1]  But as the jury heard and saw over and over, none of the dozens of FDA notices said that the pills "are illegal to sell," or that selling them would "subject your company to legal action for racketeering."  Tauler Smith nevertheless sought to deceive the store owners into believing that that was what the FDA notices said, by using the phrase "as you can see," to invoke the FDA's imprimatur.  *See Woods*, 335 F.3d at 998 (explaining that no outright falsehood is necessary, because "[t]he arrangement of the words, or the circumstances in which they are used may convey the false and deceptive appearance.") (citation omitted).  Thus, the "[d]eceitful statement[] of half-truth[]," Jury Inst. 14, lay in telling the store owners that "as you can see," the FDA had deemed the pills "illegal to sell" and had determined that selling them was a matter of "racketeering."

Tauler Smith certainly could have tried arguing to the jury that it was incumbent upon each letter's recipient to study the FDA notices to evaluate the truth of Tauler Smith's characterization.  But it didn't make that argument, and even if it had, the Stores are aware of no authority suggesting that a victim of mail fraud must exercise diligence to avoid being defrauded.  In contrast—and since no Tauler Smith witness testified otherwise—the jury certainly could have inferred that the two Harvard Law School-trained founders of Tauler Smith *had* read the FDA notices and studied them carefully, and were fully aware that they said no such thing, let alone "as you can see."

### B.   "Our client is entitled to your profits . . . dating back four years"

Next, the jury could have inferred that Tauler Smith acted with the intent to deceive by sending demand letters in December 2017 telling the stores that "our client is entitled to . . . Your profits from the sale of the Illicit Products *dating back*

---

[1] Exhibit B to the Cole Declaration does not bear the same trial exhibit tag as presented to the jury, but the Stores agree that it is otherwise a duplicate of Exhibit 107 (Tauler Smith's demand letter to Sunset Liquor) that was before the jury.

1  *four years*," Cole Decl. Ex. B at 2 (emphasis added), when Tauler Smith knew that
2  Outlaw Laboratory had only been founded fourteen months prior, in October 2016.
3  *See* Poe Decl. Ex. B (3/15 Tr. 331:4-17; 332:13-22) (Valerio testifying that Tauler
4  Smith had switched the "client" of the scheme from JST Distribution to Outlaw
5  Laboratory because the latter had been since 2016, and thus would seem like a more
6  credible plaintiff). Tauler Smith could have perhaps sought to dispel such an
7  inference by putting on Mr. Tauler or another witness to explain that Tauler Smith
8  had a sincere legal theory for how a company founded in October 2016 could claim
9  "unfair competition" with a store dating back to December 2013. But it didn't, and
10 thus left the jury to draw the (entirely fair) inference that Tauler Smith knew better,
11 but wanted to trick the letter's recipient into thinking it could be on the hook for four
12 years of profits.

### C. "We estimate that you are liable for over $100,000"

Next, the jury could have inferred that Tauler Smith's warning that "[w]e estimate that you are liable for over $100,000 if we prosecute this matter to a jury" was intended to deceive. Cole Ex. B at 3 (ECF No. 438-4). Tauler Smith chose not to present any evidence whatsoever as to how a claim against a single store could reach $100,000. And the jury heard that Sunset Liquor's total annual profits from sales of these products were approximately $12,870, and Bobar No. 2's total annual profits were just $6,500.[2] From hearing those annual sales and Tauler Smith's silence on the point, the jury would have been well within its rights to infer that Tauler Smith *knew* that there was no realistic way for liability to reach $100,000, but chose to

---

[2] Mr. Mikha testified that Sunset Liquor sold "50 to 60" units per week, at a profit of "between $4 to $5 a unit." Poe Decl. Ex. A (3/14 Tr. 139:3-4; 141:6-9). Using 55 and $4.50 as averages would yield $12,870 in annual profits. He further testified that Bobar No. 2 sold approximately "25 pills each week," at a profit of "$4 to $6, average. *Id.* Ex. A (3/14 Tr. 141:10-20). Using 25 and $5 as averages would yield $6,500 in annual profits.

5  STORES' OPP. TO JMOL

deceive the recipients of its letter into believing otherwise, so that they would fork over a "settlement" with minimal resistance.

### D. TriSteel is sold at "storefront retail locations across the United States."

Alone or in combination with any of the above, the jury could have inferred Tauler Smith's intent to deceive from the allegation it included in the "draft" complaint it attached to the demand letter that "Plaintiff sells TriSteel and TriSteel 8hour through . . . storefront retail locations across the United States." Cole Ex. B at 21 (ECF No. 438-4).

