1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10

11   | IN RE OUTLAW LABORATORIES, LP          Case No.:  18-cv-840-GPC-BGS

12   | LITIGATION

13                                          **ORDER DENYING DEFENDANT'S**
                                            **MOTION FOR JUDGMENT AS A**
14                                          **MATTER OF LAW**

15                                          **[ECF No. 438]**

16

17       Before the Court is Defendant Tauler Smith LLP's[1] Renewed Motion for Judgment

18   as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(b).  ECF No. 438.

19   Plaintiffs Roma Minkha, Inc., doing business as Bobar #2 Liquor; NMRM, Inc., doing

20   business as Sunset Liquor; and Skyline Market Inc., doing business as Skyline Farms

21   Market (collectively "The Stores") filed an opposition to Tauler Smith's motion, ECF

22   No. 440, and Tauler Smith has filed a reply, ECF No. 441.  Pursuant to Civil Local

23

24   [1] Although Tauler Smith was brought into the proceedings as a third-party defendant and
     counter-defendant, *see* ECF No. 114 (operative Second Amended Counterclaims and
25   Third-Party Claims), for convenience and clarity the Court adopts the parties'
     nomenclature, *see* ECF No. 411-6, and refers to Tauler Smith as the Defendant and the
26   opposing parties as the Plaintiffs.

27                                          1

28

Rule 7.1(d), the Court found the matter appropriate for ruling on the papers and vacated the hearing previously scheduled for Friday, June 16, 2023.  For the reasons set forth below, the Court DENIES Tauler Smith's Renewed Motion for Judgment as a Matter of Law.

## I.   FACTS AND PROCEEDINGS

### A.   Background[2]

This matter first came before this Court in May 2018 when Tauler Smith, on behalf of its then-client, Outlaw Laboratory, LP, initiated civil proceedings against roughly 50 retail stores accused of unlawfully offering sexual enhancement pills that allegedly competed with Outlaw's own products.  ECF No. 1 (Outlaw Complaint); *see also* ECF No. 28 (consolidation order).  Outlaw filed the lawsuits after sending unrequited demand letters to at least some of the retail stores.  ECF No. 411-6 at 2.[3]  The demand letters asserted that the retail stores were unlawfully selling products that were the subject of FDA warnings; that the sale of the pills violated the Lanham Act and the Racketeer Influenced Corrupt Organizations Act ("RICO"); and that the retail stores would be sued if they did not pay to Outlaw a "one-time settlement" ranging from $9,765 to $14,000.  *Id.*  Skyline Market, Bobar #2, and Sunset Liquor each received these demand letters, but only Skyline Market elected the settlement option.  *Id.*  The Stores filed a counterclaim and third-party claim against Outlaw; its owners Shawn Lynch and Michael Wear; and Tauler Smith alleging RICO violations and rescission.  ECF No. 114.

---

[2] The Court assumes the parties' familiarity with the facts and proceedings of this case and includes only a truncated summary of the background facts and procedural developments necessary to understand and decide Tauler Smith's Renewed Motion for Judgment as a Matter of Law.  Additional factual and procedural background information can be found in earlier Court orders.  *See, e.g.*, ECF Nos. 147, 209, 251, 293, 375.

[3] Page numbers are based on CM/ECF pagination.

By July 2020, the Court dismissed Outlaw's claim in its entirety.  ECF Nos. 147, 209, 251.  In April 2021, the Court dismissed The Stores' claims against Outlaw and its owners, ECF No. 363, upon their joint notice of settlement and motion to dismiss, ECF No. 362.  The only issue left for trial was whether Tauler Smith's "actions violated the RICO Act, and if so, what the proper remedy should be."  ECF No. 411-6 at 2.

### B.    Trial

From March 14 to 16, 2023, the Court conducted a three-day jury trial.  ECF Nos. 417, 418, 421.  The jury returned a verdict in favor of The Stores and awarded damages as follows:  Roma Mikha $2,700, NMRM, Inc. $5,940, and Skyline Market $3,300.  ECF No. 427.

Relevant evidence admitted at trial is discussed below.  Robert Tauler of Tauler Smith did not testify.  *See* ECF No. 435 at 87 (TR 467:12–23).

### 1.    The demand letters

Through Raid "Roy" Mikha, the owner of Sunset Liquor, ECF No. 433 at 126 (TR 126:2–8), The Stores introduced one of the demand letters which was sent by Tauler Smith to Sunset Liquor in December 2017.  ECF No. 438-4; *see* ECF No. 423 at 3 (exhibit list); ECF No. 433 at 128–29 (TR 128:7–129:3).  The letter is attached as an appendix to this Order with blank pages omitted.  In pertinent parts, the letter alleged that Tauler Smith discovered that Sunset Liquor was "selling illegal sexual enhancement products," which it called the "Illicit Products," ECF No. 438-4 at 2, and enclosed pictures of both the storefront and the purportedly illegal products, *id.* at 5–7, as well as a November 2021 notice from the Food and Drug Administration ("FDA") warning that a product like the one sold in the store had been found to "contain[] sildenafil, the active ingredient in the FDA-approved prescription drug Viagra," *id.* at 12.  The FDA notice identified only the product Blue Diamond from "*an* examination of international mail shipments."  *Id.* at 2, 12 (emphasis added).  The FDA notice "advis[ed] consumers not to purchase or use" the

product. *Id.* at 12.  Nowhere on the FDA notice does it say that the product was illegal to sell.  *See id.* at 12–13 (absence).

After pointing to the exhibits and describing the FDA notices as "regarding the illegality of the Illicit Products," the letter stated:  "As you can see, the Illicit Products are illegal to sell and subject your company to legal action for racketeering and unfair business practices under RICO . . . and the Federal Lanham Act."  *Id.* at 2.  The letter alleged that Outlaw was thus entitled to Sunset Liquor's "profits from the sale of the Illicit Products dating back four years" as well as attorneys' fees, punitive damages, and treble damages. *Id.*  The letter instructed that despite estimating that Sunset Liquor was liable for more than $100,000, Tauler Smith was "willing to settle all claims in exchange for a one-time settlement agreement of $9,765, and [Sunset Liquor's] agreement to stop selling the Illicit Products."[4]  *Id.* at 3.  The letter warned that the settlement offer would double if Tauler Smith was "forced to file a formal lawsuit, and the offer [would] be withdrawn if litigation exceed[ed] one month in duration."  *Id.*  Sunset Liquor was instructed to have its attorney contact Tauler Smith within two weeks of the date of the letter "to resolve this matter before [Tauler Smith and Outlaw] file a lawsuit against [Sunset Liquor]."  *Id.*

A draft of the complaint that would allegedly be filed against Sunset Liquor, *id.*, was attached to the letter and included causes of action for Lanham Act and RICO Act violations, *id.* at 15–27.  The draft complaint alleged that Sunset Liquor and other defendants were "engaged in a scheme to distribute tainted 'male enhancement' pills

---

[4] The actual amount for which convenience store owners could settle with Outlaw varied, and Joseph Valerio, a witness who performed work for Tauler Smith, testified that store owners would call Tauler Smith to negotiate and Tauler Smith would accept payments based "on how much pushback they received from the store" and "what the firm thought that the stores could afford."  ECF No. 434 at 60–61 (TR 302:21–303:4). Fred Mokou testified to settling with Outlaw for $2,800.  ECF No. 433 at 159 (TR 159:15–19).

containing undisclosed pharmaceuticals to the general public." *Id.* at 16.  The enhancement products at issue included, but were "not limited to, Blue Diamond (collectively, the 'Enhancement Products')." *Id.*   The draft complaint further alleged that "[a]ll of the Enhancement Products have been the subject of testing by the FDA and been found to contain sildenafil, among other hidden drug ingredients." *Id.*  In addition to repeating some of the other allegations contained in the letter, the draft lawsuit stated that Outlaw sold its competing sexual enhancement products "through its website . . . as well as through many other online and storefront retail locations across the United States."[5] *Id.* at 22.