In contrast to the other deceptive statements in the demand letter, Tauler Smith devotes a subsection of its brief to this point, in a subheading titled: "The Stores Failed to Prove that TriSteel Was *Not* Sold at Retail Locations Across The U.S." Mem. at 11. But Tauler Smith gets off on the wrong foot in this argument, in suggesting that the jury needed to "conclude that this statement was false," and that the Stores "failed to prove (and they carried the burden) that TriSteel was *not* sold in storefront retail locations across the United States." Mem. at 12. As this Court recognized three years ago, liability for mail fraud does not require the plaintiff or prosecutor to prove that any given statement is outright "false," because "'*the fact that there is no misrepresentation of a single existing fact is immaterial.*'" *Woods*, 335 F.3d at 998 (quoting *Lustiger*, 386 F.2d at 138) (emphasis in *Woods*); *see also* Order Denying Motions to Dismiss at 12 (ECF No. 190) (quoting same). As the jury instruction correctly informed the jury "[d]eceitful statements of half-truths" can suffice. Jury Inst. 14 (ECF No. 426 at 18).

With respect to the "across the United States" allegation, Mr. Lynch agreed that "that wasn't an accurate statement," and when asked "who came up with that statement," he answered: "Tauler Smith." Poe Decl. Ex. B (3/15 Tr. at 422:21-423:5). He then agreed that he would not have made such a statement, because "[t]hey were sold in some [retail locations] in Texas, but not across the United

States." *Id.* at 423:6-10. Refreshing his recollection with Exhibit 131, Mr. Lynch then told the jury that he had told Mr. Tauler that TriSteel "was not sold in retail stores across the United States," and that the date of that communication was December 1, 2017—two weeks before Tauler Smith sent its demand letter (and draft complaint containing the allegation) to Sunset Liquor. *See id.* at 423:20-424:14; Poe Decl. Ex. C (Exhibit 131[3]); Cole Decl. Ex. B (demand letter to Sunset Liquor).

In its brief, Tauler Smith ignores Mr. Lynch's testimony, but instead focuses on Mr. Wear's testimony, who testified that he had told Mr. Tauler that TriSteel was "offered through distributors," and based on that had told Mr. Tauler that "[w]e could only assume that it was [therefore sold at storefront retail locations]." Mem. at 12-13. The testimony about sales through distributors was highly equivocal. At first Mr. Lynch told Tauler Smith's counsel that "[t]here was probably one or two distributors maybe, small ones." Poe Decl. Ex. B (3/15 Tr. at 433:22-434:1). A few questions later he increased his estimate to "[p]robably two or three small ones." *Id.* at 434:19-21. On the next page he told Tauler Smith's counsel that it "would be the goal" to have a distributor "send it to stores throughout the country," and that he had told that to Mr. Tauler. *Id.* at 435:2-10. On redirect Mr. Lynch changed his testimony slightly again, testifying that "[w]e sent it to a distributor and relied off them," but that "I don't remember the name of it." *Id.* at 437:22-438:4. On the next page it increased back to "two or three distributors," with Mr. Lynch testifying that he didn't "recall" what "volume of TriSteel [Outlaw] ship[ped] to those distributors. *Id.* at 439:7-14.

Even if one fully credits this "distributor" story, and Mr. Wear's testimony that he told Mr. Tauler that Outlaw thereby "could only assume" that TriSteel was accordingly "sold at storefront retail locations," the jury would have been fully within

---

[3] Exhibit 131 was used without objection to refresh Mr. Lynch's recollection, but was not admitted into evidence.

its rights to nevertheless conclude that the draft complaint's unqualified allegation that "Plaintiff sells TriSteel and TriSteel 8hour through . . . storefront retail locations across the United States" was a "[d]eceitful statement[] of half-truth[]," and that Tauler Smith knew that it was. Or the jury may have rejected the vague "distributor" testimony, and instead accepted Mr. Lynch's more precise testimony that he told Mr. Tauler that TriSteel was not sold at storefront locations around the country on December 1, 2017. There is no way of knowing which of these alternatives the jury credited (or even whether its verdict was based on this particular deceptive statement as opposed to one or more of the others). The existence of these alternative possibilities is dispositive of Tauler Smith's motion, since a JMOL can only be granted where the evidence "permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Reese*, 888 F.3d at 1036.

## II. BECAUSE THE DECEPTIVE STATEMENTS IN THE DEMAND LETTERS WERE A SUFFICIENT BASIS TO INFER TAULER SMITH'S INTENT, ITS INVENTORY OF WITNESS TESTIMONY IS BESIDE THE POINT.