Other representatives from convenience stores testified to having received demand letters like this one.  *E.g.*, ECF No. 433 at 152–53 (TR 152:23–153:22); ECF No. 434 at 124–25 (TR 366:12—367:21); ECF No. 435 at 8–9 (TR 388:6–389:23).  Fred Mokou of Skyline Market, *see* ECF No. 433 at 151 (TR 151:12–22), testified to having attended a meeting with roughly 50 to 60 other business owners and managers from other stores that had received similar demand letters, *id.* at 156 (TR 156:4–25).

### 2.   Joseph Valerio testimony

Joseph Valerio testified to owning a firm called CTRLR that acted like a Chief Financial Officer ("CFO") "for businesses that can't afford CFOs."  ECF No. 434 at 17 (TR 259:19–21).  He stated that he started working as an independent contractor for the Law Offices of Robert Tauler[6] in January 2015. *Id.* at 16–17 (TR 258:10–12; 259:13–16).  Valerio reported that he continued "working for . . . Tauler when the law firm Tauler Smith

---

[5] Lynch testified that Tauler Smith came up with this statement.  ECF No. 435 at 43 (TR 423:4–5).

[6] Throughout his testimony, Valerio used Robert Tauler and Tauler Smith somewhat interchangeably because Robert Tauler is the person that managed the alleged scheme. ECF No. 434 at 38–39 (280:20–281:9); *see also id.* at 51 (TR 293:8–20) (explaining that Matthew Smith, of Tauler Smith was involved in the project to only a limited degree).

was created" around the end of 2015 as "their CFO, controller, also an operator"; he "did everything from helping [Tauler] find office space to . . . . the financial aspects of it:  HR, payroll, really everything."  *Id.* at 18–19 (TR 260:12–261:3).  Valerio testified to working with Tauler Smith until February 2019.  *Id.* at 19 (TR 261:13–15).  Valerio stated that he helped the firm with financial administration, including:  transitioning the firm from paper and Excel timekeeping to a software program, paying bills, dealing with taxes, and keeping track of expenses.  *Id.* at 17 (TR 259:4–12).  "[W]hen the settlement money or the judgments would come in, [Valerio] was in charge of the trust accounting."  *Id.* at 31 (TR 273:22–25).

Valerio explained the origins of the Tauler Smith project concerning "sending demand letters to convenience stores over . . . sexual enhancement pills."  *Id.* at 20 (TR 262:6–11).  He traced the project's beginnings to a lawsuit against Nutrition Distribution, whose owners are friends of Tauler, involving claims of false advertising against its bodybuilding "product that had an illegal component in it."  *Id.* at 22 (TR 264:2–7).  The friends purportedly told Tauler that they lost the lawsuit and Tauler then "came up with the idea of . . . let's create a new product, and then we'll sue everybody else who's putting in illegal stuff and you'll be able to recoup your money back."  *Id.* (TR 264:8–11).  Nutrition Distribution then created a product "as a vehicle for bringing lawsuits against other supplements."  *Id.* at 23 (TR 265:8–11).

Valerio then testified to how Outlaw "and Tauler Smith first came to be in contact":  Outlaw "also made bodybuilding supplements" and "Rob Tauler/Nutrition Distribution sued [TF Supplements[7]], which was also the same guys as Outlaw, and won either a

---

[7] Although the transcript says "FT," presumably Valerio was thinking of TF Supplements. *See* ECF No. 435 at 65 (TR 445:20–22) (Outlaw owner Michael Wear discussing ownership of TF Supplements).  Alternatively, he may have been thinking of C&S Supplements.  *See id.* at 16 (TR 396:19–24) (Outlaw owner Shawn Lynch testifying to first

settlement or a judgment against them." *Id.* at 25–26 (TR 267:3–11; 268:13–15); *see* ECF No. 435 at 17 (TR 397:2–24) (Lynch recalling settling for some amount between $5,000 and $10,000). Valerio testified that after a resolution was reached in the proceeding against Outlaw, James Stovall—who was associated with JST Distribution LLC, which was formed in March 2017, ECF No. 434 at 28–29 (TR 270:22–271:7)—called Tauler and suggested that they do something similar with sexual enhancement pills. *Id.* at 27 (TR 269:12–19).

Valerio then described an admitted exhibit that constituted a list of the JST cases in California.[8] *Id.* at 30 (TR 272:3–11). Some of the cases were filed as early as April 2017. *Id.* at 30–31 (TR 272:21–273:1). Valerio explained that there was an "obstacle" to the litigation because JST Distribution had been formed as recently as March 2017 and "people could just go online and see that the LLC was created . . . a couple of weeks before these lawsuits were filed"; and that "people weren't necessarily responding." *Id.* at 31 (TR 273:6–15). Valerio recalled that the solution to this problem was that Tauler Smith and Stovall decided to partner up with TF Supplements and Outlaw because Outlaw was established earlier than JST Distribution in 2016. *Id.* at 32 (TR 274:11–20); *see* ECF No. 435 at 16 (TR 396:8–9).

Valerio also testified that getting the "scheme" started required financing for things like building an app and hiring personnel. ECF No. 434 at 33 (TR 275:2–18). He explained that Tauler had "dr[awn] up kind of a form letter" to use, *id.* at 35 (TR 277:1–8), and that

---

contact with Tauler Smith being his receipt of a demand letter sent to retail company C&S Supplements).

[8] Valerio clarified that "there were definitely targets and settlements coming from other states," ECF No. 434 at 30 (TR 272:15–20), and Tauler Smith worked with law firms in other states, *id.* at 42–43 (TR 284:20–285:6).

at one point they were "send[ing] out 3- to 5,000 letters at a time," *id.* at 35–36 (TR 277:25–278:2), to California, Texas, Florida, and other states, *id.* at 36–37 (TR 278:25–279:6). Tauler Smith initially used a printing company, but that got too expensive because they were paying $12 to $13 for the printing, stuffing, and postage for each letter. *Id.* at 35–36 (TR 277:25–278:7). They had "troops on the ground to take photos . . . of the stores," *id.* at 37 (TR 279:4–6); people whose job it was "to follow up on the letters . . . [a]fter two weeks passed . . . to . . . call and make sure that [the store] got the letter and to push them to settle," *id.* at 40–41 (TR 282:18–283:24); and lawyers that "would come in and out," *id.* at 41 (TR 283:3–4). He recalled one "very bright" attorney who "got in, realized what she was doing for a couple months, and then left." *Id.* (TR 283:5–7).