The bulk of Tauler Smith's brief consists of an inventory of the testimony of Mr. Valerio, Mr. Lynch, and Mr. Wear, arguing that none of those three gave testimony that would support an inference of fraud. If the testimony of those three witnesses were the only evidence that the jury was permitted to consider on the issue, it would be a useful exercise for the Stores to respond point-by-point, but since the jury was also free to draw inferences based on the only direct statements by Tauler Smith in the case, whether the testimony of any of those three would further support an inference of deceptive intent is neither here nor there.

That having been said, certainly Mr. Valerio's testimony provided further basis from which the jury could infer Tauler Smith's intent to deceive the three plaintiffs here, not to mention the thousands of other "targets" of the scheme. For example, Mr. Valerio testified about how Tauler Smith came to represent JST Distribution, the original 'client' for the scheme. As he described it, originally a company called

Nutrition Distribution had—in league with Tauler Smith—developed certain nutritional supplements strictly as an artifice by which Tauler Smith could bring lawsuits against other supplement companies. Poe Decl. Ex. B (3/15 Tr. at 322:1-323:12). Mr. Valerio testified that among those targets of Nutrition Distribution and Tauler Smith was TF Supplements, a supplement retailer owned by Mr. Wear and Mr. Lynch. *Id.* at 325:4-23; 326:10-16. Mr. Valerio then explained how that connection led to Tauler Smith representing JST Distribution:

> Q. What do you know about how Tauler Smith came to be connected with JST Distribution?
>
> A. So JST Distribution, Mr. Stovall, he was very close with the guys from Outlaw and TF. So he had called up Rob and said I know what you did with these -- with the Nutrition Distribution and what you did there. Can we do that with the sexual enhancement pill that I have because there's all of these online retailers selling different pills, and I want to, you know, make some money, pretty much.

*Id.* at 327:11-20.

Next in the chain, Mr. Valerio testified that the nominal 'client' of the scheme had been switched from JST Distribution to Outlaw Laboratory after the defendants in the JST-based cases started taking note of the fact that JST had been incorporated just weeks before it started suing those targets for unfairly 'competing' with it. *Id.* at 330:4-331:17. He then testified how *Tauler Smith* devised a solution to that "obstacle":

> Q. Let me ask you this: I think a minute ago you said that the proximity of those dates was an obstacle -- a huge obstacle, maybe you said. Did Tauler Smith come up with a solution to that?
>
> A. So him and Mr. Stovall came up with -- Mr. Stovall knew the two guys from TF Supplements and Outlaw Distribution. And since Outlaw Distribution I think was established in, like, 2016, they just wanted to kind of roll that into Outlaw as being the plaintiff and then go after different targets.

*Id.* at 332:13-22.

From this history of Tauler Smith leapfrogging from one phony "client" to the next in order to get money from legitimate businesses that were supposedly "competing" with Tauler Smith's client, the jury was well within its rights to infer that Tauler Smith was indeed dealing in half-truths and acting with deceptive intent by the time it began perpetuating a version of the scheme through Outlaw.

One other important piece of Mr. Valerio's testimony provided further basis from which the jury could infer deceptive intent—Tauler Smith's willful blindness as to whether the pills sold at any given store *actually* contained a prescription ingredient, which was the entire basis for Tauler Smith's demand that the store pay it money. Mr. Valerio explained that Mr. Tauler simply did not "care" about such niceties:

> Q. So the question is do you recall any discussion -- well, statements by Mr. Tauler or other attorneys in the law firm of Tauler Smith expressing any concern over whether they were sending demand letters or whether they were actually suing stores who may have in fact not sold a pill that had any pharmaceuticals in it.
>
> A. So several of the lawyers that worked for Tauler Smith did, and Rob did not care.

*Id.* at 357:4-11).

As with the preceding discussion about the various deceptive statements in the demand letters, the jury was further permitted to infer that if any of the witnesses' testimony (or the Stores' general characterization) regarding the scheme were unfounded, surely Tauler Smith would call *some* witness to testify about Tauler Smith's bona fides in the project, to dispel the inferences that the Stores' case in chief had created. But Tauler Smith did not call any witnesses, so by its own choice the jury was left to draw inferences from the evidence that it *had* seen and heard.

## CONCLUSION

Because there was plenty of evidence from which the jury could infer a

deceptive intent by Tauler Smith, the motion should be denied.

Dated: May 5, 2023                    GAW | POE LLP

By:   s/ *Mark Poe*
         Mark Poe
         Counsel for the Stores

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the date indicated in the blue header above, I filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day either by Notice of Electronic Filing generated by CM/ECF or by U.S. mail on all counsel of record entitled to receive service.

GAW | POE LLP

By: s/ *Mark Poe*
Mark Poe
Attorneys for the Stores