Valerio recalled that the one time that Tauler Smith tested product samples taken from a convenience store, specifically from Sunset Liquor and sent to the testing facility in July 2019, the results came back negative for sildenafil—the active ingredient in Viagra and the cause of concern in the FDA notice, ECF No. 438-4 at 12—and negative for tadalafil—the active ingredient in Cialis. ECF No. 434 at 54–55 (TR 296:11–297:17).[9] The product tested was an iteration of the Horny Rhino enhancement product. *Id.* at 54 (TR 296:20–23). He testified that some of the other attorneys at "Tauler Smith express[ed] . . . concern over whether they were sending demand letters or whether they were actually suing stores who may have in fact not sold a pill that had any pharmaceuticals in it," and Tauler "did not care." *Id.* at 56–57 (TR 298:24–299:6). He additionally recalled that Tauler started affixing Smith's name to lawsuits—rather than Tauler's name—because Tauler was filing so many lawsuits that were getting thrown out "[a]nd judges were getting

---

[9] The exhibit containing the laboratory results was admitted without objection. ECF No. 434 at 54 (TR 296:2–7).

upset with Tauler and started sanctioning him, so he had to use a different lawyer." *Id.* at 52–53 (TR 294:15–295:4).

Although convenience store owners made statements during their testimony suggesting that they felt like Outlaw and Tauler Smith were targeting them because they were immigrants and had learned English as a second language, *see* ECF No. 433 at 142 (TR 142:14–20); ECF No. 435 at 11 (TR 391:14–15), Valerio testified that Tauler Smith went after the convenience stores because "he was scared of the distributors and the manufacturers," ECF No. 434 at 37–38 (TR 279:14–280:19).

### 3.   Testimony from the owners of Outlaw Laboratories

Shawn Lynch and Michael Wear were Outlaw's founders and owners.  ECF No. 435 at 15 (TR 395:16–18).  Lynch's testimony corroborated much of Valerio's testimony, but frequently referred to the products being sold at the convenience stores as "illegal products."  *See, e.g.*, *id.* at 20–23 (TR 400:3–403:18) (Lynch discussing the lawsuits, his understanding of the purpose behind the lawsuits, sources of funding, and hiring people to go investigate various convenience stores).  Lynch's testimony suggested that he believed the competing products being sold at the convenience stores were illegal.  *E.g.*, *id.* at 24, 49–50 (TR 404:9–10; 429:3–430:10).  Lynch testified that Outlaw's product was mostly sold "direct to consumer"; "[t]here was probably one or two distributors maybe, small ones" which would distribute the product to a retailer.  *Id.* at 52–54 (TR 433:19–434:1; 435:17–20).  Lynch confirmed that he would not "have written in a draft complaint that [Outlaw's product] was sold at storefront retail locations across the United States" because they were not sold "across the United States, . . . only on online."  *Id.* at 43 (TR 423:1–10).  Lynch testified that Outlaw did not make any efforts "to get stores in California to carry" their product, instead they relied on distributors to get the product in stores or sold direct to consumers.  *Id.* at 57–58 (TR 437:22–438:13).  Outlaw's practice was the same in New York and Florida as well.  *Id.* at 58–59 (TR 438:21–439:11).

Lynch testified to responding to an email that Tauler sent him in December 2017. *Id.* at 44 (TR 424:1–12); *see* ECF No. 440-1 at 36 (email used to refresh recollection but not admitted into evidence). When asked whether he recalled "telling Mr. Tauler that, in fact, [Outlaw's product] was not sold in retail stores across the United States," Lynch clarified that Outlaw's product "was distributed everywhere"; it was sold "to every city pretty much," but "direct to consumer." ECF No. 435 at 44 (TR 424:7–12).

Wear also corroborated much of Valerio's testimony. *See, e.g.*, *id.* at 65–69 (TR 445:17–449:7). Wear was not sure whether Outlaw sold its product in retail locations across the United States, *id.* at 75–76 (TR 455:2–7; 456:14–22), but testified to assuming as much and to having told Tauler that it was, *id.* at 76 (TR 456:2–13). He did not know of any store locations outside of Texas. *Id.* (TR 456:14–22). Wear also testified to his belief that competing products being sold in stores were unfairly competing with Outlaw's all natural products and that their litigation pursuits against the convenience stores were not fraudulent. *Id.* at 82–84 (TR 462:10–464:16).

### 4. Rule 50(a) motion for judgment as a matter of law and jury verdict

"On March 15, 2023, at the close of The Stores' case-in-chief and before the case was submitted to the jury, Tauler Smith made an oral Rule 50(a) judgment as a matter of law motion." ECF No. 438-1 at 7; ECF No. 440 at 3 (The Stores concede this point); ECF No. 435 at 95–96, 101 (TR 475:8–476:8; 481:17–23). Tauler Smith argued that there was insufficient evidence at trial to prove the predicate act of mail fraud. ECF No. 435 at 101–08 (TR 481:17–488:9). The Court denied the motion. *Id.* at 111 (TR 491:15).

On the afternoon of March 16 the jury completed its deliberations and reached a verdict finding Tauler Smith liable for RICO violations and awarding damages to each of the stores. ECF No. 427.

Tauler Smith timely renewed its motion for judgment as a matter of law. ECF No. 438.

## II.   LEGAL STANDARDS

"A Rule 50(b) motion for judgment as a matter of law is not a freestanding motion . . . . [but] "is a renewed Rule 50(a) motion." *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009).  Indeed, a Rule 50(b) "motion for judgment as a matter of law must be preceded by a [Rule 50(a)] motion . . . that sets forth the specific grounds raised in the renewed motion." *Wallace v. City of San Diego*, 479 F.3d 616, 631 (9th Cir. 2007).  A party may renew a properly made Rule 50(a) motion pursuant to Rule 50(b) "[i]f the judge denies or defers ruling on the [Rule 50(a)] motion, and if the jury then returns a verdict against the moving party[.]" *Go Daddy*, 581 F.3d at 961.  But the "Rule 50(b) motion is limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." *Id.*

A Rule 50(b) motion "is properly denied unless 'the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict.' " *Aguirre v. California*, 842 F.App'x 91, 93 (9th Cir. 2021) (quoting *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014)); *see also Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) ("[A] reasonable inference 'cannot be supported by only threadbare conclusory statements instead of significant probative evidence.' " (quoting *Barnes v. Arden Mayfair, Inc.*, 759 F.2d 676, 680–81 (9th Cir. 1985))).  "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).  The court "must review the entire evidentiary record." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008).  "[T]he court must not weigh the evidence, but should simply ask whether the [nonmoving party] has presented sufficient evidence to support the jury's conclusion." *Id.*

/ / /

/ / /

18-cv-840-GPC-BGS

## III.   DISCUSSION

Plaintiffs do not dispute "that Tauler Smith preserved at the [Rule 50(a)] stage the argument it now makes in its [Rule] 50(b) motion." ECF No. 440 at 3. Accordingly, the Court turns to whether The Stores offered sufficient evidence of mail fraud during trial to support the jury's RICO verdict.

"The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't*, 770 F.3d 834, 837 (9th Cir. 2014) (quoting *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)). The relevant predicate acts in this case concerned "violations of 18 U.S.C. Section 1341 which is commonly known as the mail fraud statute." ECF No. 538-5 at 29 (TR 528:1–7). The mail fraud statute "contain[s] three elements: (A) the formation of a scheme to defraud, (B) the use of the mails . . . in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). "[I]f a scheme is devised with the intent to defraud, and the mails are used in executing the scheme, the fact that there is no misrepresentation of a single existing fact is immaterial." *United States v. Woods*, 335 F.3d 993, 998 (9th Cir. 2003) (quoting *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967)); *accord United States v. Chang*, No. 16-cr-00047, 2020 WL 5702131, at *2 (N.D. Cal. Sept. 24, 2020); *In re Outlaw Lab'y, LP Litig.*, No. 18-cv-840, 2020 WL 1953584, at *6 (S.D. Cal. Apr. 23, 2020). The scheme need only be "reasonably calculated to deceive." *Woods*, 335 F.3d at 998 (quoting *Lustiger*, 386 F.2d at 138). "Misrepresentations of law," however, "are not actionable as fraud, including under the mail . . . fraud statute[], because statements of the law are considered merely opinions and may not be relied upon absent special circumstances." *Sosa v. DIRECTV, Inc*, 437 F.3d 923, 940 (9th Cir. 2006). Once the plaintiff "proves the existence of a scheme

which was 'reasonably calculated to deceive persons of ordinary prudence and comprehension,' " specific intent to defraud can be inferred "by examining the scheme itself." *Eclectic*, 751 F.3d at 997 (quoting *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1984).

In its Rule 50(b) motion, Tauler Smith contends that there was a lack of evidence introduced at trial to support the specific intent to defraud element. ECF No. 438-1 at 9–10. In addition, Tauler Smith raises in its reply for the first time the additional argument that the Stores failed to offer evidence as to the scheme to defraud element. *Compare* ECF No. 438-1 (absence), *with* ECF No. 441 at 2–5 (arguing for the first time in the Rule 50(b) motion that "there was no evidence of a scheme to deceive"). To the extent that this claim was not raised in the moving papers, Tauler Smith has waived the argument. However, a review of the evidence presented at trial supports the existence of a scheme to defraud. Ultimately, The Stores were required to submit evidence sufficient to prove the existence of a scheme to deceive and from which a factfinder could infer Tauler Smith's intent to defraud. *See Eclectic*, 751 F.3d at 997.

Tauler Smith argues that none of the testimony or tangible evidence before the jury "would support a finding that Tauler Smith had the 'specific intent to defraud,' nor could the intent be inferred from the demand letters themselves." ECF No. 438-1 at 9. The intent to defraud may be inferred from a defendant's statements and conduct. *United States v. Peters*, 962 F.2d 1410, 1414 (9th Cir. 1992). Upon review of the evidence presented at trial, the Court concludes The Stores offered evidence from which the jury could infer Tauler Smith's intention to defraud or deceive from "the deceptive and false statements in" the demand letters. ECF No. 436 at 46–48 (TR 546:4–548:21).

### A.   Allegedly "Selling Illegal Sexual Enhancement Products"

The scheme to defraud presented by the Stores at trial consisted of a demand letter campaign that relied on false or misleading claims that the Stores were knowingly selling

"illegal products." The key trial evidence included the demand letter and attachments consisting of photographs and an FDA notice dated November 20, 2017 as well as the testimony of Joseph Valerio, a former independent contractor for Tauler Smith who acted as the CFO for Tauler Smith.

The evidence at trial showed that Tauler Smith had "dr[awn] up kind of a form letter" to use, ECF No. 434 at 35 (TR 277:1–2), and that at one point they were "send[ing] out 3- to 5,000 letters at a time," *id.* at 36 (TR 278:1–3), to California, Texas, Florida, and other states. The demand letter introduced at trial stated that Tauler Smith had "recently discovered that your company, Sunset Liquor, is selling illegal sexual enhancement products, including but not limited to, Blue Diamond (the 'Illicit Products')." ECF No. 438-4 at 2. The attached photographs showed the allegedly "illegal products" available for purchase within the store, including nine different pills that were sold at Sunset Liquor, two of which were Rhino-labeled products and one of was a Blue Diamond product. *Id.* at 6. As to the claimed illegality of the pills, the letter relied on a U.S. Food and Drug Notice, *id.* at 2, which notified the public of the discovery of sildenafil in a lab tested Blue Diamond pill, *id.* at 12. The notice was intended "to inform the public of a growing trend of dietary supplements . . . with hidden drugs and chemicals." *Id.* However, the FDA notice only *advised* consumers against taking Blue Diamond without indicating that the product, or others like it, were illegal. *See id.* Meanwhile, the attached sample complaint alleged that The Stores were engaged in a conspiracy to sell the purportedly illegal "products by making false statements including that the Enhancement Products are 'all natural' " despite knowing that the pills contained "dangerous secret ingredients." *Id.* at 16.

At its core, the demand letters claimed that The Stores were knowingly and illegally selling products that contained artificial prescription drugs with known side effects, in order to extort cash payments from The Stores. However, Valerio's testimony demonstrated that this claim was false and misleading. Valerio stated that Tauler Smith

had tested product samples from stores only once and as late as July 2019, when it tested a Rhino-labeled product from Sunset Liquors and the results came back negative for both sildenafil and tadalafil, the active ingredients in Viagra and Cialis, respectively.  ECF No. 434 at 54–55 (TR 296:14–297:17).  Valerio testified that pre-demand testing was not performed, even though it was available, because it was considered too expensive, *id.* at 53–54 (TR 295:12–296:24).   The jury learned that  other attorneys at Tauler Smith "express[ed] . . . concern over whether they were sending demand letters or whether they were actually suing stores who may have in fact not sold a pill that had any pharmaceuticals in it." *Id.* at 56–57 (TR 298:24–299:6).  According to Valerio, Tauler did not care whether the pills contained pharmaceuticals in spite of the fact that thousands of stores were receiving the form demand letters.  *Id.*

This evidence supports the jury's finding that Tauler Smith had the specific intent to defraud.   Electing not to test The Stores' products before sending demand letters or initiating litigation reveals  a  reckless indifference to the contents of the pills sold by The Stores.   Coupled with testimony that Tauler did not care that his attorneys were concerned whether the stores were selling pills that contained any pharmaceuticals sufficiently supports the jury's conclusion that Tauler Smith had specific intent to deceive The Stores. *See* ECF No. 434 at 41, 56–57 (TR 283:5–7; 298:24–299:6); *United States v. McDonald*, 576 F.2d 1350, 1358 (9th Cir. 1978) ("In mail fraud cases, '[o]ne who acts with reckless indifference as to whether a representation is true or false is chargeable as if he had knowledge of its falsity.' " (alteration in original) (quoting *United States v. Love*, 535 F.2d 1152, 1158 (9th Cir. 1976))); *United States v. Caterino*, Nos. 90-50049, 90-50050, 1992 WL 33347, at *4–5 (9th Cir. Feb. 21, 1992) (" '[A]wareness of a high probability of fraud, coupled with shutting one's eyes to avoid learning the truth, may in some instances support a conviction for mail fraud.' . . . Thus, deliberate ignorance is an appropriate standard for a wire or mail fraud conviction." (alteration in original) (quoting *United States v. Price*,

623 F.2d 587, 592 (9th Cir. 1980), overruled on other grounds by *United States v. De Bright*, 730 F.2d 1255, 1259–60 (9th Cir. 1984))). A jury could further infer Tauler Smith's intent to deceive—and find support for the scheme to defraud—when, sometime around July 2019, Tauler Smith finally tested samples from Sunset Liquor only to realize they did not contain the sildenafil as indicated in the demand letter.[10] This suggests that there was no basis to claim that the pills were illegal to sell or that The Stores were aware of the presence of sildenafil in the pills. All of this supports an inference that Tauler Smith created a racket premised on false claims and ignored the concerns of attorneys at Tauler Smith that "they were actually suing stores who may have in fact not sold a pill that had any pharmaceuticals in it." See ECF No. 434 at 56–57 (TR 298:24–299:6). This evidence undergirds the jury's conclusion that Tauler Smith had the specific intent to defraud The Stores.

**B.     Products Allegedly Sold In "Storefront Retail Locations Across The United States"**

Having made the false claim that the enhancement products contained sildenafil, Tauler Smith made additional deceptive material statements in order to monetize its demands. The demand letter stated that Outlaw's products were sold in "storefront retail locations across the United States." *See* ECF No. 438-4 at 22. Lynch testified to the issue of whether Outlaw sold its products in stores outside of Texas. Lynch confirmed that he would not "have written in a draft complaint that [Outlaw's product] was sold at storefront retail locations across the United States" because they were not sold "across the United

---

[10] Although the testing occurred after the demand letters were sent to The Stores, this evidence is probative of Tauler Smith's intent under Federal Rule of Evidence 404(b). *See United States v. Lloyd*, 807 F.3d 1128, 1157 (9th Cir. 2015) ("Evidence of a subsequent bad act is admissible under Rule 404(b) to show 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" (quoting Rule 404(b)).

States, . . . only on online."  ECF No. 435 at 43 (TR 423:1–10).  Lynch explained how Outlaw did not make any efforts to put their product in stores aside from shipping the product to distributors.  ECF No. 435 at 57–59 (TR 437:22–439:11).  After being asked whether he recalled telling Tauler that Outlaw's product "was not sold in retail stores across the United States," Lynch confirmed that the product was "distributed everywhere" and sold in "every city, pretty much," but on a "direct to consumer" basis. *Id.* at 44 (TR 424:7–14).

Tauler Smith accurately points to Wear's testimony in which he recalls telling Tauler that their product was sold in storefront retail locations across the United States, ECF No. 435 at 76 (TR 456:2–13), and to Wear acknowledging that he did not "know any retail locations in any states other than Texas that, in fact, sold" Outlaw's product, *id.* (TR 456:14–22).  ECF No. 438-1 at 16–17.  However, reviewing the evidence in the light most favorable to the Stores, Lynch's and Wear's testimony provided evidence supporting the conclusions that (1) Outlaw's products at issue were not sold in retail stores across the country, maybe not even outside of Texas; and (2) that Tauler was put on notice of this fact because he had been told by one owner that although the product was sold everywhere, it was on a direct to consumer basis.  The statement in the draft complaint attached to the demand letter asserting that Outlaw's product was sold in storefronts across the United States supports the inference that Tauler Smith had the specific intent to defraud because Outlaw's alleged injury from the sale of these "illegal" sexual enhancement pills was deceptive and meant to convince The Stores that Outlaw's products had a wider distribution base from which the damages demand was justified.  *See* ECF No. 438-4 at 23, 25.

## C.    Outlaw Was Allegedly Entitled To Four Years' Worth Of Profits

Valerio testified that an "obstacle" to the litigation existed when the first lawsuits were filed in April 2017 because the forerunner to Outlaw Laboratories, JST Distribution, had been formed around March 2017 and "people could just go online and see that the LLC

18-cv-840-GPC-BGS

was created . . . a couple of weeks before these lawsuits were filed"; thus "people weren't necessarily responding." ECF No. 434 at 31 (TR 273:6–11). The solution to address this problem was for Tauler Smith and Stovall to partner up with TF Supplements and Outlaw because Outlaw was established earlier in 2016. *Id.* at 32 (TR 274:11–20); *see* ECF No. 435 at 16 (TR 396:8–9). Even though Outlaw was formed less than two years before the letter presented at trial was sent, ECF No. 434 at 32 (TR 274:15–20), the demand letter stated that the letter recipient would be liable for four years' worth of profits, among other damages. ECF No. 438–4 at 2.

Assuming, without deciding, that this statement was merely a misrepresentation of law rather than fact and thus not actionable as fraud, *see Sosa v. DIRECTV, Inc*, 437 F.3d 923, 940 (9th Cir. 2006), the Court finds that the statement contributes to the body of evidence that would allow a factfinder to infer Tauler Smith's specific intent to defraud. Tauler Smith had learned that letter recipients were less inclined to settle if they could easily determine that Tauler Smith's client company was recently created, *id.* at 31 (TR 331:8–13). In order to support the initial monetary loss estimate of $100,000, Tauler Smith and Stovall paired up with TF Supplements and Outlaw both to add legitimacy to an otherwise toothless demand letter and to increase the perception of the recipient's liability for damages. These actions reveal steps designed to deceive the recipients of the thousands of demand letters and further support the jury's conclusion that Tauler Smith had the specific intent to deceive The Stores.

Thus, The Stores presented sufficient evidence at trial to prove that Tauler Smith created a scheme to deceive convenience store owners and had the specific intent to defraud under the mail fraud statute.

## IV. CONCLUSION

For the reasons explained above, Tauler Smith's Rule 50(b) Motion for Judgment as a Matter of Law is DENIED.

1          **IT IS SO ORDERED.**

2     Dated:  August 4, 2023

3                                                    Hon. Gonzalo P. Curiel
4                                                    United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                         19

28

# Appendix

Sample Demand Letter with Attachments (Introduced at trial as Plaintiffs' Exhibit No. 107)



Leticia Kimble, Esq.
Tauler Smith LLP
626 Wilshire Blvd, Ste 510
Los Angeles, CA 90017
(310) 492-5129
Leticia.Kimble@taulersmith.com

12/15/2017

**VIA CERTIFIED MAIL**

Sunset Liquor
985 Broadway Ste L
CHULA VISTA, CA 91911

Re:   **Unlawful Sexual Enhancement Products**

To Whom It May Concern:

We represent Outlaw Laboratory, LP ("Plaintiff"), a manufacturer, distributor and retailer of male enhancement products "TriSteel" and "TriSteel 8 hour."  We have recently discovered that your company, Sunset Liquor, is selling illegal sexual enhancement products, including but not limited to, Blue Diamond (the "Illicit Products").

- Enclosed as **EXHIBIT A** are photographs taken at your place of business capturing your sale of the Illicit Products.

- Enclosed as **EXHIBIT B** are notices from the Food and Drug Administration regarding the illegality of the Illicit Products.

As you can see, the Illicit Products are illegal to sell and subject your company to legal action for racketeering and unfair business practices under RICO (Racketeer Influenced Corrupt Organizations) and the Federal Lanham Act.  Accordingly, under these federal laws our client is entitled to:

> - Your profits from the sale of the Illicit Products dating back four years.  (15 U.S.C. § 1117)
> - Attorney's fees. (18 U.S.C. § 1964)
> - Punitive damages. (15 U.S.C. § 1117)
> - Triple damages. (18 U.S.C. § 1964 & 15 U.S.C. § 1117)

**EXHIBIT**
**107**
Husby.com

**DEPOSITION EXHIBIT**
**107**
R.Tauler  6/29/20  MMcArver

COMPLAINT                                    1642

We estimate that you are liable for over $100,000 if we prosecute this matter to a jury trial.  Although Plaintiff is entitled to the monetary remedies detailed above, it is willing to settle all claims in exchange for a one-time settlement agreement of **$9,765**, and your agreement to stop selling the Illicit Products.  This offer will double if we are forced to file a formal lawsuit, and the offer will be withdrawn if litigation exceeds one month in duration.

    Please have your attorney contact our office no later than 12/29/2017 to resolve this matter before we file a lawsuit against your business, a draft of which we have attached as **EXHIBIT C**.

This letter is sent without prejudice to Plaintiff's rights and claims, all of which are expressly reserved.  Please direct any communications regarding this matter to my attention.

Best regards,

*Leticia Kimble*

Leticia Kimble, Esq.

COMPLAINT                                    1642

# EXHIBIT A

Outlaw Laboratory Supplemental Production 0001485







# EXHIBIT B

Outlaw Laboratory Supplemental Production 0001492



# Public Notification: Blue Diamond Pill contains hidden drug ingredient

[11-20-2017] The Food and Drug Administration (FDA) is advising consumers not to purchase or use Blue Diamond Pill, a product promoted for sexual enhancement. This product was identified by FDA during an examination of international mail shipments.

FDA laboratory analysis confirmed that Blue Diamond Pill contains sildenafil, the active ingredient in the FDA-approved prescription drug Viagra, used to treat erectile dysfunction. This undeclared ingredient may interact with nitrates found in some prescription drugs such as nitroglycerin and may lower blood pressure to dangerous levels. People with diabetes, high blood pressure, high cholesterol, or heart disease often take nitrates.

Health care professionals and patients should report adverse events or side effects related to the use of this product to the FDA's MedWatch Safety Information and Adverse Event Reporting Program:

- Complete and submit the report online at **MedWatch Online Voluntary Reporting Form (https://www.accessdata.fda.-gov/scripts/medwatch/)**, or;
- Download and complete the **form (http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM349464.pdf)**, then submit it via fax at 1-800-FDA-0178.

Note: This notification is to inform the public of a growing trend of dietary supplements or conventional foods with hidden drugs and chemicals. These products are typically promoted for sexual enhancement, weight loss, and body building and are often represented as being "all natural." FDA is unable to test and identify all products marketed as dietary supplements that have potentially harmful hidden ingredients. Consumers should exercise caution before purchasing any product in the above categories.

Please refer to the links below for more information:

- **Tainted Sexual Enhancement Products (http://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/Medication-HealthFraud/ucm234539.htm)**
- **Subscribe to the RSS feed (http://www.fda.gov/AboutFDA/ContactFDA/StayInformed/RSSFeeds/TDS/rss.xml)**
- **Beware of Fraudulent 'Dietary Supplements' (http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm246744.htm)**

Outlaw Laboratory Supplemental Production 0001493



---

**Contact FDA**

Toll Free
(855) 543-3784, or
(301) 796-3400
**druginfo@fda.hhs.gov (mailto:druginfo@fda.hhs.gov)**

**Human Drug Information**
**Division of Drug Information**
**(http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/ucm082585)** (CDER)
Office of Communications
**Feedback Form (http://www.accessdata.fda.gov/scripts/email/cder/comment.cfm)**
10001 New Hampshire Avenue
Hillandale Building, 4th Floor
Silver Spring, MD 20993

---

**Resources for You**

- **Sign Up for Email Alerts on Tainted Products Sold as Dietary Supplements**
  **(https://service.govdelivery.com/service/subscribe.html?code=USFDA_198)** 📧
- **Tainted Products That are Marketed as Dietary Supplements RSS Feed**
  **(http://www.fda.gov/AboutFDA/ContactFDA/StayInformed/RSSFeeds/TDS/rss.xml)** 📡

---

**More in Medication Health Fraud**
**(/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/MedicationHealthFraud/default.htm)**

**Outlaw Laboratory Supplemental Production 0001494**

# EXHIBIT C

Outlaw Laboratory Supplemental Production 0001495

1642-DC

Leticia Kimble (SBN 262012)
Tauler Smith LLP
626 Wilshire Blvd., Suite 510
Los Angeles, California 90017
Tel: (310) 492-5129
Leticia.Kimble@taulersmith.com

Attorneys for Plaintiff
OUTLAW LABORATORY, LP

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OUTLAW LABORATORY, LP, a Texas limited partnership,<br><br>        Plaintiff<br><br>VS.<br><br>Sunset Liquor;<br>**[DISTRIBUTOR REDACTED]**;<br>**[SUPPLIER REDACTED]**;<br>**[ADDITIONAL DEFENDANTS REDACTED]** and DOES 1 through 10, inclusive,<br><br>        Defendants. | **CASE NO.12801642**<br><br>**COMPLAINT FOR:**<br><br>(1)   **FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT § 43 (a)(1)(B)); AND**<br><br>(2)   **VIOLATION OF THE CIVIL RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)**<br><br><br>**[DEMAND FOR A JURY TRIAL]** |

1642

**Outlaw Laboratory Supplemental Production 0001496**

Plaintiff Outlaw Laboratory, LP, a Texas limited partnership ("Outlaw" or "Plaintiff"), by and through its undersigned attorneys, submits this Complaint against defendants Sunset Liquor, **[DISTRIBUTOR REDACTED]** ("Distributor") and **[SUPPLIER REDACTED]** ("the Supplier Defendants"), **[ADDITIONAL DEFENDANTS REDACTED]** and Does 1-10 (collectively, the "Defendants"), and in support thereof avers as follows:

## INTRODUCTION

1. Defendants are engaged in a scheme to distribute tainted "male enhancement" pills containing undisclosed pharmaceuticals to the general public. Specifically, Defendants offer for sale various sexual enhancement products, including but not limited to, Blue Diamond (collectively, the "Enhancement Products").   All of the Enhancement Products have been the subject of testing by the FDA and been found to contain sildenafil, among other hidden drug ingredients.

2. The Enhancement products are distributed through a network of co-conspirators, named herein as co-defendants (the "Conspiracy Defendants"), who own and operate independent businesses selling the Enhancement Products, and who profit from the sale of the illegal and dangerous products by making false statements including that the Enhancement Products are "all natural" and have limited side effects.  Aside from these patently false statements, Defendants have failed to disclose the true nature of the Enhancement Products to its customers, even though they are aware of their dangerous secret ingredients.

3. Plaintiff is the manufacturer of competing products called "TriSteel" and "TriSteel 8hour," which are all natural male enhancement products made in the USA and distributed for sale in all 50 US States.

4. The illegal male enhancement supplement industry that has flourished in the shadows of weak regulatory and criminal enforcement of nutritional supplement laws. Distributor and the Conspiracy Defendants have made significant profits selling dangerous

products and openly engaging in illegal activity.  In this regard, the FDA has issued several public notices regarding the use of sildenafil in over the counter "male enhancement" supplements, but has only pursued criminal action intermittently.

5.      Thus, Plaintiff's only recourse is a civil action to protect the commercial interests recognized by the Lanham Act and to expose the civil conspiracy detailed herein.  As such, Defendants have knowingly and materially participated in a false and misleading advertising campaign to promote and sell its Enhancement Products, giving consumers the false impression that these products are safe when in reality, Defendants are well aware that the Enhancement Products contain hidden drug ingredients that require a prescription from a medical doctor.

6.      Defendants' false and misleading statements and advertising pose extreme health risks to consumers in at least two ways.  First, Defendants mislead consumers into believing that the advice and authorization of a licensed medical professional is not required to mitigate or avoid the potentially life-threatening side effects, drug interactions and contraindications of the sildenafil and other drug ingredients hidden in the Enhancement Products.  Second, by failing to inform consumers that the Enhancement Products contain sildenafil, consumers who know that their medical history and drug prescriptions make sildenafil consumption dangerous may nevertheless consume the Enhancement Products because they are unaware that they contain sildenafil.

7.      Defendants have knowingly and materially participated in false and misleading marketing, advertising and labeling to promote and sell the Enhancement Products, giving consumers the false impression that these products are safe and natural dietary supplements when in reality Defendants know that the Enhancement Products contain artificially manufactured prescription drug ingredients that pose extreme health dangers when taken without the supervision of a licensed medical professional.

8.      Such false and misleading marketing and advertising is extremely dangerous to individual consumers and harmful to the dietary supplement industry as a whole.

Outlaw Laboratory Supplemental Production 0001498

1642

Defendants have created an illegitimate marketplace of consumers seeking to enhance their sexual performance but who are not informed, or who are misinformed, of the serious dangers of using Defendants' Enhancement Products.  Consumers of the Enhancement Products have little or no incentive to use natural, legitimate and safe sexual performance enhancement products, such as Plaintiff's TriSteel or TriSteel 8hour, until they are harmed or Defendants' Enhancement Products are taken off of the shelves. Defendants' continuing false, misleading, illegal and deceptive practices have violated the Lanham Act and have unjustly enriched Defendants at the expense of Plaintiff, and have caused Plaintiff extensive and irreparable harm, including but not limited to, loss of revenue, disparagement and loss of goodwill.

9.     Among other things, this action seeks to enjoin Defendants from the marketing and sale of any and all of the Enhancement Products, punitive damages and attorneys' fees as Defendants are illegally and falsely marketing such products in violation of the Lanham Act and the Civil Racketeer Influenced and Corrupt Organizations Act of 1970.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1331 (federal question jurisdiction).

11.     This Court has personal jurisdiction over Defendants because they have, directly or through their intermediaries (including distributors, retailers, and others), developed, licensed, manufactured, shipped, distributed, offered for sale, sold, and advertised their products, including but not limited to the Enhancement Products, in the United States, the State of California and this district.  Defendant has purposefully and voluntarily placed these products into the stream of commerce with the expectation that they will be purchased in this district.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions which gave rise to the claim

**Outlaw Laboratory Supplemental Production 0001499**

occurred in this district.

## PARTIES

13.     Plaintiff Outlaw Laboratory, LP is a Texas limited partnership organized under the laws of the State of Texas.

14.     Upon information and belief, defendant **[DISTRIBUTOR REDACTED]**

15.     Upon information and belief, defendant **[SUPPLIER REDACTED]**

16.     Upon information and belief, defendant Sunset Liquor is an entity of unknown type with its principal place of business located at 985 Broadway Ste L, CHULA VISTA CA 91911.

17.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1- 10, inclusive, and therefore sued these defendants by such fictitious names.  Plaintiff will amend this Complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of these fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the aforementioned defendants.

## FACTUAL ALLEGATIONS

### Sildenafil

18.     The FDA has approved sildenafil for treatment of erectile dysfunction. However, because of known side effects, drug interactions and contraindications, the FDA has deemed these drugs to be prescription drugs.

19.     The serious side effects of sildenafil include, for example, priapism (i.e., prolonged penile erections leading to tissue death and potential permanent erectile dysfunction), severe hypotension (i.e., low blood pressure), myocardial infarction (i.e., heart attack), ventricular arrhythmias, stroke, increased intraocular pressure (i.e., increased eye fluid pressure), anterior optic neuropathy (i.e., permanent optic nerve

damage), blurred vision, sudden hearing loss, and dizziness.

20.     The serious negative drug interactions of sildenafil include, for example, (i) interacting with alkyl nitrites and alpha-1 blockers to cause angina and life-threatening hypotension, (ii) interacting with protease inhibitors to increase the incidence and severity of side effects of sildenafil alone, and (iii) interacting with erythromycin and cimetidine to cause prolonged plasma half-life levels.

21.     In addition to these risks, contraindications of sildenafil include underlying cardiovascular risk factors (such as recent heart surgery, stroke or heart attack) since consumption of sildenafil by individuals with these conditions can greatly increase the risk of heart attack.

22.     Because of these dangerous side effects, drug interactions and contraindications, the advice and authorization of appropriate licensed medical professionals is absolutely crucial for the safe consumption of sildenafil.  Without such safeguards, the consequences can be dire.  Indeed, the sale of mislabeled sildenafil has led to multiple deaths reported in the media.

### Defendants' Conspiracy

23.     The Supplier Defendants are wholesale suppliers and distributors of various sexual enhancement supplements, which are often imported from China, rarely contain any manufacturer information on their packaging and contain hidden drug ingredients. The Supplier Defendants distribute the Enhancement Products through a network of co-conspirators, named herein as co-defendants (the "Conspiracy Defendants"), who own and operate independent businesses selling the Enhancement Products, and profit from the sale of the illegal and dangerous products.

24.     The Supplier Defendants contact retailers such as Sunset Liquor and offer the Enhancement Products for sale.  The Enhancement Products are high-margin products and as such are situated at or near the check out counter.  The Enhancement Products are all subject to FDA public announcements regarding their illicit contents; however, the

Conspiracy Defendants still participate in their sale, due to their profitability.

**Defendants' False Statements Regarding The Enhancement Products**

25.     Sunset Liquor is an owner and operator of the Retail Location, which advertises and offer for sale various sexual enhancement supplements, including without limitation, Blue Diamond.

26.      The Enhancement Products claim that they are "all natural" and have limited side effects.  However, such claims are materially false and misleading.  Contrary to Defendants' statements, recent FDA laboratory analyses have confirmed that the Enhancement Products contain sildenafil, a synthetic pharmaceutical with profound side effects.

27.     Defendants' false statements and advertising pose extreme health risks to consumers in at least two ways.  First, by stating that no prescription is necessary to consume the Enhancement Products, Defendants mislead consumers into believing that the advice and authorization of a licensed medical professional is not required to mitigate or avoid the potentially life-threatening side effects, drug interactions andcontraindications of sildenafil hidden in the Enhancement Products.  Second, by failing to inform consumers that the Enhancement Products contain sildenafil, consumers who know that their medical history and drug prescriptions make sildenafil consumption dangerous may nevertheless consume the Enhancement Products because they are unaware that they contain sildenafil.

28.     Accordingly, Defendants' false and misleading advertising is extremely dangerous to individual consumers and harmful to the dietary supplement industry as a whole.  Defendants have created an illegitimate marketplace of consumers seeking to enhance their sexual performance but who are not informed, or who are misinformed, of the serious dangers of using Defendants' Enhancement Products.  Consumers of the Enhancement Products have little or no incentive to use safe and legitimate sexual

performance enhancement products, such as TriSteel or TriSteel 8hour, until they are injured or Defendants' Enhancement Products are taken off of the shelves.

Plaintiff's Dietary Supplements:  TriSteel and TriSteel 8hour

29.     Plaintiff Outlaw is a manufacturer of all-natural dietary supplements. Plaintiff manufactures and offers for sale TriSteel and TriSteel 8hour, male sexual performance enhancement supplements that promote increased sexual desire and stamina. The ingredients in TriSteel are Epimedium Extract (leaves), Yohimbe Extract (8mg Yohimbine Alkaloids), Xanthoparmelia Scarbrosa Extract (Lichen), Gamma Amino Butyric Acid (GABA), L-Arginine, Gelatin, Cellulose, Magnesium Stearate and Silica. Plaintiff sells TriSteel and TriSteel 8hour through its website www.outlawlaboratory.com, as well as through many other online and storefront retail locations across the United States.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(False Advertising in Violation of Section 43(a)(1)(B) of the Lanham Act)**

30.     Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

31.     Defendants have knowingly and purposely made false and misleading descriptions of fact concerning the nature, characteristics and qualities of the Enhancement Products by, without limitation, commercially marketing and claiming that the Enhancement Products that they sell are safe and natural "dietary supplements" that will enhance a consumer's sexual performance without requiring a doctor's prescription, all while purposefully omitting that (a) the Enhancement Products contain sildenafil and therefore cannot be "dietary supplements," (b) sildenafil is not naturally occurring, (c) sildenafil is a prescription drug requiring the prior authorization of a licensed medical professional, and (d) consumption of sildenafil without consultation and advice from a licensed medical professional poses extreme health risks, including without limitation,

1642

Outlaw Laboratory Supplemental Production 0001503

hypotension, heart attack and death.

32.     The use of such false, misleading and disingenuous marketing has the tendency to deceive a substantial segment of the public and consumers, including those in this district, into believing that they are purchasing a product with different characteristics.

33.     This deception is material because:  (i) it is likely to influence a consumer's purchasing decision, especially if the consumer (a) is looking for an all-natural sexual enhancement dietary supplement, (b) is purchasing the Enhancement Products out of an attempt to avoid Sildenafil because the consumer knows that Sildenafil poses special health risks given such consumer's medical history or current drug prescriptions, and/ or (c) wants to avoid taking any prescription drugs, generally, but especially without the supervision of a licensed medical professional; and (ii) such decision could lead to dangerous and unanticipated health consequences for such consumers.

34.     Defendants have introduced their false and misleading statements into interstate commerce via marketing and advertising on product packages and labels, and on display cases placed in Retail Locations in the state of California.

35.     Plaintiff has been injured as a result of Defendants' false and misleading statements.  Specifically, Defendants' false and misleading advertising concerning the Enhancement Products has negatively impacted Plaintiff's sales of TriSteel and TriSteel 8hour because both products are intended for sexual performance enhancement and target the same consumers.  Thus, Plaintiff has suffered both an ascertainable economic loss of money and reputational injury by the diversion of business from Plaintiff to Defendants and the loss of goodwill in Plaintiff's products.  Moreover, Defendants conduct has created reputational damage in that Defendants' misconduct damages the industry as a whole and has the tendency to disparage Plaintiff's products and goodwill.

36.     Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce that, in commercial advertising

and promotion, misrepresent the nature, characteristics, and qualities of its products in violation of Section 43(a)(1)(B) of the Lanham Act.

## **SECOND CLAIM FOR RELIEF**

**(Violation of the Civil Racketeer Influenced and Corrupt Organizations Act)**

37.     Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety.

38.     Defendants are engaged in a conspiracy and scheme to defraud and mislead consumers by way of their false and misleading labeling and advertisements concerning the Enhancement Products, which they unlawfully distribute, market, and offer for sale knowing that the products contain illicit ingredients.  Thus, Defendants have a plan or scheme to defraud and intent to defraud.

39.     Due to the nature of the scheme, it is reasonably foreseeable that the mail or wires will be used, and, in fact, defendants have used the mail or wires to further the scheme on multiple occasions in purchase orders sent and received and in the unlawful importation and distribution of sildenafil.  Thus, Defendants have engaged in mail fraud as defined in § 1961(1).

40.     As detailed above, Defendants mislabel, advertise, and offer for sale the Enhancement Products as "dietary supplements."  Defendants falsely claim that these products are natural and do not require a prescription, among other misrepresentations. Defendants make these misrepresentations despite the fact that they know that such products unlawfully contain hidden prescription drug ingredients.

41.     Indeed, Defendants fail to disclose that the Enhancement Products contain drug ingredients.  The sale of products containing undisclosed drug ingredients (without requiring a prescription and without informing consumers of the health and safety risks of these drugs) is unlawful and seriously endangers consumers.  In this regard, Defendants also fail to disclose any of the adverse health consequences of taking sildenafil.

**Outlaw Laboratory Supplemental Production 0001505**

1642

According to the FDA, these undisclosed ingredients may interact with nitrates found in some prescription drugs such as nitroglycerin and may lower blood pressure to dangerous levels, among other negative side effects.

42.      Thus, Defendants market and sell the Enhancement Products using false and fraudulent labeling claims and representations, using the wires, in violation of federal law.

43.      Defendants have knowingly imported, purchased, and sold the Enhancement Products to be delivered by commercial interstate carrier, including but not limited to, use of the mails in furtherance of their scheme to defraud and mislead consumers of their products.

44.      Defendants have violated the substantive RICO statute, 18 U.S.C.A. § 1962, as detailed above by receiving income from a pattern of racketeering activity involving interstate commerce, wires, and electronic communications.

45.      Plaintiff has been injured in its business or property by reason of Defendants' violation of section 1962 by, inter alia, the massive diversion of sales to Defendants, which sell products directly in competition with Plaintiff's products, including the Enhancement Products at issue here.

## **PRAYER**

Wherefore, plaintiff Outlaw prays for judgment against Defendants as follows:

46.      For preliminary and permanent injunctive relief enjoining Defendant from producing, licensing, marketing, and selling any of the Enhancement Products, including but not limited to, [FDA BANNED PRODUCTS];

47.      For an award of compensatory damages to be proven at trial in accordance with 15 U.S.C. § 1117;

48.      For an award of any and all of Defendant's profits arising from the foregoing acts in accordance with 15 U.S.C. § 1117 and other applicable laws;

49.      For restitution of Defendant's ill-gotten gains;

50.    For treble damages in accordance with 15 U.S.C. § 1117;

51.    For treble damages in accordance with 18 U.S.C. § 1964;

52.    For punitive damages;

53.    For costs and attorneys' fees; and

54.    Any other relief the Court may deem appropriate.


DATED: 12/15/2017                              TAULER SMITH LLP



                                   By:   /s/ Leticia Kimble

                                         Leticia Kimble, Esq.
                                         PLAINTIFF
                                         OUTLAW LABORATORY, LP

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury.


DATED: 12/15/2017                                    TAULER SMITH LLP



                                          By:  __/s/ Leticia Kimble_____

                                                Leticia Kimble, Esq.
                                                PLAINTIFF
                                                OUTLAW LABORATORY, LP